**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**


CENTER FOR INDIVIDUAL FREEDOM, INC.,

                  Plaintiff,

v.                                    CIVIL ACTION NO.  1:08-cv-00190

BETTY IRELAND and
TIMOTHY D. BOGGESS,

                  Defendants,

v.

WEST VIRGINIA EDUCATION
ASSOCIATION, et al.,

                  Intervenor Defendants.




WEST VIRGINIANS FOR LIFE, INC.
and ZANE LAWHORN,

                  Plaintiffs,

v.                                    CIVIL ACTION NO.  1:08-cv-01133

BETTY IRELAND and
TIMOTHY D. BOGGESS,

                  Defendants.

**MEMORANDUM OPINION**

Pending before the Court are Plaintiff West Virginians for Life's (WVFL) Motion for Preliminary Injunction[1] [Docket 112], Plaintiff Center for Individual Freedom, Inc.'s (CFIF) Emergency Second Motion for Preliminary Injunction [Docket 90], Intervenor Defendant Margaret L. Workman's Motion to Dismiss [Docket 99], Defendant Betty Ireland's Motion to Dismiss [Docket 103] and Motion to Strike [Docket 105], and WVFL's Motion for Reconsideration [Docket 106]. The Court will address each motion in turn.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action is the consolidation of two similar actions, Center for Individual Freedom, Inc. v. Ireland, Case No. 1:08-cv-00190, and West Virginians for Life, Inc. v. Ireland, Case No. 1:08-cv-01133. CFIF is a non-partisan, non-profit organization organized under § 501(c)(4) of the Internal Revenue Code. (Docket 1 ¶¶ 3, 3(b) in Case No. 1:08-cv-00190.)[2] CFIF's stated mission "is to protect and defend individual freedoms and individual rights guaranteed by the U.S. Constitution." (Id. ¶ 3.) It plans to "speak to the public in the Southern District of West Virginia on matters of litigation reform and related justice issues, including criminal law enforcement and sentencing, legal

---

[1] Also pending before the Court are WVFL's Motion for Leave to File a Verified Complaint [Docket110] and Motion to Exceed Page Limit for Preliminary Injunction Brief [Docket 111]. Pursuant to L.R. Civ. P. 11.1 and 9.4(b), respectively, and for good cause shown, those motions are **GRANTED**. Likewise, Defendant Timothy D. Boggess' Motion to Adopt Defendant Betty Ireland's Response [Docket 104] is **GRANTED**.

[2] CFIF's complaint was subsequently verified by its president, Jeffrey Mazzella, in an affidavit filed on March 24, 2008, as an attachment to CFIF's motion for a preliminary injunction. (Docket 4-2.) Due to the consolidation of these cases, the respective complaints are both labeled as Docket 1. Accordingly, the Court will distinguish the complaints by stating the appropriate case number or by identifying the corresponding party.

reform, and judicial decision-making [using] various media, including broadcast, print, and telephone banks." (Id. ¶ 17.)  That speech "will refer to West Virginia candidates to illustrate its points and ask members of the public to contact the candidates and petition them to take or maintain certain positions." (Id.)  For fear of prosecution and litigation, CFIF suspended its plans pending judicial intervention, allegedly resulting in an unconstitutional chill on its speech. (Id. ¶ 23.)

CFIF filed its initial action on March 21, 2008, seeking to invalidate a number of provisions of West Virginia's campaign finance laws as unconstitutionally vague and/or overbroad.[3] Specifically, CFIF challenged West Virginia's prohibition on corporate spending, W. Va. Code §§ 3-8-8(a), 3-8-8(b)(2)(H), 3-9-14,[4] and W. Va. Code R. § 146-1-3, and reporting and disclosure requirements for expenses incurred for "advocating or opposing the nomination, election or defeat of any candidate," W. Va. Code § 3-8-5, for independent expenditures "in support of or opposition to the nomination or election" of a candidate, §§ 3-8-1a(14), 3-8-2(b), and for "electioneering communications," §§ 3-8-1a(11), 3-8-2b.

In anticipation of the May 13, 2008 primary election, CFIF filed a motion for a preliminary injunction holding those laws unconstitutional facially and as applied to a number of communications CFIF intended to publish in the days leading up to the primary.  By order, the West Virginia Association for Justice (WVAJ), West Virginia American Federation of Labor and Congress of Industrial Organizations (WV AFL-CIO), West Virginia Council of Churches

---

[3]  The case was originally assigned to the Honorable David A. Faber, United States District Judge for the Southern District of West Virginia, Bluefield Division.

[4]  A number of the sections referenced herein were amended effective June 7, 2007, and again effective September 26, 2008.  In this part of the opinion, the provisions are referred to as they existed on the date they were challenged.  Thereafter, the Court will refer to the current version unless otherwise noted.

(WVCOC), West Virginia Education Association (WVEA), West Virginia Citizens Action Group (WVCAG), Ohio Valley Environmental Coalition (OVEC), (Docket 13), West Virginia Employment Lawyers Association (WVELA) and West Virginia State Democratic Executive Committee (WVSDEC), (Docket 45), were permitted to participate as amici curiae.  Also by order, Robert M. Bastress, Jr., Margaret L. Workman, Menis E. Ketchum,[5] WVEA and WV AFL-CIO (Labor Intervenors) were permitted to intervene as defendants.  (Docket 25.)

Judge Faber heard argument on the motion for a preliminary injunction on April 9, 2008.  On April 22, 2008, Judge Faber entered an order granting in part and denying in part CFIF's motion.  More specifically, Judge Faber enjoined defendants Betty Ireland and Timothy D. Boggess[6] "from applying West Virginia Code §§ 3-8-1a(14), 3-8-2(b), 3-8-5(a), 3-8-8(a), 3-8-8(b)(2)(H), and 3-9-14, and West Virginia Code of State Rules § 146-1-3, to anything other than communications that expressly advocate the election or defeat of a clearly identified candidate."  (Docket 38 at 1–2.)  In that ruling, Judge Faber adopted "the bright-line definition" of express advocacy set forth in <u>Buckley v. Valeo</u>, 424 U.S.  1, 44 n.52 (1976) (per curiam).  Judge Faber also restricted the definition of "electioneering communications" to certain forms of broadcast media and enjoined Defendants "from applying  [West Virginia's] reporting and disclosure requirements to the following forms of political advocacy:  mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or

---

[5]  Bastress, Workman, and Ketchum were all seeking nomination for election to a seat on the West Virginia Supreme Court of Appeals, and were allegedly targets of CFIF's communications.

[6]  Timothy D. Boggess is the prosecuting attorney of Mercer County and represents the prosecuting attorneys in the State of West Virginia.  Together with Secretary of State Betty Ireland, Boggess and his fellow prosecutors are responsible for investigating and enforcing the criminal provisions of West Virginia's campaign finance laws, W. Va. Code §§ 3-1A-1, 3-1A-6, 3-8-7(a), 3-8-7(b), 3-8-8(e).

published materials." (Docket 38 at 2.) Based on that ruling, CFIF ran a series of ads, including ads about current West Virginia Attorney General Darrell V. McGraw. (Docket 72-2 ¶ 2.)

On June 28, 2008, in a second extraordinary session, the West Virginia Legislature passed H.B. No. 219, amending W. Va. Code §§ 3-8-1, 3-8-1a, 3-8-4, 3-8-5, and 3-9-14.[7] Thereafter, several Defendants moved to dissolve the preliminary injunction on the basis that the amendments rendered the injunction moot. CFIF opposed the dissolution of the injunction, stating that the amendments did not remedy the constitutional infirmities. Shortly before the amended sections took effect on October 1, 2008, Judge Faber granted Defendants' motions and dissolved the injunction by Order entered on September 29, 2008 and directed CFIF that it would need to move for a new injunction based on the language in the amendments. CFIF appealed that order to the United States Court of Appeals for the Fourth Circuit, which issued an Order on October 8, 2008, agreeing with Judge Faber and dismissing the appeal.

WVFL, like CFIF, is a non-partisan, non-profit organization organized under § 501(c)(4) of the Internal Revenue Code. (Docket 2 ¶ 9 in Case No. 1:08-cv-01133.) Zane Lawhorn, who is also a named Plaintiff in this case, is a resident of Princeton, West Virginia, and wishes to receive WVFL's communications. (Id. ¶¶ 12-13.) WVFL's stated purpose "is to present information upon which individuals and the general public may make informed decisions about such topics as fetal development, abortion and its alternatives, and euthanasia." (Id. ¶ 25.) In connection with that stated purpose, WVFL seeks to conduct a petition drive, run a radio ad, and distribute a mass mailing regarding Margaret L. Workman, who is currently a candidate for an open seat on the

---

[7] The West Virginia Legislature does not provide any type of formal legislative history; however, these amendments were presumably made in response to Judge Faber's injunction.

Supreme Court of Appeals of West Virginia in the upcoming November 4, 2008 election.  (Id. ¶¶ 32-36.)  Although WVFL has not run the radio ad or begun the mass mailing, it briefly circulated the petition on its website.  However, it ceased immediately upon learning of the law.  (Id. ¶¶ 42-43.) WVFL alleges that its speech has been chilled by the recent amendments to West Virginia's campaign finance laws because it reasonably fears prosecution by Defendants if it proceeds with the communications and for its brief circulation of the petition.  (Id. ¶ 44.)

On September 30, 2008, WVFL filed a verified complaint and motion for preliminary injunction seeking relief from several of the amended provisions, such as West Virginia's ban on corporate express advocacy, W. Va. Code §§ 3-8-1a(13), 3-8-8, W. Va. Code R. § 146-1-3, reporting requirements for express advocacy, W. Va. Code §§ 3-8-2b, 3-8-5a, 3-8-5b, definition of political committee, political action committee (PAC), and unaffiliated PAC, §§ 3-8-1a(21), (22), (29), definition of electioneering communication, §§ 3-8-1a(12), (26), and reporting requirements for electioneering communications, §§ 3-8-1a(20), 3-8-2(a), 3-8-2(d), 3-8-2b(a)-(g), 3-8-5, 3-8-5b. Specifically, WVFL alleges that those provisions are vague and overbroad and accordingly unconstitutional both facially and as applied.

Shortly after WVFL filed its complaint, CFIF filed an emergency motion for a preliminary injunction on October 6, 2008, challenging some of those same provisions, namely the ban on corporate express advocacy and the definition of electioneering communications, §§ 3-8-1a(13), (12), (26), 3-8-8, and the reporting requirements pertaining thereto.  In support of its emergency motion, CFIF states that Attorney General McGraw has engaged in a series of threats and retaliatory acts in response to CFIF's earlier ads.  (Docket 90-2 ¶ 2.)  CFIF further states that it wishes to respond to McGraw's alleged threats and retaliatory acts, however, it fears that such a response

6

would be deemed express advocacy or electioneering communications under the recent amendments. (Id. ¶ 6.)  Accordingly, CFIF seeks injunctive relief holding that the amended sections are unconstitutional both facially and as applied.

On October 7, 2008, CFIF v. Ireland, No. 1:08-cv-00190, was reassigned to the undersigned District Judge and consolidated with WVFL v. Ireland, No. 1:08-cv-01133.

The Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331 because the case arises under the First and Fourteenth Amendments to the United States Constitution.  The Court held a hearing on both preliminary injunction motions on October 14, 2008, in which it heard argument from counsel for Plaintiffs, Defendants, and Intervenors.  The issues have been fully briefed and argued, and the matter is now ripe for the Court's consideration.

