## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CENTER FOR INDIVIDUAL FREEDOM, INC.,

        *Plaintiff*,

v.                                     Civil Action No.:  1:08-cv-00190

NATALIE E. TENNANT and TIMOTHY D. BOGGESS,

        *Defendants*,

v.

WEST VIRGINIANS FOR LIFE, INC., and ZANE LAWHORN,

        *Plaintiffs*,

v.                                     Civil Action No.: 1:08-cv-01133

NATALIE E. TENNANT, *et al.*

GARY A.  COLLIAS, WILLIAM N. RENZELLI, ROBERT RUPP
and CINDY SMITH, in their official capacities as members of the
WestVirginia State Election Commission,

        *Defendants*.

## DEFENDANTS' MEMORANDUM IN RESPONSE TO
## PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

DARRELL V. McGRAW, JR.
ATTORNEY GENERAL

THOMAS W. SMITH
MANAGING DEPUTY ATTORNEY GENERAL

SILAS B. TAYLOR
MANAGING DEPUTY ATTORNEY GENERAL
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:   (304) 558-2021
Fax:        (304) 558-0140
E-mail:     silastaylor@yahoo.com

## TABLE OF CONTENTS

I.  RESPONSE TO CFIF'S STATEMENT OF
    UNCONTESTED MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. THE DEFINITION OF "EXPRESSLY ADVOCATING"
    CONTAINED IN WEST VIRGINIA CODE § 3-8-1a(12)(A)
    IS NEITHER VAGUE NOR OVERLY BROAD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.  Genesis of the "Express Advocacy" Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  The Definition of "Expressly Advocating" Contained in West
        Virginia Code § 3-8-1a(13)(A) Is Not Vague or Overly Broad Merely
        Because it Regulates Speech Other than the "Magic Words" of
        Advocacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  West Virginia Code § 3-8-1a(13)(A) (2008) Defining "Expressly
        Advocating," Is Not Vague or Overly Broad Simply Because it
        Encompasses Speech That "In Context Can Have "No Other
        Reasonable Meaning" than Advocating for the Election or Defeat of
        a Candidate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    E.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. WEST VIRGINIA'S REGULATION OF ELECTIONEERING
     COMMUNICATIONS" IS CONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.  The West Virginia Legislature's Decision to Minimally Regulate
        Certain Non-broadcast Communication Is Supported by Expert
        Testimony, Practical Experience and Empirical Data . . . . . . . . . . . . . . . . . . 20

    B.  CFIF Offers No Support for its Argument That West Virginia
        "Electioneering" Provisions That Have No Counterpart in Bcra Are
        Therefor Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.  Neither West Virginia's Campaign Finance Laws Nor
            BCRA Regulate Posters, Fliers, or the Internet . . . . . . . . . . . . . . . . . 26

        2.  The "News Story" Exemption from Electioneering
            Communications Is Clear and Nearly Identical to its
            Federal Counterpart, Which has Been Upheld by the
            Supreme Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        3.     The Exemption for 501(c)(3) Corporations Does Not
               Create a Viable Equal Protection Claim . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    WVFL'S REMAINING ARGUMENTS LACK MERIT . . . . . . . . . . . . . . . . . . . . . . . 37

      A.    West Virginia's Ban on Corporate Express Advocacy Does Not
           Apply to MCFL Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      B.    West Virginia's Definitions of Political Committee, Pac, and
           Unaffiliated-pac Are Narrow and Clear . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ii

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

**CENTER FOR INDIVIDUAL FREEDOM, INC.,**

       *Plaintiff*,

**v.**                                          **Civil Action No.:  1:08-cv-00190**

**NATALIE E. TENNANT and TIMOTHY D. BOGGESS,**

       *Defendants*,

**v.**

**WEST VIRGINIANS FOR LIFE, INC., and ZANE LAWHORN,**

       *Plaintiffs*,

**v.**                                          **Civil Action No.: 1:08-cv-01133**

**NATALIE E. TENNANT,** *et al.*

**GARY A.  COLLIAS, WILLIAM N. RENZELLI, ROBERT RUPP
and CINDY SMITH, in their official capacities as members of the
WestVirginia State Election Commission,**

       *Defendants*.

-------------------------------------------------------

## DEFENDANTS' MEMORANDUM IN RESPONSE TO
## PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT
-------------------------------------------------------

This Memorandum is filed jointly on behalf of all Defendants in response to the Motions for

Summary Judgment filed by the Center for Individual Freedoms ("CFIF") (Docket 154), and West

Virginians for Life, Inc. ("WVFL") (Docket 153).

## I.

### RESPONSE TO CFIF'S STATEMENT OF
### UNCONTESTED MATERIAL FACT.

Over a decade ago, Rule 56 of the Federal Rules of Civil Procedure required a movant for summary judgment to supply a "statement of uncontested material facts." The Rule no longer requires such a statement, but CFIF nonetheless provided one (Docket 154-11). Several of the critical "facts" recited in CFIF's "Statement" are not historical facts, but rather self-serving mischaracterizations, and others inaccurately describe the affidavits and other source-documents to which they refer. Defendants consequently take issue with CFIF's Statement as follows:

In paragraph 1 of its Statement, CFIF represents that it is "dedicated to preserving constitutional freedoms and the rule of law," phraseology that is surpassingly vague. Based on its own website, CFIF is, for the most part, an advocate for conservative business interests. It is opposed to government regulations, consumer laws, common-law tort actions by trial lawyers, restrictions on corporate speech (whether commercial or political), and government policies favoring labor unions.[1] It is thus highly selective with respect to the "constitutional freedoms and rules of law" that it wishes to preserve.

---

[1] Exhibit K to CFIF's Motion for Summary Judgment (Docket 154-2) is a page from its website at http://www.cfif.org. Other pages from that same website include: "Killing Frivolous Lawsuits . . . ," "Fairness Coming to Florida's Civil Justice System," "Stopping Trial Lawyer Shakedowns in California", "Shocking News: Big Labor Implicated In Blagojevich Arrest," "Congress Becomes Big Labor's Obedient Subsidiary," "Proposed Bailout Would Save Big Labor, Not Automakers," "Take Action: EPA Regulation to Cost Jobs, Hurt Small Business and Farmers," "Corporate America's Right to Free Speech: Center Files Brief with Supreme Court in *Nike* Case," "Dairy Farmers and Center for Individual Freedom Mount Legal Challenge to Dairy Checkoff ," "CFIF Urges Congress to Oppose Burdensome Regulation of the Internet," "Government-Run Health Care: The Wrong Prescription for America."

Documents disclosed in the National Tobacco Litigation show that CFIF rose Phoenix-like from the ashes of the National Smokers Alliance (NSA), which self-immolated after Phillip Morris withdrew its support in 1999 (Exhibits 1-2).[2]  William Thomas Humber, who was founder of the CFIF, and President of both the NSA and CFIF at the time of the transfer of NSA assets to CFIF, explained the connection in a 2001 press release:

> The effort to disenfranchise and marginalize smokers is, in reality, only one facet of a much broader assault on individual freedoms that has begun to infuse society.  Consequently, upon dissolution, the NSA will contribute some remaining assets to the Center for Individual Freedom.  (Exhibit 2.)

In the same press-release, Humber explained that the transferred funds originally came from three tobacco companies–Phillip Morris, Brown & Williamson, and Lorillard–as well as "hundreds of small businesses and corporations and dues and contributions from our members." Such contributions had been used by NSA, in part, to produce a national radio program, "Freedom Line," which Humber described as a "conservative/libertarian news magazine."  (Exhibit 1.) "Freedom Line" continues today as a CFIF-sponsored internet news and opinion forum.[3]

Attorney General McGraw's pre-eminent role in the successful National Tobacco Litigation, in which the above Phillip Morris/NSA/CFIF connection was discovered, may explain why CFIF was motivated to retaliate by attacking the terms of the attorney-fees portion of the tobacco settlement in its independent campaign against candidate Darrell McGraw, Jr. (Exhibits N, P, Q, R and S to Plaintiff's "Statement"--Docket 154-5 to 154-9.)

---

[2]Exhibits 1 and 2 are bates-stamped documents disclosed in discovery in the National Tobacco Litigation, and are both authored by then President of CFIF, Thomas Humber.

[3]http://www.cfif.org/htdocs/freedomline/index.htm.

3

In paragraphs 1 and 6, CFIF represents that it did not and does not seek to engage in "express candidate advocacy." Of course, "express advocacy" is a legal term of art. As is apparent from the "Fourth Declaration of Jeffrey L. Mazzella" (Docket 154-12), all that CFIF means by this is that it doesn't use the "magic words" listed in *Buckley v. Valeo*[4] so as to avoid triggering laws that would require it to disclose its contributors, which disclosure would "deter and chill" CFIF's speech. (*See* ¶¶ 6 and 7 of CFIF's Statement of Uncontested Facts – Docket 154-11– and ¶¶ 3, 4, 5, 9, and 10 of Mazzella's Fourth Declaration–Docket 154-12.) CFIF does *NOT* mean that it refrains from supporting or opposing specific candidates for office on behalf of its anonymous contributors. The examples of its broadcast ads and mailers, appended to that very declaration, demonstrate that its contributors fund vigorous campaigns for or against specific candidates, while using CFIF as a go-between to avoid the reporting and disclosures required for independent campaign expenditures. (Docket 154, items 2-9 and 12.)

Make no mistake about it, CFIF is a device to shield from voter-scrutiny the special interests that fund its allegedly grass-roots campaigns, just as the National Smokers Alliance was used to shield the tobacco companies. Such organizations are why campaign finance disclosure laws exist.

