# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 1

UNIVERSITY OF CALIFORNIA, SAN FRANCISCO

## LEGACY TOBACCO DOCUMENTS LIBRARY

| HOME | SEARCH | LINKS & RESOURCES | POPULAR DOCUMENTS | ABOUT THE LIBR |
|------|--------|-------------------|-------------------|----------------|

BASIC SEARCH      ADVANCED SEARCH      EXPERT SEARCH      BOOKBAG      SEARCH HISTORY

*No Title*

|  |  |
|--|--|
| **Organization Author** | NATL SMOKERS ALLIANCE |
| **Person Authors** | HUMBER,T |
| **Document Date** | 19990716 (July 16, 1999) |
| **Document Type** | LETT, LETTER ; REPT, OTHER REPORT |
| **Bates Number** | ◁ 86052153/2155 ▷ |
| **Collection** | Lorillard |
| **Pages** | 3 |
| **Person Recipients** | MILSTEIN,R |
| **Organizations Mentioned** | AMERICANS FOR NON SMOKERS RIGHTS; AZ; BOARD OF HEALTH; CA; CA ASSEMBLY HEALTH SERVICES; CENTER FOR INDIVIDUAL FREEDOM; ETHICS COMM; GLAXO WEL NATL SMOKERS ALLIANCE; NY; PM, PHILIP MORRIS; ROBERT WOOD JOHNSON FOUN SENATE; UNIV OF CA; UNIV OF WI; US SUPREME COURT; VA; VALLEY BUSINESS OW CONCERN CITIZEN; WA |
| **Persons Mentioned** | AMES,B; DAYNARD; FRIEDMAN,LM; GLANTZ; HAMBRICK,M; MCCAFFREY; MCCAIN,J; SINGER,F; YOON,J |
| **Characteristics** | ATCH, ATTACHMENTS MISSING; MARG, MARGINALIA |
| **File Number** | 86052151/86052156/NATIONAL SMOKERS ALLIANCE |
| **Litigation Usage** | FEDA/PRODUCED |
| **Area** | SHANNON,MICHAEL/OFFICE |
| **Site** | N152 |
| **Date Added UCSF** | 20020709 (July 9, 2002) |
| **Date Added Industry** | 20020322 (March 22, 2002) |
| **TID** | lwd62d00 |

☐ Add to Bookbag

🔒 View as PDF document

🔳 View as TIFF image

🔲 View page-by-page

🖳 http://legacy.library ucsf edu/tid/lwd62d00


**UCSF LIBRARY**
and Center for Knowledge Management

Contact Us | Legal | Privacy | Site Map | Sponsors | UCSF Tobacco Control Archives ▷

University of California, San Francisco ©2007 The Regents of the University of California

# NATIONAL SMOKERS ALLIANCE

*File in NSA file, my NSA file.*

Thomas Humber
President & CEO

July 16, 1999

Ron Milstein
Lorillard Tobacco Company
714 Green Valley Road
Greensboro, NC  27404-0529

Dear Ron:

As you undoubtedly know, Philip Morris has now withdrawn support from the NSA as a result of our request for a Senate Ethics Committee review of a political letter sent by Senator John McCain at taxpayer expense.  It is somewhat ironic that while the McCain letter was sent primarily to NSA members who opposed the McCain bill, the substance of it was to bash the industry.  In fact, my primary concern before initiating our effort was whether we would be accused of whoring for the industry.

Perhaps this will convince the skeptics that the NSA is indeed independent.  If the cost of that independence is high, it is also necessary, whether we are able to continue or not.  One of the fascinating by-products is that the Philip Morris action has galvanized smokers' rights activists who had previously kept their distance in support of the NSA.

We do intend to continue, for as long as we can maintain a credible and effective resistance.  But now we must divert considerable energy to fundraising, and we need as much help as we can get from all those who will continue to support us. We sincerely hope that includes Lorillard.

This has been -- and will continue to be -- a long, brutal and nasty war. The antis have no interest whatsoever in peace.  In fact, at the levels at which we fight, activity is intensifying, not subsiding, and the activity is being leveraged by gigantic infusions of money from taxpayer funds, from the settlement and from such sources as the Robert Wood Johnson Foundation and Glaxo Wellcome.

The National Smokers Alliance represents the most successful smokers' rights effort in history, providing leadership, focus and a unique grassroots political approach that adds both substance and volume to the effort.  We have become the voice of opposition for the media, as well as a reliable and accurate source of information.  We are controversial, but we have, frankly, exploited that to our advantage.  Our work exposing Dr. Glantz and others has been exceptionally effective and continues.

86052153

A few specifics about the depth and breadth of our work:

- Earlier this year, we successfully litigated and reversed a smoking ban imposed by the Board of Health in Niagara County, New York. That important precedent already has had a significant impact in New York state and will extend to other areas.

- Our current lawsuit against a smoking ban in Montgomery County, Maryland, will be heard in the fall and has almost 400 named plaintiffs, made up of NSA members, individual restaurant owners, their employees and loyal customers, both smokers and nonsmokers. While that number means very little legally, it means a great deal politically. We worked hard to build that political strength, not only for Montgomery County, but for Washington and Northern Virginia, as well, because the antis are seeking a "regional" approach.

- We were extremely active in this year's Maryland tax battle, and I believe that your lobbyists there will tell you we acquitted ourselves well, providing grassroots support, substantive testimony and effective lobbying.

- As this is being written, the California state auditor is beginning, at the direction of the legislature (and the instigation of the NSA), an investigation of suppressed research by the California Department of Health Services (DHS) that would have been helpful to NSA legislation then pending in the California Assembly. That investigation alone will raise the comparative credibility of the NSA considerably. Our hope is to get the investigation expanded to include misuse of Prop. 99 money and the collusion of DHS with such groups as Americans for Non-Smokers' Rights. If successful, this effort has the potential for significantly restraining the use of taxpayer money to fund anti-smoking efforts. While we have thus far been unsuccessful in overturning California's smoking ban, we have built an organization of several thousand business owners, have created a significant backfire and are responsible for literally hundreds of media stories on problems with the law.

- **Freedom Line with Mike Hambrick** is a weekly national radio program owned, produced and sponsored by the NSA. After only 10 programs, it is rapidly gaining a positive reputation with conservative and libertarian groups and with elected officials. It is best described as a conservative/libertarian news magazine program that goes beyond the standard talk show format. We are currently working to expand our station base to 100 markets by the end of the year. In addition to broadcasting a responsible and substantive individual rights message, it is rapidly expanding our ally base for specific political purposes. With guests as distinguished as Nobel Laureate Milton Friedman, scientists Fred Singer and Bruce Ames, and even Drug Czar General McCaffrey, it is a quality effort that elevates the NSA's reputation.

860521754

- This week, the NSA filed an amicus brief with the U.S. Supreme Court in a compelled speech case involving the University of Wisconsin. The brief is authored by John Yoo, a professor of constitutional law at the University of California, Boalt Hall. Why are we doing this? Very simply because positive judgments in compelled speech cases will have a substantive effect on reducing the flow of taxpayer money to anti-smoking organizations, as well as curtailing university-supported efforts of people like Daynard and Glantz. I enclose a copy, although I strongly suspect that your daily reading already includes too many briefs.

- You may recall our efforts in Mesa, Arizona, and our close association with a group called the Valley Business Owners (and Concerned Citizens). Several weeks ago, that group, which was formed to fight a smoking ban, defeated, against all odds, a local stadium project, and has altered the political landscape. We care about that because it demonstrates an expansion of a political base we have nurtured which is now being activated against other smoking ban proposals in Gilbert, Chandler and Tempe. Most important, it is a formidable model that we are seeking to duplicate in other areas.

- Last year, working with local NSA members and business owners, we defeated an initiative in Lake Havasu, Arizona, that would have banned smoking. The notable factor in that small effort was the registration of 500 new voters, which had a significant impact on the outcome and provided yet another model of NSA capabilities.

I could go on, regarding the breadth, depth and variety of our work, much of which is invisible, but important. When we help a mother retain custody of her children where her smoking is the issue, we regard that as no less important than our other work, because it is symbolic of what we represent.

Ron, we need whatever help Lorillard can see its way to provide, whether through direct contributions, increased Lorillard employee membership support, requests to suppliers or some form of solicitation of activist customers. I would even like to talk with you about a development project, the Center for Individual Freedom, which might be of some interest to Lorillard's parent or associated companies.

Could I visit with you and others in Greensboro to candidly express our needs, detail our activities and outline our long term potential?