## II.  PRELIMINARY INJUNCTION STANDARD

The issuance of a preliminary injunction is entrusted to the district court's discretion.  See In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 524-25 (4th Cir. 2003).  The Fourth Circuit follows the "hardship-balancing test" first articulated in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977).  The test involves four factors which the Court must examine when considering a motion for a preliminary injunction:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

> (2) the likelihood of harm to the defendant if the requested relief is granted;

> (3) the likelihood that the plaintiff will succeed on the merits; and

> (4) the public interest.

Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

Under the Blackwelder test, the balancing of the likelihood of harm to the plaintiff and the defendant are the two most important factors. Id. The Court must first consider the likelihood of irreparable harm to the plaintiff. Id. If the plaintiff makes a "clear showing" of "immediate and irreparable harm," the Court must "balance the 'likelihood' of irreparable harm to the plaintiff [without an injunction] against the 'likelihood' of harm to the defendant [if an injunction is granted.]" Id. (citing Blackwelder, 550 F.2d at 195). "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Id. at 813 (citing Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991)). The more the balance tips in favor of defendants, the greater the showing of success on the merits is required. Id. Finally, the Court should consider the public interest. Blackwelder, 550 F.2d at 196.

The burden of establishing that the factors weigh in favor of injunctive relief normally rests on the plaintiff. Id. (citations omitted). When a challenged law implicates First Amendment concerns, however, it is subject to strict scrutiny. FEC v. Wis. Right to Life, Inc. (WRTL II), 127 S. Ct. 2652, 2664 (2007). In an as-applied challenge, "[u]nder strict scrutiny, the Government must prove that applying [the challenged law] furthers a compelling interest and is narrowly tailored to achieve that interest." Id. (emphasis in original). Accordingly, "[a]s the Government bears the burden of proof on the ultimate question of . . . constitutionality, [a party seeking a preliminary injunction] must be deemed likely to prevail unless the Government has shown that [the law survives the strict scrutiny analysis]." Ashcroft v. ACLU, 542 U.S. 656, 666 (2004). Conversely, when a plaintiff mounts a facial challenge, the plaintiff faces a "heavy burden," FEC v. McConnell, 540

U.S. 93, 207 (2003), because facial invalidation is "strong medicine to be applied sparingly and only as a last resort." United Seniors Ass'n v. Social Sec. Admin., 423 F.3d 397, 406 (4th Cir. 2005) (internal quotation marks omitted).

## III.  BLACKWELDER ANALYSIS

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).  Thus, where Plaintiffs' alleged harm "is inseparably linked to [a] claim of a violation of [their] First Amendment rights," the Court must first turn to Plaintiffs' likelihood of success on the merits.  Newsom ex rel. Newsom v. Albermarle County Sch. Bd., 354 F.3d 249, 254-55 (4th Cir. 2003); see also Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 511 (4th Cir. 2002) ("Determination of irreparable harm thus requires analysis of [the plaintiff's] likelihood of success on the merits, and we turn to this question first.") Accordingly, the Court will first address Plaintiffs' likelihood of success on the merits.

A.      Likelihood of Success on the Merits

WVFL raises four claims: 1) that it is an MCFL corporation and accordingly exempted from West Virginia's ban on corporate express advocacy, W. Va. Code § 3-8-8(a); 2) that West Virginia's definition of express advocacy, § 3-8-1a(13) is vague and overbroad both facially and as applied to WVFL; 3) that West Virginia's definition of political committee, political action committee (PAC), and unaffiliated PAC, § 3-8-1a(21), (22), (29), are vague and overbroad both facially and as applied to WVFL; and 4) that West Virginia's definition of electioneering communication, § 3-8-1a(12), is vague and overbroad both facially and as applied to WVFL.  CFIF joins in claims 2) and 4).  The Court will address each claim and Plaintiffs' likelihood of success on the merits on each claim in turn.

The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. I. The seminal case addressing the interplay between campaign finance regulation and the First Amendment is Buckley v. Valeo, 424 U.S. 1 (1976). According to Buckley,

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

424 U.S. at 14, (citing Roth v. United States, 354 U.S. 476, 484 (1957)). "[T]he use of funds to support a political candidate is 'speech . . . .'" Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 657 (1990). "[R]estrictions [on campaign speech], while neutral as to the ideas expressed, limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'" Buckley, 424 U.S. at 39 (citing Williams v. Rhodes, 393 U.S. 23, 32 (1968)).

The power of legislatures to regulate elections is well established. Id. at 13. That power is rooted in the Constitution and justified by the need to "limit the actuality and appearance of corruption" in elections. Id. at 26. When a legislature steps beyond that justification, however, its regulatory power is circumscribed. Thus, in demarcating which speech is regulable, the Supreme Court held that legislatures may regulate only speech that is "unambiguously related to the campaign of a particular . . . candidate." Id. at 80.

### (1) MCFL Corporation

WVFL asserts that it qualifies as an MCFL corporation. In FEC v. Mass. Citizens for Life, Inc. (MCFL), 479 U.S. 238, 263 (1986), the Supreme Court identified a class of corporations which

"should not have to bear burdens on independent spending solely because of their incorporated status."  Courts have since referred to such corporations as "<u>MCFL</u> corporations."  <u>See, e.g.,</u> <u>McConnell</u>, 540 U.S. at 339 (Kennedy, J., concurring in part and dissenting in part).

If it is an <u>MCFL</u> corporation, then WVFL posits that West Virginia's ban on corporate express advocacy, W. Va. Code § 3-8-8(a), is unconstitutional as applied to it.  WVFL asserts that, if it is found to be an <u>MCFL</u> corporation and § 3-8-8(a) is unconstitutional as applied to it, it "has a First Amendment right to do the [communications] notwithstanding West Virginia's definition of express advocacy and ban on corporate express advocacy," and that it would then be "unnecessary to consider . . . whether West Virginia's express-advocacy definition is vague and therefore overbroad."  (Docket 113 at 23, n.30.)

The Labor Intervenors contest WVFL's allegation that it is an <u>MCFL</u> corporation.  Specifically, the Labor Intervenors assert that determining whether WVFL's "major purpose [is] political campaign activity . . . requires factual determinations [and cannot be] established on WVFL's assertions alone."  (Docket 102 n.1.)  Further, they claim that the statutes at issue here "need not explicitly exempt '<u>MCFL</u> organizations' in order to be understood to do so."  (<u>Id.</u>)  Finally, the Labor Intervenors posit that <u>MCFL</u> corporations are nevertheless "properly subject to the same reporting and disclosure requirements as any other organization making independent campaign expenditures."  (<u>Id.</u>)

a.      <u>Applicable Law</u>

W. Va. Code § 3-8-8(a) provides:

Notwithstanding any provision of section two-b of this article, no officer, agent or person acting on behalf of any corporation, whether incorporated under the laws of this or any other state or of a foreign country, may pay, give, lend or authorize to be paid, given or lent any money or other thing of value belonging to the corporation

11

for the purpose of expressly advocating the election or defeat of a clearly identified candidate for state, district, county or municipal office, to any candidate, financial agent, political committee or other person.  No person may solicit or receive any payment, contribution or other thing from any corporation or from any officer, agent or other person acting on behalf of the corporation.

By the plain language of this statute, a ban on express advocacy by all corporations using corporate funds is contemplated.

In MCFL, the Supreme Court examined an as-applied challenge to a provision of the Federal Election Campaign Act (FECA) prohibiting corporations from engaging in express advocacy using corporate funds.  479 U.S. at 241.  Thus, MCFL was "subject to more extensive requirements and more stringent restrictions than it would be if it were not incorporated [and which] may create a disincentive for such organizations to engage in political speech."  Id. at 254.  Although Congress's justification for the ban was to remedy "the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace," id. at 257, the Court found such a justification to be inapplicable to a corporation whose "available [resources] are not a function of its success in the economic marketplace, but its popularity in the political marketplace."  Id. at 259.  Accordingly, applying strict scrutiny, the Court held that any remaining legitimate legislative interest in assuring that contributions to MCFL corporations are used as the contributor intends may be served by a "more narrowly tailored and less burdensome" restriction. Id. at 261.

In finding that corporations with "features more akin to voluntary political associations than business firms . . . should not have to bear burdens on independent spending solely because of their incorporated status," id. at 263, the Supreme Court identified three characteristics of MCFL that gave rise to its holding:

> <u>First</u>, it was formed for the express purpose of promoting political ideas, and cannot engage in business activities. If political fundraising events are expressly denominated as requests for contributions that will be used for political purposes, including direct expenditures, these events cannot be considered business activities. This ensures that political resources reflect political support. <u>Second</u>, it has no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity. <u>Third</u>, MCFL was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities. This prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace.

<u>Id.</u> at 264. These factors, however, do not "impose a code of compliance that other nonprofit corporations must follow to the letter." <u>FEC v. Survival Educ. Fund, Inc.</u>, 65 F.3d 285, 292 (2d Cir. 1995). It is permissible, for example, for a corporation to accept a "modest percentage of revenue" from for-profit corporations, <u>N.C. Right to Life, Inc. v. Bartlett</u> (<u>NCRL I</u>), 168 F.3d 705, 714 (4th Cir. 1999) (so finding in the case of a corporation that accepted contributions from for-profit entities up to eight percent of its overall revenue), and to "engage[] in minor business activities," <u>Minn. Citizens Concerned for Life v. FEC</u> (<u>MCCL</u>), 113 F.3d 129, 130 (8th Cir. 1997), without forfeiting their <u>MCFL</u> status.

Finally, the failure of a statute to expressly exempt <u>MCFL</u> corporations is not fatal. In <u>McConnell</u>, the Supreme Court addressed this precise issue when it evaluated a federal prohibition on corporate express advocacy. 540 U.S. at 209-11. Specifically, the Court held:

> That [a statute] does not, on its face, exempt <u>MCFL</u> organizations from its prohibition is not a sufficient reason to invalidate the entire section. If a reasonable limiting construction "has been or could be placed on the challenged statute" to avoid constitutional concerns, we should embrace it. Because our decision in the <u>MCFL</u> case was on the books for many years before BCRA was enacted, we presume that the legislators who drafted § 316(c)(6) were fully aware that the provision could not validly apply to <u>MCFL</u>-type entities. . . . As so construed, the provision is plainly valid.

13

Id. at 211 (citations omitted).  Accordingly, there is an implied exemption for MCFL corporations where a legislature had the benefit of the Supreme Court's decision in MCFL at the time it enacted the statute.

          b.      Analysis

       Based on the record as it currently exists at this preliminary stage, it appears that WVFL has alleged in its verified complaint sufficient facts to show that it is likely to succeed in proving that it is an MCFL corporation.  In its Verified Complaint [Docket 2 in Case No. 1:08-cv-1133], WVFL alleges that it was "formed to promote political ideas and engages in only the minor business activities of bake sales and selling ads for its convention booklets." (Id. ¶ 51.)  It further alleges that it "has no shareholders or other people who have a claim on [its] assets or earnings," (id.), and that it "was not established by a business corporation or union and accepts only minor contributions from for-profit corporations."  (Id.)  These allegations in WVFL's verified complaint are sufficient to establish the three factors set out in MCFL.  Moreover, WVFL's practices of accepting only up to 4.4 percent of its revenue from businesses and engaging in minor business activities do not disqualify it in light of the loosened nature of the requirements identified in Survival Educ. Fund, 65 F.3d at 292; see also NCRL I, 168 F.3d at 714 ("We do not think this modest percentage of revenue [(zero to eight percent)] disqualifies NCRL for the nonprofit exemption to North Carolina's ban on corporate expenditures."); MCCL, 113 F.3d at 130 ("MCCL may not be denied the MCFL exemption merely because it engages in minor business activities or accepts insignificant contributions from business corporations.")  No party has offered evidence genuinely disputing the factual basis for finding that WVFL is an MCFL corporation.