Paragraph 23 of CFIF's "Statement of Uncontested Facts" characterizes certain actions of the Attorney General's office and of candidate Darrell McGraw, Jr. (making no distinction between the two), as "retaliatory," but that characterization is not contained in the verified documents to which CFIF refers, and is, consequently, an inappropriate and inflammatory mischaracterization of the underlying documents.

---

[4]424 U.S. 1 (1976).

4

Further, paragraph 23 is plagued with inaccuracies calculated to lend credence to that mischaracterization.  It alleges that "Attorney General McGraw ran a television ad attacking the Center" by calling it a "new scam" and a "fake citizens group."  Actually, however, the ad was not run by the Attorney General, but was a campaign ad by the "Friends of Darrell McGraw."  (Exhibit F to Second Mazzella declaration–Docket 72-3).  Surely, the CFIF did not think its campaign ads would go unanswered by the candidate against whom they were directed?  At least the candidate's response disclosed who was paying for it!  To characterize such ads as "retaliatory" goes against the very principles for which CFIF purports to stand – the right to speak out in a public debate.

Paragraph 23 also alleges that "the Attorney General, in his official capacity," filed a complaint with the Secretary of State.  However, the complaint referenced by CFIF to support this assertion stated, in the opening sentence, that it was filed "in my individual capacity . . .," nor was it on Attorney General letterhead.  (Exhibit C to Second Mazzella Declaration –Docket 72-3.)  If CFIF was in compliance with the laws enforced by the Secretary of State, it would have nothing to fear.  A complaint by a private citizen to an investigative agency is not "retaliation."  By so characterizing it, CFIF simply seeks to deter state officials from investigating the complaint.

This Court has already opined that the entirety of the supposedly "retaliatory" actions alleged in said paragraph 23 are not of a character that would chill First Amendment rights, nor prevent "as applied" enforcement of general independent campaign disclosure requirements to CFIF.  (Docket 155 at 44-48.)  Consequently, further discussion is unwarranted.

## II.

### THE DEFINITION OF "EXPRESSLY ADVOCATING" CONTAINED IN WEST VIRGINIA CODE § 3-8-1a(12)(A) IS NEITHER VAGUE NOR OVERLY BROAD.

**A.** **Introduction.**

West Virginia Code § 3-8-8  prohibits corporate campaign expenditures only if they are "for the purpose of *expressly advocating* the election or defeat of a clearly identified candidate" for a state-wide, legislative, county or municipal office.[5]   (Emphasis added.) An "independent expenditure", which must be reported by third parties to the Secretary of State,[6] is also restricted to expenditures "expressly advocating" the election or defeat of a candidate.[7]  West Virginia Code

---

[5]West Virginia Code § 3-8-8 provides, in pertinent part:

(a) Notwithstanding any provision of section two-b of this article, *no officer, agent or person acting on behalf of any corporation*, whether incorporated under the laws of this or any other state or of a foreign country, *may pay, give, lend or authorize* to be paid, given or lent *any money or other thing of value belonging to the corporation for the purpose of expressly advocating the election or defeat of a clearly identified candidate for state, district, county or municipal office, to any candidate,* financial agent, political committee *or other person.* No person may solicit or receive any payment, contribution or other thing from any corporation or from any officer, agent or other person acting on behalf of the corporation. (Emphasis added).

[6]*See* W. Va. Code §§ 3-8-2; 3-8-5.

[7]West Virginia Code § 3-8-1a(16) provides:

(16) "Independent expenditure" means an expenditure by a person:

(A) Expressly advocating the election or defeat of a clearly identified candidate; and

(B) That is not made in concert or cooperation with or at the request or suggestion of such candidate, his or her agents, the candidate's authorized political committee or a political party

(continued...)

6

§ 3-8-1a(16).   A two-part definition of "expressly advocating" is contained in West Virginia Code § 3-8-1a(13)(A): The first part defines "expressly advocating" to mean communications that use explicit phrases of advocacy, such as "vote for" and "vote against"; the second part includes communications that do not use the listed explicit words but which "in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates".[8] Plaintiffs argue that the corporate expenditure prohibition in West Virginia Code § 3-8-8 and the expenditure reporting requirements contained in West Virginia Code §§ 3-8-2 and 3-8-5are both unconstitutional because the definition of "expressly advocating" contained in West Virginia Code

---

[7](...continued)
         committee or its agents.

   Supporting or opposing the election of a clearly identified candidate includes supporting or opposing the candidates of a political party. An expenditure which does not meet the criteria for an independent expenditure is considered a contribution.

[8]West Virginia Code § 3-8-1a(13)(A) (2008) defines "expressly advocating" as "any communication that"

         Uses phrases such as "vote for the Governor," "re-elect your Senator," "support the Democratic nominee for Supreme Court," "cast your ballot for the Republican challenger for House of Delegates," "Smith for House," "Bob Smith in '04," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidates, "reject the incumbent," or *communications of campaign slogans or individual words, that in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, advertisements, etc. which say "Smith's the One," "Jones '06," "Baker*"[.]

(Emphasis added.)

7

§ 3-8-1a(13)(A) is vague and overly broad. However, said definition is narrowly drawn, comports with United States Supreme Court precedent, and should be upheld.[9]

**B.    Genesis of the "Express Advocacy" Rule .**

The "express advocacy" theory on which plaintiffs arose in the context of First Amendment challenges to statutory restrictions on contributions and expenditures in political campaigns. The use of funds to support a political candidate is "speech" that is protected by the First Amendment. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652  (1990); *Buckley v. Valeo*,  424 U.S. 1 (1976); *Williams v. Rhodes,* 393 U.S. 23 (1968). The degree of scrutiny to be applied in determining whether a particular limitation violates the First Amendment depends on the nature of the activity regulated.  *Federal Election Commission v. Beaumont*, 539 U.S. 146 (2003). Generally speaking, expenditure limitations impose greater restraints on speech, warranting strict scrutiny, while contribution limitations impose a lesser burden and need only be closely drawn and satisfy an important state interest.  *Buckley v. Valeo, supra.* Corporate contributions and expenditures are generally subject to less scrutiny. *See, e.g.*, *Beaumont, supra; First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958).

Accordingly, the United States Supreme Court has repeatedly held that statutory prohibitions on corporate contributions and expenditures in political campaigns are justified because the special advantages accorded to corporations by the states, *i.e.,* limited liability, perpetual life and favorable

---

[9]The alternative definition of "expressly advocating" contained in West Virginia Code § 3-8-1a(13)(B) has also been attacked by Plaintiffs, but has already been thoroughly briefed in conjunction with the Plaintiffs' Preliminary Injunction motions.  Those arguments will not be repeated here. Even if said subparagraph B is stricken in accordance with the reasoning of this Court's preliminary injunction, subparagraph A remains constitutional and consistent with legislative intent, and should be preserved in accordance with the arguments hereafter set forth.

treatment of the accumulation and distribution of assets, allow them to use sometimes vast resources acquired in the economic marketplace to obtain an unfair advantage in the political process, leading to corruption or the appearance of corruption. *E.g, Austin, supra*; *FEC v. National Right to Work Committee,* 459 U.S. 197 (1982); *Bellotti*, *supra*; *Pipefitters Local Union No. 562 v. United States,* 407 U.S. 385 (1972); *United States v. United Automobile etc., Workers*, 352 U.S. 567 (1957); *United States v. CIO,* 335 U.S. 106 (1948). As a result, the Court has recognized a strong public interest in restricting the conversion of corporate earnings into a political "war chest" funneled through the corporate form. *Federal Election Commission v. Beaumont*, 539 U.S. 146 (2003); *FEC v. National Conservative Political Action Committee*, 470 U.S. 480 (1985) (*NCPAC*).

In *Buckley v. Valeo*, 424 U.S. 1 (1976*)*, the parties challenged the constitutionality of various provisions of the Federal Election Campaign Act of 1971 ("FECA"). Among other things, the appellants in *Buckley* asserted that the FECA provisions limiting the amount of independent, *i.e.*, third-party, expenditures "relative to" a clearly identified candidate to $1,000 per person or group per calendar year[10] constituted an impermissible infringement of their free speech rights. Before reaching the First Amendment issue, however, the Court noted that the statute's use of the phrase "relative to" made no distinction between communications advocating the election or defeat of a candidate and discussions of issues of public interest. As a consequence, a majority of the Court concluded that facial invalidity on grounds of unconstitutional vagueness[11]

> can be avoided only by reading [the statute] as limited to communications that
> include *explicit words of advocacy* of election or defeat of a candidate, much as the

---

[10]*See* 18 U.S.C. § 608 [1970].

[11]The vagueness doctrine is an outgrowth not of the First Amendment, but of due process principles. *United States v. Williams*, _ U.S. _, 128 S. Ct. 1830 (2008).

9

definition of "clearly identified" . . . requires that an explicit and unambiguous reference to the candidate appear as part of the communication. (Emphasis added.)