Sincerely,

Enclosure

86052155

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 2

UNIVERSITY OF CALIFORNIA, SAN FRANCISCO

| HOME | SEARCH | LINKS & RESOURCES | POPULAR DOCUMENTS | ABOUT THE LIBRARY | HELP |
|---|---|---|---|---|---|

Last Search

BASIC SEARCH     ADVANCED SEARCH     EXPERT SEARCH     BOOKBAG     SEARCH HISTORY     PREFS

## DAILY CLIP REPORT. TUESDAY, JANUARY 30, 2001 (2001...

| | |
|---|---|
| **Title** | DAILY CLIP REPORT. TUESDAY, JANUARY 30, 2001 (20010130) |
| **Document Date** | 20010130 (January 30, 2001) |
| **Document Type** | INTERNET; LIST; PUBLISHED DOC |
| **Bates Number** | 525156658/6684 |
| **Collection** | RJ Reynolds |
| **Pages** | 27 |
| **Mentioned** | SMITH J; RJR; CAMPAIGN FOR TOBACCO FREE KIDS; ACS; AMERICAN HEART; MYERS M; FDA; MOSKOWITZ S |
| **Characteristics** | N |
| **Brands** | DORAL; ECLIPSE |
| **Minnesota Request Number** | VERMONT REQ23; VERMONT REQ17; WALLACE 1RFP1; VERMONT REQ15; VERMONT REQ7; VERMONT REQ18 |
| **Date Shipped** | 20060622 (June 22, 2006) |
| **Area** | EXTERNAL RELATIONS; COMMUNICATIONS-PUBLIC RELATIONS; SMITH JF; SR DIR; |
| **Referenced Documents** | LIST OF SMOKING AND HEALTH ARTICLES. ANTI-SMOKING GROUPS FUMING OVER RJR COLLECTIBLE-CARDS CAMPAIGN, BY ASSOCIATED PRESS, WINSTON SALEM JOURNAL, 20010130. CIGARETTE OPPONENTS CRY FOUL OVER TRADING CARD GIMMICK, BY CHASE R, ASSOCIATED PRESS, CHARLOTTE OBSERVER, 20010130. DORAL COLLECTIBLE CARDS DRAW FIRE FROM ANTI-SMOKING GROUPS, BY CHASE R, ASSOCIATED PRESS, NC BUSINESS WIRE, 20010130. CIGARETTE TRADING CARDS DRAW IRE, BY CHASE R, ASSOCIATED PRESS, 20010129. RJR-COLLECTOR CARDS, BY CHASE R, ASSO |
| **Box** | RJR7809 |
| **Date Added UCSF** | 20060818 (August 18, 2006) |
| **Date Added Industry** | 20060724 (July 24, 2006) |
| **TID** | qws17a00 |

☐ Add to Bookbag

📄 View as PDF document

🖼 View as TIFF image

📑 View page-by-page

🔗 http://legacy.library.ucsf.edu/tid/qws17a00

 UCSF LIBRARY

Legacy

Contact Us | Legal | Privacy | Site Map | Sponsors | UCSF Tobacco Control Archives

University of California, San Francisco ©2007 The Regents of the University of California

Date:       25-Jan-2001
Source:     National Smokers Alliance
Carried by: National Smokers Alliance
Title:      National Smokers Alliance To Cease Operations
Location:   Virginia

The Board of Directors of the National Smokers Alliance (NSA) has voted to dissolve the organization.

Thomas Humber, President of the NSA, issued the following statement:

"For almost eight years, the National Smokers Alliance has defended the rights of adult smokers with an intensity that has replicated dozens of simultaneous political campaigns.

"We began as a grassroots political organization, believing that the political process was the answer. However, the courts have supplanted the political process as the ultimate arbiter of most controversial public policy issues. While we don't like that, we are realists, and the reality is that the social war over smoking has changed drastically since we began. We have had more than our fair share of victories politically, and in the courts, where the rule of law supercedes the rhetoric.

"I have no doubt that the decision to discontinue operations will be misconstrued. The NSA is neither out of money nor are we defeated. Yet the long-term financial reality is quite simple: The continuation of our activities would require too large a professional structure and a massive diversion of energy and resources to fundraising, making effective commitment to our primary mission secondary. That would serve no one, least of all the adult smokers of America who have endured more than a decade of the anti-smoking movement systematically taxing, regulating and banning tobacco products wherever they can.

"The NSA has many members and friends who became politically active and organized through our programs. We appreciate their support, and we know that their activism will continue long after this organization is gone. As with most controversial issues, this is not one that will end. We regret that the NSA, as an organization, must end, but that does nothing to diminish the commitment to individual freedom that has driven the NSA.

"The effort to disenfranchise and marginalize smokers is, in reality, only one facet of a much broader assault on individual freedoms that has begun to infuse this society. Consequently, upon dissolution, the NSA will contribute some remaining assets to the Center for Individual Freedom, a 501(c)(4) corporation that supports the constitutional freedoms that all individuals must enjoy."

The National Smokers Alliance was a non-profit grassroots political organization of adults from across the country dedicated to fighting discrimination against smokers and to supporting business owners who wished to make their own decisions about their businesses without unnecessary government interference. Founded in 1993, the NSA became the primary voice for adult smokers and was comprised of over 3 million members. Financial support over the years came in the form of contributions from Philip Morris, Brown & Williamson and Lorillard, from hundreds of small businesses and corporations and dues and contributions from our members.

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 3

## DECLARATION OF PAMELA M. VAN HORN

I, Pamela M. Van Horn make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 this 5th day of September, 2008:

1.      I am Pamela M. Van Horn. I am the founding Executive Director of the West Virginia Democratic Legislative Council ("DLC"). I have been involved in various West Virginia political campaigns beginning in the 1980's. I have been professionally involved in electoral campaigns since 1988.

2.      My undergraduate degree is from Marshall University with concentrations in Political Science and Psychology. I am a graduate of the Yale University Women's Campaign School. I have directed or participated in campaigns in a number of West Virginia municipalities including Charleston, Huntington, and Parkersburg.

3.      I was President of the West Virginia Young Democrats from 1995 until 1997. I was elected by the Young Democrats of America as their female representative on the Democratic National Committee from 1997 until 1999. In 1999, I was elected chair of the YDA Women's Caucus, the largest caucus in the Young Democrats of America organization. I am a founding board member of the DREMA Dems Coalition, a statewide coalition of Democratic women.

4.      I have served as a campaign trainer for the Democratic National Committee in several states, and have traveled to Bosnia-Herzegovina to conduct political party training for the National Democratic Institute.

5.      The DLC was established in 1996. The DLC is the campaign committee for the Democrats in the State who are legislative incumbents or candidates. The purpose of the DLC is to assist members of the Legislature and nominees with their respective elections to the body.

As executive director, I assist DLC members with planning all aspects of their campaigns, from writing their plan to getting out their vote. In my position as Executive Director, I have participated in hundreds of West Virginia legislative races over the past twelve years.

6.     Prior to 2004, there were no significant third-party expenditures in West Virginia state races. The 2004 election saw an explosion of expenditures by groups independent of candidates. These expenditures were made by groups created under various provisions of the Internal Revenue Code including sections 527, 501(c)(4) and 501(c)(6). Because of their special status, these organizations were able to spend millions of dollars attacking or supporting candidates without having to timely (or ever) disclose the source of the funds.

7.     The expenditures by these groups used all media types including broadcast and non-broadcast media.

8.     Candidates targeted by theses expenditures were unable to effectively counter the allegations because they could not inform the electorate who was placing the advertisements so as to allow the electorate to judge the credibility of the attacks.

9.     As a result of these expenditures there were publicly expressed concerns over such large sums of money being spent to influence elections without disclosure of the sources of the funds. Thereafter, the West Virginia Legislature enacted provisions requiring disclosures of the sources of these funds when they referenced an identified candidate and were spent during the period immediately prior to the primary or general election.

10.     These provisions were in effect during the 2006 election. There were still third-party expenditures during the 2006 election. The difference was the new provisions required timely disclosures of the source of the funds. This allowed the targeted candidates to attack the credibility of the message by informing the electorate who the messengers were and arguing that

the messengers had an agenda that was different than the message being portrayed in the advertisements.

11.     For example, in the 2006 election A.T. Massey Energy CEO, Don Blankenship engaged in a multi-million dollar third-party campaign targeting about 40 seats in the West Virginia House of Delegates held by Democrats. The attacks on the candidates unfairly distorted their records and were disseminated via mail, broadcast, billboard and telephone.   Examples of the non-broadcast media pieces used are attached as Exhibit A.

12.     With the help of DLC, the targeted candidates were able to efficiently respond by challenging Blankenship's credibility and biases. Blankenship's campaign went down in utter defeat. Only one of the legislative candidates targeted by Blankenship was defeated. Democrats gained four seats in the House of Delegates and two in the State Senate. Absent our ability to identify the source of the funds, the candidates' ability to successfully respond to the unfair attacks would have been severely compromised.

13.     West Virginia campaigns rely extensively on non-broadcast media.   Most candidates run in districts that vary in size from parts of one or more counties, to whole counties, to multiple counties. Broadcast media markets, on the other hand, do not share the same reach as the electorate targeted. The use of broadcast media in smaller communities requires purchasing airtime from television or radio stations, the majority of which are in metropolitan areas. Because broadcast airtime is priced based on the size of the total audience, candidates purchasing advertising from broadcast media outlets are paying to reach voters who cannot vote for them. This is true even in statewide races because many of the available broadcast markets include residents of other states bordering West Virginia.

14.    Non-broadcast media, on the other hand, can be targeted to households where registered voters in the relevant district reside. Thus, these efforts are particularly cost-effective relative to broadcast advertising, which is far more expensive in absolute dollar terms and per eligible voter reached. To be effective, non-broadcast advertising, like broadcast advertising, requires multiple contacts. With its increased use, non-broadcast media has also become increasingly sophisticated both in terms of graphics and content. Consequently, while non-broadcast media is cost-effective, it is not inexpensive.

15.    Third-party expenditures in West Virginia campaigns have increasingly made use of non-broadcast media. Recent examples are attached as Exhibits A & B.

16.    Many of the persons funding third-party expenditures seek to hide their identity. This allows them to attempt to use hot-button issues such as crime, abortion, or gun control to influence votes when their core interests, likely economic, favor outcomes contrary to the interests of the targeted voter. If these third parties are forced to identify their funding sources, the advertisements are not as effective or not placed. This is exactly what happened to Massey CEO Don Blankenship's political advertising efforts in 2004 and 2006. In 2004, when his identity was hidden, the huge amount of advertising he funded had a substantial effect on election outcomes. But when he was identified as a funding source for political ads in 2006, as required by legislation passed after the 2004 races, the electorate rejected his message so resoundingly that all but one of his preferred candidates lost, and all but one of the candidates he attacked won.