Even if WVFL eventually prevails on its claim that it is an <u>MCFL</u> corporation, however, it is not likely to succeed in showing that W. Va. Code § 3-8-8(a) is unconstitutional.  This case presents a situation nearly identical to the one addressed by the Supreme Court in <u>McConnell</u>.  Just as Congress had the benefit of <u>MCFL</u> when it enacted BCRA, the West Virginia Legislature had the benefit of <u>MCFL</u> when it amended § 3-8-8(a).  Thus, because § 3-8-8(a) is similarly subject to a proper limiting construction, the Court concludes that it is likely to be construed as not applying to <u>MCFL</u> corporations and is accordingly valid.

Finally, the Court turns to WVFL's contention that a finding that it is an <u>MCFL</u> corporation precludes any further constitutional inquiry.  When it decided <u>MCFL</u>, the Supreme Court based its decision on a policy that corporations that resembled voluntary political associations should be treated as such, and should not be punished based solely on their corporate form by being banned from engaging in express advocacy.  479 U.S. at 259-60.  That policy is informed by the inapplicability to <u>MCFL</u> corporations of the legitimate governmental interest of preventing the translation of corporate economic success into political influence.  <u>Id.</u> at 258.  Although such an interest may legitimize a complete ban on express advocacy by for-profit corporations, the Supreme Court in <u>Buckley</u> identified a separate and distinct interest to legitimize reporting and disclosure requirements for all other persons and entities engaged in express advocacy: the prevention of actual corruption or the appearance of corruption.[8] 424 U.S. at 78-79.  Thus, all entities, including <u>MCFL</u> corporations, may be subject to reporting and disclosure requirements when they engage in express advocacy.  <u>See also</u> <u>MCFL</u>, 479 U.S. at 262-63.  Accordingly, even assuming that WVFL is an <u>MCFL</u> corporation, the Court must still proceed to the next step of the inquiry.

---

[8]  <u>Buckley</u> will be discussed in greater detail below.  <u>See</u> <u>infra</u> Part III.A.(2).

(2)   Express Advocacy

Plaintiffs challenge West Virginia's definition of express advocacy, W. Va. Code § 3-8-1a(13).  That section, which was added by the legislature in June 2008, states:

"Expressly advocating" means any communication that:

> (A) Uses phrases such as "vote for the Governor," "re-elect your Senator," "support the Democratic nominee for Supreme Court," "cast your ballot for the Republican challenger for House of Delegates," "Smith for House," "Bob Smith in '04," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidates, "reject the incumbent," or communications of campaign slogans or individual words, that in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, advertisements, etc. which say "Smith's the One," "Jones '06," "Baker"; or

> (B) When considered in its entirety, the communication can only be interpreted by a reasonable person as advocating the election or defeat of one or more clearly identified candidates because:

>> (i) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

>> (ii) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidates.

Id.

Specifically, Plaintiffs allege that subsection (B)[9] is overbroad and vague, both facially and as applied.   They take issue with the terms "reasonable person," "electoral portion," and "[r]easonable minds," arguing that these words are vague, imprecise, and leave open the possibility

---

[9]  The Court is somewhat concerned that the words "in context," contained in subsection (A), run afoul of Chief Justice Roberts' admonitions against contextual considerations in WRTL II.  See 127 S. Ct. at 2669.  However, because Plaintiffs do not challenge subsection (A), the Court will not address it.

of inappropriately including protected speech.  Accordingly, Plaintiffs allege that the reporting requirements that attend to such express advocacy, §§ 3-8-2 and 3-8-5, chill their speech and are thus unconstitutional by extension.  Defendants, on the other hand, contend that the recent amendments cured any constitutional infirmities.

a. <u>Applicable Law</u>

Any discussion regarding the proper definition of express advocacy and associated reporting requirements must necessarily begin with <u>Buckley</u>.  At the time <u>Buckley</u> was decided, it was well-established that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  424 U.S. at 64.  Applying strict scrutiny, the Supreme Court examined Congress's purpose for enacting reporting and disclosure requirements in FECA—"promot[ing] full disclosure of campaign-oriented spending to insure both the reality and the appearance of the purity and openness of the federal election process," <u>id.</u> at 78-79—and determined that the purpose was insufficient to restrict the speech of persons and groups engaging only in issue advocacy.  <u>Id.</u> ("To fulfill the purposes of the Act [the requirements] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate.") Accordingly, the Court limited the definition of "expenditure" to "reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate [and that are] directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate."  <u>Id.</u> at 80 (footnote omitted).  The Court then articulated a list of what have become known as "magic words" which are indicative of such express advocacy.  <u>Id.</u> at 44 n.52 and 80 n.108.

Buckley's bright line "magic words" test stood as the law on this issue for over twenty-five years, until Congress passed the Bipartisan Campaign Reform Act of 2002 (BCRA), also referred to as "McCain-Feingold," and the Supreme Court revisited the issue in McConnell, 540 U.S. 93. In McConnell, the Court rejected the idea that "the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy" and determined that the "magic words" test was "functionally meaningless" because persons and organizations could avoid reporting simply by not using those words. Id. at 192. Then, finding that the governmental interests articulated in Buckley applied in full to the new provisions of BCRA requiring reporting and disclosure of expenditures for ads that "are intended to influence voters' decisions and have that effect," the Court expanded the legitimate sweep of such requirements to reach the "functional equivalent of express advocacy." Id. at 206.

A more recent discussion by the Supreme Court of the "functional equivalent of express advocacy" has resulted in a more refined demarcation of its limits. Addressing an as-applied challenge to the same provision that was held to be facially valid in McConnell, Chief Justice Roberts[10] recognized in WRTL II that McConnell "did not explain that it was adopting a particular test for determining what constituted the 'functional equivalent' of express advocacy." 127 S. Ct.

---

[10] Chief Justice Roberts was joined only by Justice Alito in Parts III and IV of the opinion. Justice Scalia filed a separate opinion, joined by Justices Kennedy and Thomas, concurring in part and concurring in the judgment. Specifically, although Chief Justice Roberts and Justice Alito saw "no occasion to revisit" McConnell, WRTL II, 127 S. Ct. at 2674, Justices Scalia, Kennedy and Thomas nevertheless expressed a desire to overrule its "functional equivalent" holding. Id. at 2687. Accordingly, Parts III and IV constitute binding portions of the opinion. Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'") (citing Gregg v. Georgia, 428 U.S. 153, 169 n. 15 (1976)).

at 2665.   Accordingly, Chief Justice Roberts held that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is <u>susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate</u>."  <u>WRTL II</u>, 127 S. Ct. at 2667 (emphasis added).  In declining to adopt a subjective, intent-based test because such a test "would chill core political speech by opening the door to a trial on every ad," <u>id.</u> at 2666, Chief Justice Roberts emphasized that "the proper standard for an as-applied challenge . . . must be objective, focusing on the substance of the communication rather than the amorphous considerations of intent and effect," <u>id.</u>, and that "contextual factors . . . should seldom play a significant role in the inquiry."  <u>Id.</u> at 2669.

Since <u>WRTL II</u> was decided, the Fourth Circuit has had occasion to apply the Supreme Court's holding to a case strikingly similar to the one at bar.  In <u>N.C. Right to Life v. Leake</u> (<u>NCRL III</u>), 525 F.3d 274 (4th Cir. 2008), a non-profit corporation challenged, among other things, North Carolina's two-pronged test to determine whether "an individual acted 'to support or oppose the nomination or election of one or more clearly identified candidates."  <u>Id.</u> (quoting N.C. Gen. Stat. § 163-278.14A(a)).  The Fourth Circuit held that

> to be considered the "functional equivalent of express advocacy," a communication must meet two separate requirements[:]  <u>the communication must qualify as an "electioneering communication," [as] defined by [BCRA]</u>, [and then] only if [it] is <u>susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.</u>

<u>NCRL III</u>, 525 F.3d at 281-82 (emphasis added).  Applying that test and recognizing that <u>WRTL II</u> "was entertaining an 'as-applied challenge'" to a statute held facially valid in <u>McConnell</u>, the Fourth Circuit struck down North Carolina's regulation as facially vague and overbroad.  <u>NCRL III</u>, 525 F.3d at 285.  The Court based its holding on the "multiple First Amendment deficiencies that North

Carolina's definition displays," including "determin[ing] whether speech is regulable based on how a 'reasonable person' interprets the speech's 'essential nature' in light of four 'contextual factors.'" Id. at 285-86.  With this precedent in mind, the Court turns to West Virginia's definition of express advocacy.

b.    <u>Analysis</u>

Much like the statute that was invalidated by the Fourth Circuit in *NCRL III*, West Virginia's definition of express advocacy fails to comport with the boundaries set by <u>Buckley</u>, <u>McConnell</u>, and <u>WRTL III</u>.  This failure is manifested in two ways.

First, the definition contained in W. Va. Code § 3-8-1a(13) in no way incorporates the definition of "electioneering communication" as adopted in BCRA.[11]  Indeed, subsections (12) and (13) of § 3-8-1a, which define "expressly advocating" and "electioneering communications," respectively, appear to be entirely separate, both in meaning and application to the operative provisions of the statutes to which they provide definitions.  For example, § 3-8-2b sets forth requirements for the disclosure of "electioneering communications," while § 3-8-5a sets forth the information required in a financial statement "other than [for] a disclosure of electioneering communications."  On the other hand, § 3-8-5 sets forth requirements for the disclosure of independent expenditures "expressly advocating the election or defeat of a clearly identified candidate," and §§ 3-8-8(a) and 3-9-14 provide for a ban on corporate express advocacy and resulting penalties.  Nowhere in these sections are the phrases "expressly advocating" and "electioneering communication" mentioned together.  Thus, not only is the BCRA definition of

---

[11]  The separate issues raised by Plaintiffs regarding the definition of "electioneering communications" set forth in W. Va. Code § 3-8-1a(12) are addressed in Part III.A.(4), <u>infra</u>.

20

electioneering communications not incorporated in the West Virginia definition of express advocacy, it further appears that the two definitions serve separate functions in West Virginia law.

Second, the language contained in W. Va. Code § 3-8-1a(13)(B) does not comply with Chief Justice Roberts' formulation of the functional equivalent of express advocacy as that which "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667.  Subsection (B) includes within express advocacy communications that "can only be interpreted by a reasonable person" as advocating the election or defeat of a candidate because "the electoral portion" is clear and "[r]easonable minds could not differ" as to whether the message encourages electoral action.  Like the statute in NCRL III, this statute "runs directly counter to the teaching of WRTL when it determines whether speech is regulable based on how a 'reasonable person' interprets a communication in light of . . . contextual factors."  NCRL III, 525 F.3d at 283.

Although there are no contextual factors spelled out in the West Virginia statute, there is likewise no guidance given with regard to how a "reasonable person" might approach a particular communication.  Who is the reasonable person?  What are the reasonable person's experience, intelligence, and sophistication in political matters?  What does the reasonable person know about the various contextual factors condemned in NCRL III ?  See id. at 283-86.  "[A] test based on the actual effect speech will have on an election or a particular segment of the target audience . . . unquestionably chill[s] a substantial amount of political speech."  WTRL II, 127 S. Ct. at 2666; NCRL III, 525 F.3d at 284-85.  The West Virginia statute's complete lack of guidance on the perspective of the reasonable person may well lead to the "open-ended rough-and-tumble of factors which invite burdensome discovery and lengthy litigation."  NCRL III, 525 F.3d at 282 (internal

quotation marks omitted). Further, "this sort of ad hoc, totality of the circumstances-based approach provides neither fair warning to speakers that their speech will be regulated nor sufficient direction to regulators as to what constitutes political speech." Id. at 283. The analysis for the term "reasonable minds" is the same as the Court can find no difference between that term and "reasonable person[s]."