421 U.S. at 43.   The Court held that legislation restricting communications referring to a clearly identified candidate's position on an issue, but not expressly advocating his or her election or defeat were constitutionally protected..[12]   The majority went on to say:  "This construction would restrict application of [the statute] to communications containing ***express words of advocacy*** of election or defeat, such as 'vote for', 'elect', 'support cast your ballot for', 'Smith for Congress', 'vote against', 'defeat', 'reject'." (Emphasis added).  *Id.* at n.52.[13]

C.   **The Definition of "Expressly Advocating" Contained in West Virginia Code § 3-8-1a(13)(A) Is Not Vague or Overly Broad Merely Because it Regulates Speech Other than the "Magic Words" of Advocacy.**

Plaintiffs assert that because the second part of the statutory definition of "expressly advocating" in West Virginia Code § 3-8-1a(13)(A) includes speech that is not expressed in the "magic words" approved in *Buckley*, it encompasses communications that do not involve "express advocacy" and, accordingly is vague and overly broad.  Plaintiffs assert that as a consequence, they assert that only the first part of the definition of "expressly advocating" contained in the statue is facially valid.

_____

[12]The Court in *Buckley* did ultimately rule that even when the statute was narrowly construed to apply only to "express advocacy", the Government's stated interest in limiting the amount of independent expenditures (a loop-hole closing provision necessary to prevent circumvention of contribution limits) was not sufficiently compelling to warrant infringement on the First Amendment speech rights implicated.  424 U.S. at 44-48.

[13]The Court in *Buckley* did ultimately rule that even when the statute was narrowly construed to apply only to "express advocacy", the Government's stated interest in limiting the amount of independent expenditures (a loop-hole closing provision necessary to prevent circumvention of contribution limits) was not sufficiently compelling to warrant infringement on the First Amendment speech rights implicated.  424 U.S. at 44-48.

Plaintiffs conveniently ignore, however, that the Supreme Court has since rejected the "magic words" test. In *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), the Court addressed a facial constitutional challenge to statutory restrictions on corporate expenditures for "electioneering communications", *i.e.,* broadcast candidate advertising during periods shortly before federal elections under the Bipartisan Campaign Reform Act of 2002 (BCRA).[14] The Court rejected the idea "that *Buckley* drew a constitutionally mandated line between express advocacy ["magic words"] and so-called issue advocacy [everything else], and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." 540 U.S. at 190. Instead, the Court concluded, "the express advocacy limitation [in *Buckley*] was the product of statutory interpretation rather than a constitutional command." *Id*. at 192.

> [T]he presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad" since ads that "esche[w] the use of magic words . . . are no less clearly intended to influence the election. Indeed, the unmistakable lesson from the record in this litigation . . . is that *Buckley's* magic-words requirement is functionally meaningless. Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted. And although the resulting advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election. *Buckley*'s express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption . . . .

*Id.* at 193 (citations and footnotes omitted). The Court concluded that the compelling governmental interest, *i.e.,* the perceived "corrosive and distorting effects of immense aggregations of [corporate] wealth," justified statutory restrictions on corporate independent expenditures "to the extent that . . . [the ads] are ***the functional equivalent*** of express advocacy." 540 U.S. at 205, 206 (Emphasis added).

---

[14]The BCRA prohibits corporate-sponsored broadcast communications, airing within 30 days before a primary election or 60 days before a general election, that refer to a federal candidate in the jurisdiction in which the candidate is running for office. 2 U.S.C. § 434(f)(3)(A).

Later, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 127 S. Ct. 2652 (2007) (*WRTL),* the Court confirmed the holding in *McConnell*. While *WRTL* involved as-applied challenge to the BCRA corporate independent expenditure restrictions, as opposed to a facial challenge, the majority in *WRTL* did review the facial challenge in *McConnell* and devoted considerable discussion to the appropriate standard to be used for determining whether a communication was the "functional equivalent" of express advocacy in an "as-applied" challenge. *Id.* at 2659-2670. The Court ultimately found that the appropriate test was an objective one--"whether the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 2667.

The mere fact that the Court in *WRTL* spent considerable time discussing what constitutes the "functional equivalent" of express advocacy clearly indicates that the Court has not overruled *McConnell*'s rejection of the "magic words" as the sole standard of express advocacy. The Supreme Court now recognizes that a statute limiting corporate spending to advocate the election or defeat of a candidate is not facially invalid simply because it encompasses speech other than the "magic words" approved in *Buckley*.[15] Accordingly, Plaintiffs' argument must fail.

---

[15]*See* the dissenting opinion of Justice Souter in *WRTL*, in which Justices Stevens, Ginsburg and Breyer joined, which was even more strident in rejecting the "magic words" test than the principal opinion. 127 S.Ct. at 2687, Souter, J., dissenting

**D.**    **West Virginia Code § 3-8-1a(13)(A) (2008) Defining "Expressly Advocating," Is Not Vague or Overly Broad Simply Because it Encompasses Speech That "In Context Can Have "No Other Reasonable Meaning" than Advocating for the Election or Defeat of a Candidate.**

Plaintiff CFIF also asserts that the statutory definition of "expressly advocating" is facially unconstitutional to the extent it includes the phrase, "campaign slogans or individual words, that *in context* can have *no other reasonable meaning* than to urge the election or defeat of one or more clearly identified candidates." (Emphasis added.) W. Va. Code § 3-8-1a(13)(A) (2008). CFIF relies on *WRTL*.

In *WRTL*, the FEC argued that in order to determine whether a communication was the "functional equivalent" of express advocacy, it was necessary to consider contextual factors, such as the proximity of the broadcast to the election, whether the sponsor of the communication also actively advocated the election or defeat of the candidate in other ads, whether ads were run after the election and the like. The Court concluded that given the objective standard it had adopted for determining whether an ad is the functional equivalent of express advocacy, "contextual factors of the sort invoked by the appellants should seldom play a significant role in the inquiry. . . [and] the need to consider such background should not become an excuse for discovery or a broader inquiry of the sort we have just noted raises First Amendment concerns." 127 S. Ct. at 2669.

CFIF asserts that in light of *WRTL*, the inclusion of the phrase "in context" in the definition of "expressly advocating" in West Virginia Code § 3-8-1a(13)(A) renders the statute unconstitutionally overbroad and, consequently in conflict with the First Amendment. This argument assumes that under *WRTL* (1) the determination of whether speech is the functional equivalent of express advocacy may never be predicated on consideration of contextual factors, and (2) the mere use of the words "in context" indicates that the Legislature intended that contextual

13

factors to be considered in determining whether communications fall within the definition of "expressly advocating".

CFIF's argument fails for three reasons. First, *WRTL* involved an as-applied challenge rather than a facial challenge to the statute. Here, except for WVFL's as- applied arguments relating to *MCFL*, all of the constitutional challenges rely on a finding that the statutes are facially overbroad.

Second, even addressing the merits of an as-applied challenge, it is clear that in *WRTL*, the Supreme Court did not hold that contextual factors could ***never*** be considered in determining whether an ad is the functional equivalent of express advocacy.

> Courts need not ignore basic background information that may be necessary to put an ad in context-such as whether an ad "describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future".

127 S. Ct. at 2669, *quoting Wisconsin Right to Life v. FEC*, 466 F. Supp. 2d 195, 207 (D. D.C 2006). The Court simply held that contextual factors should "seldom play a significant role in the inquiry . . . [and] should not become an excuse for discovery or a broader inquiry[.]" 127 S. Ct. at 2669.

In summary, the *WRTL* decision recognized that where the determination of what constitutes the "functional equivalent of express advocacy" turns on consideration of contextual factors, the restrictions on campaign spending or contributions may, on an "as-applied" basis, violate the First Amendment. However, the Court did not hold that a statute permitting the employment of contextual factors to make that determination would be facially invalid under the First Amendment.

Third, CFIF cites no support for its precept that the use of the words "in context" in the statute is, in and of itself, a violation of the First Amendment. The Court in *WVFL* found the statute in question overly broad and vague due to "'the open-ended rough-and-tumble" consideration of contextual factors, "which 'invites complex argument in a trial court and a virtually inevitable

14

appeal.'" 127 S. Ct. at 2666, *quoting Jerome B. Grubhart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995). The words "in context" as used in West Virginia Code § 3-8-1a(13)(A) do not necessarily implicate the particular evil addressed by the Court in *WVFL*.  Indeed, the phrase can easily be read and understood in the sense of "considering the substance of the communication as a whole"--in other words with reference to the *internal* content or substance of the communication. If so construed, a speaker need not look beyond the "four corners" of an anticipated communication to determine if it is "express advocacy," thereby avoiding the "rough and tumble" or "open-ended" analysis of external factors that concerned the *WVFL* Court.

It is well-settled that a court is obligated to construe a statute so as to avoid constitutional problems if it is fairly possible to do so.  *Boumediene v. Bush*, __ U.S. ___, 128 S. Ct. 2229 (2008). When a statute is capable of being reasonably construed in more than one way, the court should read the statute to avoid constitutional conflicts. *Gonzales v. Carhart*, 550 U.S. 124 (2007); *Clark v. Martinez*,  543 U.S. 371 (2005); Syl. Pt. 3, *State v. Mullens*, 650 S.E.2d 160  (W. Va. 2007); *Morris v. Crown Equip. Corp.*, 633 S.E.2d 315 (W. Va. 2006); Syl. Pt. 1, *Perrelli v. Board of Educ.*, 387 S.E.2d 315 (W. Va. 1989); Syl. Pt. 3, *Slack v. Jacob*, 8 W. Va. 612 (1875).  The logical course to take here would be to read the ambiguity in the statute to uphold its constitutionality.