17.    If not all effective media are regulated, third parties wishing to avoid regulation will transfer their expenditures to unregulated media. For example, the plaintiff in this action, the Center for Individual Freedom, which in the past had expended millions of dollars in

4

broadcast advertising, when forced to comply with the West Virginia disclosure rules in the primary, placed newspaper advertisements instead. The Center has been running broadcast advertisements on radio and television in advance of the 2008 general elections. *See* http://www.cfif.org/htdocs/legislative_issues/state_issues/Public-Education-Effort-West-Virginia.htm as Exhibit C. This effort, which began in late August, 2008, has now apparently stopped with the onset of the pre-election period when funding source disclosures are required. Similarly, Citizens Against Lawsuit Abuse just stopped running its broadcast advertisements attacking one of the candidates for the Supreme Court of Appeals now that disclosure is required.

18. I am generally aware of this litigation and this Court's prior ruling. I am also aware that this summer, the West Virginia Legislature enacted several provisions designed to address the concerns of the Court in its prior rulings. I have reviewed the factual findings made by the legislature in connection with the adoption of the 2008 Amendments. The findings set forth by the legislature in the adoption of the 2008 Amendments fully accord with my experience of fact and practice in electoral campaigns in West Virginia. I note that the findings, which were the subject of some debate, were made by a body whose members by definition have experience and expertise in West Virginia elections.

19. The opinions I have offered herein I hold to a reasonable degree of certainty. These opinions are based upon my education, training, research, and years of experience as a campaign professional.

Pamela M. Van Horn

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CENTER FOR INDIVIDUAL
FREEDOM, INC.,

      Plaintiff,

                             No. 1:08-CV-190

v.

                             Hon. David A. Faber

BETTY IRELAND, *et al.*,

      Defendants.

### DECLARATION OF DAVID H. GOLD

    I, David H. Gold, make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 this 5th day of September, 2008:

    1.    I am David H. Gold. I am the President of Gold Communications. For the past twenty-five years, I have specialized in using direct mail in support of electoral campaigns, ballot measures, and corporate public affairs efforts.

    2.    Some of my clients have included the Presidential campaigns of Bill Richardson of New Mexico and Dick Gephardt of Missouri; Governors Bill Richardson (NM), Ed Rendell (PA) and Ann Richards (TX); US Senators Joe Biden (DE) and Jeff Bingaman (NM); Congresswoman Betty McCollum (MN), Congressman Lloyd Doggett (TX) and Congressman Keith Ellison (MN). Additionally, I have provided direct mail support to numerous federal, state and municipal candidates.

    3.    I previously served as Senior Managing Director of Targeted Communications at Public Strategies, Inc., a public affairs firm based in Austin, Texas. While at PSI, I created award winning strategic communications for several Fortune 500 corporations.



4. I graduated *summa cum laude* from Tufts University and pursued graduate studies in political science at Massachusetts Institute of Technology.

5. The use of direct mail and other forms of non-broadcast media is and has been increasing because campaign professionals have found it to be a cost effective means of communicating with voters.

6. Academic research supports this conclusion. The Virginia Public Access Project, a non profit group dedicated to demonstrating how technology can improve public understanding of money's role in Virginia politics, examined the campaign finance reports filed in the 2001 races for seats in the Virginia General Assembly. This research disclosed that direct mail expenditures were 30.9% of total expenditures or $2,241,448 while radio and television was only 5.6% or $403,179. *See* http://www.people.vcu.edu/~jcsouth/on-the-lege/advertising-summary.htm.

7. Direct mail and other non-broadcast media are cost effective in both statewide and so-called down ballot races. This is because the message can be targeted in a number of ways.

8. First, unlike broadcast media, non-broadcast media can be better directed to households in the candidate's district. Broadcast media covers markets that exclude portions of the electorate i.e. residents of boarder counties who are in media markets originating in other states – such as West Virginia's northern and eastern panhandles. Broadcast media also includes markets beyond the district at issue in the election. A State Senate Candidate in Kanawha County, West Virginia who purchases television time in Charleston is paying to broadcast the advertisement to viewers as far away as Ironton, Ohio and Ashland, Kentucky.



9. Direct mail can be effectively used where broadcast media would be cost prohibitive. Broadcast advertising is sold by rating points. A point is the measurement of the number of people who view a particular advertisement. In 2004, the cost per point for viewers 25 or older was as follows for the various West Virginia media markets: Bluefield/Beckley ($32/point), Charleston/Huntington ($65.00/point), Clarksburg/Weston ($26/point), Parkersburg ($32/point), Wheeling/Steubenville, Ohio ($37/point). These markets, however, represented only 83.2% of the likely voters in West Virginia in 2004. To reach the other 16.8%, it would have been necessary to advertise in spillover markets in Washington, D.C. ($471/point), Pittsburgh ($182/point), and Harrisonville, Va. ($40.00/point). Thus, while reaching 83.2% of the likely voters in West Virginia cost $192/point, it cost an additional $693/point to reach the final 16.8% of the voters. This final 16.8% represents approximately 100,000 likely voters who, while it is not cost efficient to reach with broadcast media, can be cost effectively reached by direct mail.

10. Direct mail can also be used to target messages based on geography and demographics. Certain voters in an election may be more likely to be moved by a message targeted to them based on demographic characteristics such as income, age or sex. In addition, in larger districts or state-wide races certain issues may move voters who live in particular areas. Direct mail lists can efficiently target voters based on these demographic or geographic characteristics.

11. For these reasons, direct mail will most almost always be the lead media used in Delegate races. Direct mail will also be a significant part of the media mix in sophisticated statewide campaigns. Generally, the smaller the size of the electoral

district in comparison to the size of the media market, the greater the use of direct mail will be in that race.

12.     I am familiar with the increasing use of third party expenditures in various state and federal races across the country. Often, persons engaging in third party expenditures do not wish to disclose the source of the funds used for those communications. Various state and federal laws have been adopted to require such disclosure.

13.     To be effective, such disclosure rules must be comprehensive. I understand that this Court has previously limited West Virginia's disclosure rules to broadcast media. If this limitation stands, the likely result will be that those third-party entities seeking to hide the source of their funds will shift their expenditures into direct mail and other cost effective non-broadcast media.

14.     The opinions I have offered herein I hold to a reasonable degree of certainty. These opinions are based upon my education, training, research, and over 25 years of experience as a campaign professional.

David H. Gold

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 5

PAMELA VAN HORN, INTERVENOR DEFENDANTS' WITNESS, SWORN
14 DIRECT EXAMINATION
15 BY MR. MAJESTRO:
16 Q. Ms. Van Horn, can you state your full name for the court?
17 A. Pamela Van Horn.
18 Q. Ms. Van Horn, how are you employed?
19 A. I work for West Virginia Democratic Legislative Council.
20 Q. Ms. Van Horn, are you the same Pamela Van Horn that filed
21 the declaration in this matter regarding the non-broadcast
22 media?
23 A. Yes.
24 Q. And in that you set forth your experience and
25 qualifications, and I won't go through them again, but I'll
VAN HORN - Direct (Majestro) 99
1 ask you if those were correct in your declarations?
2 A. Yes.
3 Q. In your position as executive director -- well, maybe for
4 the Court we need to go this far, can you tell the Court what
5 the Democratic Leadership (sic) Council does?
6 A. We help sitting members of the Legislature who are
7 Democrats with their elections to the body. In addition, we
8 work with nominees of the party for their election to the body
9 also.
10 Q. And how long have you been involved with the DLC?
11 A. Twelve years.
12 Q. And in that twelve-year period can you estimate for us how
13 many elections -- legislative races you have been involved
14 with?
15 A. Thirty active a year, probably around 860 elections.
16 Q. And in the course of those elections as part of your job
17 have you priced direct mail pieces like the ones sent out by
18 the Center for Individual Freedom in this case?
19 A. Yes, I did.
20 MR. KIRBY: Objection, Your Honor. Vague. It refers
21 to "like this one." I don't know what that means.
22 MR. MAJESTRO: Okay.
23 THE COURT: Why don't you rephrase the question.
24 BY MR. MAJESTRO:
25 Q. In the course of your work, do you have to go out and
VAN HORN - Direct (Majestro) 100
1 figure out how much it would cost to send a particular piece of
2 direct mail?
3 A. Yes, I do.
4 Q. Are you able to look at a piece of direct mail and then
5 offer an opinion as to what it would cost to send that out to a
6 particular group of voters?
7 A. Yes.

8 Q. And that's because that is part of your job in these
9 campaigns that you testified about?
10 A. Yes.
11 MR. MAJESTRO: Your Honor, may I approach the
12 witness?
13 THE COURT: You may.
14 BY MR. MAJESTRO:
15 Q. Ms. Van Horn, I'm going to show you what we have marked as
16 Defendant's Exhibit 1 and ask you if you can identify it?
17 A. Yes.
18 Q. Can you tell us what that is?
19 A. It is a mailing talking about Darrell McGraw's audit, the
20 state legislative auditor looking at the Attorney General's
21 Office.
22 Q. And who -- according to the document, at least, who is
23 responsible for disseminateing that?
24 A. The Center for Individual Freedom in Alexandria, Virginia.
25 Q. And is that a piece of mail you received at your house?
VAN HORN - Direct (Majestro) 101
1 A. I did.
2 Q. I'd like you to assume that you were pricing that piece of
3 mail. Could you give the Court an estimate of what it would
4 cost to send that piece of mail statewide?
5 A. Yes. It was sent to likely voters in the state of West
6 Virginia, which is what a person would do. That would be
7 400,521 pieces of mail.
8 Q. And can you tell the Court what likelihood -- in the
9 campaign field, how you define this?
10 A. Folks who voted in two of the past three general
11 elections, anyone who voted in the primary election, and new
12 registrants since the first of the year.
13 Q. And how do you know that's the number for likely voters?
14 Where do you get that information?
15 A. I looked it up on the state voter file.
16 Q. Okay. And is that how campaign professionals determine --
17 is that the method campaign professionals use to determine the
18 number of likely voters?
19 A. Yes, it is.
20 Q. And that state voter file, is that a reliable and trusted
21 source?
22 A. Yes.
23 Q. And I stopped you. You said five hundred some thousand
24 likely voters?
25 A. Four hundred thousand.
VAN HORN - Direct (Majestro) 102
1 Q. I'm sorry; 400,000 likely voters. What would the cost be
2 to send that piece of mail to 400,000?
3 A. On a nonprofit permit like what the Center for Individual