Finally, the term "electoral portion" of a communication appears to be new to the vocabulary of campaign finance. It is not defined in the West Virginia statutes. The Court has not been directed to any precedent for its meaning or interpretation. Does it imply that there are electoral and non-electoral portions of certain communications? How does one distinguish the two? Does this concept suggest that a portion of an ad could be express advocacy and another portion issue advocacy (to put it in what now must be considered the mercifully clear terminology of Buckley)? The Court must conclude that this term, along with its companions, "reasonable person" and "reasonable minds", is unconstitutionally vague.

Counsel for Defendant Ireland suggested during oral argument that Chief Justice Roberts' "reasonable interpretation" formulation is what is meant by the language contained in § 3-8-1a(13)(B). That may very well be.[12] However, if the West Virginia Legislature indeed intended that meaning, why did it not use those words? It certainly could have. It had the benefit of having all of the relevant precedents to this Court's decision available at the time subsection (13)(B) was enacted. Instead, it chose a formulation that has ventured too far from the substance of the

---

[12] The Court does not doubt that the most recent revisions to the statutes including the definition of "expressly advocating," W. Va. Code § 3-8-1a(13)(B), constitute a good faith effort on the part of the West Virginia Legislature to comply with the less than abundantly clear precedents on this subject. Unfortunately, that does not change the constitutional analysis.

communication itself and toward the impermissible factors and context-based standards condemned by the Supreme Court and Fourth Circuit.

Therefore, the West Virginia statute fails both prongs of the applicable two-part test for defining express advocacy because it fails to limit its scope to electioneering communications, as defined by BCRA, that are susceptible of no other reasonable interpretation than as an appeal to vote for or against a specific candidate. Accordingly, the Court **FINDS** that, pursuant to the tests set forth in <u>WRTL II</u>, 127 S. Ct. 2652, and <u>NCRL III</u>, 525 F.3d 274, Plaintiffs are likely to prevail on their claim that W. Va. Code § 3-8-1a(13)(B) is unconstitutionally vague on its face.

(3)   <u>Political Committee</u>

WVFL challenges several subsections of W. Va. Code § 3-8-1a, which provides the definitions for terms relating to political organizations, such as a political action committee (PAC). More specifically, "WVFL seeks a declaratory judgment that the political-committee, PAC, and unaffiliated-PAC definitions are unconstitutional."[13]   (Docket 2 ¶ 161 in Case No. 1:08-cv-1133.) WVFL does not challenge the substance of the definitions. Rather, it is challenges their scope. WVFL claims that the definitions of political committee, PAC, and unaffiliated PAC are facially vague and overbroad and that WVFL does not know if its planned advertising and advocacy efforts will convert it into a political committee as that term is defined by W. Va. Code § 3-8-1a(22). As a consequence of this uncertainty, WVFL states that it will continue to refrain from communicating its message for fear that it will run afoul of West Virginia law. In WVFL's words, it seeks to

---

[13]   CFIF does not challenge these statutory provisions. Consequently, this issue was not addressed in Judge Faber's order of April 22, 2008, granting in part and denying in part CFIF's motion for preliminary injunction.

23

conduct its operations "without fear of becoming a political committee."[14]  (Docket 2 ¶ 163 in Case No. 1:08-cv-1133.)

WVFL's broader argument is that the phrase "the purpose of supporting or opposing" in the PAC definition is unconstitutional as applied to WVFL and facially vague and overbroad.  However, WVFL dissects this phrase into "the purpose of" and "supporting or opposing" and maintains that each constituent part is constitutionally infirm for separate reasons.

WVFL points to its planned communications concerning West Virginia Supreme Court of Appeals candidate Margaret Workman.  In 1993, then-Chief Justice Workman penned the Supreme Court of Appeals' decision in  Women's Health Ctr. of W. Va. v. Panepinto, 446 S.E.2d 658 (W. Va. 1993), a prominent abortion-rights case.  WVFL plans to conduct a mass mailing, radio advertising campaign, and petition drive to highlight Workman's opinion in Panepinto.  (Docket 2-2 at 42-45 in  Case No. 1:08-cv-1133.)  WVFL fears that these communications may be construed as "opposing" Workman's candidacy, thereby converting WVFL into a PAC and subjecting it to West Virginia's campaign laws.

a.     Applicable Law

In their current forms, the challenged definitions are as follows:

(21) "Political action committee" means a committee organized by one or more persons for the purpose of supporting or opposing the nomination or election of one or more candidates. The following are types of political action committees:

---

[14]  WVFL objects to being classified as a political committee because many of the provisions of W. Va. Code ch. 3, art. 8 are triggered if the actor is a political committee.  For instance, PACs and political committees must file a written statement of organization with the Secretary of State, W. Va. Code § 3-8-4; maintain and report detailed records of all financial transactions, including the identity of contributors, id. §§ 3-8-5, -5a, -5b; refuse contributions from corporations,  id. § 3-8-8(a); and refrain from soliciting or accepting funds in excess of $1000 prior to registration, id. § 3-8-12(g).

> (A) A corporate political action committee, as that term is defined by subdivision (8) of this section;
>
> (B) A membership organization, as that term is defined by subdivision (18) of this section;
>
> (C) An unaffiliated political action committee, as that term is defined by subdivision (29) of this section.
>
> (22) "Political committee" means any candidate committee, political action committee or political party committee.
>
> . . . .
>
> (29) "Unaffiliated political action committee" means a political action committee that is not affiliated with a corporation or a membership organization.

W. Va. Code § 3-8-1a (emphasis added). The challenged definitions were enacted by the West Virginia Legislature on June 7, 2007 and were not changed subsequent to Judge Faber's April 22, 2008, ruling. See 2008 W. Va. Acts 13.

Although WVFL fears becoming a "political committee" under West Virginia law, only the definition of "political action committee" need be addressed; an organization becomes a "political committee" or "unaffiliated political action committee" by virtue of its status as a PAC. See W. Va. Code § 3-8-1a(22) (defining political committee as "any candidate committee, political action committee or political party committee").

            b.       Analysis

WVFL's bifurcation of the phrase "the purpose of supporting or opposing" in the PAC definition  unnecessarily complicates the issue. Cf. NCRL III, 525 F.3d at 286 (evaluating the phrase "a major purpose to support or oppose the nomination or election of one or more clearly identified candidates" as a compete unit in a challenge to North Carolina's definition of political committee). However, in the interests of comprehensiveness, each argument will be addressed.

25

i.      <u>"The Purpose Of"</u>

The definitions in W. Va. Code § 3-8-1a were not cut from whole cloth.  Similarly worded statutes have been challenged in other cases and the contours of constitutionally permissible language are well-established.  As will be explained in detail below, the question presented by WVFL's PAC definition argument is a matter of semantics: Is the phrase "<u>the purpose</u> of supporting or opposing" found in W. VA. Code § 3-8-1a(21) more like "<u>a major purpose</u> to support or oppose" (which is unconstitutionally vague) or "<u>the major purpose</u> of supporting or opposing" (which is constitutional)?

In <u>Buckley</u>, the Supreme Court made a distinction between issue advocacy and advocacy for the election of a particular candidate.  See <u>Buckley</u>, 424 at 80 (holding that campaign finance laws must be "unambiguously related to the campaign of a particular . . . candidate").  Although each form of speech is of equal constitutional gravity, <u>see</u> <u>McConnell</u>, 540 U.S. at 193, the latter form may be subject to narrowly tailored regulation in order to serve the important governmental interests of preventing corruption or the appearance of corruption in elections.  See <u>Buckley</u>, 424 U.S. at 25–26.  The government's interest in preventing corruption in elections, however, does not extend in equal measure to speech that advocates for or against issues that do not directly relate to the election of a candidate for public office.  Accordingly, campaign finance laws must not be so broad as to infringe individuals' rights to express opinions on such issues, <u>see</u> <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."), nor may they be so vague as to make it uncertain whether they cover issue advocacy, <u>see</u> <u>Ctr. for Individual Freedom v. Carmouche</u>, 449 F.3d 655, 665 (5th Cir. 2005).

26

To screen issue advocacy groups from the reach of campaign finance laws, the <u>Buckley</u> Court stated that the term "political committee" "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." <u>Id.</u> at 79.  Although the <u>Buckley</u> opinion addressed federal campaign law, many states, including West Virginia, have incorporated this language into their definitions of political committees, PACs, or similar terms.  <u>See, e.g.</u>, Alaska Stat. § 15.13.400(8); Ariz. Rev. Stat. Ann. § 16-901(19); Kan. Stat. Ann. § 25-4143(k); La. Rev. Stat. Ann. § 18:1483(14); N.C. Gen. Stat.§ 163-278.6(14); Wash. Rev. Code § 42.17.020(39); W. Va. Code § 3-8-1a(21).  It therefore behooves the Court to view West Virginia's campaign law through the lense of <u>Buckley</u> and its progeny.

<u>Buckley</u> makes it clear that it is constitutionally permissible to define a political committee as an organization controlled by a candidate or an organization for which "the major purpose" is the election of a candidate to public office.  In <u>NCRL III</u>, the Fourth Circuit reviewed a North Carolina campaign law that closely tracked the language of <u>Buckley</u>.  The law defined "political committee" as

> a combination of two or more individuals . . . that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:
>
> > a. Is controlled by a candidate; [or]
> >
> > . . . .
> >
> > d. Has as <u>a major purpose to support or oppose</u> the nomination or election of one or more clearly identified candidates.

N.C. Gen. Stat.§ 163-278.6(14) (emphasis added).  North Carolina's campaign laws, like West Virginia's, impose significantly greater burdens on political committees than on other entities.  North Carolina Right to Life, Inc. lodged a facial challenge to the law, arguing that the phrase "a

major purpose" was unconstitutionally vague and potentially subjected it to regulation as a political committee.  See NCRL III, 525 F.3d  at 287.

The  task  before  the  Fourth  Circuit  in  NCRL III  was  to  determine  if  there  was  a constitutionally significant difference between "a major purpose," which was used by North Carolina to define "political committee,"  and "the major purpose," which was approved by Buckley.  The Fourth Circuit concluded there was.  The court reasoned that the Supreme Court did not speak haphazardly in Buckley when it said that a political committee was an organization with "the major purpose" of electing a candidate.  By use of the definite article, "the," the Buckley court was signifying that the major-purpose test referred to organizations whose "only or primary goal" was the election or opposition of a candidate.  Id. at 287.  In contrast, the phrase, "a major purpose," does not denote an only or primary purpose.  It indicates that the election or opposition of a candidate is but one purpose among many.  "Permitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple 'major purposes' threatens  the regulation of too much ordinary political speech to be constitutional."  Id. at 288–89.

West Virginia's definition of PAC does not use "the major purpose" or "a major purpose." It omits the word "major," regulating groups "organized . . . for the purpose of supporting or opposing the nomination or election of one or more candidates."  W. Va. Code § 3-8-1a(21) (emphasis added).  The question, therefore, is whether the absence of the adjective "major" makes West Virginia's statute more like the definition of political committee in Buckley or NCRL III.

Like the Supreme Court in Buckley, West Virginia's legislature chose the definite article to limit the word "purpose."  However, West Virginia differs because it does not qualify the requisite purpose with the word "major."  This difference does not make West Virginia's statute more vague

or more broad; the opposite is true.  Stating that an organization has one "major purpose" implies that it at least could have other, minor purposes.  "The purpose," being without qualification, indicates that there is but one and only one purpose—namely, to support or oppose a candidate. Thus, by omitting "major," West Virginia's definition of a PAC more precisely identifies the scope of regulated organizations than the language found to be constitutional in Buckley.