CFIF also asserts that second part of the statutory definition of "expressly advocating" is facially invalid because the determining factor is whether the communication has "no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates." W. Va. Code §  3-8-1a(13)(A) (2008).  CFIF relies on this Court's ruling that Paragraph (B) of the statute "'runs directly counter to the teaching of *WRTL* when it determines whether speech is regulable based on how a "reasonable person" interprets a communication in light of . . . contextual

15

factors.'" (Docket 155 at 21, *quoting North Carolina Right to Life v. Leake*, 525 F.3d 274, 283 (4th Cir. 2008).)

However, unlike the words in Paragraph (B), Code § 3-8-1a(13)(A) does not require an intent-based determination that no "reasonable person" could view the communication as anything other than advocating the election or defeat of a candidate. Instead, the statute attempts to mimic the objective standard adopted in *WRTL* for as-applied challenges-- "whether the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667.

Further, this Court's discussion, on which CFIF relies, placed inappropriate reliance on *Leake*'s determination that a communication, in order to be the "functional equivalent" of express advocacy, must also be an "electioneering communication" as defined in the Bipartisan Campaign Reform Act (BCRA). In *Leake*, an anti-abortion political action committee brought a § 1983 First Amendment challenge against provisions of a North Carolina campaign finance law that permitted examination of "contextual factors" in determining whether a given communication is in support of a specific candidate."[16] The Court of Appeals noted that, to date, the United States Supreme Court had recognized two categories of constitutionally valid campaign restrictions: "magic words" and their "functional equivalent." 525 F.3d at 281-282.

---

[16]Like West Virginia Code § 3-8-1a(13)(A), the North Carolina statute had a two-prong test to determine whether the expenditure was made to "support or oppose the nomination or election" of a clearly identified candidate: The first prong involved explicit use of specific words; the second prong involves determining the "essential nature" of the communication by reference to a variety of contextual factors, including "the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication ... in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election." N.C. Gen. Stat. § 163-278.14A(a).

16

However, the majority in *Leake* went even further and ruled:

[T]o be considered the "functional equivalent of express advocacy," a communication must meet two separate requirements. First, *the communication must qualify as an "electioneering communication,"* defined by . . . BCRA [citations omitted] as a "broadcast, cable, or satellite communication" that refers to a "clearly identified candidate" within sixty days of a general election or thirty days of a primary election.  (Emphasis added.)

*Id.* at 282.

As Judge Michael noted in his dissenting opinion, the majority in *Leake* "seriously misconstrues Supreme Court precedent with respect to the regulation of express . . and issue advocacy." *Id.* at 313. The majority's only support for its adoption of the "electioneering communication" component of its new definition of "functional equivalent" was a mere *fragment* of a footnote from *WRTL*, taken out of context.  The footnote was in response to concerns that the objective reasonableness test adopted by the Court for an as-applied challenge to § 203 of the BCRA, was impermissibly vague.[17]   As Judge Michael noted in his dissenting opinion:

[17]     Justice SCALIA thinks our test impermissibly vague. See *post,* at 2680 - 2681 (opinion concurring in part and concurring in judgment). As should be evident, we agree with Justice SCALIA on the imperative for clarity in this area; that is why our test affords protection unless an ad is susceptible of *no reasonable interpretation* other than as an appeal to vote for or against a specific candidate. It is why we emphasize that (1) there can be no free-ranging intent-and-effect test; (2) there generally should be no discovery or inquiry into the sort of "contextual" factors highlighted by the FEC and intervenors; (3) discussion of issues cannot be banned merely because the issues might be relevant to an election; and (4) in a debatable case, the tie is resolved in favor of protecting speech. And keep in mind *this test is only triggered if the speech meets the brightline requirements of BCRA § 203 in the first place.* Justice SCALIA's criticism of our test is all the more confusing because he accepts WRTL's proposed three-prong test as "clear." *Post,* at 2683. We do not think our test any vaguer than WRTL's, and it is more protective of political speech.

(continued...)

17

Nowhere does *WRTL II* state that the specific requirements of BCRA § 203 are the only way that a statute could be sufficiently clear; nor does *WRTL II* even purport to adopt BCRA's requirements to avoid overbreadth. . . . The majority clearly errs by mandating the elements of BCRA § 203, which is simply an ***example*** of a clear and sufficiently tailored statute, as an essential part of any campaign regulation. (Emphasis in original.)

525 F.3d at 315-16. In other words, footnote 7 in *WRTL* refers to § 203 of the BCRA only because

that is the only provision scrutinized by the Court ***in that case***--not because only "electioneering

communications" can be the "functional equivalent of express advocacy."

---

[17](...continued)

Justice SCALIA also asserts that our test conflicts with *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ( *per curiam* ). Post, at 2681 - 2683. The *Buckley* Court confronted a statute restricting "any expenditure ... relative to a clearly identified candidate." 424 U.S., at 42, 96 S.Ct. 612 (internal quotation marks omitted). To avoid vagueness concerns, this Court first narrowed the statute to cover only expenditures expressly "advocating the election or defeat of a candidate"-using the so-called "magic words" of express advocacy. *Ibid.* (internal quotation marks omitted). The Court then proceeded to strike down the newly narrowed statute under strict scrutiny on the ground that its reach was not broad enough. *Id.,* at 44, 96 S.Ct. 612. From this, Justice SCALIA concludes that "[i]f a permissible test short of the magic-words test existed, *Buckley* would surely have adopted it." *Post,* at 2682. We are not so sure. The question in *Buckley* was how a particular statutory provision could be construed to avoid vagueness concerns, not what the constitutional standard for clarity was in the abstract, divorced from specific statutory language. *Buckley's* intermediate step of statutory construction on the way to its constitutional holding does not dictate a constitutional test. The *Buckley* Court's "express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law." *McConnell,* 540 U.S., at 190, 124 S.Ct. 619. And despite Justice SCALIA's claim to the contrary, our citation of *Buckley* along with other decisions in rejecting an intent-and-effect test does not force us to adopt (or reject) *Buckley's* statutory construction as a constitutional test. (Emphasis added.)

127 S.Ct. at 2669 n.7.

18

As Judge Michael goes on to demonstrate at length in his dissenting opinion, the majority in *Leake* grossly misconstrued and misread the precedents relating to First Amendment issues with regard to restrictions on campaign contributions and expenditures. No other court in the country, including the United States Supreme Court, has adopted the narrow definition of "functional equivalent of express advocacy" put forth by the majority in *Leake*.  In the interest of "clarity," the Court of Appeals sacrificed "a campaign finance law that is aimed at promoting transparency and openness in the electoral process[.]" and opened the door for "organizations and individuals to conceal their identities, spend unlimited amounts on campaign advertising masked as discussion of issues, and 'hide themselves from the scrutiny of the voting public.' *McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 197, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003) (internal quotation marks omitted)." 525 F.3d at 308, Michael, J., dissenting.

**E.    Conclusion.**

In conclusion, the preceding arguments clearly demonstrate that West Virginia Code §§ 3-8-8 and 3-8-1a(13)(A) are not facially invalid as violating the First Amendment. These statutes are carefully drawn to protect speech, but at the same time to protect the public from the corrupting influence of corporate expenditures on the political process.  Plaintiffs have failed to demonstrate that any as-applied challenge entitles them to an exemption from the corporate expenditure prohibition.

19

### III.

### WEST VIRGINIA'S REGULATION OF ELECTIONEERING COMMUNICATIONS" IS CONSTITUTIONAL.

A.  **The West Virginia Legislature's Decision to Minimally Regulate Certain Non-broadcast Communication Is Supported by Expert Testimony, Practical Experience and Empirical Data.**

Defendants respectfully submit that the West Virginia Legislature's attempt to regulate non-broadcast media is well within the right of a state to do and in this instance is supported by myriad types of evidence, some of which is already of record.  Additional evidence is submitted herewith.  This evidence is sufficient to create a material issue of fact precluding summary judgment.

In the Memorandum Opinion supporting the Order granting Plaintiff's, Center for Individual Freedom, Inc., Motion for Preliminary Injunction, Judge Faber stated "the Court is not convinced that there exists an empirical justification for regulating mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or published materials."  (Memorandum Opinion, April 22, 2008, pp. 11, 12 – Docket 37.)

In a footnote referenced to this finding, Judge Faber stated "[t]he West Virginia Election Code does not contain legislative findings or a statement of purpose explaining the State's justification for the various prohibitions and/or reporting requirements set forth therein." [Referencing *Walters v. Nat'L Ass'n of Radiation Survivors*, 473 U.S. 305, 330 N. 12 (1985); *Rostkerr v. Goldberg*, 453 U.S. 57, 72-74; *Cal. ProLife Council Political Action Comm. v. Scully*, 989 F.Supp. 1282, 1294 (E.D. Cal. 1998).]

Clearly heeding the Court's suggestion, the Governor of West Virginia, Joe Manchin III, placed House Bill 219 and Senate Bill 2010 on the Legislative agenda for the Second Extraordinary

Session of 2008 held June 24, 2008 through June 28, 2008.  H.B. 219 was the legislative "vehicle" and passed the Legislature on June 28, 2008.

As it relates to the issue of regulating non-broadcast media in elections, H.B. 219 did the following:

1.      Made some nineteen (19) legislative findings relating to the need for regulation of non-broadcast media in elections and the need for disclosure of the identities of persons and entities funding political advertisements (W. Va. Code § 3-8-1.);

2.      Added a definition of billboard (W. Va. Code § 3-8-1a (2); and,

3.      Removed leaflets, pamphlets, flyers and outdoor advertising from the definition of electioneering communication (W. Va. Code § 3-8-1a (12)).

The findings were much discussed and changed throughout the legislative process.  The final version of the Bill made the following findings:

(1) West Virginia's population is 1,808,344, ranking 37th among the 50 states.