4 Freedom has, it would cost estimated $110,144.47.
5 Q. Okay. In comparison to television, based on your
6 experience, is that in the same ballpark as to what some sort
7 of reasonable statewide television campaign would cost?
8 MR. KIRBY: Objection. Vague, Your Honor.
9 THE COURT: Overruled.
10 THE WITNESS: That would be a significant statewide
11 television buy, yes.
12 MR. MAJESTRO: That's all the questions I have for
13 the witness, Your Honor. I have some argument I want to make
14 based upon the facts she has just set forth, and that would be
15 my conclusion, but it would probably make sense to tender the
16 witness to Mr. Kirby now.
17 THE COURT: I have a question. The dollar figure you
18 said, $110,000, does that include preparation work, or does
19 that include postage?
20 THE WITNESS: That includes postage, printing, and
21 preparation work to get it out. It would not include the
22 graphic design work. I have a breakdown of the whole thing, if
23 you would like.
24 THE COURT: Mr. Kirby, your witness.
25
VAN HORN - Cross (Kirby) 103
1 CROSS-EXAMINATION
2 BY MR. KIRBY:
3 Q. Ms. Van Horn, I'm Tom Kirby, counsel for the CFIF. The
4 figure you gave us, the four hundred thousand some odd dollars,
5 that was assuming that the piece of mail was sent to each of
6 the likely voters; is that right?
7 A. Yes.
8 Q. Now, you have to have the likely voters' addresses to send
9 the mail; right?
10 A. Correct.
11 Q. And a lot of times if a husband is a likely voter the wife
12 is too; isn't that right?
13 A. That is correct.
14 Q. So you wouldn't send out 400,000, you would sort it out
15 and send out maybe 250,000?
16 A. That was households; I'm sorry.
17 Q. I thought you said it was four hundred thousand voters?
18 A. No, voter households. Sorry.
19 Q. What sort of -- how many impressions were you assuming for
20 this $110,000 figure for the broadcast?
21 A. For television broadcast?
22 Q. Yes.
23 A. How many rating points?
24 Q. How many times were you assuming that each one person
25 would see the ad?

VAN HORN - Cross (Kirby) 104
1 A. At 110,000 -- I will say that I have not purchased
2 statewide television myself, but that would be a significant ad
3 buy.
4 MR. KIRBY: All right. Then, Your Honor, I'm going
5 to move to strike her testimony with respect to the state
6 television buy since she hasn't done that.
7 MR. MAJESTRO: Your Honor, she didn't say she didn't
8 know how to do it or what it had cost; she just said she hadn't
9 done it.
10 THE COURT: I'm going to deny the motion. I'll give
11 that part of her testimony such weight as I determine is
12 appropriate.
13 BY MR. KIRBY:
14 Q. But again, how many times would that buy cause each of
15 these 400,000 people to see that broadcast ad?
16 A. That would be -- I would say you're probably looking at
17 for that around six hundred gross rating points, which means
18 that it would be seen in a hundred thousand households at
least
19 sixty times, so that would be -- that's basically how it
breaks
20 down.
21 Q. Now, suppose you wanted to send that mailer out to be
22 received by 500 people. Now, I gather that you were looking at
23 households; is that right? So how many people would you
24 believe would receive a mailing that went to a household?
25 A. Are you asking me how many average people are in a
VAN HORN - Cross (Kirby) 105
1 household --
2 Q. Yes.
3 A. -- in West Virginia? Usually when you sort it down to
4 households you will lose about forty percent of your original
5 vote total, so say you had a hundred thousand voters and you
6 sorted it down to just the household, you would probably come
7 up with a list of around sixty thousand voters. Is that
8 answering your question?
9 Q. Let me try the question another way. Suppose I want to
10 send out a mailer that can be received by five hundred people,
11 using the language of the statute. How many households would I
12 have to send that mailer to to have the potential that it
would
13 be received by five hundred people?
14 A. Well, I mean, it would be going to five hundred
15 households, so it would be at least five hundred people
16 receiving it.
17 Q. Well, suppose I sent it to two hundred households. Isn't
18 it possible five hundred people would receive it?
19 A. It's possible, depending on which household you get.

20 Q. How much would it cost me to send that mailer out to, say,
21 two hundred households?
22 A. Oh, let's see, your printing would probably be around --
23 200 households -- you might have -- well, you would probably
24 have about $400 in your printing, and postage would be 200
25 pieces times 27 cents basically is what that would be, because
VAN HORN - Cross (Kirby) 106
1 you're not going to get any sort of break on your postage
2 because it can't be sorted in a certain way to make it easier
3 to deliver; and then your preparatory work is based on a
4 thousand pieces, so you've got maybe 20 bucks, at the most, in
5 preparatory work, so it's a very small amount of money for 200
6 households.
7 Q. Right; and particularly if I had it printed at Kinkos and
8 addressed it myself and sent it out. At this rate it might
9 just be a few hundred dollars; right?
10 A. Right, if you had --
11 Q. How much would it cost to reach 500 homes in West Virginia
12 with any kind of broadcast?
13 MR. SMITH: Your Honor, I would posit an objection.
14 The statute speaks of pieces of mail, not people, and I don't
15 think this is relevant and potentially misleading.
16 MR. KIRBY: It talks about -- in defining, Your
17 Honor, what constitutes a targeted mailing, it talks about how
18 many people are capable of receiving it.
19 BY MR. KIRBY:
20 Q. But let's even talk about 500. If I print 500 at Kinkos
21 and address it myself, I can get down pretty cheap, can't I?
22 A. Well, if you did 500 copies at Kinkos, this would cost
23 you -- two-sided color copy like this would cost you a little
24 over $2.
25 Q. Suppose I did black and white?
VAN HORN - Redirect (Majestro) 107
1 A. That would be around ten cents a copy for each side, so
2 you would have twenty cents in it.
3 Q. How much would it cost me if I wanted to reach that same
4 number of people by broadcast?
5 A. That would be impossible to do broadcast-wise.
6 Q. You would end up spending tens of thousands of dollars any
7 way you tried; correct?
8 A. Correct.
9 MR. KIRBY: Thank you, Your Honor.
10 THE COURT: Anyone else have any inquiry for the
11 witness?
12 MR. BOPP: No Your Honor.
13 MR. SMITH: No, Your Honor.
14 THE COURT: Mr. Majestro, anything further for the
15 witness?

16 MR. MAJESTRO: One question, Your Honor.
17 REDIRECT EXAMINATION
18 BY MR. MAJESTRO:
19 Q. When someone sends an expensive glossy mailing in a
20 statewide race, is it fair to assume that the voters receiving
21 it believe that the appearance is that that's going statewide?
22 MR. KIRBY: Objection. Beyond the scope, Your Honor.
23 THE COURT: Well, it's not cross-examination, but so
24 on that basis --
25 MR. KIRBY: It's beyond the scope of redirect (sic),
108
1 Your Honor, but beyond that it was proffered for a very limited
2 purpose and it was on that basis I didn't object and now she is
3 being asked on matters she wasn't proffered for.
4 THE COURT: Well, I think the question invites
5 speculation as to what might be in the mind of a recipient of a
6 piece of mail, so on that basis I'm going to sustain my own
7 objection.
8 (Laughter).
9 MR. MAJESTRO: I thought I would get it passed him,
10 Your Honor. I didn't know if you would catch it. I have no
11 other questions of the witness, Your Honor.
12 THE COURT: Thank you, ma'am. You may step down.
13 All right, Mr. Majestro.
14 MR. MAJESTRO: Yes, let me finish my argument. I
15 would offer three points with respect to this witness's
16 testimony. At least in context of what these parties actually
17 are doing that it creates the same appearance of corruption
18 because of its expense that other -- that other broadcast
19 media do, and I would make that argument, Your Honor, when
20 referred to as speculation that it is reasonable at least for
21 the Legislature to conclude that when these pieces go out like
22 this that people have the same appearance of corruption
23 thoughts that -- you know, they set the test and what the --
24 THE COURT: You may be overthinking the perceptions
25 of the average recipients of these pieces of mail.
109
1 MR. MAJESTRO: I don't think so, Your Honor. I
2 think -- and it may not be true with all the people, but I
3 think it's important to remember what the Supreme Court pointed
4 out, and I think it was in McConnell, it's a case we have
cited
5 in our brief and that is this kind of line drawing is a
6 legislative function, not a judicial function. And so
7 especially -- and I think I might be able to stipulate that my
8 client wouldn't object if Mr. Kirby wants to send out 500
9 black-and-white pieces of mail that he photocopies at Kinkos
10 and addresses himself. That's not why we are here. That's not
11 what this is about. And they don't have any irreparable harm

12 from being prohibited from doing that.
13 And, lastly, I'd like to address a point you made, and I
14 don't remember who was arguing at that point and you were
15 talking about the single district here in Kanawha County.
16 Well, that single district happened to be occupied by the chair
17 of the house judiciary committee who has received a significant
18 amount of -- people have targeted her for that reason, so
19 therefore I believe the Legislature can validly conclude that
20 all of its members are important and that there is a -- that
21 you can affect elections and affect the public even by taking
22 out one member in a small district, and what would the
23 appearance of corruption be if someone who had interest in how
24 the legislature is governed if it decides to take out the house
25 judiciary chair or the speaker of house? Senators are all in
110
1 the same size, but with respect to the House sometimes contains
2 legislators who are extremely powerful, and if you create a
3 rule that says that you can do these sorts of media that are --
4 don't come within the requirement to disclose just because it's
5 in some small legislative district, then you give those people
6 the opportunity to end run around the statute, affect a lot of
7 change by targeting these people, and that's precisely one of
8 the things that Mr. Blankenship did, which he didn't succeed in
9 because, as the declarations in the record point out, the
10 candidates were allowed to contest the veracity of his message
11 by pointing out who the messenger was.
12 And unless Your Honor has any other questions, I'll call
13 it a day.
14 THE COURT: Nothing further, Mr. Majestro.
15 MR. JENKINS: Timothy Boggess would just adopt as
16 argument in response to the opposition to the preliminary
17 injunction presented by Mr. Smith and counsel for intervenors
18 and we would pray that this Court would deny their motion.
19 THE COURT: I will give the plaintiffs

**CFIF V.TENNANT**
**CASE NO. 1:08cv00190**

**WVFL V TENNANT**
**CASE NO. 1:08CV01133**

**DEFENDANTS' EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

CENTER FOR INDIVIDUAL
FREEDOM, INC.,

     Plaintiff,

v.