The Court does not arrive at this meaning by construction or interpretation.  Instead, it is the plain meaning of this statute to limit its application to singular–purpose organizations.  See Caminetti v. United States, 242 U.S. 470, 485 ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.").

An organization is a regulable "political committee" under W. Va. Code § 3-8-1a(22) only if it is a "candidate committee, [PAC] or political party committee."  Similarly, "unaffiliated PACs," as defined in W. Va. Code § 3-8-1a(29), are merely a subset of organizations labeled as PACs. Because the definition of PAC is not unconstitutionally vague or overbroad on its face, it follows that the definitions of political committee and unaffiliated PAC are not unconstitutional on the grounds alleged by WVFL.

ii.      "Supporting or Opposing"

WVFL lodges a facial constitutional challenge to the use of "supporting or opposing" in W. Va. Code § 3-8-1a(22).  It therefore bears the "heavy burden" of proving "a substantial risk that application of the provision will lead to the suppression of speech."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998).  WVFL does not appear to meet this burden.

Tellingly, WVFL cites no authority where a court has found the terms "supporting or opposing" a candidate in the definition of political committee or PAC to be unconstitutionally vague. The few courts which have addressed the issue raised here have concluded that "supporting or opposing" a candidate is not vague or overbroad. See, e.g., McConnell, 540 U.S. at 170 n.64; NCRL III, 525 F.3d at 289 ("[T]he Supreme Court[] insist[s] that political committees can only be regulated if they have the support or opposition of candidates as their primary purpose . . . ."); Real Truth About Obama, Inc. v. FEC, No. 3:08-cv-483, 2008 U.S. Dist. LEXIS 73551, at * 37 (E.D. Va. Sept. 24, 2008) ("[C]ase law and Supreme Court precedent make it clear that the use of 'support or oppose' is not unconstitutionally vague . . . ."); EMILY'S List v. FEC, No. 05-0049 (CKK), 2008 U.S. Dist. LEXIS 58046, at *98 (D.D.C. July 31, 2008) ("EMILY's List's [vagueness] argument is entirely unavailing as to the words 'support' or 'oppose,' because the Supreme Court rejected just such a claim in McConnell . . . ."); Voters Educ. Comm. v. Pub. Disclosure Comm'n, 166 P.3d 1174, 1184 (Wash. 2007) ("[W]e conclude that a person of ordinary intelligence would have a reasonable opportunity to understand the meaning of 'in support of, or opposition to, any candidate' in the definition of '[p]olitical committee' . . . ."); cf. Carmouche, 449 F.3d at 663 (dismissing a vagueness and overbroad challenge to a Louisiana statute that defined "expenditure" as "a purchase . . . made for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office" because a limiting construction was sufficient). In cases where statutes containing the phrase "support or oppose" were found to be vague or overbroad, the words "support" and "oppose" were not the offending terms. See Real Truth About Obama, 2008 U.S. Dist. LEXIS 73551, at *36–*38 (discussing cases).

WVFL's attempt to distinguish the instant action from <u>McConnell</u> is not persuasive.  In <u>McConnell</u>, the Supreme Court held that the words "support" and "oppose" are not unconstitutionally vague in the campaign finance law context because they "clearly set forth the confines within which potential <u>party speakers</u> must act in order to avoid triggering the provision." <u>McConnell</u>, 540 U.S. at 170 n.64 (emphasis added).  WVFL correctly points out that the statute at issue in this section of <u>McConnell</u>, 2 U.S.C. § 301(20)(A)(iii), applies to political parties involved in federal election campaigns.  WVFL would have this Court limit the application of the <u>McConnell</u> Court's holding to statutes applying to sophisticated political parties, but not other individuals.  This argument might be more convincing were it not for the remainder of the Supreme Court's discussion on the matter: "These words [support and oppose] 'provide explicit standards for those who apply them' and '<u>give the person of ordinary intelligence a reasonable opportunity to know what is prohibited</u>.'" <u>Id.</u> (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108–09 (1972)) (emphasis added).  Thus, it is evident that the <u>McConnell</u> Court's reasoning should not be limited to sophisticated political party members.  The phrase "supporting or opposing" is not unconstitutionally vague.  Furthermore, because it has been established that the phrase applies to groups organized for the only purpose of supporting or opposing a candidate for election, its sweep is not overbroad.

For the reasons stated above, the Court concludes that West Virginia's definitions of political committee, PAC, and unaffiliated PAC are not unconstitutionally vague or overbroad.  The definitions are "'unambiguously related to the campaign of a particular . . . candidate.'" <u>NCRL III</u>, 525 F.3d at 287 (quoting <u>Buckley</u>, 424 U.S. at 80).  Accordingly, the Court further **FINDS** that there is no likelihood that WVFL will succeed on the merits with its facial challenge to those definitions.

31

c.     Political Action Committee Definition As-Applied

WVFL's as-applied challenge to the definitions has a similar fate.  Defendants have not argued in their briefs that WVFL's only or primary purpose is to support or oppose a candidate for state election.  Furthermore, Defendant Betty Ireland, West Virginia Secretary of State, conceded at the hearing on October 14, 2008, that WVFL's sole purpose is not supporting or opposing candidates.  Because there appears to be no basis to find that WVFL's sole, or even major, purpose is supporting or opposing candidates, the likelihood of success of WVFL's as-applied challenge is easily ascertained.  As WVFL will be not be deemed a PAC under the constitutionally valid definition in W. Va. Code § 3-8-1a, there is little likelihood that the challenged section will be impermissibly applied to WVFL.  See Turchick v. United States, 561 F.2d 719, 721 n.3 (distinguishing overbreadth and as-applied challenges in First Amendment context).  Accordingly, the Court **FINDS** that there is little likelihood that WVFL will succeed on the merits of its as-applied challenge to the organizational definitions in W. Va. Code § 3-8-1a.

(4)     Electioneering Communication

Both CFIF and WVRTL challenge West Virginia's definition of "electioneering communication."[15]  West Virginia's definition was amended in the June 28, 2008, second

---

[15]

(12)(A) "Electioneering communication" means any paid communication made by broadcast, cable or satellite signal, mass mailing, telephone bank, billboard advertising, or published in any newspaper, magazine or other periodical that:

(i) Refers to a clearly identified candidate for Governor, Secretary of State, Attorney General, Treasurer, Auditor, Commissioner of Agriculture, Supreme Court of Appeals or the Legislature;

(ii) Is publicly disseminated within:

(continued...)

extraordinary session in response to Judge Faber's Order [Docket 38] granting a preliminary injunction on the motion of CFIF.  In that order, Judge Faber held that West Virginia's definition of "electioneering communication" was vague and overbroad because, unlike its federal counterpart in BCRA,[16] West Virginia's definition included "mailings, faxes, emails, phone banks, leaflets,

---

[15](...continued)

> (I) Thirty days before a primary election at which the nomination for office sought by the candidate is to be determined; or

> (II) Sixty days before a general or special election at which the office sought by the candidate is to be filled; and

(iii) Is targeted to the relevant electorate: Provided, That for purposes of the general election of two thousand eight the amendments to this article shall be effective the first day of October, two thousand eight.

W. Va. Code § 3-8-1a(12)(A).

[16]

(i) The term "electioneering communication" means any <u>broadcast, cable, or satellite communication</u> which-

> (I) refers to a clearly identified candidate for Federal office;

> (II) is made within–

>> (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

>> (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

> (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

<u>Bipartisan Campaign Finance Reform Act of 2002</u>, Pub. L. No. 107-155, 2 U.S.C. § 434(f)(3)(A)(i) (emphasis added).

(continued...)

pamphlets, and other printed or published materials." (Docket 38 at 2.) Judge Faber concluded that the excessive portions of the definition of "electioneering communications" might not "further the compelling interests at which they are aimed" because there was no "empirical justification for regulating mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or published materials." (Docket 37 at 11.)

In response, the West Virginia Legislature removed leaflets, pamphlets, flyers, and outdoor advertisements from the list of types of communications that are included in the definition of "electioneering communication," but added billboard advertisements. See W. Va. Code § 3-8-1a(12)(A). Thus, the current definition of "electioneering communication" in West Virginia differs from its federal counterpart by its inclusion of mass mailings, telephone banks, billboard advertisements, newpapers, magazines, and other periodicals as types of communications that will be defined as "electioneering communications."

Plaintiffs contend that West Virginia's inclusion of print media, in addition to broadcast media, chills the speech of organizations that wish to engage in these types of communications without adhering to burdensome reporting requirements. (Docket 110 at 43.) In particular, WVFL seeks to broadcast a radio advertisement,[17] send out a mass mailing, and circulate petitions.[18] Id. at

---

[16](...continued)

[17] As discussed in Part III.A.(4).a, infra, the Supreme Court has already held that BCRA's definition of "electioneering communication" was constitutional on its face. This definition included broadcast media. Therefore, it is well established that the legislature may constitutionally regulate campaign communications that are broadcast over the radio.

[18] Secretary of State Betty Ireland represented for the record, both in her brief and at oral argument, that she does not believe that petitions, either hard copy or online, constitute "electioneering communications."

44. WVFL asserts that "[a]bsent a declaratory judgment and an injunction against the electioneering communication definition and the reporting requirements,[19] it will not do the Radio Ad or the Mass Mailing." Id.

> a.   Applicable Law

As previously discussed, BCRA requires stringent reporting requirements of broadcast communications that are included in the definition of "electioneering communications." See supra Part III.A.(2).a.  In McConnell, the Supreme Court found BCRA's definition of "electioneering communication" was constitutional on its face. 540 U.S. at 194.  Thus, the definition was narrowly tailored to achieve a compelling interest.  To support its finding, the McConnell Court noted that "Congress found that corporations and unions used soft money to finance a virtual torrent of televised election-related ads during the periods immediately preceding federal elections, and that remedial legislation was needed to stanch that flow of money." Id. at 207.

> b.   Analysis

Defendants ask the Court to uphold West Virginia's definition of "electioneering communication" though it goes significantly beyond the types of communications regulated by BCRA. When Judge Faber entered the April 22, 2008 injunction, West Virginia's election laws did not contain legislative findings or a statement of purpose explaining the State's justification for including various forms of print media in its definition. (Docket 37 at 12 n. 4 (citations omitted.)) However, House Bill 402 included a statement of purpose, explaining that due to the small size of

---

[19] In its briefing, WVFL challenges the vagueness of the terms "supporting," "opposing," and "aiding" in W. Va. Code §§ 3-8-2(a) and 3-8-5(a).  At oral argument counsel for WVFL suggested these challenges may be a typographical error, particularly with respect to § 3-8-2(a).  In any event, reference is made to the cases cited in Part III.A.(3).b.ii, supra, which articulate that "supporting or opposing" a candidate is not vague or overbroad.

the state senate districts, print media is prevalent during elections.  W. Va. Code § 3-8-1.  Among

other findings, the Legislature provided that the

> [d]isclosure provisions are appropriate legislative weapons against the reality or
> appearance of improper influence stemming from the dependence of candidates on
> large campaign contributions, and the ceilings imposed accordingly serve the basic
> governmental interest in safeguarding the integrity of the electoral process without
> directly impinging upon the rights of individual citizens and candidates to engage in
> political debate and discussion.

Id.

In addition, Defendant Ireland has provided the Court with declarations of several members

of the legislature.  Each of these West Virginia legislators assert that they participated in the drafting

and/or discussions of H.B. 402 and its sister bill in the Senate, S.B. 4009.  (Docket 107, Ex. 8 at 2.)