(2) State Senate districts have a population of approximately one hundred six thousand three hundred seventy-three, and the average Delegate district has a population of approximately thirty- one thousand, one hundred seventy-eight. The size of these districts is substantially smaller than the United States Senatorial and Congressional Districts.

(3) When the relatively small size of the State's legislative and other voting districts is combined with the economics and typical uses of various forms of electioneering communication, history shows that non-broadcast media is and will continue to be a widely used means of making campaign related communications to target relevant audiences. Consequently, non-broadcast communications are prevalent during elections.

(4) Disclosure provisions are appropriate legislative weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions, and the ceilings imposed accordingly serve the basic governmental interest in safeguarding the integrity of the electoral

21

process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion.

(5) Disclosure of expenditures serve a substantial governmental interest in informing the electorate and preventing the corruption of the political process.

(6) Disclosure by persons and entities that make expenditures for communications that expressly advocate the election or defeat of clearly identified candidates, or perform its functional equivalent, is a reasonable and minimally restrictive method of furthering First Amendment values by public exposure of the state election system.

(7) Failing to regulate non-broadcast media messages would permit those desiring to influence elections to avoid the principles and policies that are embodied in existing state law.

(8) The regulation of the various types of non-broadcast media embodied within the amendments enacted during the second extraordinary session of two thousand eight, in addition to broadcast media, is tailored to meet the circumstances found in the State of West Virginia.

(9) Non-broadcast media such as mass mailing, telephone banks and billboards have proven to be effective means of election communication in West Virginia. Broadcast, satellite and non- broadcast media have all been used to influence election outcomes.

(10) Mass mailing and telephone communications can be more effective campaign methods than broadcast media because such communications can be targeted to registered voters or historical voters in the particular district. In contrast, broadcasted messages reach all of the general public, including person ineligible to vote in the district.

(11) Mass mailings or telephone communications in the final days of a campaign can be particularly damaging to the public's confidence in the election process because they reduce or make impossible an effective response.

(12) Identifying those funding mass mailing or telephone campaigns in the final days of a campaign may at least permit voters to evaluate the credibility of the message.

(13) In West Virginia, contributions up to the amounts specified in this article allow contributors to express their opinions, level of support and their affiliations.

22

(14) In West Virginia, campaign expenditures by entities and persons who are not candidates have been increasing. Public confidence is eroded when substantial amounts of such money, the source of which is hidden or disguised, is expended. This is particularly true during the final days of a campaign.

(15) In West Virginia, contributions to political organizations (defined in Section 527(e)(1) of the Internal Revenue Code of 1986) substantially larger than the amounts permitted to be received by a candidate's political committee have been recorded and are considered by the legislature to be large contributions.

(16) Independent expenditures intended to influence candidates' campaigns in the State are increasingly utilizing non-broadcast media to support or defeat candidates.

(17) Identification of persons or entities funding political advertisements assists in enforcement of the contribution and expenditure limitations established by this article and simply informs voters of the actual identities of persons or entities advocating the election or defeat of candidates.

(18) Identification of persons or entities funding political advertisements allows voters to evaluate the credibility of the message contained in the advertisement.

(19) Disclosure of the identity of persons or entities funding political communications regarding candidates bolsters the right of listeners to be fully informed.

Enrolled H.B. 219.

Defendant has previously supplied the court and the parties with a disc of documentation received from the Legislature supporting the findings.  *See* Oct. 15, 2008, letter to Teresa L. Deppner, Clerk, United States Southern District Court (Docket 121).

That the findings and other changes in West Virginia election law were a direct reaction to this Court's Order of April 22, 2008 would appear inarguable.  Defendants submit that the documentation in support of the findings does in fact fully support them.  Courts must accord legislative findings substantial deference even in First Amendment cases. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).

23

The Legislature's findings are bolstered by the declarations of Pamela Van Horn and David H. Gold filed by then intervenors Ketchum, Bastress, and Workman in their September 5, 2008, Motion to Vacate the Preliminary Injunction and in Ms. Van Horn's testimony at the October 15, 2008 hearing.  (*See* Exhibits 3, 4 & 5.)  Defendants respectfully submit that Ms. Van Horn and Mr. Gold meet the qualification requirements for experts under the Federal Rules of Evidence, Article VII, and the applicable case law, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

A review of the declarations and Ms. Van Horn's testimony provide substantial support to the Legislature's stated goal of requiring disclosure of identities of persons issuing electioneering communications by means of non-broadcast media.  (Tr., 98-110.)

There is further support of the Legislature's actions in the declarations of Senator Jeffrey Kessler, Chairman of the Senate Judiciary Committee, Delegate Carrie Webster, Chair, House of Delegates Judiciary Committee, and Delegates Robert Tabb and John Pino.  (*See* Exhibits 6, 7, 8 & 9.)  All three legislators have campaign experience at the legislative level and all three referenced the need to regulate non-broadcast media if the public purpose approved by this and other federal courts relating to broadcast media in national elections is to have function at the state and legislative levels.  Defendants again submit that the legislators qualify as experts under the provisions of Article VII of the Federal Rules of Evidence.

In an attempt to supply still more evidence to support the Legislature's actions, accompanying this Response is an affidavit and data from G. Nicholas Casey, Esq., Chairman of the West Virginia Democratic Party.  (*See* Exhibit 10.)  The data shows campaign expenditures in 2008 statewide general election races and 25 contested legislative races.  Defendants submit that this data

empirically reflects what is stated by Ms. Van Horn and Messrs. Kessler, Tabb, Pino and Gold; to wit non-broadcast media such as are regulated by the provisions of West Virginia Code Article 8, Chapter 3, are a critical means of electioneering in West Virginia, particularly outside major population centers and in the panhandles, on which substantial sums are spent, particularly in legislative races.[18] To ensure that the voting public is fully informed as to which persons or entities are engaging in large scale express advocacy and its functional equivalent in those periods immediately prior to an election disclosure must apply to those forms of non-broadcast media West Virginia is attempting to regulate.

The purpose and effect of H.B. 219 was to bring West Virginia election law into compliance with federal constitutional standards in the area of electioneering communications. The changes effected track these provisions of the Bipartisan Campaign Reform Act of 2002 (BCRA) and the rules promulgated thereunder by the Federal Elections Commission as modified by decisions of the United States Supreme Court. The intent of the legislation was to address the deficiencies in state law addressed by this Court in this action.

The BCRA, after which the West Virginia amendments were modeled, was designed to deal with "sham issue" advertisements, ads which avoided the "magic words" referred to in a footnote in *Buckley v. Valeo,* 421 U.S.1 (1976), but are clearly intended to influence campaigns for office. The BCRA, like the West Virginia Law as presently enacted, bans the use of corporate treasury funds for express advocacy. Further, it requires disclosure of funding for "electioneering communications."

---

[18]But for large broadcast media expenditures by Don Blankenship and the National Chamber of Commerce, the data in Exhibit 10 show that non-broadcast media expenditures are of the same order of magnitude as broadcast media, particularly in non statewide races.

The disclosure requirements of the BCRA were upheld by an 8-1 majority in *McConnell v. FEC*, 540 U.S. 93 (2003).

Where the West Virginia law varies from the BCRA is its regulation of non-broadcast media, specifically, mass mailing, telephone banks, billboards and newspapers. A significant number of legislative findings in support of the inclusion of media are made. It is well settled that even in First Amendment cases courts give substantial deference to legislative findings of the sort made by the Legislature in this case. *Turner Broadcasting System, Inc. v. FCC*, *supra*. While courts may exercise their independent judgment on facts involving issues of constitutional law, ". . . it is not a license to re-weigh the evidence *de novo* or to replace Congress' factual predictions with [the court's] own." *Id.* at 666. The federal courts grant the same deference to the findings of a state legislation. *McCrerey v. Allen*, 118 F. 3d. 242 (1997; *Akers v. Caperton*, 998 F. 2d 220 (1993).

In conclusion, Defendants respectfully submit that the amendments to State election law, made via the provisions of H.B. 219, relating to regulation of non-broadcast electioneering communications, bring West Virginia election law into compliance with federal constitutional standards.

**B.    CFIF Offers No Support for its Argument That West Virginia "Electioneering" Provisions That Have No Counterpart in Bcra Are Therefor Unconstitutional.**

**1.    Neither West Virginia's Campaign Finance Laws Nor BCRA Regulate Posters, Fliers, or the Internet.**

CFIF argues that West Virginia's "electioneering communication" statute applies to communications received by fewer people than the broadcasts regulated by its federal counterpart, and, thus, is overly restrictive. (Docket 154 at 13-16.) However, CFIF's discussion relates only to the inherent difficulty of measuring the number of people reached by internet communications,

posters, or fliers, none of which media are regulated by West Virginia.  Further, CFIF's arguments relating thereto do *not* relate to the *number* of persons that must be reached to satisfy the statutory threshold.  The only decision cited by CFIF enjoined a Florida statute defining "electioneering communications" as "a paid expression in any communications media" that reached 1,000 or more people and referred to a candidate or issue "without expressly advocating the election or defeat of the candidate or issue." *Broward Coalition of Condominiums, Homeowners Associations and Community Organizations Inc. v. Browning,* 2008 WL 4791004, *2 (N.D. Fla. 2008).