                                                CIVIL ACTION NO.  1:08-00190

BETTY IRELAND and
TIMOTHY BOGGESS,

     Defendants,

v.

WEST VIRGINIA EDUCATION
ASSOCIATION,  et al.,

     Intervenor Defendants,

WEST VIRGINIANS FOR LIFE,
INC., and ZANE LAWHORN,

     Plaintiffs,

vs.

                                                  Civil Action No.: 1:08-cv-1133

BETTY IRELAND and
TIMOTHY D. BOGGESS, West Virginia,

     Defendants.

---

## DECLARATION OF JEFFREY V. KESSLER

---

I, Jeffrey V. Kessler, make the following declaration, under the penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746:

1.      I am a West Virginia State Senator from the Second District. I have served in the Senate since 1997 and I have served as Senate Judiciary Committee Chair since 2003.

2.      I have personal knowledge that West Virginians for Life (WVFL) have been an active presence at the West Virginia Legislature since I have been a member.

3.      Specifically, I am aware that representatives of WVFL were actively involved in the development of H.B.402 during the 2005 Fourth Extraordinary Legislative Session as WVFL had concerns about proposed provisions which I felt were addressed to WVFL's satisfaction. I do not believe that WVFL opposed the passage of H.B. 402 in 2005 and the bill passed unanimously in the Senate 33-0 with one member absent.

4.      I have personal knowledge that WVFL was aware of the Legislature's consideration of H.B. 219 during the Second Extraordinary Session of 2008 as I received communications from a representative of WVFL during the Extraordinary Session (June 24 to June 28, 2008) concerning the bill.

5.      During the Second Extraordinary Session of 2008 the Judiciary Committee considered S.B. 2010, the "same as" bill as H.B. 219, as introduced and amendments were made to the findings supporting the regulation on non-broadcast media.

6.      As H.B. 219 passed its house of origin first it became, based upon legislative protocol, the "vehicle." A number of Senate Judiciary Committee amendments to the bill were adopted in the final version which ultimately adopted by the West Virginia Legislature on June 28, 2008.

2

7.      H.B. 219 and S.B. 2010 were the subjects of significant discussion and debate in both the Senate and the House of Delegates.

8.      I was elected to the Senate in 1998, 2000 and 2004. I am a candidate for re-election in the upcoming 2008 general election. I have been an active participant in all my campaigns.

9.      I have over the years viewed the campaigns of others as well as my own. Based upon my experience I unequivocally believe that non-broadcast media such as phone banks, mass mailings and billboards are extremely effective forms of political communication.

10.     I voted and supported for H.B. 219 because I believe that transparency in political advertising is an an important tool to  for voters to make  informed  decisions. Oftentimes the identity of the messenger helps the electorate weigh the  credibility and/or bias of the message itself. I also believe that for transparency to exist, effective non-broadcast media such as those included in H.B. 219 must be regulated.

A copy of my legislative biography accompanies this Declaration.

_____
Jeffrey V. Kessler

Sworn to and subscribed before me, a notary public for the State of West Virginia, this __10__ day of October 2008.

_____
Notary Public

_____
My commission expires

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Rebecca K. Schuman
Berry, Kessler, Crutchfield & Taylor
514 Seventh Street
Moundsville, WV 26041
My Commission Expires May 5, 2013

3

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 7

## AFFIDAVIT

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

BEFORE ME, the undersigned Notary, _Jerri L Deckner_ , on this _7th_ day of April, 2008, personally appeared Delegate Carrie Webster, known to me to be a credible person and of lawful age, who being by me first duly sworn, on her oath, deposes and says:

1. That I am a member of the West Virginia House of Delegates and the Chair of the House Committee on the Judiciary;

2. That bills relating to elections are typically referred to the Committee on the Judiciary for review;

3. That at my direction, the staff of the Committee on the Judiciary has conducted an electronic search of all bills introduced in the West Virginia House of Delegates and of all bills referred to the Committee on the Judiciary during the 2008 Regular Session of the West Virginia Legislature;

4. That the electronic search reveals that no bill was introduced in the West Virginia House of Delegates or referred to the Committee on the Judiciary during the 2008 Regular Session of the West Virginia Legislature which proposed amendments to West Virginia Code §§ 3-8-2b, 3-8-8 or §3-9-14;

5. That during the 2008 Regular Session of the Legislature, House Bill 4231, authorizing the State Election Commission to propose amendments to an existing

1

legislative rule governing corporate political activity, was introduced in the House of Delegates and referred to the Committee on the Judiciary;

6.      That the amendments proposed in House Bill 4231 did nothing more than update the rule to reflect the statutory changes to West Virginia Code §3-8-8 during the 2005 Fourth Extraordinary Session of the West Virginia Legislature,

7.      That the provisions of the State Election Commission's proposed rule were approved and adopted by the West Virginia Legislature when it passed in the form of Committee Substitute for Senate Bill 349 on March 8, 2008; and

8.      That at no time before, during or after the 2008 Regular Session of the West Virginia Legislature have I or any member of the staff of the Committee on the Judiciary been contacted by a representative of the Center for Individual Freedom, Inc., for the purpose of proposing, supporting or opposing any legislation or legislative action.

Carrie Webster, Chair
Committee on the Judiciary
West Virginia House of Delegates
410-M, State Capitol Complex
Charleston WV 25305

Subscribed and sworn to before me, this ___7th___ day of April, 2008.

My commission expires ___April  11, 2011___

(SEAL)

Notary Public

2

**CFIF V. TENNANT
CASE NO. 1:08cv00190**

**WVFL V TENNANT
CASE NO. 1:08CV01133**

**DEFENDANTS' EXHIBIT 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

CENTER FOR INDIVIDUAL
FREEDOM, INC.,

     Plaintiff,

v.

BETTY IRELAND and
TIMOTHY BOGGESS,

     Defendants,

v.

WEST VIRGINIA EDUCATION
ASSOCIATION, et al.,

     Intervenor Defendants,

WEST VIRGINIANS FOR LIFE,
INC., and ZANE LAWHORN,

     Plaintiffs,

v.

BETTY IRELAND and
TIMOTHY D. BOGGESS, West Virginia,

     Defendants.

Civil Action No.: 1:08-00190

Civil Action No.: 1:08-cv-1133

---

## DECLARATION OF ROBERT C. TABB

1

I, Robert C. Tabb, make the following declaration, under the penalty of perjury, pursuant to the provisions of 28 U.S.C. ' 1746:

1.      My name is Robert C. Tabb. I am currently a member of the West Virginia House of Delegates from the 56th Delegate District which is made up of a portion of Jefferson County. Mine is one of three (3) Delegate Districts in Jefferson County. I have served as a member of the House of Delegates since January 2003.

2.      I am in the process of completing my fourth successful campaign for my seat. Having won the May 12, 2008 Democratic Primary, I am unopposed in the upcoming general election.

3.      I have always managed my own campaigns. I am familiar, through my election races and observing the races of other candidates, with the various forms of political advertising used in political races in West Virginia, including television, radio, direct mail, telephone banks, newspaper advertising and billboards.

4.      I am aware of the provisions in H.B. 219 passed by the Legislature during the June 2008 Second Extraordinary Session. I voted for passage of H.B. 219.

5.      The purpose of this declaration is to inform the Court of my belief that the forms of non-broadcast media regulated by the provisions of H.B. 219 must be regulated so as to ensure the efficacy and fairness of the election process.

6.      It is my opinion that non-broadcast as well as broadcast media need to be regulated to ensure compliance with election laws, generally, and to ensure that the election process is not corrupted nor appear corrupted.

7.      Given the characteristics of the Eastern Panhandle, the size of my district and others in the Panhandle, broadcast media are not as effective as campaign tools as they

2

might be in areas away from large out-of-state metropolitan areas or in a larger district. Given my district and its proximity to the Washington D.C. – Baltimore - Maryland metro area, broadcast television and radio are prohibitively expensive and broadcast over a far larger area than my district for no campaign benefit.

8.     I have always used non-broadcast media, including direct mail and newspapers and I have found them extremely effective.  My knowledge of the effectiveness of non-broadcast media provided me the (art) empirical data I needed to vote for H.B. 219 to regulate non-broadcast media along with broadcast media.

9.     If effective forms of political advertising, such as those regulated in H.B. 219, are not allowed to be regulated, I believe that advertisers, fair and nefarious, honest and misleading, will gravitate to the non-regulated forms of advertising, thus circumventing any regulation and the State=s interest in fair elections.

10.     I have personal experience which I believe is illustrative of my opinion.

In the 2006 election tens of thousands of dollars for broadcast media, television and radio, were used by a non-profit entity and an individual in an attempt to defeat me.  I spent significantly less than that amount, all on non-broadcast media, and won re-election by the largest margin of any of my campaigns.

11.     It is my opinion that in smaller geographic areas, direct mail, telephone banks, billboards and newspapers as well as signs, posters, door hangers, leaflets and flyers are more cost effective and persuasive forms of political advertising than broadcast media.