They also suggest that these bills were "the subjects of significant discussion and debate in both the

Senate and the House of Delegates."  (Docket 107, Ex. 7 at 3.);(Docket 115 at 2.)  Furthermore, they

claim that, based upon their experience campaigning, "non-broadcast media such as phone banks,

mass mailings, and billboards are extremely effective forms of political communication."  Id.  They

aver that "transparency in political advertising is an important tool for voters to make informed

decisions," and that "[o]ftentimes the identity of the messenger who is bankrolling the message is

an important factor for the electorate to consider in weighing the credibility and/or bias of the

message itself."[20]  Id.

---

[20] Delegate John Pino makes an assertion that does not support Plaintiffs' argument against
regulating non-broadcast media.  (Docket 116, Ex. 1 at 3.)  Delegate Pino complains that damaging
direct mail advertisements attacking him and his voting record were disseminated shortly before the
2008 primary election.  Delegate Pino, among other things, complains that these mailings occurred
so late that no response was possible.  However, if no response was possible, it is difficult to
understand what use disclosures may have been.

36

The Defendants clearly demonstrate that the Legislature has a compelling interest in safeguarding the integrity of the electoral process. The Supreme Court has long recognized "the governmental interest in preventing corruption and the appearance of corruption in election campaigns." WRTL, 125 S.Ct. at 2672 (citing Buckley, 424 U.S. at 45). In both WRTL and Buckley, the Court explained that this interest supports upholding contribution limits, and "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." Id. (citing Buckley, 424 U.S. at 26-27). Furthermore, the Court said that "this interest might also justify limits on electioneering expenditures because it may be that, in some circumstances, 'large independent expenditures pose the same dangers of actual or apparent quid pro quo arrangements as do large contributions.'" Id. (citing Buckley, 424 U.S. at 45).

However, in addition to showing a compelling interest, Defendants must show that the definition of "electioneering communication" is narrowly tailored to meet that interest. WRTL II, 127 S. Ct. at 2664. In determining whether Defendants have proven the definition to be narrowly tailored, the Court recognizes that Defendants have the great burden of justifying the restriction of free speech in print media. In McConnell, the Supreme Court reached the maximum extent of the curtailment of free speech for the laudable purpose of political integrity when it upheld BCRA. See WRTL II, 127 S.Ct. at 2686 (Scalia, J., concurring). Notably, in McConnell, the Court found the regulation of only broadcast media to be constitutional when it upheld BCRA. However, more recently the Court has tipped the scale back toward First Amendment rights in WRTL II by recognizing that "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." Id. at 2659.

Defendants have failed to show how West Virginia's definition of "electioneering communication" is narrowly tailored despite the fact it goes far beyond the definition in BCRA. Unlike Congress's proof that "remedial legislation was needed to stanch [the] flow of money" to broadcast media, Defendants have not sufficiently shown that large amounts of money are being spent for print electioneering communications. For example, when justifying the inclusion of broadcast media in the definition of "electioneering communication," Senator Feingold offered a study by the Brennan Center that found forty cents of every dollar is used to purchase broadcast ads in support of or opposition to candidates for federal office. 148 Cong. Rec. S1991-02 (daily ed. March 18, 2002). Also, the Brennan Center found that "the vast money spent by the parties on TV ads was 'soft money.'" Id. In addition, Senator Snow quoted from a 2001 Annenberg Public Policy Center study that found spending on sham issue advocacy advertisements was at $500 million in the year 2000 election.  147 Cong. Rec. S2433-02 (daily ed. March 19, 2001).  It is clear that Senator Snow was referring primarily to television ads because at the same time, she cited statistics regarding television ads.  Id.[21]  Moreover, Senator Edwards said that, "in support of restricting broadcast media through BCRA, congress (sic) made several findings."  147 Cong.Rec. S3022-05 (daily ed. March 28, 2001).[22]

---

[21]  The study she cited regarding television ads was to justify the sixty-day period included in the definition of "electioneering communication."  She stated that in 2000, "[n]inety-five percent of all television shots that aired 2 [sic] months before the election mentioned the candidates [sic] name."

[22] For example, he mentioned that Senator Wellstone pointed to a Brennan research group study that found that only two out of one hundred "issue" advertisements were true issue ads.  Congress's failure to make legislative findings regarding print media is indicative of its lack of concern regarding non-broadcast media.

Conversely, Defendant Betty Ireland, West Virginia Secretary of State, has merely offered assertions that various members of the Legislature believe that campaign communications in print media are effective. She supports these assertions with an article, stating the general proposition that direct mailing can be effective on a national level. (Docket 121, Campaign Findings no. 11.) In addition, she filed an article that quotes Kathleen Sullivan, Dean and professor of constitutional law at Stanford Law School who states, "Mandatory disclosure of the amounts and sources of political contributions enables the voters themselves, aided by the press, to follow the money and hold their representatives accountable if they smell the foul aroma of undue influence." (Docket 121, Finding 13.) However, this article does not assert that the same type of influence backing broadcast media advertisements is used for print media advertisements. Id. Furthermore, Dean Sullivan also provides a statement in reference to limits on political contributions that should be applied to the restrictions on the speech in question: "They should be constitutionally permissible only if there is strong justifications for them—that is, if they will truly work to serve important or compelling government interests." Defendants have not shown that including print media in the definition of "electioneering communication" will "truly work to serve important or compelling government interests."

The Secretary of State has also filed a number of documents that do not support the assertion that print media is effective in West Virginia or that with it comes the risk of corruption or the risk of the appearance of corruption. She filed information about the general census; information regarding the democratic party; definitions provided by Wikipedia; a Gallup poll indicating that the public is dissatisfied with campaign finance laws; independent expenditure and electioneering communications reports; and other seemingly irrelevant information. (Docket 121.) Moreover, one

article filed by the Secretary of State undermines her argument that print media has the same kind of influence as broadcast media because, though the article shows that expenditures on print media are growing, its shows that direct mail is still a small fraction of overall spending.  (Docket 121, Campaign Finding no. 9.)  This article specifically states, "What's exploded is broadcast and cable advertising."  Id.  Another article filed by the Secretary of State follow suit by stating that "states have witnessed an escalating volley of televised attack and counter-attack ads."  (Docket 121, Campaign Finding 12.)(emphasis added).  That article did not mention print advertising.

It appears that Defendant Betty Ireland has certainly filed a sufficient amount of information for the inclusion of broadcast media in West Virginia's definition of "electioneering communication," which is clearly constitutional.  However, much less has been offered in support the inclusion of print media.  In general what was been offered is (1) conclusory, as in the case of the legislative findings, (2) anecdotal instead of empirical, such as the testimonials of several legislators, or (3) not specifically applicable to West Virginia.

In the absence of more concrete data supporting the inclusion of print media, the Court must "err on the side of protecting political speech," WRTL II, 127 S.Ct. at 2659, and find that Defendants have not met their burden of showing West Virginia's definition of "electioneering communication" is narrowly tailored.   Further, in contrast to McConnell's limitation of electioneering communications to broadcast media, the parties have not offered a single case where a court has upheld an extension of electioneering communications to print media.  This Court is unwilling to blaze that trail on this record.  Accordingly, the Court FINDS it likely that Plaintiffs

will succeed on the merits of their facial challenge to the definition of "electioneering communication" as provided in W. Va. Code § 3-8-1a(12)(A).[23]

(5)    Disclosure Requirements

CFIF brings an as-applied challenge to West Virginia's corporate speech ban, W. Va. Code § 3-8-8, and electioneering communication provision, id. § 3-8-1a(12).  This challenge arises from an apparent ongoing dispute between CFIF and West Virginia Attorney General Darrell McGraw. Attorney General McGraw is presently a candidate for reelection and counsel to Defendant Ireland, but he is not a party to this action.

Following Judge Faber's April 22, 2008, preliminary injunction prohibiting the enforcement of several provisions of West Virginia's previous campaign finance law, CFIF launched an advertising campaign critical of Attorney General McGraw.  As the parties acknowledge, "public criticism invites public reply."  (Docket 90 at 5; Docket 109 at 4.)  However, CFIF alleges that Attorney General McGraw's response "went far beyond vigorous public debate.  He has used his official status and office to wage a campaign of threats and retaliation against CFIF."  (Docket 90 at 5.)  CFIF alleges numerous acts of official misconduct, which it summarizes as the following:

> • West Virginia media has reported that the Attorney General was planning to file complaints against CFIF with the Federal Communications Commission and the Internal Revenue Service. Chief Deputy Attorney General Fran Hughes has been quoted as saying, "We are going to pursue every legal remedy."

---

[23] CFIF also challenges the terms "publicly disseminated" in W. Va. Code § 3-8-1a(12)(A)(ii), "substantially similar" in § 3-8-1a(17), and "targeted to the relevant electorate" in § 3-8-26 as being vague only as applied to print communications.  (Docket 5.)  Because the Court has found the inclusion of print media in § 3-8-1a(12)(A) likely to be unconstitutional, these challenges are moot. In addition, CFIF asserts that exceptions to the definition of "electioneering communication" are vague.  Id.  CFIF has cited no authority for this proposition and did not present this argument at the motion hearing.  Therefore, the Court does not find a substantial likelihood of success on the merits on these issues.

• Attorney General McGraw and Chief Deputy Hughes have also filed identical complaints against CFIF with the West Virginia Secretary of State. While Chief Deputy Hughes purports to be acting as "a resident of West Virginia and a registered voter," the Attorney General's complaint states that he is acting in "my individual capacity as the incumbent West Virginia Attorney-General running for reelection" (emphasis added).

• Attorney General McGraw has sent letters to West Virginia television stations seeking to stop CFIF's ads. The copy CFIF obtained was written on the letterhead of the Attorney General's office.

• Chief Deputy Hughes has appeared on the radio program "Talkline," hosted by Hoppy Kercheval, that is carried on various West Virginia radio stations. On the program, she stated that the Attorney General's office has "put the Center for Individual Freedom, and I say that term with some derision, on notice that we are going to pursue every legal remedy available to us to stop them from spreading out-and-out lies." Chief Deputy Hughes made clear that the attacks on CFIF are by the Attorney General's Office, and not just a campaign committee. Moreover, she emphasized that the reason for the attacks is the content of CFIF's ads.

• The Attorney General ran a television ad broadcast in West Virginia in which CFIF is attacked directly. The ad calls CFIF a "new scam" and a "fake citizens group" and implies that it is one of the "lawbreakers" from which the Attorney General purports to have protected West Virginians. It portrays Mr. McGraw saying "I'm Attorney General Darrell McGraw" and says that it parallels prior "Citizen Alerts" by the Attorney General.

(Id. at 5–6 (footnote omitted).)[24]

CFIF claims that it cannot exercise its right to respond publicly to the allegedly unlawful actions of Attorney General McGraw for fear of further retribution. In light of this concern, CFIF contends that West Virginia's corporate speech ban and electioneering communications provision are unconstitutional as-applied to its planned speech in two respects.

---

[24]  The allegations are set forth in greater detail in the Second Declaration of Jeffrey Mazzella, attached as Exhibit 1 to CFIF's Response to Motion for Expedited Hearing [Docket 72] and the Third Declaration of Jeffrey Mazzella, attached as Exhibit 1 to CFIF's Emergency Motion for Preliminary Injunction [Docket 90].

First, CFIF argues that Attorney General McGraw "may well claim that the speech is banned under the broad alternative definition of express advocacy in § 3-8-1a(13)(B)." (Id. at 8.)  CFIF characterizes its planned advertisements not as express advocacy opposing candidate McGraw, but as public statements exposing Attorney General McGraw's alleged corruption and defending itself from unfounded accusations and attacks.  Attorney General McGraw may shield himself from the legitimate criticisms, alleges CFIF, by abusing his status as a candidate and his position as Attorney General to apply West Virginia's campaign finance laws to CFIF in an unconstitutional manner.