The district court in *Broward* held that Florida's definition was overly broad in numerous respects, in part because it reached a homeowner's association internet newsletter and nonpartisan fliers by university librarians announcing the appearances of candidates at campus forums, neither of which was a paid communication on any form of broadcast or print media of general circulation. The district court was also critical of the "1,000 or more" people criterion *as applied to internet communications, posters, and fliers*:

> In today's Internet age, it is impossible to know-in-advance whether any particular Internet communication will fall within that definition. A website that is linked to by a popular blog could overnight quadruple the number of hits to that website. And an organization would have no way of knowing whether each hit represents a separate recipient or even whether the recipient is located in the targeted area. Low-tech advertising may raise problems as well. For instance, if the University of Florida College Libertarians put up posters and fliers advertising their events in the University student center and dining hall-as they have regularly done in the past-it is impossible for them to know how many people would actually look at the posters and fliers. Therefore, it would be nearly impossible for any of the Plaintiffs to ascertain whether their flyer or website actually constitutes "electioneering communication."

*Id.* at *12.

West Virginia's definition of electioneering communications, like its federal counterpart, includes neither internet communications nor posters and fliers.  In other words, CFIF is complaining about imaginary problems that don't exist in West Virginia.

> 2.    The "News Story" Exemption from Electioneering Communications Is Clear and Nearly Identical to its Federal Counterpart, Which has Been Upheld by the Supreme Court.

Like its federal counterpart, West Virginia exempts from its definition of "electioneering communications" "news stories, commentaries or editorials" disseminated by broadcasters or print media, provided the media facilities are not owned by candidates, political parties or political committees.   W. Va. Code § 3-8-1a(12)(B)(i).[19]   CFIF claims that this exemption is "vague" and consequently leaves too much discretion to regulators.  (CFIF's Motion at 10-12; Docket 154.)  The exemption appears in West Virginia Code § 3-8-1a(12) and is quoted below:

(B) "Electioneering communication" does not include:

(i) A news story, commentary or editorial disseminated through the facilities of any broadcast, cable or satellite television or radio station, newspaper, magazine or other periodical publication not owned or controlled by a political party, political committee or candidate: Provided, that a news story disseminated through a medium owned or controlled by a political party, political committee or candidate is nevertheless exempt if the news is:

(I) A bona fide news account communicated in a publication of general circulation or through a licensed broadcasting facility; and

(II) Is part of a general pattern of campaign-related news that gives reasonably equal coverage to all opposing candidates in the circulation, viewing or listening area;

---

[19]There is no general exemption for "bona fide news accounts," as alleged by CFIF in its Motion for Summary Judgement (Docket 154 at12).  Rather, this phrase appears only with respect to communications by broadcast or print media facilities owned by candidates, political parties, or committees, who may, despite such ownership, nonetheless broadcast "bona fide news accounts" that meet other objective criteria.  The actual statutory language is taken from BCRA regulations and is hereafter quoted in the text.

This exemption is modeled closely after BCRA and its implementing regulations.[20]  Indeed, the language is identical to its federal counterpart but for the need to additionally include newspapers and periodicals, since West Virginia's definition of "electioneering communications" includes print media.

The federal exemption was sustained in *McConnell v. Federal Election Com'n*,  540 U.S. 93, at 211 (2003), against an equal protection challenge alleging that the exception unfairly favored the media.  The Supreme Court held that the exception was narrow and justified:

> The statute's narrow exception is wholly consistent with First Amendment principles. "A valid distinction ... exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public."

---

[20]2 U.S.C. § 434(f)(3)(B) of BCRA provides that

[t]he term "electioneering communication" does not include -

(i) a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate; .

BCRA's implementing regulations (at 11 CFR 100.29) further exempt a communication that is

[a] news story distributed through a broadcast, cable, or satellite television or radio station owned or controlled by any political party, political committee, or candidate is nevertheless exempt if the news story meets the requirements described in 11 CFR 100.132(a) and (b);

[The referenced regulations add these requirements:]

(a) That represents a bona fide news account communicated in a publication of general circulation or on a licensed broadcasting facility; and

(b) That is part of a general pattern of campaign-related news accounts that gives reasonably equal coverage to all opposing candidates in the circulation or listening area, is not an expenditure.

*McConnell* at 208 (citations omitted.).

CFIF's challenge is not really to the news and commentary exemption, but to an exception to an exception to this exemption. Although CFIF claims that there is an "exemption" for bona fide news accounts, its Memorandum does not disclose that this "exemption" is really an escape valve to allow a candidate who happens to own media to continue his or her business. Such persons can continue to publish or broadcast a "bona fide news account in a publication of general circulation or on a licensed broadcast facility that is part of a general pattern of campaign-related news accounts that gives reasonable equal coverage to all opposing candidates . . .." Code § 3-8-1a(12)(B)(i).

CFIF claims that the use of the term "bona fide" renders this escape valve unconstitutionally vague. This "issue" is totally irrelevant to this case because neither CFIF nor WVFL is a political party, a candidate or a committee, nor do they own broadcast media or print media of general circulation, nor do they engage in a general pattern of news accounts that gives equal coverage to all candidates. They cannot possibly be impacted by the language complained of, *nor have they posited anyone who could*. Thus, an "overbreadth" standing argument cannot justify taking cognizance of this issue.

Moreover, the authorities cited in CFIF's Memorandum addressed statutes wherein the term "bona fide" was the principal adjective used to identify the regulated population, and was unaccompanied by other objective criteria. *Walker v. Wegner,* 477 F. Supp. 648, 650 (D. S.D., 1979) (charitable organizations soliciting funds for "bona fide religious purposes" were exempt from registration); *Duke v. Connell*, 790 F. Supp. 50, 51 (D. R.I.,1992) (only "bona fide national candidates" permitted on the presidential ballot). In neither case did the statute contain the multiple additional criteria present in West Virginia's statute ("news story, commentary or editorial,

30

communicated in a publication of general circulation or through a licensed broadcasting facility, as part of a general pattern of campaign-related news that gives reasonably equal coverage to all opposing candidates"). Unlike the cited decisions, the determination of what communications qualify for the exception is not likely to turn on any subjective notion of the meaning of "bona fide." Given that CFIF posited not a single example, speculative or otherwise, of how this term could adversely affect anyone, it should be of no concern to this Court.[21]

------

[21]The Defendants argue that the exemption for nonpartisan voter guides appears to be unmanageably ambiguous in its use of the phrase, "which is intended as nonpartisan public education focused on issues and voting history." Plaintiffs make no claim that the remainder of the exemption is vague or otherwise suspect. In its entirety, the exemption reads as follows:

> A communication, such as a voter's guide, which refers to all of the candidates for one or more offices, which contains no appearance of endorsement for or opposition to the nomination or election of any candidate *and which is intended as nonpartisan public education focused on issues and voting history*.

CFIF cites no decision striking any similar provision, and makes no effort to identify any situation where this language would result in the inappropriate application of the electioneering provisions. Nor does CFIF identify any communication that it or anyone else has attempted, or is contemplating, with respect to which the alleged ambiguity would cause doubt as to its applicability.

However, in the event that this Court nonetheless agrees with CFIF, the proper remedy would be to strike the italicized phrase, leaving the remainder of the voter's-guide exemption intact. If this remedy has any practical effect, it will be to broaden the exemption and lessen the restriction on protected speech, while preserving the compelling interest of the Legislature to require the reporting of independent expenditures and their contributors. Consequently, the offending phrase is severable without causing damage to the legislative scheme or rewriting state law.

The question of the severability of a state statute is governed by state law. *See Department of Treasury v. Fabe*, 508 U.S. 491 (1993); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Virginia DMV Comm'r*, 288 F.3d 610 (4th Cir. 2002); *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir.1996). West Virginia Code § 2-2-10(cc) provides, in part, "[T]he provisions of every section . . . of this code, . . . shall be severable so that if any provision . . . is held to be unconstitutional or void, the remaining provisions . . . shall remain valid."

31

3.     **The Exemption for 501(c)(3) Corporations Does Not Create a Viable Equal Protection Claim.**

Plaintiff CFIF argues that the definition of electioneering communication treats various types of tax-exempt organizations differently, giving rise to an equal protection claim.  Specifically, CFIF contends that West Virginia Code § 3-8-1a(12)(B)(4), which excludes from the definition of "electioneering communication" "[a] communication paid for by any organization operating under Section 501(c)(3) of the Internal Revenue Code of 1986," is unconstitutional insofar as it does not also exclude other 501(c) tax exempt organizations, such as itself, a 501(c)(4) organization, from the definition of "electioneering communications.[22]  CFIF Brief at 13.

The Equal Protection Clause of the Fourteenth Amendment provides that "no State [shall] deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., Amend. 14, Cl. 1.

> This provision creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly. If a legislative classification or distinction "neither burdens a fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end." (Citations omitted).

*Vacco v. Quill*, 521 U.S. 793, 799  (1997)  *See Romer v. Evans,* 517 U.S. 620 (1996); *Plyler v. Doe,* 457 U.S. 202 (1982)*; San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1 (1973); *Tigner v. Texas,* 310 U.S. 141 (1940).

When the Legislature was considering electioneering communication legislation in September of 2005, the FEC's regulations implementing the BCRA which included the same 503(c)(3)  exemption contained in the West Virginia statute.   *See* 62 F.R. 65190-01.  At the time

---

[22]The "501(c)" label refers to certain organizations that are tax-exempt pursuant to the Internal Revenue Code.  26 U.S.C. § 501(c).

the regulation was proposed in October of 2002, the FEC 's justification for including the 510(c)(3)

exemption was the concern among non-profit organizations that the definition of "electioneering

communication" in the BCRA "could inadvertently stifle the ability of charitable organizations to

carry out their core functions by limiting or prohibiting their advertising on television and radio."