12.     Attached as exhibits are examples of direct mail and door hanger advertising I have used as well as my West Virginia Blue Book biography.

3



_Robert C. Tabb_

Robert C. Tabb

Sworn to and subscribed before me, a notary public for the State of West Virginia, this ___10th___ day of October 2008.

OFFICIAL SEAL
NOTARY PUBLIC, STATE OF WEST VIRGINIA
KERRY WHITE
[BDA]
247 BURNS ST.
RANSON, WV 26438
My Commission Expires April 23, 2018

_____
Notary Public

April 23, 2018
My commission expires

# West Virginia Legislature

2nd Session of the 78th Legislature

| Senate | House | Joint | Bill Status | WV Code | Audits/ Reports |

## House of Delegates Members

Find by Name

Robert C. Tabb    [Submit]

Find by District

56    [Submit]



**Robert C. Tabb**
(D - Jefferson)

District 56

**Capitol Address:**
Room 6U-C, Building 1
State Capitol Complex
Charleston, WV 25305

*Capitol Phone:* (304) 340-3274
*Business Phone:* (304) 725-1252
*E-mail:* rtabb@mail.wvnet.edu

**Vice-Chair - Agriculture**

**HOUSE COMMITTEES:**
Agriculture & Natural Resources
Political Subdivisions
Judiciary

**Biography:**
Nurseryman, Farmer; Agri-tourism **Born** January 21, 1952, the son of Virginia D. and the late Lyle C. Tabb **Education** Char
**Wife** Nancy Kathryn Payne **Children** Andrew, Brian and Bobby **Affiliations** Member, Independent Fire Company, 30 years
Incident Stress Management Team; Jefferson County Vocational Advisory Council; Superintendent of Livestock, Jefferson (
Jefferson County Agriculture Task Force; West Virginia Farm Bureau; West Virginia Nursery and Landscape Association; B
Associations; Recipient, 2002 Lifetime Member of Independent Fire Company, 25 years active service; 2002 Honorary Cha
Elected 2002-2006 **Legislative Positions Held** Vice Chair, Committee on Agriculture, 77th Legislature **Religion** Presbyteri

Bill Status | Bill Tracking | WV Code | Bulletin Board | District Maps | News Releases | Court of Claims | Crime Victims | Links

This Web site is maintained by the West Virginia Legislature's Office of Reference & Information. | Terms of Use | Web Administrator | © 2008 West Virginia Leg

# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

CENTER FOR INDIVIDUAL
FREEDOM, INC.,

     Plaintiff,

v.                                Civil Action No.:  1:08-00190

BETTY IRELAND and
TIMOTHY BOGGESS,

     Defendants,

v.

WEST VIRGINIA EDUCATION
ASSOCIATION, et al.,

     Intervenor Defendants,

WEST VIRGINIANS FOR LIFE,
INC., and ZANE LAWHORN,

     Plaintiffs,

v.                                Civil Action No.: 1:08-cv-1133

BETTY IRELAND and
TIMOTHY D.  BOGGESS, West Virginia,

     Defendants.

---

## DECLARATION OF JOHN PINO

---

I, John Pino, make the following declaration, under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746:

1.      My name is John Pino. I am currently one of three (3) members of the West Virginia House of Delegates from the 29th Delegate District which is made up of Fayette County and portions of Nicholas and Clay Counties. I have served as a Delegate for ten terms, during the years 1985-1988 and 1993 to date.

2.      I am very active in my own campaign and I am familiar, through my election races and observing those of other candidates, with the various forms of political advertising, including television, radio, direct mail, telephone banks, newspaper advertising and use of billboards, all of which are used in elections in West Virginia.

3.      During my election contests over the years I have used various types of the aforementioned media in different combinations.

4.      I am aware of the provisions of H.B. 219 which was passed by the Legislature during the Second Extraordinary Legislative Session of 2008   I voted for the legislation.

5.      Based upon my experience, knowledge, information and belief, it is my opinion that in West Virginia, in order to functionally and properly regulate political advertising to ensure no corruption or appearance of corruption in the election process, the State must regulate non-broadcast media such as are regulated by H.B. 219.

6.      It is further my opinion that effective regulation requires disclosure of the identities of persons and entities funding political advertising.

7.      During the 2008 Democratic Primary Election I saw first hand how effective non-broadcast media can be, specifically in the form of direct mail advertising.

2

8.   Very shortly before the May 12, 2008 primary, a large number of direct mail advertisements were disseminated in my district which attacked me, distorted my voting record and, I believe, caused my re-election bid to fail.

9.   Direct mail and telephone banks can be particularly effective as groups of voters can be targeted with particularized messages aimed at an aspect or aspects of the recipient's demographic. Last minute advertising, whether misleading or not, is extremely effective as their dissemination can be timed to make an equally effective response hard or impossible to make prior to an election.

10.   House Bill 219 would not preclude the dissemination of ads such as were used against me, it would simply ensure that sometimes artfully or misleadingly named entities cannot engage in express advocacy involving a candidate or candidates without disclosing the names of those funding such ads.

11.   Copies of some of the direct mail advertisements used against me are attached hereto. I am also attaching my biography from the West Virginia Blue Book.

12.   I believe that disclosure of the identities of those funding express advocacy advertisements is an essential part of ensuring an informed electorate and a necessary tool to ensure that those entities which are not allowed do not do so.

13.   If all of the effective forms of political advertising are not regulated, I believe that those persons engaged in advertising, misleading or otherwise, will gravitate to the unregulated media.

3

_John Pino_
John Pino

Sworn to and subscribed before me, a notary public for the State of West Virginia,

this __14__ day of October 2008.

_Barbara L. Daniel_
Notary Public

__12/16/2010__
My commission expires

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
BARBARA L. DANIEL
100 IDLEMAN DRIVE
ELKVIEW, WV 25071
MY COMMISSION EXPIRES DEC. 16, 2010

4

# West Virginia Legislature
## 2nd Session of the 78th Legislature

| Senate | House | Joint | Bill Status | WV Code | Audits/ Reports |
|--------|-------|-------|-------------|---------|-----------------|

## House of Delegates Members

Find by Name

John Pino  ·  Submit

Find by District

29  ·  Submit



**John Pino**
(D - Fayette)

District 29

**Capitol Address:**
Room 219E, Building 1
State Capitol Complex
Charleston, WV 25305

*Capitol Phone:* (304) 340-3170
*Business Phone:* (304) 469-3295
*E-mail:* jpino@mail wvnet edu

**Chair - Interstate Cooperation**

**HOUSE COMMITTEES:**

Select Committee on Senior Citizens
Issues
Health and Human Resources
Constitutional Revision
Roads and Transportation
Judiciary

**Biography:**
Builder / Contractor **Born** July 12, 1931, in Mount Hope, West Virginia, son of Pietro and Santa Pino **Education** Public Sch
Kathryn, Joe, Theresa, Cynthia, Mark, Richard, Angela **Affiliations** Member, Lions Club; Knights of Columbus **Legislative**
**Legislative Positions Held** Vice Chairman, Committee on the Judiciary, 72nd Legislature; Speaker Pro Tempore, 73rd, 74
**Other Public Service** Member, Past Director, Fayette County Business-Development Association; Chair, Board of Zoning /
Treasurer, Fayette County Chapter American Red Cross **Religion** Catholic.

Bill Status  |  Bill Tracking  |  WV Code  |  Bulletin Board  |  District Maps  |  News Releases  |  Court of Claims  |  Crime Victims  |  Links

This Web site is maintained by the West Virginia Legislature's Office of Reference & Information.  |  Terms of Use  |  Web Administrator  |  © 2008 West Virginia Leg

# High healthcare costs have us all worried sick.

Roy Smith, Treasurer

RCD BY FRIEND WEEK BEFORE
ELECTION

(A-1)

# Tom Louisos, Margaret Staggers and Dave Perry for House of Delegates.

**They have the right ideas to help cure West Virginia's healthcare crisis.**

Rising health care costs have too many West Virginia families worried about making ends meet.

That's why we need **Tom Louisos, Margaret Staggers, and David Perry** fighting for us in the House of Delegates.

Louisos, Staggers, and Perry support common-sense plans to bring down healthcare costs. They want to ease the burden on our families and make sure more of us have access to the care we need for ourselves and our families.



A PRESCRIPTION
FOR BETTER HEALTHCARE
IN WEST VIRGINIA

Name _____

Address _____  Date _____

❷ Access to healthcare and prevention services for all West Virginians to keep our families healthy.

❷ Crack down on insurance companies that overcharge customers or unfairly deny claims.

❷ Adequate in-home care programs for seniors.





A-2

On May 13, vote for Democrats Tom Louisos, Margaret Staggers and Dave Perry.

A HEALTHY CHANGE FOR WEST VIRGINIA.







Roy Smith, Treasurer
West Virginia Building and Construction Trades PAC
600 Leon Sullivan Way
Charleston, WV 25301
WV HD 29

*Not authorized by any candidate or candidate's committee.*

ı.ı.ıl.ı.ı.ılı....ll..lıl.lllı..l.l...llllı.llı..ll..ll..ı
4"1***********************5-DIGIT 25901

RCD 5-8-08
D-1

PRSRT STD
US Postage
PAID
Huntington WV
Permit 229

**Margaret Staggers, Dave Perry, and Tom Louisos will roll up their sleeves to keep the jobs we have and help create new ones.**

Margaret Staggers, Dave Perry, and Tom Louisos know West Virginia needs to be in the business of creating new jobs and fighting for working families. That's why they will demand that any company getting a state tax break must hire West Virginia workers.

A better future for West Virginia can be fueled with clean coal technology. We need State Delegates ready to fight for this clean energy alternative and create new jobs right here at home. With their proven commitment to fight for West Virginia workers, we trust Margaret Staggers, Dave Perry and Tom Louisos to be leaders on this issue in the House of Delegates for District 29.