Second, CFIF avers it "cannot risk exposing its donors to retaliation" by complying with disclosure requirements that apply to organizations engaging in express advocacy.  (Id. at 9.)  CFIF alleges that Attorney General McGraw is actively seeking to discover the identities of CFIF's donors, who he may accuse of criminal activity in connection with their support of CFIF.  Thus, the potential threat to CFIF's contributors causes it to refrain from publicly responding to Attorney General McGraw, thereby chilling its constitutionally protected right to speech.

Of the two arguments CFIF makes in support of its as-applied challenge, only the second will be addressed in detail.  The first argument—that CFIF's speech may be deemed express advocacy under § 3-8-1a(13)(B)—has been rendered moot.  For the reasons discussed in Part III.A.(2).b, this section is unconstitutionally vague and overbroad.  It is, therefore, unenforceable against CFIF.

a.      Applicable Law

CFIF cites an isolated discussion in Buckley as the only authority to support its contention that it should be exempted from disclosing its donors under relevant provisions of West Virginia's campaign laws.  In this discussion, the Supreme Court considered the argument that minor political parties should be afforded a "blanket exemption" from disclosure requirements in campaign finance

laws.  See Buckley, 424 U.S. at 72–74.  The blanket exemption argument was rejected, but the door

was opened for political organizations to bring as-applied challenges to disclosure requirements if

the requisite burden was met.  The burden was described thusly:

> The evidence offered need show only a reasonable probability that the compelled
> disclosure of a party's contributors' names will subject them to threats, harassment,
> or reprisals from either Government officials or private parties.  The proof may
> include, for example, specific evidence of past or present harassment of members due
> to their associational ties, or of harassment directed against the organization itself.
> A pattern of threats or specific manifestations of public hostility may be sufficient.

Id. at 74.  Instructive as it is, the section of Buckley relied on by CFIF cannot be applied to the

present circumstances in a vacuum.  As the Buckley Court notes,  NAACP v. Alabama, 357 U.S.

449 (1958), provides the standard by which CFIF's allegations should be judged.  Buckley, 424 U.S.

at 74 ("Where [evidence of reprisals and threats] exists the type of chill and harassment identified

in NAACP v. Alabama can be shown.").

In NAACP v. Alabama, 357 U.S. 449 (1958), the Supreme Court recognized that "[i]t is

hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy

may constitute [an] effective . . . restraint" on the exercise of First Amendment rights.  Id. at 462.

This observation was made in the context of the NAACP's activities in Alabama in the early years

of the civil rights movement—just four years after an NAACP attorney successfully argued Brown

v. Bd. of Educ., 347 U.S. 483 (1954), and just two years after NAACP-member Rosa Parks

prompted the Montgomery, Alabama bus boycott.  The Court acknowledged that membership in

unpopular organizations may entail significant risks for the individuals involved.  This was

particularly true in the case of NAACP, which had demonstrated that in past instances, "the

revelation of the identity of its rank-and-file members has exposed these members to economic

reprisal, loss of employment, threat of physical coercion, and other manifestations of public

hostility." Id. at 462.  Accordingly, the Court held that Alabama's corporate disclosure law was unconstitutional as-applied to the NAACP because of the chilling effects disclosure would have on the First Amendment rights of the NAACP's members.

Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87 (1982), a case decided shortly after Buckley, provides additional guidance as to how to apply Buckley's disclosure requirement exemption.  In Brown, the Socialist Worker's Party (SWP) challenged a provision of Ohio's campaign finance laws that mandated the disclosure of the identity of all contributors and recipients of campaign funds.  Id. at 88.  The Supreme Court sustained the SWP's as-applied challenge to the disclosure requirements because the party had provided "substantial evidence" of public and private hostility," including: threatening phone calls and hate mail, burning of SWP literature, destruction of the party's property, harassment SWP's candidates by police officers, firing of shots at SWP's offices, surveillance and counterintelligence efforts by the FBI, disclosure of SWP members' criminal records to the press, and anonymous letters to family members and employers of SWP members.  See id. 98–100.  Based on these actions, the Supreme Court held that SWP had met its burden of demonstrating that disclosure of its members would subject those members to potential threats, harassment, and reprisals.  SWP was therefore exempted from Ohio's disclosure requirements.

The party seeking an exemption from campaign disclosure requirements bears the burden of establishing that disclosure will impose a "substantial burden" on its First Amendment rights.  Master Printers of Am. v. Donovan, 751 F.2d 700, 705 (4th Cir. 1984).  A substantial burden can be demonstrated by evidence of threats, harassment, or reprisals roughly on par with NAACP and Brown.  Where this burden has not been met, but where the party has alleged facts constituting a

"not entirely consequential" chill on its rights, the government must show that disclosure and reporting requirements are serve compelling government interests. See Master Printers, 751 F.2d at 705.

With the above-cited cases in mind, the Court turns to CFIF's allegations to determine whether there is a "probability that the compelled disclosure of a party's contributors' names will subject CFIF to threats, harassment, or reprisals from either Government officials or private parties." Buckley, 424 U.S. at 74. If CFIF cannot demonstrate a substantial burden its First Amendment rights, but nonetheless shows a not inconsequential burden, the Court must consider whether the government's interests justify the disclosure requirements.

b.    Analysis

It must be noted that only "in peculiar circumstances" does the disclosure of a person's identity chill First Amendment rights to the extent that an as-applied challenge will be successful. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 379 (1995) (Scalia, J., dissenting) (emphasis in original). The disclosure requirements exemption in Buckley is a rarely applied remedy[25] and requires a substantial showing that an organization's members may be subjected to threats, harassment, or reprisals if their identities are made public.

CFIF has not established that its speech will be substantially burdened by West Virginia's disclosure requirements. CFIF has not demonstrated that its members will be subject to threats, harassment, or reprisals even remotely approaching the severity of the situations in NAACP and Brown. CFIF alleges that Attorney General McGraw has instituted or threatened legal action against

---

[25] For other cases in which disclosure requirements were found to be unconstitutional, see, e.g., FEC. v. Hall-Tyner Election Campaign Comm., 678 F.2d 416 (2d Cir. 1982); Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir. 1980).

the organization by filing complaints with the West Virginia Secretary of State, Federal Communications Commission, and the Internal Revenue Service. These actual or threatened legal actions each require the participation of independent government agencies to bring CFIF's feared harm to fruition. The Court cannot presume that these agencies will be complicit in maintaining unlawful legal action against CFIF for the purpose of chilling its speech. CFIF also alleges that Attorney General McGraw has sent letters to West Virginia television stations with the intent to persuade those stations to refrain from carrying CFIF's ads. These allegations, if true, may raise other issues. They do not, however, represent dangers to CFIF's members on par with those in NAACP and Brown. Additionally, CFIF represents that Attorney General McGraw or his representatives have been attacking it in the public forum through radio and television broadcasts. These allegations concern mere speech which does not raise any concerns of incitement against, or physical threats of harm to, CFIF or its members. CFIF does not allege that any of its members have been subjected to acts or threats of physical harm, endangerment to their employment, or demonstrable fear of unlawful reprisals. Thus, CFIF has not met its burden of showing that disclosure would substantially chill its speech.

CFIF has potentially demonstrated a "not inconsequential" burden on its speech by the disclosure requirements. However, West Virginia's disclosure requirements are narrowly tailored to advance the compelling governmental interest of eliminating corruption and the appearance of corruption from statewide elections. See Buckley, 424 U.S. at 26. The disclosure requirements are triggered when an organization is a political committee, or engages in express advocacy or electioneering communications. The reach of the terms express advocacy and electioneering communication, when limited to its proper constitutional scope, ensnare only communications that

are "unambiguously related to the campaign of a particular . . . candidate." <u>Id.</u> at 80.  These terms, as construed and limited by this opinion, have been found to be constitutionally permissible.  Thus, the government defendants have met their burden.  <u>See</u> <u>Master Printers</u>, 751 F.2d at 705. Accordingly, the Court **FINDS** that CFIF's as-applied challenge to West Virginia's corporate speech ban, W. Va. Code § 3-8-8, and electioneering communication provision, § 3-8-1a(12), have an insufficient likelihood of success to justify a preliminary injunction.

B.    <u>Balancing of the Harms</u>

WVFL alleges that it is "chilled from proceeding with [its] communications[] because it reasonably believes it will be subject to an investigation and an enforcement action . . . and possible prosecution."[26]  (Docket 2 ¶ 44 in Case No. 1:08-cv-01133.)  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976).  Indeed, the Supreme Court has recognized the "significant encroachments on First Amendment rights" imposed by compelled disclosure.  <u>See</u> <u>Buckley</u>, 424

---

[26] In their Response [Docket 102 at 3 n.1], the Labor Intervenors assert that WVFL's statements that "[a]bsent the relief it seeks, WVFL will not do the[] communications," (<u>see, e.g.</u>, Docket 2 ¶ 93 in Case No. 1:08-cv-01133), effectively deprive WVFL of standing.  In support of that assertion, Intervenors cite to <u>Minn. Citizens Concerned for Life, Inc. v. Kelley</u> (<u>MCCL</u>), 291 F. Supp. 2d 1052, 1070 (D. Minn. 2003); <u>rev'd and remanded on other grounds</u>, 427 F.3d 1106 (8th Cir. 2005), for the proposition that a party may negate its own standing by placing itself "outside the ambit" of the statutory provisions it challenges.  In <u>MCCL</u>, however, the Minnesota Supreme Court answered a certified question regarding Minnesota's statutory definition of express advocacy.  Here, the Court has been afforded no such guidance by the Supreme Court of Appeals of West Virginia.  Accordingly, WVFL has a reasonable fear that its activities will place it within the ambit of the challenged statutes and thus has standing to challenge those provisions.  Defendant Ireland also raised the issue of standing in her Response [Docket 107], stating that WVFL's disqualification from fundraising in West Virginia deprive it of standing to pursue its challenges.  At the preliminary injunction hearing, however, counsel for Ireland conceded that to the extent WVFL has funds on hand and does not need to engage in further fundraising, its challenges are valid.

U.S. at 64.  Defendants[27] and Intervenors, however, argue that WVFL's delay in filing this lawsuit

evinces a lack of irreparable injury[28] and is "nothing more than an attempt at gaining a strategic

advantage."  (Docket 108 at 4.)  In support of this argument, Defendant Ireland cites to a case from

this District recognizing that "[l]aches can, in some circumstances, serve as a defense to First

Amendment claims."  Nader 2000 Primary Comm., Inc. v. Hechler, 112 F. Supp. 2d 575, 579 n.2

(S.D. W. Va. 2000) (Haden, C.J.) (citing Gay Men's Health Crisis v. Sullivan, 733 F. Supp. 619, 631

(S.D.N.Y. 1989)).  In Hechler, however, Chief Judge Haden held that "in light of the types of harm

at issue, i.e. First Amendment violations versus increased monetary expenditures, the balance tips

decidedly in favor of the Plaintiffs."  112 F. Supp. 2d at 579.  In this case, the balance tips even

farther in Plaintiffs' favor because Defendants will not be required to increase monetary

expenditures.

　　　Although there may be some attendant strategic advantages, a two to three month

delay—from the passage of the amendments until the suit was filed—is slight given the ample

---

[27]  Defendant Ireland contends that the instant case should be barred based on the doctrine of "estoppel by acquiescence" because Plaintiffs were aware of, and lobbied for, the recent amendments.  Ireland cites one case in support of this theory, Dolby v. Robertson, 654 F. Supp. 815 (N.D. Cal. 1986), which declined to apply the doctrine of laches to bar a case for trademark infringement against a defendant who had received a letter from the plaintiffs threatening court action nearly five years before suit was filed.  The Court is unaware of the application of this doctrine to any case involving the legislative process, and will accordingly decline to apply it here.