*Explanation and Justification*,  62 F.R. 65190-01(I)(F). The FEC concluded that the tax code

prohibited 501(c)(3) organizations from engaging in electoral activity and that should a 501(c)(3)

organization venture beyond the limits of its charitable purpose in the electoral arena, the IRS could

revoke the organization's tax-exempt status.  *Id.*  Thus, the "exemption" for 501(c)(3) corporations

was not intended to permit them to engage in electoral activity in preference to other corporations,

but rather was to avoid multiple layers of enforcement, leaving the IRS and as the principal enforcer

of the prohibition against 501(c)(3) political activities.

    The West Virginia Legislature, in keeping with its general policy of making West Virginia

election laws conform to federal election laws insofar as it is practicable,[23] drew the 501(c)(3)

exemption in West Virginia Code § 3-8-1a from the FEC regulation in effect at that time. A

501(c)(3) classification absolutely prohibits an organization from participating or intervening in any

---

[23]*See* W. Va. Code § 3-8-8(d).

political campaign on behalf of or in opposition to candidates for public office.[24]  A  501(c)(4)

organization, however, is not, by definition, subject to the same absolute prohibition.[25]

Moreover, in *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), the Supreme

Court recognized another substantial distinction between the two types of organizations: while both

are tax-exempt, only 501(c)(3) organizations can accept tax-deductible contributions.  In *Regan*, the

IRS rejected plaintiff's application for 501(c)(3) status because it appeared that a substantial amount

of the plaintiff's activities would consist of lobbying, which is prohibited by Section 501(c)(3).

Although the plaintiff could qualify for tax-exempt status under 501(c)(4), it brought a declaratory

---

[24]A 501(c)(3) designation refers to:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition . . . or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation (except as otherwise provided in subsection (h)), and *which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office*."

(Emphasis added.) 26 U.S.C. § 501(c)(3).

[25]A 501(c)(4) tax exemption is granted for

"Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes. . . . [and] shall not apply to an entity unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual. "

26 U.S.C. § 501(c)(4).

judgment action alleging, *inter alia*, that Section 501(c)(3)'s prohibition on lobbying violated the Equal Protection Clause.  In upholding the disparate treatment of the two types of organizations, the Court stated:

> The system Congress has enacted provides this kind of subsidy [tax exempt status] to non profit civic welfare organizations generally, and an additional subsidy [tax deductible contributions] to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

461 U.S. at 544.

Although *Regan* dealt with Equal Protection in the context of classifications for taxation purposes, it illustrates the FEC's justification for treating 501(c)(3) organizations differently for purposes of the BCRA's electioneering communications provisions.  Including the activities of 501(c)(4) organizations, which are not by their very nature precluded from participating in political campaigns, in the definition of "electioneering communication" is a reasonable means of fulfilling the legitimate governmental interest in regulating the use of "soft money" in elections. 501(c)(3) entities, on the other hand, are, by definition, prohibited from entering the political arena.  Because they do not present the same risk, there is a legitimate reason for treating them differently.  The distinction between the two entities is not based on the content of the communications engaged in, but the nature of the corporate entity.

The West Virginia Legislature simply codified the 501(c)(3) exemption contained in the federal regulation, using exactly the same language.  The same justification therefore applies to the provisions of West Virginia Code § 3-8-1a(12)(B)(4).  Consequently, the exclusion of 501(c)(3) entities from the definition of "electioneering communication" does not violate the Equal Protection Clause of the Fourteenth Amendment.

While maintaining the constitutionality of West Virginia Code § 3-8-1a(12)(B)(4) against

CFIF's equal protection argument, the defendant asserts, in the alternative, that should this Court rule

that the exemption of the activities of 501(c)(3) organizations from the definition of "electioneering

communication" does represent an equal protection violation, the appropriate remedy is not to hold

the entire definition of "electioneering communication" invalid.

> "Where a statute serves an urgent and necessary public purpose but is technically deficient for constitutional reasons, this Court will apply the doctrine of the least intrusive remedy and give the statute, wherever possible, an interpretation which will cure its defect and save it from total invalidation." Syl. pt. 2, *Weaver v. Shaffer,* 170 W. Va. 107, 290 S.E.2d 244 (1980).

Syllabus Point 2, *Anderson's Paving, Inc. v. Hayes,* 170 W. Va. 640, 295 S.E.2d 805 (1982). West

Virginia Code § 2-2-10(cc), our Code's general severability provision,[26] provides, in pertinent part:

"[T]he provisions of every section, article or chapter of this code, . . . shall be severable so that if any

provision of any such section, article or chapter is held to be unconstitutional or void, the remaining

provisions of such section, article or chapter shall remain valid. . . . "[27]

---

[26]The question of severability of a state statute is governed by state law. *See Department of Treasury v. Fabe,* 508 U.S. 491 (1993); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Virginia DMV Comm'r,* 288 F.3d 610 (4th Cir. 2002); *Environmental Technology Council v. Sierra Club,* 98 F.3d 774 (4th Cir.1996).

[27]West Virginia Code § 2-2-10(cc) provides, in its entirety:

> Unless there is a provision in a section, article or chapter of this code specifying that the provisions thereof shall not be severable, the provisions of every section, article or chapter of this code, whether enacted before or subsequent to the effective date of this subdivision, shall be severable so that if any provision of any such section, article or chapter is held to be unconstitutional or void, the remaining provisions of such section, article or chapter shall remain valid, unless the court finds the valid provisions are so essentially and inseparably connected with, and so dependent upon, the unconstitutional or void provision that the court cannot presume the Legislature would have enacted the remaining valid provisions without the unconstitutional or void one, or unless the court finds the remaining valid provisions,

(continued...)

Here, the invalidation of the 501(c)(3) exemption would have no effect on the other provisions of West Virginia Code § 3-8-1a.  The remaining provisions are distinct and separate and are capable of being executed independently of West Virginia Code § 3-8-1a(12)(B)(4). Striking the exception will not undermine the statutory scheme and would be consistent with the legislature's desire to remain consistent with federal law.[28]   Accordingly, the appropriate disposition would be to strike the offending provision and leave the remainder in effect.  *See, e.g., State v. Stamm*, 664 S.E.2d 161 (W. Va. 2008); *Frantz v. Palmer,* 564 S.E.2d 398 (W. Va. 2001); *State v. Heston,* 71 S.E.2d 481 (W. Va.1952).

## IV.

## WVFL'S REMAINING ARGUMENTS LACK MERIT

WVFL's Summary Judgment Brief (Docket 153) is nearly 100 pages long, demonstrating its authors' considerable erudition and experience in campaign finance litigation, but much of the brief was obviously generated from work in other cases and has little, if any, relevance to any controversy between the parties in *this* case.  Prime examples of this are those sections where WVFL argues that

---

[27](...continued)
standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent: Provided, That if any such section, article or chapter of this code has its own severability clause, then such severability clause shall govern and control with respect to such section, article or chapter in lieu of the provisions of this subdivision. The provisions of this subdivision shall be fully applicable to all future amendments or additions to this code, with like effect as if the provisions of this subdivision were set forth in extenso in every such amendment or addition and were reenacted as a part thereof, unless such amendment or addition contains its own severability clause[.]

[28]In September of 2005, the FEC put the regulation out for comment again, and on December 21, 2005, filed an amended regulation rescinding the 501(c)(3) exemption.  *See* 11 C.F.R. §100.29(c); 70 F.R. 75713-01.  Thus, striking the exemption would be consistent with current federal law.

the ban on corporate express advocacy will be applied to it despite its exempt status as an MCFL corporation, and that it will be regulated as a PAC, despite its not fitting West Virginia's statutory definition thereof.  Although these laws have not, in fact, been applied to WVFL, and although this Court has already ruled they cannot reasonably be construed to reach WVFL, its attorneys remain determined to suggest otherwise, thereby creating imaginary controversies.

A.     **West Virginia's Ban on Corporate Express Advocacy Does Not Apply to MCFL Corporations.**

WVFL's Motion for Summary Judgment (Docket 153) asserts that West Virginia's statutory ban on corporate express advocacy (W. Va. Code § 3-8-8(a)) is unconstitutional "as applied" to WVFL, because WVFL is an "MCFL" corporation formed for the purpose of promoting political ideas rather than business interests.[29]  This Court, in its Memorandum Opinion of February 12, 2009, determined that this statute should be construed as inapplicable to MCFL corporations, thereby eliminating the question of whether it is unconstitutional for failing to expressly exempt MCFL's. (Docket 155 at 15, following *McConnell v. Federal Election Comm'n,* 540 U.S. 93, at 211 (2003).) The Defendants herein accept that construction and, in fact, have never applied the corporate ban to MCFL corporations generally, nor to WVFL in particular, nor does WVFL suggest otherwise.

Assuming that it is an MCFL corporation, this Court's construction of the statute would render WVFL immune from the ban on corporate express advocacy, an immunity it enjoyed even before this case was ever brought.  Inexplicably, however, WVFL now insists that the statute *cannot*

_____

[29](Docket 153 at 32-36.)  In *FEC v. Mass. Citizens for Life* (MCFL), 479 U.S. 238 (1986), the Supreme Court held that federal regulation of independent corporate expenditures was justified by the ability of business corporations to amass wealth in the commercial marketplace and direct it to political ends.  That threat did not exist with respect to nonprofit corporations formed solely for the purpose of promoting political ideas, and consequently the federal statute constituted unjustifiable regulation of speech as applied to such corporations.

be so construed and that WVFL remains vulnerable to prosecution, despite its MCFL status, requiring this Court to reach the issue of the constitutionality of the ban as applied to MCFL corporations.  In support of this position, WVFL relies almost exclusively upon *Colorado Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137 (10th Cir. 2007) (*CRLC*), for the proposition that "narrowing glosses apply only to facial challenges," and that WVFL's challenge is "as applied." (Docket 153 at 35.)[30]  Assuming this distinction is valid, it should be noted that WVFL's challenge, in this case, is more of a facial challenge than as applied, because WVFL's argument that the statute is unconstitutional is because it *might* be applied to *any* MCFL corporation.  WVFL makes no claim that West Virginia has threatened to prosecute WVFL, nor that it has any peculiar characteristic making it more vulnerable to regulation than any other MCFL corporation.  In cases where courts have refused to use a "narrowing gloss" to save a state statute from constitutional infirmity, there has either been a prosecution in progress (*FEC v. Mass. Citizens for Life* (MCFL), 479 U.S. 238 (1986)) or a concrete expression by state officials of an intention to prosecute (*CRLC*), in either case demonstrating that the statute was *not* being construed by state authorities to exempt MCFL corporations.  In this case, however, there has never been any such threat, nor any indication that state officials have applied that ban on corporate express advocacy to *any* MCFL corporation, including WVFL.

By way of contrast, in *CLRC*, the Tenth Circuit determined that it could *not* rely on a "narrowing gloss" to save a statutory definition of "political committee."  Unlike the facts in this case, however, the Colorado Secretary of State "had indicated unequivocally his intent to prosecute CRLC" as a political committee.  498 F.3d at 1145 n.6.  CLRC maintained that, because it did not

---

[30]WVFL also maintains that a "narrowing gloss" may only be applied to federal statutes, but offers no support for this proposition.

have the "major purpose" of supporting or opposing a political candidate, it could not be regulated

consistently with the First Amendment.  According to the statute in question, however, CLRC *was*

subject to regulation as a political committee because it met the statutory threshold of spending in

excess of $200 to support or oppose a candidate.

In court, the Secretary maintained that the $200 threshold was a reasonable proxy for the

"major purpose" test.  However, he alternatively argued that a "major purpose" test could be

engrafted onto the statute by the Court to save it from constitutional infirmity.  The Tenth Circuit

rejected this invitation because the Secretary himself did not so construe the statute, and because

such a construction was directly contrary to the legislative history, which made clear that the "major

purpose" test had been *deliberately* omitted.  498 F.3d at 1155.

> Generally, we consider the application of a narrowing construction in the
> context of a facial challenge. See *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S.
> 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) ("It has long been a tenet of First
> Amendment law that in determining a facial challenge to a statute, if it be 'readily
> susceptible' to a narrowing construction that would make it constitutional, it will be
> upheld."); *Citizens for Responsible Gov't State Political Action Comm.*, 236 F.3d at
> 1194. . . . However, regardless of whether we characterize the Secretary's argument
> as addressing a facial or as-applied challenge, we agree with the district court that the
> statute does not lend itself to a narrowing construction.

> To be readily susceptible to a narrowing construction, such a construction
> must be "reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944,
> 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (internal quotation marks omitted).
> "[W]here an otherwise acceptable construction of a statute would raise serious
> constitutional problems, the Court will construe the statute to avoid such problems
> unless such construction is plainly contrary to the intent of Congress." *Edward J.
> DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,
> 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Thus, "we will not rewrite a state law
> to conform it to constitutional requirements." *Am. Booksellers Ass'n*, 484 U.S. at 397,
> 108 S.Ct. 636.

In other words, to remove the $200 threshold and substitute a "major purpose" test in its

place would have been contrary to the Colorado Legislature's manifest intent, and contrary to the

construction place on the statute by the executive official that enforced it.  Consequently, the Tenth

Circuit would have had to "rewrite a state law" to save the statute, thereby performing a legislative

rather than judicial act.  No such problem is evident in this case, as this Court has already observed

in its Amended Memorandum Opinion of February 12, 2009:

> This case presents a situation nearly identical to the one addressed by the Supreme Court in *McConnell*.[31]  Just as Congress had the benefit of *MCFL* when it enacted the Bipartisan Campaign Reform Act, . . . the West Virginia Legislature had the benefit of *MCFL* when it amended § 3-8-8(a).  Thus, . . . the Court concludes that it s likely to be construed as not applying to MCFL corporations and is, accordingly, valid.

(Docket 155 at 15.)

**B.**      **West Virginia's Definitions of Political Committee, Pac, and Unaffiliated-pac Are Narrow and Clear.**

WVFL's Motion for Summary Judgment repeats the arguments previously made in support

of its Motion for Preliminary Injunction (Docket 112, 113) that it fears being regulated as a "political

committee" (or a PAC or an unaffiliated-PAC) despite that it does not have the "major purpose of

supporting or opposing a political candidate."[32]  However, this Court has already held that WVFL's

fears, if real, are not objectively reasonable, because West Virginia law regulates only those

committees "organized for the purpose of supporting or opposing the nomination or election of one

or more candidates."  W. Va. Code § 3-8-1a(21).  (Docket 155 at 25-32.)  WVFL argues that there

is a possibility that this language could be construed to reach organizations organized for several

---

[31]It is worth noting that the plaintiffs in *McConnell* included numerous corporate plaintiffs with colorable MCFL status, including the National Right to Life Committee, Inc.  *McConnell v. Federal Election Commission,* 251 F. Supp. 2d 176, 220 (D. D.C. 2003).

[32]Docket 153 at 62-78.  The Supreme Court and other courts have repeatedly held that the regulation of campaign expenditures by political committees and PAC's is justifiable under the First Amendment only if the regulations are limited to organizations that have such a "major purpose." *See*, *N.C. Right to Life v. Leake*, 525 F.3d 274, 287 (4th Cir. 2008).

purposes, one of which is the support or opposition of a particular candidate. (Docket 153 at 78-79.) This Court, however, has already determined that the statute is *not* susceptible of such a construction (Docket 155 at 29) and that, even if it were applied broadly to include committees with the primary or major purpose of supporting or opposing a candidate, it could not be applied to WVFL. (*Id*. at 32.)

Thus, here again, the controversy is imaginary.

## V.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for Summary Judgment must be denied.

Respectfully submitted,

NATALIE E. TENNANT, SECRETARY OF STATE OF WEST VIRGINIA and GARY A. COLLIAS, WILLIAM N. RENZELLI, ROBERT RUPP and CINDY SMITH, in their official capacities as members of the West Virginia State Election Commission

By counsel,

DARRELL V. McGRAW, JR.
ATTORNEY GENERAL

/s/   *Silas B. Taylor*
Silas B. Taylor
Managing Deputy Attorney General
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:      (304) 558-2021
Fax:             (304) 558-0140
E-mail:          silastaylor@yahoo.com
*Counsel for Natalie E. Tennant, Secretary of*
*State of West Virginia*

/s/ *Thomas W. Smith*

Thomas W. Smith
Managing Deputy Attorney General
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:      (304) 558-2021
Fax:                  (304) 558-0140
E-mail:            tws@wvago.gov
*Counsel for Gary A. Collias, William N. Renzelli,*
*Robert Rupp and Cindy Smith, in their official capacities*
*as members of the West Virginia State Election Commission*

43

## CERTIFICATE OF SERVICE

I, Silas B. Taylor, Managing Deputy Attorney General, do hereby certify that on the 24th day of June 2009, I electronically filed the foregoing "Defendants' Memorandum in Response to Plaintiffs' Motions for Summary Judgment" with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

William C. Porth, Esq.
Robinson, McElwee
Post Office Box 1791
Charleston, WV  25326-1791

James Bopp, Jr., Esq.
Bopp, Coleson & Bostrom
One South Sixth Street
Terre Haute, IN  47807-3510

Kathy A. Brown, Esq.
Wexler, Toriseva & Wallace
1446 National Road
Wheeling, WV  26003

Kaylan Lytle Phillips, Esq.
Bopp, Coleson & Bostrom
One South Sixth Street
Terre Haute, IN  47807-3510

Joseph A. Vanderhulst, Esq.
Bopp, Coleson & Bostrom
One South Sixth Street
Terre Haute, IN  47807-3510

Shirley J. Stanton, Esq.
Stanton Law Firm
Post Office Box 968
Fairmont, WV  26555

Randy Elf, Esq.
Bopp, Coleson & Bostrom
One South Sixth Street
Terre Haute, IN  47807-3510

Joseph L. Jenkins, Esq.
Preservati Law Offices
Post Office Box 1431
Charleston, WV  25325-1431

Nicholas S. Preservati, Esq.
Preservati Law Offices
Post Office Box 1431
Charleston, WV  25325-1431

Jan Witold Baran, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, DC  20006

Thomas W. Kirby, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, DC  20006

Patrick K. Maroney, Esq.
Maroney Williams Weaver & Pancake
608 Virginia Street, East
Charleston, WV 25301

Teresa C. Toriseva, Esq.
Wexler, Toriseva & Wallace
1446 National Road
Wheeling, WV  26003

/s/  *Silas B. Taylor*
Silas B. Taylor
Managing Deputy Attorney General

Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:     (304) 558-2021
Fax:              (304) 558-0140
E-mail:          silastaylor@yahoo.com

2