**Democrats Tom Louisos, Margaret Staggers and Dave Perry.**
THEY WILL MAKE SURE WEST VIRGINIA WORKS FOR US.

On May 13, vote for
**Margaret Staggers and Dave Perry.**



# Perry, Staggers, and Louisos know Clean Coal technology can fuel West Virginia's future.

**Roy Smith, Treasurer**
West Virginia Building and Construction Trades PAC
600 Leon Sullivan Way
Charleston, WV 25301
WV HD 29

*Not authorized by any candidate or candidate's committee.*

RCO 5-9-08
E-1

PRSRT STD
US Postage
PAID
Huntington WV
Permit 229

# Vote for Dave Perry, Margaret Staggers, and Tom Louisos for House of Delegates.

## They'll roll up their sleeves to bring new jobs and a better future to our state.

Coal. It's West Virginia's most valuable natural resource. And new Clean Coal technology will make sure it's on the cutting edge of environmentally-responsible, home-grown alternative energies. We can believe in leaders like Perry, Staggers, and Louisos to make Clean Coal a priority, so West Virginia's economy can begin to thrive again.

WV Building and Construction Trades trust that Perry, Staggers, and Louisos will be strong supporters of efforts to market Clean Coal technology and put West Virginia coal on the alternative-energy fast track.

On May 13, vote for Democrats Perry, Staggers, and Louisos for House of Delegates.

E-2

# Voting NO to healthcare once is bad enough.

## BUT JOHN PINO DID IT TWICE.

Roy Smith, Treasurer
West Virginia Building
and Construction Trades PAC
Charleston WV 25301

R-D  5-10-08
B-1
+ P.

PRSRT STD
US Postage
PAID
Huntington W
Permit 229



## JOHN PINO HAD TWO CHANCES TO MAKE SURE CONSTRUCTION WORKERS ON STATE PROJECTS COULD RECEIVE HEALTHCARE.

# But two different times, Pino said NO.

If we couldn't trust John Pino to do the right thing then, how can we rely on him to fight for affordable healthcare in the future?

## Make the healthy choice for West Virginia Families.

### Margaret Staggers • David Perry • Tom Louisos

**Vote for**

Democrats we can trust to fight for better healthcare for all West Virginians.

RCD 5-10-08
(B2)

Vote for Staggers, Perry and Louisos on Tuesday, May 13th.

# SAY IT AIN'T SO, JOHN!

Roy Smith, Treasurer
West Virginia Building and Construction Trades PAC
600 Leon Sullivan Way
Charleston, WV 25301
WV HD 79

*Not authorized by any candidate or candidate's committee.*

PRSRT STD
US Postage
PAID
Huntington WV
Permit 229

RCD 5-12-08
C 1



# That's why it's time to say NO to John Pino.

**DELEGATE JOHN PINO VOTED AGAINST EFFORTS TO MAKE HEALTHCARE MORE AFFORDABLE FOR OUR FAMILIES.** (SOURCE: HB 4520, HB 2438, WWW.LEGIS.STATE.WV.US)

If you want delegates who are going to fight for the needs of working families, **vote for the team we believe is ready to make healthcare more affordable and more accessible in West Virginia.**

Tuesday, May 13th, vote for Democrats

**DAVE PERRY, TOM LOUISOS, AND MARGARET STAGGERS FOR HOUSE OF DELEGATES.**

Perry, Louisos, and Staggers for House of Delegates.

**THE HEALTHY CHOICE FOR WEST VIRGINIA.**



# CFIF V.TENNANT
# CASE NO. 1:08cv00190

# WVFL V TENNANT
# CASE NO. 1:08CV01133

# DEFENDANTS' EXHIBIT 10

STATE OF WEST VIRIGNIA
COUNTY OF KANAWHA; to wit:

## AFFIDAVIT

I, G. Nicholas Casey, Jr., under penalty of perjury, pursuant to 28 U.S.C. §1746, make the following declaration:

1.      I am the Chairman of the West Virginia Democratic Executive Committee, commonly known as the West Virginia State Democratic Party.

2.      I was elected for a four year term as Chairman by members of the Executive Committee in the summer of 2004.

3.      I was re-elected to serve an additional four year term as Chairman in the summer of 2008.

4.      I have served as a campaign treasurer for statewide campaigns in West Virginia; for countywide campaigns in Kanawha County West Virginia; for House of Delegate district campaigns in West Virginia; and for municipal campaigns in Charleston, West Virginia.  As a campaign treasurer, I was involved in the planning and purchasing of campaign media, including broadcast and targeted non-broadcast media.

5.      As Chairman of the West Virginia Democratic Executive Committee, I have been involved in the planning and purchasing of campaign media, including broadcast and targeted non-broadcast media in the state of West Virginia.

6.      I, with the assistance of the staff of the West Virginia State Democratic Executive Committee, have gathered, reviewed, and analyzed readily available public information relating to campaign expenditures by statewide and district candidates for the 2006 and 2008 general elections.  I have also gathered, reviewed and analyzed comparable information for third party spending by individuals or organizations that filed campaign finance reports with the West Virginia Secretary of State's office for the 2008 general election.

7.      Three separate lists of expenditures, by category, based upon the information provided in the readily available, public information, are attached on the state, competitive district races and third party spending.

8.    My review of the information indicates that, in statewide races, broadcast media represents significant expenditures and plays a significant role; representing 61.6% of spending. Based on my experience with the media market in the State of West Virginia, broadcast media in statewide races is widely used and provides an effective way to communicate with potential voters. Targeted print media, particularly mass mailings, is not as significant representing only 10.6% of spending. My experience is that broadcast media gets results from voters in statewide races and is a wise expenditure of a candidate's money.

9.    In regards to competitive district races, broadcast media is substantially less effective and the expenditures by candidates is substantially less than non-broadcast media; representing 27.8%, however, mass mailing is more effective and represents 24.7% of spending. Using the State Democratic Party voter file information, non-broadcast media can be expressly targeted to particular individuals based upon their voting frequency; geographic location; number of members in a household; professional licensing; designation as labor or non-labor households; designation as veteran or non-veterans; and other identifying factors found in the State Democratic Party Executive Committee voter file. Thus, for district races, targeted, non-broadcast media is a more effective means of communications and more cost effective, since it can be targeted. It is less expensive then broadcast media, which cannot be specifically targeted because broadcast media markets are much larger than the districts and payment is calculated for messaging based on population not on eligible voters.

10.    In regards to third party expenditures, which can cover statewide or district races, or both, 65.8% of the expenditures are on broadcast media and 28.6% are for targeted non-broadcast media. Third parties, whether friend or foe of a district candidate, are outspending candidates percentage wise on non-broadcast media and outspending statewide candidates percentage wise on broadcast media at 65.8%. Third parties recognize the importance of both broadcast and non-broadcast media as a way to educate or influence voters.

11.    The West Virginia Legislature, through various legislative efforts, has attempted to regulate broadcast and non-broadcast media.

12.    On information and belief, parts of the regulation of non-broadcast media have been determined improper by the Federal Courts under the application of various laws.

13.    Although broadcast media is a costly but effective means of communication for candidates in statewide races, targeted non-broadcast media is equally or more effective and less

costly in district races and for targeting particular populations in any race, whether statewide or district.

14.   Since broadcast and non-broadcast media are both effective means of communication, comprehensive regulation of both methods is necessary.

And further the affiant sayeth not:

_____
G. Nicholas Casey, Jr.

I, G. Elizabeth Jarrett _____, a Notary Public in and for the State of West Virginia, do hereby certify that G. Nicholas Casey, Jr., whose name is signed to the writing above, has this day acknowledged the same before me.

My commission expires: June 13, 2011 _____

_____
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
G ELIZABETH JARRETT
709 Perry Lane
Charleston, WV 25312
My Commission Expires June 13, 2011

## Third Party Spending

**Amount Spent on Category**

| Year/Group | Broadcast - TV/Radio | Print/Newspaper | Mass Mail | Phones | Billboards | Fundraising | Yard Signs | Travel | Other* | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/Communication Workers PAC | | | $ 11,571.50 | | | | | | | $ 11,571.50 |
| 08/David Waxman | | | $ 420.00 | | | | | | | $ 420.00 |
| 08/Harvey Peyton | | $ 374.50 | | | | | | | | $ 374.50 |
| 08/Robert Potter | | $ 2,335.00 | | | | | | | | $ 2,335.00 |
| 08/Lacy Wright | | $ 405.90 | | | | | | | | $ 405.90 |
| 08/Warren R. McGraw, II | $ 9,329.00 | $ 2,014.50 | | $ 7,102.00 | | | | | | $ 18,445.50 |
| 08/Marty Owens Ashley | | | | | $ 187.38 | | $ 966.00 | | | $ 1,153.38 |
| 08/William Flanhigan | | | $ 100.00 | | | | | | | $ 100.00 |
| 08/Harrison Co. Chamber PAC | | $ 1,842.12 | | | | | | | | $ 1,842.12 |
| 08/SEIU 1199 PAC | | | $ 130,727.23 | | | | | | | $ 130,727.23 |
| 08/UMWA PAC | | | | $ 2,752.00 | | | | | | $ 2,752.00 |
| 08/WESPAC | | | | | | | | | $ 14,999.76 | $ 14,999.76 |
| 06/WV AFL-CIO PAC | | | $ 16,340.40 | | | | | | | $ 16,340.40 |
| 06/WV Building Trades PAC | | | $ 56,334.82 | | | | | | | $ 56,334.82 |
| 06/WV Chamber of Commerce | $ 1,649,544.16 | | | | | | | | | $ 1,649,544.16 |
| 06/WV Democratic Party | $ 7,000.00 | | $ 96,970.59 | | | | | | | $ 103,970.59 |
| 06/WV 4 Life PAC | | | $ 40,427.78 | | | | | | | $ 40,427.78 |
| 06/WV Building Trades PAC | | | $ 20,961.83 | | | | | | | $ 20,961.83 |
| 06/Charleston Chamber of Commerce PAC | | $ 4,372.50 | | | | | | | | $ 4,372.50 |
| 06/Communication Workers PAC | | | $ 6,007.80 | | | | | | | $ 6,007.80 |
| 06/Don Blankenship | $ 914,415.69 | | $ 432,604.59 | | $ 136,150.00 | | | | $ 23,962.19 | $ 1,507,132.47 |
| 06/Edward Coyne | | | $ 8,910.34 | | | | | | | $ 8,910.34 |
| 06/Gary Lilly | | $ 355.50 | | | | | | | | $ 355.50 |
| 06/Harold Wolfe | | $ 450.33 | | | | | | | | $ 450.33 |
| 06/Robert Shell, III | | | | | | | | | $ 52.00 | $ 52.00 |
| 06/SEIU 1199 PAC | | | $ 61,371.24 | | | | | | | $ 61,371.24 |
| 06/WV AFL-CIO PAC | | | $ 23,260.65 | | | | | | | $ 23,260.65 |
| 06/WV 4 a Brighter Tommorrow PAC | $ 14,424.80 | $ 3,906.78 | | | | | | | | $ 18,331.58 |
| 06/WV 4 Life PAC | | | $ 27,886.76 | | | | | | | $ 27,886.76 |
| 06/WV Democratic Party | | | $ 195,000.00 | $ 20,000.00 | | | | | | $ 215,000.00 |
| **GRAND TOTALS** | $ 2,594,713.65 | $ 16,057.13 | $ 1,128,895.53 | $ 29,854.00 | $ 136,337.38 | $ - | $ 966.00 | $ - | $ 39,013.95 | $ 3,945,837.64 |
| percent of grand total | 65.8% | 0.4% | 28.6% | 0.8% | 3.5% | | 0.0% | | 1.0% | |

*the majority of "other" consists of polling

**not able to categorize WESPAC's spending

## Candidate Spending

### Amount Spent on Category

| Year/District/Candidate | Broadcast - TV/Radio | Print/Newspaper | Mass Mail | Phones | Billboards | Fundraising | Yard Signs | Travel | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/SupCo/Ketchum - won | $941,937.16 | $2,528.00 | $88,282.43 | $7,703.46 | | $29,775.11 | $6,598.50 | $9,018.36 | $192,660.80 | $1,278,503.82 |
| 08/SupCo/Workman - won | $188,993.04 | 41,640.61 | $7,445.30 | $2,450.00 | | $9,466.66 | $2,928.10 | $26,283.18 | $56,308.72 | $335,515.61 |
| 08/SupCo/Walker - lost | $306,358.15 | 375.00 | $2,377.69 | | $5,151.30 | $38,253.04 | $6,480.65 | $3,680.24 | $109,335.71 | $472,011.78 |
| 08/AttGen/McGraw - won | $75,707.13 | 850.00 | $118,245.22 | $2,940.28 | | $1,672.93 | $9,917.99 | $584.29 | $14,828.88 | $224,746.72 |
| 08/AttGen/Greear - lost | $45,550.73 | 13,605.82 | $51,396.92 | | | $12,167.43 | $10,659.88 | $1,333.67 | $83,989.57 | $218,744.02 |
| | Broadcast - TV/Radio | Print/Newspaper | Mass Mail | Phones | Billboards | Fundraising | Yard Signs | Travel | Other | Total |
| GRAND TOTALS | $1,558,546.21 | $58,999.43 | $267,747.56 | $13,093.74 | $5,151.30 | $91,335.17 | $36,625.12 | $40,899.74 | $457,123.68 | $2,529,521.95 |
| percent of grand total | 61.6% | 2.3% | 10.6% | 0.5% | 0.2% | 3.6% | 1.4% | 1.6% | 18.1% | |

*the majority of "other" expenditures consists of polling, staff, and HQ expenses

## Candidate Spending

**Amount Spent on Category - (In General Elections only)**

| Year/District/Candidate | Broadcast - TV/Radio | Print/Newspaper | Mass Mail | Phones | Billboards | Fundraising | Yard Signs | Travel | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/Senate 14/Williams - won | $ 8,683.65 | $ 10,346.60 | $ 32,065.39 | $ - | $ - | $ 324.23 | $ 3,342.56 | $1,329.80 | $ 2,115.01 | $ 58,207.24 |
| 08/Senate 14/Howell - lost | $ 6,073.29 | $ 1,105.00 | $ - | $ - | $ - | $ 9.33 | $ 321.24 | $ - | $ 8,510.79 | $ 16,020.65 |
| 08/Senate 16/Snyder - won | $ 2,334.00 | $ 18,893.99 | $ 6,915.05 | $ - | $ - | $ 1,178.25 | $ 184.44 | $ - | $ 13,511.27 | $ 43,017.00 |
| 08/Senate 16/Adams - lost | $ 600.00 | $ 6,201.91 | $ 10,674.76 | $ - | $ - | $ - | $ 4,765.74 | $ - | $ 14,687.00 | $ 36,933.41 |
| 08/House 10/Polite - won | $ 12,546.74 | $ 4,410.00 | $ 9,876.22 | $ - | $ 6,458.80 | $ 1,005.24 | $ 780.48 | $ - | $ 23,382.09 | $ 58,459.57 |
| 08/House 10/Bourn - lost | $ 1,000.00 | $ 1,595.40 | $ 5,278.78 | $ - | $ - | $ - | $ 955.01 | $ 747.56 | $ 2,355.21 | $ 11,931.96 |
| 08/House 10/McCrady - lost | $ - | $ 2,132.00 | $ 397.50 | $ - | $ - | $ - | $ 677.18 | $ - | $ 1,735.06 | $ 4,941.74 |
| 08/House 10/Abington - won | $ 2,304.00 | $ 6,731.46 | $ 3,995.39 | $ - | $ - | $ 490.20 | $ 50.00 | $ 175.00 | $ 5,694.55 | $ 16,873.70 |
| 08/House 10/Ellem - won | $ - | $ 1,275.00 | $ 9,148.30 | $ - | $ 7,691.00 | $ - | $ 126.81 | $ - | $ 820.00 | $ 19,061.11 |
| 08/House 10/Gillespie - lost | $ 3,648.73 | $ 1,826.00 | $ 10,639.77 | $ - | $ - | $ - | $ 1,509.91 | $ - | $ 220.93 | $ 17,839.34 |
| 08/House 15/Craig - won | $ - | $ 17,095.71 | $ 8,354.74 | $ - | $ 6,832.20 | $ 639.00 | $ - | $ - | $ 6,196.48 | $ 38,479.13 |
| 08/House 15/Morgan - won | $ 705.00 | $ 7,294.06 | $ 7,028.18 | $ - | $ 2,498.00 | $ 789.41 | $ 35.98 | $ - | $ 20,547.19 | $ 38,747.41 |
| 08/House 15/Eastham - lost | $ - | $ 5,795.48 | $ 13,933.00 | $ - | $ 2,100.60 | $ 546.19 | $ 1,515.70 | $ - | $ 5,793.55 | $ 29,878.14 |
| 08/House 25/Miller - won | $ 2,114.00 | $ 4,312.55 | $ 9,865.66 | $ - | $ 5,000.00 | $ - | $ 1,837.87 | $ - | $ 4,058.55 | $ 27,735.22 |
| 08/House 25/Frazier - won | $ 22,669.00 | $ 171.50 | $ 12,726.65 | $ - | $ 2,710.00 | $ - | $ 789.55 | $ - | $ 2,323.89 | $ 41,591.29 |
| 08/House 25/Long - lost | $ 13,532.67 | $ - | $ 10,131.06 | $ - | $ 3,415.60 | $ - | $ 550.00 | $ - | $ 9,797.43 | $ 37,426.76 |
| 08/House 25/Porter - won | $ 6,631.70 | $ 3,274.30 | $ 4,789.83 | $ - | $ 6,495.00 | $ - | $ 2,674.75 | $ - | $ 2,370.55 | $ 26,236.13 |
| 08/House 25/Ellington - lost | $ 1,987.00 | $ - | $ - | $ - | $ 3,220.00 | $ - | $ - | $ - | $ - | $ 5,207.00 |
| 08/House 44/Marshall - won | $ 5,549.85 | $ 7,549.93 | $ 491.63 | $ - | $ 1,000.00 | $ - | $ 2,626.79 | $ - | $ 6,114.89 | $ 23,333.09 |
| 08/House 44/Beech - won | $ 7,847.00 | $ 8,537.59 | $ 1,734.28 | $ - | $ - | $ - | $ 105.14 | $ 840.65 | $ 4,750.66 | $ 23,815.32 |
| 08/House 44/Cheek - won | $ 9,129.55 | $ 356.87 | $ 1,809.28 | $ - | $ - | $ 1,020.00 | $ - | $ - | $ 6,423.65 | $ 18,735.45 |
| 08 House 44/Fletchear - won | $ 16,016.52 | $ 2,183.16 | $ 27,451.54 | $ - | $ - | $ 374.46 | $ 524.40 | $ - | $ 26,245.68 | $ 72,795.76 |
| 08/House 44/Fritch - lost | $ 7,780.40 | $ 6,280.62 | $ 12,593.08 | $ - | $ - | $ - | $ - | $ - | $ 3,497.94 | $ 30,152.04 |
| 08/House 44/Ikerum - lost | $ 2,683.12 | $ 284.24 | $ 2,530.45 | $ - | $ - | $ 5.58 | $ - | $ - | $ 552.12 | $ 6,035.51 |
| Year/District/Candidate | Broadcast - TV/Radio | Print/Newspaper | Mass Mail | Phones | Billboards | Fundraising | Yard Signs | Travel | Other | Total |