[28]  In light of the Supreme Court's holding in Elrod, 427 U.S. at 373, that a burden on First Amendment rights "unquestionably" is an irreparable injury, the Court will give this argument due weight in balancing the harms.  Intervenor Margaret Workman also filed a Motion to Dismiss [Docket 99] for failure to state a claim based on the equitable doctrine of laches and referencing many of the same arguments she addressed in her Response [Docket 108].  The Court will address the motion to dismiss in further detail in Part IV.C., infra.

potential justifications for WVFL's delay.[29]  For example, as Judge Faber correctly noted when he granted CFIF's motion for an injunction, filing suit too far in advance of the election or before the effective date of the amendments may have raised standing and ripeness concerns.  (Docket 37 at 13 n.5.)

WVFL could have been monitoring CFIF's litigation to determine the legal result therein. WVFL could also have delayed because it did not arrive at a plan to exercise its rights to speak until relatively recently.  Although filing sooner may have been more beneficial overall, finding these laws unconstitutional will not likely result in the type of chaotic "wild west" scenario Defendants and Intervenors foretell.  Rather, it will simply result in the dissemination of more information of precisely the kind the First Amendment was designed to protect.  Given the Court's finding that Plaintiffs are likely to prevail on the merits of their claim, the resulting chill on speech—especially leading up to an election—overrides any concern about delay.

It is difficult to fathom any harm to Defendants Ireland and Boggess as it is simply their responsibility to enforce the law, whatever it says.  Moreover, as entities to which the laws in question could apply, the Court's ruling is not only not harmful but potentially favorable to the Intervenors.  As to the candidate Defendants, this decision could affect their campaigns, but that is a political, and not a legal, consequence.  Any "October surprises" sprung upon candidates for office may be managed like the countless other surprises and challenges routinely encountered by political campaigns.  Moreover, even if the candidate Defendants do suffer some legally cognizable harm,

_____

[29]  This argument does not implicate CFIF because Judge Faber's previous injunction was not dissolved until September 29, 2008.  CFIF filed its second motion for a preliminary injunction one week later, on October 6, 2008.

it pales in comparison to violating the First Amendment rights of other citizens.  Accordingly, the Court **FINDS** that the balance of the harms tips decidedly in favor of Plaintiffs.

     C.    <u>Public Interest</u>

In this opinion, the Court has discussed at length the importance of the First Amendment freedom of speech.  This freedom is of paramount importance to a republic like the United States that depends on open and robust political discussion to ensure a meaningful democratic process, especially at election times.  Obviously, the protection of First Amendment rights is very much in the public's interest, as it is their right, but it also cuts in favor of the Plaintiffs.  On the other hand, as has been noted herein, the state has a legitimate interest in appropriately regulating elections.  This interest and the First Amendment are necessarily in conflict in these cases.  However, "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor."  <u>WRTL II</u>, 127 S. Ct. at 2669.

The Court is also mindful that the 2008 general election is now less than three weeks away, and is somewhat concerned that changing the rules this late in the game could cause disruption.  The media has reported just this week that virtually no independent expenditures have been made this fall in West Virginia's Supreme Court race, contrasted with nearly $800,000 in the 2008 primary.  <u>Third Parties Silent in Supreme Court Race</u>, Charleston Gazette, Oct. 12, 2008.

Could this be the autumn chill of unconstitutional laws? Or could it be that this year in West Virginia there is just less interest in our political discourse?  The Court has little from which to draw answers to these questions, other than to note that no one has produced any evidence from which one could expect a substantial disruption on account of this Court's ruling.  Accordingly, although disruption is a concern, it is overshadowed by the necessary vindication of First Amendment rights.

51

D.     Summary

For the reasons stated above, Plaintiffs are likely to succeed on the merits of their challnges to W. Va. Code §§ 3-8-1a(12)(A) and (13)(B).  Further, the balance of the harms tips decidedly in favor of Plaintiffs as to these statutes and according them relief would, on balance, serve the public interest.  Accordingly, they are entitled to a preliminary injunction.

## IV.   OTHER MOTIONS

A.     WVFL's Motion for Reconsideration

WVFL asks the Court to reconsider its previous Orders [Docket 97 and 98] denying as moot Margaret Workman's motion to intervene in Case No. 1:08-cv-01133, permitting her to continue in her capacity as intervenor in this consolidated case, and deeming filed her motion to dismiss.  In support of its motion, WVFL states that Workman failed to follow the proper procedure for intervention under Fed. R. Civ. P. 24(c) because she did not file a pleading to accompany her motion to dismiss.  WVFL further states that Workman's intervention in the lead case "does not automatically grant her the right to intervene" in the CFIF case.  (Docket 106 at 4.)  In support of that contention, WVFL cites to Schneider v. United States, 197 F.R.D. 397, 402-03 (D. Neb. 2000) for the proposition that "'[c]ommon questions of law and fact' between the two cases, standing alone, 'do not require intervention.'"

The Court first notes that its denial of Workman's motion to intervene as moot negates any concern over any alleged Rule 24(c) deficiencies in her filing.  To the extent that WVFL contends that consolidation does not require intervention, its citation to Schneider misapprehends the issue. In Schneider, a magistrate judge recommended that the presiding district judge deny class certification and instead consolidate four cases with nearly identical facts.  197 F.R.D. at 402.

52

Schneider, a plaintiff in one of the cases recommended for consolidation, had previously sought to intervene in two of the other cases.  Id.  The district court, however, denied Schneider's motion to intervene because his case had been consolidated with those cases in which he sought intervention. Id. at 403.  Thus, his interests were adequately protected, rendering him unable to satisfy the requirements of Rule 24.  Id.

Contrary to WVFL's assertion, Schneider actually supports the Court's decision on this issue.  Because she had already intervened in Case No. 1:08-cv-00190, her interests were adequately protected in Case No. 1:08-cv-01133 when the cases were consolidated.  Much like Schneider, then, Workman was properly permitted to carry on in her same capacity when the cases were consolidated.  Accordingly, WVFL's Motion for Reconsideration [Docket 106] is **DENIED**.

B.    Ireland's Motion to Strike

Defendant Ireland asks the Court to strike, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, any and all references to West Virginia Attorney General Darrell V. McGraw from CFIF's Emergency Motion for Preliminary Injunction [Docket 90].  Specifically, Ireland contends that CFIF's allegations regarding McGraw are "scandalous" and should be stricken as such because they have "been confined to a partisan electioneering attack" on McGraw, who has "done nothing more than seek redress by legal means."  (Docket 105 at 5.)  Despite these assertions, Ireland fails to cite to any specific portion of CFIF's brief that is particularly "scandalous."

Motions under Rule 12(f) are disfavored.  See Pigford v. Veneman, 215 F.R.D. 2, 4 (D.D.C. 2003).  Upon review of CFIF's brief, the Court is unable to ascertain any portion that rises to such a level as would merit granting Ireland's motion.  Generally, CFIF's brief describes the actions taken by McGraw in response to earlier ads by CFIF and alleges that those actions are harassing and

threatening.  (See Docket 90 pp. 5, 10.)  CFIF then uses those allegations to support an as-applied challenge to the reporting and disclose requirements based on Buckley's exemption reserved for small parties that may face "threats, harassment, or reprisals" upon disclosure of contributors' names.  424 U.S. at 74.  Accordingly, to the extent that CFIF's allegations may be deemed "scandalous," they are made in good faith in support of a colorable First Amendment claim.  For these reasons, Ireland's Motion to Strike [Docket 105] is **DENIED**.

       C.    <u>Ireland's Motion to Dismiss</u>

Ireland seeks dismissal of the instant matter pursuant to Fed. R. Civ. P. 12(b)(7) and 19 based on Plaintiffs' failure to name the State Election Commission (SEC) as a party.  In his Memorandum Opinion [Docket 37] granting CFIF's original motion for preliminary injunction, Judge Faber denied Ireland's motion to dismiss that case for failure to name an indispensable party because Ireland, who as Secretary of State is a statutorily mandated member of the SEC, could adequately represent the SEC's interests in the proceeding.  (Docket 37 at 2 n.1.)  Ireland, however, contends that the analysis should change in light of a recent development whereby Ireland recused herself from consideration of a complaint filed with her against CFIF and subsequent referral of that complaint to the SEC. Further, she contends that WVFL's reference to SEC jurisdiction in its complaint "constitutes an acknowledgment that the [SEC] is an indispensable party."  (Docket 103 at 3.)

Rule 12(b)(7) permits a defendant to move for dismissal for "failure to join a party under Rule 19."  Rule 19 states that a person must be joined as a party if "the court cannot accord complete relief" without the person or the person claims an interest such that proceeding may "impair or impede the person's ability to protect the interest" or subject an existing party to multiple or inconsistent obligations.  Fed. R. Civ. P. 19(a)(1).  Judge Faber recognized that Ireland could

adequately represent the SEC's interests and that complete relief could be accorded when he issued the previous injunction, and the complaint against CFIF before the SEC does nothing to change that analysis.  Any new complaint against WVFL or CFIF that is filed with Ireland will no longer be subject to such recusal; if she receives a complaint based on any provision of the statute that the Court holds unconstitutional, she will be bound not to enforce it.  Thus, complete relief can be accorded in this case.  Moreover, Ireland is part of the SEC by statute; she can adequately represent the interests of that entity regardless of whether she recuses herself on one particular complaint.  Accordingly, Ireland's Motion to Dismiss [Docket 103] is **DENIED**.

      D.      <u>Workman's Motion to Dismiss</u>

      In her Motion to Dismiss [Docket 100], Workman asserts that WVFL's late filing of this case gives rise to the affirmative defense of laches.  Accordingly, Workman contends that WVFL fails to state a claim upon which relief can be granted and that the case should be dismissed pursuant to Rule 12(b)(6).  WVFL, in responding to the motion, notes that Workman's motion depends on facts that have neither been pled nor introduced into the record.  (Docket 106 at 5.)  Moreover, WVFL correctly points out that laches, as an affirmative defense, must be stated in response to a pleading pursuant to Rule 8(c).  <u>Fed. Express Corp. v. U.S. Postal Serv.</u>, 75 F. Supp. 2d 807, 814 (W.D. Tenn. 1999) ("As evaluation of a claim of laches is dependant upon the submission of evidence, Fed. R. Civ. P. 12(b)(6) is not the proper vehicle for bringing such a request.")  Accordingly, because laches is not a proper basis for a motion to dismiss because it relies on facts outside the pleadings, Workman's Motion to Dismiss [Docket 99] is **DENIED**.

## V.  CONCLUSION

For the reasons stated above, WVFL's Motion for Leave to File a Verified Complaint [Docket 110] and Motion to Exceed Page Limit for Preliminary Injunction Brief [Docket 111] are **GRANTED**.  Likewise, Defendant Timothy D. Boggess' Motion to Adopt Defendant Betty Ireland's Response [Docket 104] is **GRANTED**.  WVFL's Motion for Preliminary Injunction [Docket 112] is **GRANTED IN PART** as to West Virginia's definition of "expressly advocating," W. Va. Code § 3-8-1a(13), and "electioneering communication," § 3-8-1a(12) and **DENIED IN PART** as to West Virginia's definition of a political committee, § 3-8-1a(21).  Similarly, CFIF's Emergency Motion for Preliminary Injunction [Docket 90] is **GRANTED**.  Intervenor Defendant Margaret L. Workman's Motion to Dismiss [Docket 99], Defendant Betty Ireland's Motion to Dismiss [Docket 103] and Motion to Strike [Docket 105], and WVFL's Motion for Reconsideration [Docket 106] are hereby **DENIED**.  A separate Preliminary Injunction Order will enter this day implementing the rulings contained within.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          October 17, 2008

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE