## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CENTER FOR INDIVIDUAL FREEDOM, INC., ) ) ) Plaintiff, ) ) v. ) ) NATALIE TENNANT, *et al.*, ) ) Defendants. ) ) ) | Case No. 1:08-00190 |

# PLAINTIFF CENTER FOR INDIVIDUAL FREEDOM'S RENEWED MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

William C. Porth (W. Va. Bar. No. 2943)
Robinson & McElwee PLLC
400 Fifth Third Center
700 Virginia St., East
P.O. Box 1791
Charleston, WV  25301
(304) 344-5800

*Attorney for Plaintiff Center for Individual Freedom*

Jan Witold Baran
Thomas W. Kirby
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
(202) 719-7000

*Attorneys for Plaintiff Center for Individual Freedom*

September 14, 2010

# TABLE OF CONTENTS

                                                                                        **PAGE**

**MOTION** ........................................................................................................................... 1

**THE UNDISPUTED FACTS** ........................................................................................ 3

**ARGUMENT** .................................................................................................................. 4

I.  *CITIZENS UNITED* DID NOT ALTER THE LONG-STANDING
     REQUIREMENT THAT DISCLOSURE STATUTES MUST AVOID
     VAGUENESS. ............................................................................................................ 5

II. WEST VIRGINIA'S LARGELY SUPERFICIAL AMENDMENTS TO THE
     DEFINITION OF "EXPRESS ADVOCACY" DO NOT REMEDY ALL THE
     VAGUENESS ISSUES. .............................................................................................. 8

III. WEST VIRGINIA'S ELECTIONEERING COMMUNICATION PROVISIONS
      ARE FACIALLY INVALID IN THEIR ENTIRETY OR, IN THE
      ALTERNATIVE, TO THE EXTENT THAT THEY APPLY TO SPEECH
      USING NON-BROADCAST MEDIA ....................................................................... 13

   A. West Virginia's Regulation of Non-Broadcast Communications Remains
      Unjustified and Unconstitutional. ........................................................................ 14

   B. West Virginia's Regulation of Broadcast Communications Has Unconstitutional
      Features Not Present In Its Federal Analog and Not Otherwise Justified. ......... 16

      1.  West Virginia's Statute Lacks the Clarity and Procedural Safeguards of Its
          Federal Counterpart. ..................................................................................... 16

      2.  Many of the Statutory Exceptions Are Vague. .............................................. 17

      3.  The West Virginia Legislature Has Articulated No Basis for Enacting a
          Blanket Exemption for Communications by a 501(c)(3) Organization, but
          Not a 501(c)(4). ............................................................................................. 24

   C. West Virginia's Electioneering Communication Provisions Intentionally Burden
      Substantial Protected Speech and, Hence, Are Facially Invalid. ....................... 25

IV. THE REPORTING REQUIREMENTS FOR ELECTIONEERING
     COMMUNICATIONS AND INDEPENDENT EXPENDITURES USE VAGUE
     TERMINOLOGY THAT MUST BE SEVERED OR NARROWLY
     CONSTRUED. ......................................................................................................... 27

   A. The Requirement to Disclose the Names of Persons "Sharing or Exercising
      Direction or Control" Over the Person's Activities is Vague. ........................... 27

B.  The Phrase "Support Or Oppose" Requires Clarification When Used to Classify
    Speech. .................................................................................................................... 28

C.  The Requirements to Disclose Contributors Whose Donations Were "Used to Pay
    for Electioneering Communications" or Made "For the Purpose of Furthering the
    Expenditure" Are Vague. ........................................................................................ 31

**V. WEST VIRGINIA'S CAMPAIGN FINANCE LAWS MAY NOT
CONSTITUTIONALLY BE APPLIED TO THE CENTER'S PRIOR
ADVERTISEMENTS. ........................................................................................................ 32**

**CONCLUSION ...................................................................................................................... 34**

Plaintiff Center for Individual Freedom, Inc. ("Center") moves pursuant to Fed. R. Civ. P. 56, for summary judgment in its favor on all claims.  There are no genuine issues of material fact and the Center is entitled to judgment as a matter of law that:

1.      West Virginia's regulation of "express[] advoca[cy]" is unconstitutionally vague, and therefore facially invalid, to the extent that it applies to speech other than communications that use explicit words that expressly advocate the election or defeat of clearly identified candidates for state office.  W. Va. Code §§ 3-8-1a(12) (definition of "expressly advocating"), (15) (definition of "independent expenditure"), (23) (definition of "political purposes"), 3-8-2(b) (independent expenditure reporting requirements), 3-8-5 (detailed accounting and reporting requirements), 3-8-7 (penalties for failing to file required statements); W. Va. Code of State Rules § 146-1-3 (regulating corporate political activity).[1]

2.      West Virginia's electioneering communication provisions are facially invalid in their entirety or, in the alternative, to the extent they apply to speech in media other than the forms of broadcast[2] communications regulated by their federal counterpart.  W. Va. Code §§ 3-8-1a(11) (definition of "electioneering communication"), (24) (definition of "targeted to the relevant electorate"), 3-8-2b (electioneering communication reporting requirements).

---

[1]      The administrative code uses the vague terminology "in connection with election to any state or local office."  W. Va. Code of State Rules § 146-1-3.1.  Moreover, as far as the Center is aware, the Secretary of State has not amended this rule – which still prohibits corporate expenditures – to reflect the Supreme Court's decision in *Citizens United v. FEC*, 130 S. Ct. 876 (2010).  Thus, this regulation is unconstitutional for multiple reasons.

[2]      Unless otherwise noted, the term "broadcast" is used in a generic sense to refer to communications made by broadcast, cable, satellite, or radio.

3.      West Virginia's reporting requirements for electioneering communications and independent expenditures are unconstitutionally vague, and therefore facially invalid, to the extent that they require disclosure of persons "sharing or exercising direction or control over the activities of the person making the expenditure." W. Va. Code §§ 3-8-2b, 3-8-2(b)(1)(A).

4.      West Virginia's reliance on the phrases "supporting or opposing" and "advocating or opposing" to delineate various record-keeping and reporting requirements renders such statutes unconstitutionally vague unless such phrases are declared to have a narrow construction that requires explicit words of express advocacy. W. Va. Code §§ 3-8-1a(23), 3-8-5.

5.      West Virginia's requirement to disclose contributors whose donations were "used to pay for electioneering communications" or made "for the purpose of furthering [an independent] expenditure" are vague unless declared to be narrowly construed to apply only to funds specifically earmarked for such purposes.  W. Va. Code §§ 3-8-2b(b)(5), 3-8-2(b)(1).

6.      West Virginia's campaign finance laws cannot constitutionally be applied to punish the Center on the basis of the ads that the Center disseminated in West Virginia during 2008.  *See* Dkt. No. 154, Exs. K, L, M, N, O,[3] P, Q, R, and S; Fourth Declaration of Jeffrey L. Mazzella ¶¶ 7-8 (describing telephone communications) (attached to Dkt. No. 154 hereto).  The grounds are those

---

[3]      Exhibit O was inadvertently omitted from the Center's first summary judgment motion.  (Dkt. No. 154.)  It is attached as an exhibit to this motion.

briefed in support of the Center's prior motions for preliminary relief, which are incorporated by reference.  *See, e.g.*, Dkt. Nos. 5, 29, 90, 154, 180.

The Center moves that these rulings be embodied in appropriate declaratory judgments and injunctions.  In addition, as a prevailing party in an action under 42 U.S.C. § 1983, the Center moves for its reasonable fees and expenses pursuant to § 1988.[4]

## THE UNDISPUTED FACTS

A Statement of Undisputed Material Facts ("Stmnt.") was attached to the Center's original Motion for Summary Judgment (Dkt. No. 154) and is incorporated by reference here. That Statement cites the supporting evidence, much of which is attached thereto.  In a nutshell, those facts establish that:

- The Center is a corporation that intended and intends to spend corporate funds to address issues of public policy in West Virginia during pre-election periods when the Center believes the public is focused upon and receptive to such matters.

- The Center has included and intends to include references to candidates for West Virginia state office in its public messages, but it has not used and does not seek to engage in "express advocacy" as that term is defined in *Buckley v. Valeo*, 424 U.S. 1, 43-44 & n.52 (1976).

- The Center will not disclose its donors or otherwise make the disclosures sought by the challenged West Virginia laws, both as a matter of principle and because its donors will withdraw their support if such disclosure is made or threatened.

- Until preliminary relief was granted, the Center's speech was actually suppressed by its reasonable fear of possible punishment under the challenged West Virginia laws, and the Center's free expression will be chilled in the future if the requested relief is not granted.

---

[4]      A prevailing § 1983 plaintiff is entitled to fees unless "special circumstances would render such an award unjust."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted).  The "special circumstances" exception is "narrow" and arises "only on rare occasions."  *Nat'l Home Equity Mortgage Ass'n v. Face*, 283 F.3d 220, 226 (4th Cir. 2002) (quoting authority), *aff'd on reconsideration*, 322 F.3d 802 (4th Cir. 2003).  Assuming fees are awarded, the Center will promptly submit a motion addressing the issue of amount.

- The Center disseminated several ads prior to the 2008 West Virginia elections that were proscribed and otherwise burdened by the language of the West Virginia statutes in effect at the time.

- West Virginia's Attorney General has threatened to pursue all possible legal avenues of challenge against the Center and similar groups.

## ARGUMENT

For the most part, this motion covers familiar territory.  Two considered preliminary injunction opinions sustain many of the positions this motion advocates, and the Center's core arguments are strongly supported by recent circuit precedent.  *See North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) ("*NCRL v. Leake*").  Moreover, while *Citizens United v. FEC*, 130 S. Ct. 876, 915 (2010), clarified that disclosure laws are subject to "exacting" rather than the slightly higher standard of "strict" scrutiny, the opinion did not alter the rigorous level of review applied in assessing statutory vagueness or the government's burden to provide empirical justification.  With that legal landscape unchanged, the Court rightly noted in its September 3, 2010, Order (Dkt. No. 206 at 3) that the legislature has failed to "directly and completely address the concerns . . . raised in connection with the Preliminary Injunction."  The Center, therefore, will largely rely on its preliminary injunction submissions, *see, e.g.*, Dkt. Nos. 1, 5, 29, 90, 154, 180, and the rulings thereon, Dkt. Nos. 37, 155.  But in connection with final disposition, the Center asks the Court to address a few additional issues.

Since the Court no longer is called upon to balance competing interests in the preliminary injunction context, but rather to fully implement the First Amendment and address claims exclusively on their merits, the Center also seeks final injunctions more appropriate to correcting the comprehensive First Amendment violations than the preliminary injunctions previously granted.  In that regard, the Supreme Court's ruling in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 823-24 (2000), is important:

> Indeed, to the extent the District Court erred, it was only in attempting to implement the less restrictive alternative through judicial decree . . . . The appropriate remedy was not to repair the statute, it was to enjoin the speech restriction. . . . [If] the Legislature wished to improve its statute, perhaps in the process giving careful consideration to other alternatives, it then could do so.

Similarly, the time here has come to enjoin the offending statutory provisions and leave it to the West Virginia legislature to craft proper legislation.  A proposed judgment is attached.

Finally, the earlier preliminary injunctions would have had little effect if, due to changes in the law, they were not followed by permanent protection.  Accordingly, the Court should protect speech made under the preliminary injunctions from application of the former law.

## I.   *CITIZENS UNITED* DID NOT ALTER THE LONG-STANDING REQUIREMENT THAT DISCLOSURE STATUTES MUST AVOID VAGUENESS.

Speech about how we are governed and those who govern us lies at the very core of the First Amendment. *Buckley*, 424 U.S. at 44-45, 47-48, 71 n.85 (1976).  Requiring those who speak on such topics to disclose their funding sources is a substantial burden on that core speech. *Id.* at 64.  The First Amendment forbids imposing such a burden unless the government, under "exacting scrutiny," demonstrates that the disclosures are tailored to serve "a substantial governmental interest."  *Id.* at 64, 80.

The First Amendment demands exceptional clarity of legislation burdening core speech since public discourse concerning how we govern ourselves is one of our most "precious freedoms."  *Id.* at 41.   Regulation in this area requires heightened precision and "an even greater degree of specificity" than for other activities.  *Id.* at 77 (internal quotations omitted).

This demanding standard applies when core speech is burdened by disclosure obligations, doubly so where criminal punishment is threatened.  *Id.* at 76-79.  The reason for demanding great clarity is simple:  to avoid the risk that speakers will "hedge and trim" and "steer far wider"

of speech that possibly may trigger regulation.  *Id.* at 41 n.48, 43, 78-79.  At bottom, vagueness suppresses core speech to which the legislation does not actually apply.  *Id.* at 79-80.

*Buckley*, the Supreme Court's seminal campaign finance case, addressed the facial vagueness of two federal campaign finance provisions.  The first federal provision imposed a dollar limit on "expenditures," a term defined as spending "relative to a clearly identified candidate."  *Id.* at 41-42.  The D.C. Circuit had tried to cure the definition's vagueness by limiting it to spending for speech "advocating the election or defeat of a candidate."  *Id.* at 42.  But that correction did not go nearly far enough to "eliminate the problem of unconstitutional vagueness."  *Id.*  Speakers still could not be confident what enforcers might conclude about implied meanings or subjective understandings or purposes.  *Id.* at 42-47.  *Buckley* held that the provision's unconstitutional vagueness could "be avoided only by reading [it] as limited to communications that include explicit words [that] in express terms advocate the election or defeat of a candidate."  *Id.* at 43-44 (the "express advocacy" standard).

The second vague federal provision addressed in *Buckley* required disclosures with respect to "expenditures" and "contributions," terms defined as using assets "for the purpose of influencing" nomination or election.  *Id.* at 77.  This statutory language posed "similar vagueness problems" to the provision first discussed.  *Id.* at 79.  To prevent needless suppression of core speech, the Court also construed this vague provision to apply to "communications that expressly advocate" by using explicit words such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."  *Id.* at 80 & n.108 (citing n.52).  Thus, with respect to provisions limiting or burdening core speech, *Buckley* rejected subjective standards turning on inferred meanings or purposes and demanded an explicit and objective standard.

The Court's September 3, 2010, Order (Dkt. No. 206 at 3) accurately observes that "several developments in campaign finance jurisprudence [have created] a legal paradigm that has now been significantly altered" in some respects.  *But there has been no change with respect to vagueness.*  The holding of *Citizens United* that reasonable disclosure – as opposed to direct limitations – could be required of all "electioneering communications," whether or not they were functionally equivalent to express advocacy, did not deal with vagueness.  130 S. Ct. at 915.  The Court already had held that the detailed and explicit statutory definition of "electioneering communication" was not vague.  *See McConnell v. FEC*, 540 U.S. 93, 194 (2003) (noting that the precise, detailed, and objective statutory definition simply "raises none of the vagueness problems that drove our analysis in *Buckley*").  Instead, *Citizens United* reflected the slightly lower standard of justification – "exacting" rather than "strict" scrutiny – that applies where speech is burdened by disclosure obligations, but not banned outright.  The Court held that, as to all electioneering communications, the government's informational interests were sufficient to satisfy the "exacting scrutiny" test applicable to disclosure requirements.  130 S. Ct. at 915-16.  To the extent West Virginia's definition of "electioneering communication" is the same, the State may rely on that holding.

Nothing in *McConnell*, *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL II*"), or *Citizens United* even hinted that disclosure statutes, however justified, may be *vague*, and they may not.  *See also NCRL v. Leake*, 525 F.3d at 301 (reporting and disclosure requirements may not be vague); *Nat'l Org. for Marriage v. McKee*, Civil No. 09-538-B-H, 2010 WL 3270092, *7-8 (D. Me. Aug. 19, 2010) (severing vague provision from PAC registration requirement).  To the contrary, where core speech is burdened, a lesser substantive standard of justification does not authorize greater vagueness.  *Fox Television Stations, Inc. v. FCC*, No. 06-

1760, 2010 WL 2736937, at *10 (2d Cir., July 13, 2010) ("Broadcasters are entitled to the same degree of clarity as other speakers, even if restrictions on their speech are subject to a lower level of scrutiny").  That is why *Buckley* had applied the same vagueness standards to both the disclosure requirements and speech limits.  424 U.S. at 41-44, 76-80.  As to each provision, it demanded and imposed an objective and precise standard.  *Id.*  And well after *McConnell*, the Fifth Circuit applied *Buckley* standards to hold that a Louisiana disclosure statute similar to the West Virginia provisions challenged here was vague, and it cured the vagueness by limiting it to express advocacy.  *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 665-66 (5th Cir. 2006).

In its earlier order granting a stay, *see* Dkt. No. 184, the Court also noted an apparent conflict between *NCRL v. Leake* and *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009).  However, the latter decision was vacated by the Supreme Court earlier this year, *see Real Truth About Obama, Inc. v. FEC*, 130 S. Ct. 2371 (2010).  A vacated decision has no precedential effect.  *See Los Angeles County v. Davis*, 440 U.S. 625, 634 n.6 (1979) (collecting authority).  The binding Fourth Circuit precedent is *NCRL v. Leake*.

## II.   WEST VIRGINIA'S LARGELY SUPERFICIAL AMENDMENTS TO THE DEFINITION OF "EXPRESS ADVOCACY" DO NOT REMEDY ALL THE VAGUENESS ISSUES.

This Court's February 12, 2009, opinion ("Feb. 12 Op.")[5] recognized the fundamental problems inherent in West Virginia's attempt to regulate "express advocacy."  In its analysis of then-subpart (B) of W. Va. Code § 3-8-1a(13)(B) (2008), the Court explained (at 20-21) that the provision "fails to comport with the boundaries set by *Buckley* [because it] . . . in no way

---

[5]      The original version of the Court's opinion was issued on October 17, 2008.  All citations herein are to the February 12, 2009, opinion (Dkt. No. 155) that replaced the Court's prior ruling.

incorporates the definition of 'electioneering communication' as adopted in BCRA[6] [and it] . . . does not comply with Chief Justice Roberts' formulation of the functional equivalent of express advocacy [and] . . . runs directly counter to [Justice Roberts' opinion in *WRTL II*]."[7]  *See also NCRL v. Leake*, 525 F.3d at 281-85.  The Court further observed that other portions of then-subpart (A) likewise appeared to conflict with the controlling *WRTL II* opinion.  *See* Feb. 12 Op. at 17 n.11.

In March, the West Virginia legislature partially responded to the Court's concerns by making a few superficial modifications to the statute and breaking up the definition into three parts.  West Virginia now defines "expressly advocating" to cover a communication that comes within the following three categories:

> (A)  Uses phrases such as "vote for the Governor," "re-elect your Senator," "support the Democratic nominee for Supreme Court," "cast your ballot for the Republican challenger for House of Delegates," "Smith for House," "Bob Smith in '04," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidates, "reject the incumbent"; or

> (B)  Communications of campaign slogans or individual words, that can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, advertisements, etc., which say "Smith's the One," "Jones '06," "Baker", etc; or

> (C)  Is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.

W. Va. Code § 3-8-1a(12).  Subsection (A) is based on *Buckley* and provides clear, objective guidance enabling speakers to determine whether a particular communication is regulated as

---

[6]         The Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (2002).

[7]         Unless otherwise noted, all citations herein are to the opinion of Chief Justice Roberts, which is controlling. *See Marks v. United States*, 430 U.S. 188, 192-93 (1977); *Horn v. Thoratec Corp.*, 376 F.3d 163, 175 (3d Cir. 2004).

"express advocacy."  But subsections (B) and (C) continue to subject speech to regulation and potential penalty while relying on impermissible determinations about "reasonableness."

In the case of subsection (B), the legislature removed the words "in context" from the statute but nevertheless retained the equally problematic phrase "reasonable meaning." "Meaning," however, is defined as "the thing one *intends* to convey, [especially] by language." Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (emphasis added).  At its core, subsection (B) merely disguises an impermissible intent-and-effect test that raises the same problems identified by Chief Justice Roberts in *WRTL II*, 551 U.S. at 467-69.  It exposes speakers to *post hoc* inferences of precisely the type that *Buckley*'s demand for "explicit" advocacy sought to prevent.

Subsection (B) appears to be a flawed attempt to give effect to *Buckley*'s statement that some campaign slogans, such as "Nixon's the One," may constitute express advocacy.  424 U.S. at 44 n.52.  But *Buckley*'s ruling simply reflects the obvious fact that words mean what they are commonly used to communicate.  *See, e.g.*, *Director, Office of Workers Compensation Program v. Greenwich Collieries*, 512 U.S. 267, 276 (1984) (meaning of "burden of proof" is determined by examining current usage).  Where a distinctive campaign slogan is being actively used to advocate election of a candidate, it may acquire that explicit meaning, just as "Baby Ruth" has come to mean a particular candy bar.  Truly distinctive and current campaign slogans thus are regulated under *Buckley*'s express advocacy test (subsection (A) of West Virginia's definition), though it is essential to avoid subjective speculation as to intended or implied meaning.  Those applying the test always must "err on the side of protecting political speech."  *WRTL II*, 551 U.S. at 457.  Subsection B reaches far beyond the type of explicit and express slogans identified by

*Buckley* and threatens to punish speech based on unspecified considerations of allegedly "reasonable" meanings.  The statute is, therefore, unconstitutional on its face.[8]

Subsection (C) has its own vagueness problem.  Although the amended statute now incorporates certain language from the *WRTL II* opinion, the legislature inexplicably overlooked the important precondition Chief Justice Roberts identified at the outset: the "test is only triggered if the speech meets the brightline requirements of BCRA § 203 in the first place." *WRTL II*, 551 U.S. at 474 n.7.  *See also NCRL v. Leake*, 525 F.3d 274, 281-85 (4th Cir. 2008) (permissible alternatives are (i) express advocacy or (ii) an electioneering communication that also is "functional[ly] equivalent," which includes, *inter alia*, limiting regulation to the 30/60 day pre-election windows).

The point is simple.  *Buckley* demands a facially clear standard.  424 U.S. 78-80 & n.108. *McConnell* holds that the "electioneering communication" standard is facially clear – i.e., not vague.  540 U.S. at 194.  *WRTL II* holds that the government cannot justify applying this clear definition to speech that is not "functionally equivalent" to express advocacy, 551 U.S. at 457. And no authority holds that a judicial construction limiting the application of a facially clear statute must itself meet the vagueness standards applicable to legislation.

Unlike the federal statute, West Virginia's "no reasonable interpretation" test supplants the facially clear "express advocacy" definition, but it lacks the objective safeguards identified in *WRTL II*.  Without this crucial element, a communication aired in West Virginia may be subjected to regulation based on a "reasonable interpretation" regardless of whether it is aired 30

---

[8]    Subsection (B) cannot reasonably be construed to demand explicit and express advocacy, because it would duplicate subsection (A).  To the extent it goes further, however, it is vague and should be struck down.

or 300 days before an election.  While perhaps well-intentioned, the 2010 amendments thus do precious little to ease the statutory vagueness.[9]

The other problem with both subsections (B) and (C) is that the statute provides no direction or guidance about who gets to decide whether a "meaning" or "interpretation" is reasonable.  *See WRTL II*, 551 U.S. at 493. (Op. of Justice Scalia, concurring in part).  *See also* Feb. 12 Op. at 21 (noting difficulties inherent with determining "reasonable" person's experience, intelligence, and sophistication).  If the communicant or some other third-party articulates a reasonable interpretation of the ad, does that bind the Secretary of State even if she disagrees?  Or does the Secretary have blanket authority to disregard a communicant's explanation and only use meanings or interpretations that she finds reasonable?  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), holds that leaving such decisions "to policemen, judges, and juries for resolution on an ad hoc and subjective basis" is not consistent with acceptable standards for avoiding vagueness.  But nothing in the West Virginia statute limits the role of state regulators in making such determinations, and the lack of fair warning of what communications may be covered only exasperates speakers' fears that their "reasonable" interpretations will be set aside long after any communications have aired.  *Cf. NCRL v. Leake*, 525 F.3d at 284 (emphasizing needs for "clear notice as to what communications could be regulated" to avoid chilling political expression).  And if "the First Amendment protects anything, it is the right of political speakers to express their beliefs without having to fear

---

[9]     While the Court correctly observed in its February 12, 2009, Opinion (at 21) that West Virginia law did not even comply with the "appeal to vote" language of *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL II*"), that was simply one part of a two-step analysis and is not by itself sufficient to remedy the vagueness issue.  *See, e.g., NCRL v. Leake*, 525 F.3d at 297.

subsequent civil and criminal reprisals from regulators authorized to employ broad and vague definitions as they see fit."  *Id.* at 302.

Thus, the Court should declare that both subsections (B) and (C) of W. Va. Code § 3-8-1a(12) are unconstitutionally vague and enjoin enforcement of all West Virginia's regulation of "express advocacy," except under subsection (A), which adopts *Buckley*'s "magic words" definition.

## III.   WEST VIRGINIA'S ELECTIONEERING COMMUNICATION PROVISIONS ARE FACIALLY INVALID IN THEIR ENTIRETY OR, IN THE ALTERNATIVE, TO THE EXTENT THAT THEY APPLY TO SPEECH USING NON-BROADCAST MEDIA.

The Court's February 12 Opinion indicated that West Virginia's burdens on "electioneering communications" were unconstitutional in several respects:

- Defendants "failed to show how West Virginia's definition of 'electioneering communication' is narrowly-tailored despite the fact it is broader than the definition in BCRA."  Feb. 12 Op. at 38;

- Defendants failed to show "that including print media in the definition of 'electioneering communication' will 'truly work to serve important or compelling government interests.'"  Feb. 12 Op. at 40; and

- The evidence offered to justify the definition of electioneering communications that covers print media was either "conclusory, . . . anecdotal instead of empirical, . . . or not specifically applicable to West Virginia."  Feb. 12 Op. at 40-41.

However, because *McConnell* had held that federal restrictions on electioneering communications in certain broadcast media were facially valid, this Court tailored its *preliminary* injunction to protect only non-broadcast speech.  For purposes of final relief, the Center asks the Court to go further and hold that considerations not applicable to the federal analog require that the broadcast provisions also be struck down.  *See Playboy Entm't Group*, 529 U.S. at 823-24.

**A.    West Virginia's Regulation of Non-Broadcast Communications Remains Unjustified and Unconstitutional.**

Rather than correct the constitutional infirmities identified in the Court's February 12 opinion, the West Virginia legislature insists on regulating virtually all types of non-broadcast mass media, but it does so without developing the type of convincing factual record that the Supreme Court relied upon to sustain the carefully limited federal standard.  For example, the statute continues to burden communications "published in any newspaper, magazine or other periodical."  W. Va. Code § 3-8-1a(11).  Yet nothing the legislature has done in the two years since issuance of the preliminary injunction undercuts this Court's initial reasoning or justifies regulation of non-broadcast communications.  In fact, the legislative record and statutory text show that state lawmakers essentially ignored this Court's clear directive to provide "concrete data supporting the inclusion of print media."  Feb. 12 Op. at 41.  And nothing in *Citizens United* or any other case decided since issuance of the preliminary injunction relieves the Government of that obligation here.  Even under exacting scrutiny, the Government must still demonstrate an evidentiary basis for regulating speech.[10]

These are not just the Center's views.  During debate on H.B. 4647, a number of senators criticized the legislature's decision to include print media in the amended statute.  State Senator Evan Jenkins (D-Cabell), who ultimately voted for the bill, observed that the legislature was

---

[10]      *See, e.g.*, *John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2819 (2010) (noting that harms justifying disclosure were "not merely hypothetical" but empirically supported); *Citizens in Charge v. Brunner*, 689 F. Supp. 2d 992, 993 (D. Ohio 2010) (examining evidence in applying exacting scrutiny to compelled disclosure statute); *Broward Coalition of Condominiums v. Browning*, No. 4:08cv445, 2008 U.S. Dist. LEXIS 91591, at *18 (N.D. Fla. Oct. 29, 2008) ("[n]o matter what level of scrutiny applies, . . . real evidence" is required); *McConnell v. FEC*, 251 F. Supp. 2d 176, 422-26 (D.D.C. 2003), *aff'd on appeal*, 540 U.S. 93 (2003) (Op. of Judge Henderson) (critiquing government's "remarkably thin" evidence offered as a "sufficiently important interest"), 717-18 (Op. of Kollar-Kotelly) ("evidence presented is insufficient" to satisfy exacting scrutiny).

"getting the cart before the horse" by including print media with almost no fact-finding,

testimony, or research by the legislature.  He predicted that:

> [I]f the Judge wants to look at the record, he will see that it came
> up in Senate Judiciary [and we] passed this out in seven
> minutes. . . . There wasn't any discussion about the research, and
> the data, and the information that justified why we are expanding
> this to the print media. . . . If we get struck down a third time,
> which we probably will if the Court looks at the process that we
> went through because we haven't collected that data ourselves and
> made an informed decision based on that data[,] . . . please, when
> we do it the fourth time, let's do it right.

*See* Dkt. No. 198, Ex. A at 12:28-16:05.  Moreover, Senator Jeffrey Kessler (D-Marshall), Chair

of the Senate Judiciary Committee, admitted during a colloquy on the senate floor that there had

been no public hearings on the bill, that he personally did not have any specific data to

substantiate regulation of print media, and that he had only "been advised" that some affidavits

supporting the new law had been submitted describing the factual basis for the law, but that he

had not even reviewed them.  *See id.* at 7:30-7:55.  As the Court observed in its earlier opinion,

this hardly constitutes a sufficient record upon which to "blaze [a] trail" for regulating print

communications.  Dkt. No. 155 at 41.[11]

---

[11]     The Center noted in its opening Memorandum of Law supporting its preliminary injunction request that the
state's attempt to regulate electioneering communications in print media also raised vagueness issues when
determining how to apply the statute.  *See, e.g.*, Dkt. No. 5 at 16 (noting that "the time of public dissemination is
quite vague" for newspaper and periodical ads).  *See also* Dkt. No. 198 at 7 (noting that the phrase "targeted to the
relevant electorate" is vague in the context of newspapers, magazines, and other publications), 8 (noting challenge to
the phrase "publicly disseminated").  Moreover, there has been no showing by the state that the numerical
population thresholds for non-broadcast media should necessarily be the same as for broadcast advertisements.  As
noted in the February 12 Opinion, these challenges were mooted when the Court ruled that West Virginia's entire
attempt to regulate print media as an electioneering communication was unconstitutional.  Dkt. No. 155 at 41 n.26.
Relying on this conclusion, the Center notes – but does not separately reiterate here – its vagueness challenges to the
terminology used to regulate print media.  *See also* Dkt. No. 37 at 11-12 (where Judge Faber notes the potential
vagueness problems associated with regulation of "printed or published materials").

**B.   West Virginia's Regulation of Broadcast Communications Has Unconstitutional Features Not Present In Its Federal Analog and Not Otherwise Justified.[12]**

**1.   West Virginia's Statute Lacks the Clarity and Procedural Safeguards of Its Federal Counterpart.**

West Virginia's electioneering communication statute also lacks an important safeguard incorporated into federal law – a clear and objective way to determine the essential elements of "targeting."  As part of the federal electioneering communication statute, Congress required the Federal Communications Commission to provide an electronic database of states and congressional districts, overlaid with various media outlets, to enable prospective communicants to gauge whether ads run on a particular station could reach 50,000 residents in a specific state or district.  *See* BCRA, § 201(b).  Reliance on the database is a "complete defense."  11 C.F.R. § 100.29(b)(6)(i).  This both provides a clear and objective standard to guide speakers and greatly reduces the burden of compliance.  That precision is critical to the facial validity of the federal standard.

By contrast, West Virginia provides no comparable method for verifying whether a particular communication may be received by the requisite number of individuals.  Given the state's relatively small triggering thresholds, it will often be difficult – particularly in rural communities – to judge whether a specific communication will reach a sufficient number of individuals to trigger regulation.  Without any objective mechanism for measurement, prospective speakers will hedge, trim, and steer clear, suppressing core speech.  *Buckley*, 424 U.S. at 43.  That is not constitutionally tolerable.

---

[12]    Many of the problematic features of the broadcast communication restrictions discussed in the following sections apply equally to non-broadcast media.

Defendants' suggested "fix" illustrates how acute the problem actually is.  The best they can do is refer speakers to the website of an obscure organization with limited publicly-available information about *aggregate* circulation totals.  *See* Dkt. No. 199 at 9 n.9.  Unlike the federal database, however, such websites do not provide district-by-district statistics, which is the level of analysis required by the statute.  *See* W. Va. Code § 3-8-1a(24) (noting that the relevant criteria for legislative elections is whether "individuals *in the district*" can receive a communication) (emphasis added).  Nor do they address the question of how many readers may see a given publication.  West Virginia's statute simply falls short of its federal analog in this vitally important area.

## 2.    Many of the Statutory Exceptions Are Vague.[13]

"Due process requires that [an ordinary] criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal[.]"  *Buckley*, 424 U.S. at 77.  Where First Amendment rights are implicated, however, "an even 'greater degree of specificity' is required."  *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)).  *See also United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (stressing the greater demands of the First Amendment).  The First Amendment does not tolerate gray zones where speakers must hedge, trim, or stand silent to avoid risk.  *Buckley*, 424 U.S. at 43-44.  Nor does it permit room for speech to be punished under fuzzy or subjective tests that invite government discretion.  *Id.* Instead, where speech is at risk, lines must be objective, precise, and narrow.  *Citizens United*,

---

[13]    In its February 12, 2009, opinion (at 41 n.26), the Court did not find a "substantial likelihood of success on the merits" regarding the exceptions because, in part, the Center "did not present this argument at the motion hearing."  Although the Center did not press those arguments in the limited context of pursuing the preliminary injunction, the Center summarized these concerns in its March 24, 2008, Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 5 at 17-18), and now reasserts those arguments in greater detail here.

which dealt with the Government's ability to require disclosure, did not change the vagueness analysis.

Despite Judge Faber's April 22 warning, West Virginia's exceptions to the definition of electioneering communication lack these essential safeguards and provide no precise and objective guidance for willing speakers.  The vague standards only serve to "empower administrators to burden core political expression" in ways that violate the First Amendment's central protections.  *NCRL v. Leake*, 525 F.3d 296-97.  Here are several examples:

> **(a)  The "Grassroots Lobbying" Exception Impermissibly Discriminates Based on the Content and Viewpoint of a Communication, and Also Is Vague.**

West Virginia decided that its electioneering communication provision should not apply to certain grassroots lobbying.  However, the West Virginia provision imposes content-based limits that the Defendants cannot justify.  W. Va. Code § 3-8-1a(11)(B)(v).  Specifically, West Virginia's provision excludes from regulation:

> A communication made while the Legislature is in session which, incidental to promoting or opposing a specific piece of legislation pending before the Legislature, urges the audience to communicate with a member or members of the Legislature concerning that piece of legislation.

This provision obviously is content based.  It applies to a communication only if it (i) "refers to a clearly identified candidate,"[14] (ii) is "incidental to promoting or opposing" legislation, and (iii) "urges the audience to communicate . . . concerning that piece of legislation."  It also is viewpoint based – disfavoring communications that advocate taking action

---

[14]    This is from the definition of "electioneering communication," to which this is an exemption.  W. Va. Code § 3-8-1a(11)(A)(i).

and favoring those that advocate inaction. Most critically, it regulates the content of core First Amendment speech.

Thus, this provision is subject to strict scrutiny. *Playboy Entm't Group*, 529 U.S. at 813; *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004) ("[a]s a content-based restriction on expression, [a] statute may only be upheld if it survives strict scrutiny"); *Sons of Confederate Veterans, Inc. v. Commissioner of Virginia Dept. of Motor Vehicles*, 288 F.3d 610, 616 & n.4 (4th Cir. 2002) ("Where the Government imposes viewpoint-based restrictions, we evaluate the restrictions pursuant to strict scrutiny. . . . [V]iewpoint-based restrictions of private speech are presumptively unconstitutional."); *Schirmer v. Edwards*, 2 F.3d 117, 120 (5th Cir. 1993) ("content-based restrictions" must "still be gauged under the strict scrutiny standard even [if they are] viewpoint-neutral"). It must be invalidated unless Defendants can prove that the distinctions it draws are necessary to serve a compelling interest that no less restrictive alternative can adequately achieve, and that it is exceptionally precise so that there can be no need to hedge, trim, or steer clear of possible risk. *Ashcroft v. ACLU*, 542 U.S. at 665; *Buckley v. Valeo*, 424 U.S. 1, 43-44 (1976); *PSINet, Inc.*, 362 F.3d at 233-34.[15]

Defendants cannot make the necessary showing. Indefensible aspects of the provision include the following:

- What evidence supports the limitation that such favored speech may only be made "while the Legislature is in session?" Why must West Virginia disfavor speech

---

[15] "The fact that these content-based provisions take the form not of regulations but of <u>exceptions</u> from regulations is immaterial." *Solantic LLC v. City of Neptune Beach*, 410 F.3d 1250, 1264 n.13 (11th Cir. 2005) (emphasis in original) (citing and quoting *Ackerley Commc'n of Mass., Inc. v. City of Somerville*, 878 F.2d 513, 521 (1st Cir. 1989)). Because it is a content-based exception, it is still subject to strict scrutiny. *See id.* at 1256 n.6, 1267 (noting that "[c]ontent-based exemptions . . . raise serious questions of constitutionality" and are subject to strict scrutiny; *see also Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998) ("[C]ontent-based exemptions may pass constitutional muster only if they are the least restrictive means to further a compelling interest.").

that is made outside the legislative session, while legislators are away from Charleston and at home in their districts?[16]

- What evidence shows it is essential for the favored speech to concern "a specific piece of legislation" that already is "pending before the Legislature?"  Why must West Virginia disfavor speech concerning a bill that has been proposed but not yet introduced, or speech urging that a bill be drafted to address a topic?

- What evidence shows it is necessary for favored speech to urge communication with a member of the legislature?  Why must West Virginia disfavor speech urging communication with a non-incumbent candidate for the legislature?

- Why must West Virginia favor speech urging contact with a legislator over speech urging contact with the Governor or other executive officials urging them to take or refrain from taking official action, e.g., that a pending or proposed bill be supported, that a passed bill be signed into law or vetoed, that a prison sentence be commuted, or that an official policy be established, modified, or revoked?

- What evidence makes it critical to favor communications that support or oppose legislation over those that advocate different action, e.g., that a bill be amended, or subjected to hearings, that a nominee be confirmed or rejected, or that a vote be expedited or delayed?[17]

The provision also is vague.  Much like the "essential nature" inquiry held vague in

*NCRL v. Leake*, 525 F.3d at 283-84, there are no objective standards to determine at what point

an "incidental" grassroots lobbying communication becomes subject to state campaign finance

laws.  Moreover, as applied to candidates, terms like "promoting" and "opposing" repeatedly

have been held impermissibly vague.  *Carmouche*, 449 F.3d 655, 665-66 (5th Cir. 2006)

---

[16]     Note that the Supreme Court rejected the claim that an ad should be regulated because it aired outside the legislative session.  According to the Court, legislators "often return to their districts during recess, precisely to determine the views of their constituents; an ad run at that time may succeed in getting more constituents to contact the Representative while he or she is back home.  In any event, a group can certainly choose to run an issue ad to coincide with public interest rather than a floor vote."  *WRTL II*, 551 U.S. at 472-73.

[17]     This statutory provision has superficial similarities to the "as applied" limitations imposed on the federal standard by the Supreme Court in *WRTL II*.  However, its explicit terms cannot fairly be construed to describe the broader *WRTL II* holding, which was delivered in the context of ads regarding U.S. Senate votes on judicial nominees – ads that, because they did not address a "specific piece of legislation pending before the Legislature," would not fall within this state exception.  Since the West Virginia legislature expressly considered the precise subject and adopted an impermissibly narrow provision, the courts may not re-write the statute in an attempt to mirror the *WRTL II* holding.

(holding that "support" and "oppose" are vague terms); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 712-13 (4th Cir. 1999) (same).  Sometimes those terms have been saved by giving them a "narrowing construction" that limits them to *Buckley* express advocacy. *Carmouche*, 449 F.3d at 665-66.  But that option is not available here because narrowing the construction of these terms narrows the exception to regulation and, hence, actually expands the speech subject to regulation.[18]

It is no answer for Defendants to argue that this vague provision is an exception that relaxes the statutory burden on speech and that speakers should be grateful for it.  The right to speak freely, particularly on matters of governance, is never a matter of legislative grace.  As a matter of constitutional duty, the legislature must impose only those speech burdens that are necessary and proper when judged by strict scrutiny, and none other.  Since there is a category of speech the legislature has deemed unnecessary to burden or otherwise regulate, the First Amendment compels Defendants to prove that the legislature defined that category with precision.  They cannot do so.

> **(b)    The Exception for Voter Guides and Other Similar Communications Is Vague and Impermissibly Hinges on a Speaker's Intent.**

The state's electioneering communication statute exempts "voter guides" from its broad restrictions on issue-based speech, but only those which, *inter alia*, contain "<u>no appearance of</u>

---

[18]    Moreover, Defendants cannot claim that the legislature intended that "promoting" and "opposing" are to be narrowly construed as "express advocacy" because such a standard only applies to speech about candidates, not issues.

endorsement" and are "<u>intended</u> as nonpartisan public education focused on issues and voting history."  W. Va. Code § 3-8-1a(11)(B)(viii) (emphasis added).[19]

This provision absolutely bristles with vague terms.  Abundant authority holds that language like "endorsement for or opposition to" a candidate is vague.  *See, e.g.*, *Bartlett*, 168 F.3d at 712-13 (holding "support" and "oppose" to be vague).  The statute here fails to offer any criteria – much less provide an objective, bright-line standard – for evaluating whether a particular communication has the "appearance of an endorsement."  Requiring a speaker to judge how a message will appear to others creates fatal uncertainty.  *WRTL II*, 551 U.S. at 469; *Buckley*, 424 U.S. at 43; *NCRL v. Leake*, 525 F.3d 274, 283-84 (4th Cir. 2008).  Moreover, this Court has already opined that to determine whether a voter guide actually endorses or opposes a candidate "invites just the sort of constitutional questions the Court sought to avoid" in *Buckley*. *West Virginians For Life, Inc. v. Smith*, 960 F. Supp. 1036, 1040 (S.D. W.Va.) (internal quotation omitted).

The exception's intent-based component likewise is impermissible for the reasons noted by Chief Justice Roberts:

> Far from serving the values the First Amendment is meant to protect, an intent-based test [like at issue here] would chill core political speech by opening the door to a trial on every ad . . . . [This type of] standard "blankets with uncertainty whatever may be said," and "offers no security for free discussion." . . . "First Amendment freedoms need breathing space to survive."  An intent test provides none.

---

[19]      Neither the statute, nor the Center's challenge, are limited to voter guides in print or electronic format.  A voter guide also may take the form of television or radio advertising.  In any event, the statute merely uses the term "voter guide" as one example of a type of exempt "communication."  W. Va. Code § 3-8-1a(11)(B)(viii).  Thus, the question of whether a wide variety of media – and not just written handouts or e-mails – qualify for the exemption impermissibly hinges on the intent standard as discussed below.

*WRTL II*, 551 U.S. at 468-69 (internal citations omitted).  Vagueness is compounded by linking intent to the term "nonpartisan," which in this context can mean many things.

The statute's use of the term "focused on" multiplies the vagueness problem that the intent standard creates.  One plausible way to read this phrase is in relative terms – i.e., one "object can be more in focus than another."  *Cytyc Corp. v. TriPath Imaging*, 505 F. Supp. 2d 199, 233 (D. Mass. 2007).  Viewed in this manner, a communication could be exempt where 51% of the ad space is devoted to "issues and voting history," while the remaining 49% discusses something else.  A second reading is that the "point of concentration" or exclusive focus of the communication must be on "issues and voting history" to qualify as an exempt communication.  *Random House Roget's College Thesaurus*, 282 (2000).  The statute does not speak to which of these two (or perhaps more?) readings is correct, and speakers are forced to either stand silent or gamble that a jury will ultimately agree with their conclusion.  This type of false choice does not comport with the Court's directive that "'[p]recision of regulation must be touchstone' where core First Amendment rights are regulated."  Apr. 22 Op. at 7-8 (Dkt. No. 37).

> **(c)**      **The Exception for "Bona Fide" News Accounts Is Vague and Leaves Too Much Discretion to Regulators.**

The statute also exempts certain "bona fide news account[s]" from its coverage.  W. Va. Code § 3-8-1a(11)(B)(i).  But this exception is just as problematic as the first.  Deciding what constitutes a "bona fide" news account "is necessarily left to unbridled administrative discretion[,] . . . unguided by anything other than what [the Secretary of State or any county prosecutor] determines to be in the public interest" on a given day.  *Walker v. Wegner*, 477 F. Supp. 648, 653 (D.S.D. 1979) (finding exception for "bona fide" religious organizations in a charitable solicitation statute unconstitutionally vague).  *See also Duke v. Connell*, 790 F. Supp. 50, 54 (D.R.I. 1992) (holding that statute limiting ballot access to "bona fide national

23

candidate[s]" did "not provide any meaningful criteria").  And "[i]f the First Amendment

protects anything, it is the right of political speakers to express their beliefs without having to

fear subsequent civil and criminal reprisals from regulators authorized to employ broad and

vague definitions as they see fit."  *NCRL v. Leake*, 525 F.3d at 302 (citing *Buckley*, 424 U.S. at

43).

### 3.  The West Virginia Legislature Has Articulated No Basis for Enacting a Blanket Exemption for Communications by a 501(c)(3) Organization, but Not a 501(c)(4).

Without any apparent explanation, much less an actual one provided by the legislature,

§ 3-8-1a(11)(B)(iv) adopts a *per se* rule that any communication by an organization "operating

under Section 501(c)(3) of the Internal Revenue Code" is automatically exempt from regulation.

But other tax-exempt organizations under § 501(c) – including the Center – receive no such

blanket exemption.  The difference in the burdens imposed on the fundamental right of free

speech is not justified.  Moreover, this provision, however, does not define "operating under."

Federal tax law does not require prior Internal Revenue Service ("IRS") approval to begin

claiming 501(c)(3) status.  IRS, *Contributions to Organization with IRS Application Pending*,

(updated July 30, 2010) *available at*

http://www.irs.gov/charities/charitable/article/0,,id=164254,00.html ("while an application is

pending, the organization can treat itself as exempt from federal income tax under section

501(c)(3)").  Is such a claim enough for *per se* protection?  Is a good faith claim necessary?  If

the IRS letter disapproves 501(c)(3) status, is the organization at risk retroactively?  Are West

Virginia authorities bound by federal IRS determinations, or may they decide for themselves whether 501(c)(3) status is proper?[20]

In addition to the vagueness, the provision violates equal protection.  Statutes that treat various types of 501(c) organizations differently "are subjected to a higher level of scrutiny," i.e., strict scrutiny, under the Equal Protection Clause, "if they interfere . . . a fundamental right, such as freedom of speech."  *Regan v. Taxation with Representation*, 461 U.S. 540, 547 (1983).[21]  The state has not offered any justification – much less a compelling one – to explain why different non-profit organizations should receive such disparate treatment.

### C.   West Virginia's Electioneering Communication Provisions Intentionally Burden Substantial Protected Speech and, Hence, Are Facially Invalid.

The electioneering provisions cannot be saved by striking down these exceptions in isolation since the result would be to impose substantially more burdensome speech restrictions than the legislature intended and authorized.  *See, e.g.*, *Rappa v. New Castle County*, 18 F.3d 1043, 1072-73 (3d Cir. 1994) (invalidating entire subchapter when severing exception would restrict more speech).  Similarly, imposing a narrowing construction on an exemption from a restriction on speech expands the basic restriction beyond the clear legislative authorization – an improper role for a court.  *See, e.g.*, *West Virginia Pride, Inc. v. Wood County*, 811 F. Supp. 1142, 1150 (S.D. W. Va. 1993) (noting that "federal courts lack jurisdiction to authoritatively

---

[20]    Such concerns are not unfounded.  In fact, the Attorney General has argued that West Virginia authorities should not be bound by the IRS's determination that the Center qualifies as a 501(c)(4) organization.  *See* Dkt. No. 154, Ex. T at 2.

[21]    Strict scrutiny is particularly appropriate where a legislative body "aim[s] at the suppression of dangerous ideas," including speech that is critical of the government and its policies.  *Regan v. Taxation with Representation*, 461 U.S. 540, 547, 548, 550 (1983); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 n.16 (1950) (collecting authority).  *See also Leathers v. Medlock*, 499 U.S. 439, 452 (1991) (strict scrutiny applied to classifications that were "intended to suppress . . . ideas" or where there was evidence "that it had that effect.").

construe state legislation"). Nor are there readily apparent narrowing constructions. Thus, the vagueness affects the entire provision.

West Virginia's restrictions are unsustainable for a second reason. Under the overbreadth doctrine, a statute is unconstitutional where (1) a substantial amount of protected speech is prohibited compared to the law's "plainly legitimate sweep," and (2) no "limiting construction" or "partial invalidation" exists that could remove the threat to protected expression. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 512, 515 (4th Cir. 2002). Resolution of the second question is controlled by state law, *see Muller v. Curran*, 889 F.2d 54, 57 (4th Cir. 1989), and in West Virginia, "the most critical aspect of severability analysis involves the degree of dependency of statutes." *West Virginia v. Stamm*, 664 S.E.2d 161, 167 (W. Va. 2008) (internal quotation marks and citation omitted). *See also* W. Va. Code § 2-2-10(cc). If provisions are "connected and interdependent in subject matter, meaning, or purpose [so] as to preclude the belief . . . that the Legislature would have passed the one without the other, the whole statute will be declared invalid." *Stamm*, 664 S.E.2d at 167. And where the bulk of a provision is invalid, courts should refrain from "rummaging through the entire Act, patching together sentences which we feel would reach a constitutional result." *W. Va. Trust Fund, Inc. v. Bailey,* 485 S.E.2d 407, 422 (W. Va. 1997). *See also Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 788 n.21 (4th Cir. 1996) (rejecting severability where unconstitutional provisions were important to the overall scheme and may have affected relevant compromises); *Nat'l Adver. Co. v. Niagara,* 942 F.2d 145, 148 (2d Cir. 1991) ("We should not . . . treat a severability clause as an invitation . . . to write whatever statute we can fashion from the constitutional remnants.").

The legislature has all but conceded this test by placing such emphasis on non-broadcast electioneering communications. *See, e.g.*, *id.* § 3-8-1(a)(3) (noting that non-broadcast media was

"widely used" and "prevalent" during periods leading up to an election), (a)(10) (finding that "[c]ertain non-broadcast communications . . . *can be more effective campaign methods than broadcast media*"), (a)(7) (emphasizing that "[f]ailing to regulate non-broadcast media would [frustrate] the principles and policies that are embodied in existing state law") (emphasis added). Moreover, once the vague exceptions are stricken and *WRTL II*-style challenges are upheld, little of the legislature's original regulatory purpose is left.  With a multitude of variables to consider and so many errors to correct, courts should not presume how the legislature would react.  The proper remedy is to strike down the provisions and allow the legislature to enact an electioneering communication statute that actually comports with the Constitution – without substantial judicial intervention and revision.  *See Randall*, 540 U.S. at 262 (plurality opinion).

IV.   **THE REPORTING REQUIREMENTS FOR ELECTIONEERING COMMUNICATIONS AND INDEPENDENT EXPENDITURES USE VAGUE TERMINOLOGY THAT MUST BE SEVERED OR NARROWLY CONSTRUED.**

A.   **The Requirement to Disclose the Names of Persons "Sharing or Exercising Direction or Control" Over the Person's Activities is Vague.**

West Virginia's "electioneering communication" reports require disclosure of "the name of any person sharing or exercising direction or control over the activities of the person making the expenditure."  W. Va. Code § 3-8-2b.  *See also id.* § 3-8-2(b)(1)(A) (requiring disclosure of the same information for independent expenditures).  But the statute offers no guidance on what it means to "direct[] or control" an entity, much less to "share" such control.  Moreover, the statute's reference to "activities" is equally vague and may plausibly be read to encompass (1) only the political/policy speech of an organization or (2) everything that the organization does.  Under one reading of the statute, organizations could be required to disclose individuals, like an Executive Vice-President of Human Resources, who have some decision-making authority on matters completely outside the campaign finance realm.  But the legislature would

27

be hard-pressed to justify such burdensome and intrusive disclosures if that was its intention.

The larger point, however, is that the statutory vagueness prevents speakers from discerning

exactly what information must be reported.

West Virginia's law appears to largely be modeled after a similar federal provision. *See*

2 U.S.C. § 434(f)(2)(A). But recognizing the vagueness inherent in the federal statute, the

Federal Election Commission ("FEC") subsequently promulgated its own regulation clarifying

that disclosure is limited to "officers, directors, executive directors or their equivalent, partners,

and in the case of unincorporated organizations, owners, of the entity or person making the

disbursement for the electioneering communication." 11 C.F.R. § 104.20(a)(3). The FEC

selected this "bright-line alternative" from among several other proposals "in order to avoid the

vagueness involved in describing the functions that the rule intended to capture." *Bipartisan

Campaign Reform Act of 2002 Reporting; Coordinated and Independent Expenditures; Final

Rules*, 68 Fed. Reg. 404, 411 (Jan. 3, 2003). Here, however, West Virginia has not adopted any

additional clarification or safeguards to eliminate the statutory vagueness, and speakers are left to

guess, with the prospect of criminal penalties if state regulators take a different view, at the

information required to be disclosed. Rather than itself rewriting this requirement to provide

clear, objective standards, the Court should declare this provision unconstitutionally vague and

enjoin its enforcement, leaving to the legislature the responsibility for articulating a

constitutionally permissible disclosure requirement.

**B.      The Phrase "Support Or Oppose" Requires Clarification When Used to
          Classify Speech.**

West Virginia defines a "political committee" to include a "committee organized . . .  for

the purpose of supporting or opposing the nomination or election of one or more candidates."

W. Va. Code § 3-8-1a(19), (20). The February 12 Opinion (at 30-32) held this definition was at

least as precise as the test relating to political committees approved in *McConnell*, 540 U.S. 93,

170 n.64 (2003), and, hence, was not facially vague or overbroad in that context.  However, the

Opinion included a discussion (at 30-31) that might be read to suggest that "support or oppose"

is precise enough to be substituted for the express advocacy or electioneering communication

tests as a standard for regulating particular statements.  The Center respectfully requests that the

Court clarify that aspect of its opinion.

Determining the purpose of an organization is a different matter from classifying

particular statements in ongoing discourse.  Those who organize and control an organization can

specify the purpose for which it is organized in its foundational documents.  West Virginia law

does not, on its face, purport to look beyond the purpose at the time of organization, and it

should not be extended by implication.  But even if assuming that an organization's sustained

conduct ultimately may establish a new organizational purpose, an organization's nature still is

relatively stable and need not be reassessed on a day-by-day basis.  There is time for reflection

and analysis, legal advice, and perhaps even advance judicial guidance, and the organization's

conduct is judged against the background of its original and declared purposes, matters it

controls.  It is in this context that *McConnell* approved "support or oppose" language.  *Id.*

By contrast, public discourse happens quickly, and the tendency of a statement to support

or oppose a candidate may depend on unfolding background developments and audience

assumptions and perceptions that the speaker cannot know, much less take weeks or months to

evaluate.  These are the very considerations that led *Buckley* to demand express advocacy.

The court of appeals in *Buckley* went halfway in narrowing and clarifying the speech

restrictions at issue there, construing them to mean "advocat[ing] the election or defeat of" a

candidate.  424 U.S. at 42 (quoting *Buckley v. Valeo*, 519 F.2d 821, 853 (D.D.C. 1975), *rev'd in*

*part*, 424 U.S. 1 (1976)).  The Supreme Court said that construction moved in the right direction but failed to "eliminate[] the problem."  424 U.S. at 42.  Noting that "advocating the election or defeat" invited consideration of the speaker's intent or the listener's understanding, the *Buckley* majority demanded explicit words of express advocacy.  *Id.* at 43-44.[22]

West Virginia continues to require burdensome accounting of spending for "political purposes," *see* W. Va. Code § 3-8-5, which is broadly defined to mean "*supporting or opposing* the nomination, election or defeat of one or more candidates . . . ."  *Id*. § 3-8-1a(23) (emphasis added).  Moreover, § 3-8-5(b) of the West Virginia Code continues to require reporting of financial transactions annually and at various times after a primary election.  The term "financial transactions" is defined to "include[] all contributions or loans received and all repayments of loans or expenditures made to promote the candidacy of any person by any candidate or any organization *advocating or opposing* the nomination, election or defeat of any candidate to be voted on."  *Id*. § 3-8-5(d) (emphasis added).

When used to regulate ongoing speech, the "supporting/advocating or opposing" language in these statutes are illustrations of the same vagueness concerns that drove the Court's analysis in *Buckley*.  The speaker either must predict how its subjective intent will be evaluated, or it must predict how listeners will understand the speech.  Listener understanding, of course, will depend on surrounding context that may be developing without the speaker's knowledge.  Either way, the standard is vague and overbroad unless construed to require express advocacy.

---

[22]       A long line of loyalty oath cases held that "support" or "oppose" were vague if used to require a speaker to characterize conduct on pain of penalty, though acceptable if used for essentially meaningless "amenity" purposes.  *See Cole v. Richardson*, 405 U.S. 676, 678-85 (1972) (summarizing and harmonizing cases); *Cramp v. Bd. of Public Instruction*, 368 U.S. 278, 283-84 (1964) ("support" is vague).  *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662-63 (5th Cir. 2006), construed the entire phrase "supporting, opposing, or otherwise influencing" an election to require express advocacy.  The decision cannot be explained on the supposition that only "otherwise influencing" was vague since, if that were true, only that phrase would have been construed to require express advocacy.

*Id.*; *WRTL II*, 551 U.S. at 467-68.  Moreover, if used as a standard for judging particular speech, as opposed to a description of the purpose for which a group is organized, "support or oppose" runs afoul of *NCRL v. Leake*, 525 F.3d at 280-84, which permits speech to be restricted by campaign finance regulation only if the standard is either (a) express advocacy or (b) electioneering communication plus the functional equivalent of express advocacy.  In this context, Judge Faber's April 22, 2008, Opinion (at 8) held that "support or oppose" was vague. The Center respectfully requests the Court to clarify that, *when used as a standard for judging particular speech*, "supporting or opposing a candidate" must be narrowly construed to require express advocacy.

### C.    The Requirements to Disclose Contributors Whose Donations Were "Used to Pay for Electioneering Communications" or Made "For the Purpose of Furthering the Expenditure" Are Vague.

The electioneering communication reporting requirements mandate disclosure of the "names and addresses of any contributors who contributed a total of more than one thousand dollars between the first day of the preceding calendar year and the disclosure date and whose contributions were used to pay for electioneering communications."  W. Va. Code § 3-8-2b(b)(5).  *See also id.* §§ 3-8-2(b)(1) (requiring disclosure of the "name and address of any person who contributed a total of more than $250 between the first day of the preceding calendar year, and the disclosure date, and whose contributions were made for the purpose of furthering" an independent expenditure), 3-8-2(b)(1)(G) (requiring contributor to provide certain information where a contribution is given "for the purpose of funding an independent expenditure").

The phrases "whose contributions were used to pay for electioneering communications" and "for the purpose of furthering [an independent expenditure]" are vague under the same principles just discussed.  An over-eager enforcer could seek disclosure of the sources of funds that entered a speaker's general treasury months or years earlier.  Regulators could likewise

apply these vague standards to demand disclosure of general donors to an organization who live outside West Virginia and have no cognizable interest in the state's policy or political discussions.  On the other hand, these disclosure requirements could (and should) be read to require disclosure where a donation is earmarked for the specific purpose of funding electioneering communications or independent expenditures.

The FEC has explained that phrases similar to those used in the West Virginia Code are limited to "funds received in response to solicitations specifically requesting funds to pay for [electioneering communications] as well as funds specifically designated for [electioneering communications] by the donor."  72 Fed. Reg. 72899, 72911 (Dec. 26, 2007).  *See also id.* (describing the "inordinate amount of effort" and burden associated with disclosing contributors under a broader reading of the disclosure requirement).  The Center is entitled to a declaration narrowly construing these reporting requirements to apply only to donations earmarked by the donor to pay for electioneering communications or independent expenditures.

## V.   WEST VIRGINIA'S CAMPAIGN FINANCE LAWS MAY NOT CONSTITUTIONALLY BE APPLIED TO THE CENTER'S PRIOR ADVERTISEMENTS.

During the time that preliminary injunctions were in effect, the Center disseminated several ads in West Virginia that fell within the electioneering communication provisions then in effect and also might be challenged under West Virginia's broad bans on corporate speech.  *See* Dkt. No. 154, Exs. K, L, M, N, O, P, Q, R, and S; Fourth Declaration of Jeffrey L. Mazzella ¶¶ 7-8.  For the reasons stated in the Court's earlier opinions, such conduct was lawful and should be protected.  To provide continuing protection once the preliminary injunctions are dissolved, and to provide concrete future guidance, the Center now seeks a determination that West Virginia's campaign finance statutes cannot constitutionally be applied to burden or punish it based on that speech.  Although the speech is in the past, the as-applied challenge is not moot

because (a) there is a continuing threat of attempted enforcement[23] and (b) this is a classic example of a situation that may recur while evading full review.  *See WRTL II*, 551 U.S. at 462-64 (deciding an as applied challenge with respect to past examples of speech).

In this as-applied challenge, as in the Center's facial challenge, the government has the burden of proving the core speech at issue constitutionally may be burdened.  *See id.* at 464-65 ("The *Government* must prove that applying [the restriction] furthers a compelling interest and is narrowly tailored.") (emphasis in original).  Defendants cannot meet this burden.

First, the ads clearly are not express advocacy.  Although candidates mentioned in the ads may have viewed them as strongly unfavorable, the ads contain no explicit words that expressly advocate the election or defeat of any candidate.  Thus, West Virginia's various speech bans cannot be applied to them.

Second, the ads are not the functional equivalent of express advocacy because they are not "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *Id.* at 470.  To the contrary, the ads fall easily within the Supreme Court's description of the *WRTL II* ads:

> First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter.  Second, their content lacks indicia of express advocacy:  The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

---

[23]     For additional information describing the basis of the Center's concerns, *see* Dkt. No. 198 at 10-14.  *See also* Defendants' Reply Memorandum In Support of the Defendants' Motion to Dismiss As Moot (Dkt. No. 199 at 5 n.5 (noting that the complaint against CFIF for past speech is "still-pending" with state officials).

*Id.*  The Center's advertisements addressed issues such as the Attorney General's use of funds obtained in a settlement, cited newspaper articles in which examples of the Attorney General's spending were provided, and asked citizens to contact Attorney General McGraw to tell "him to return the people's money."  Stmnt. ¶¶ 9, 25.  They did not refer to the McGraw campaign, his status as a candidate, or his opponent; rather they focused on the decisions and legal arguments that he had made in his capacity as Attorney General.

Other advertisements discussed the importance of a fair and impartial judiciary, using a named Justice of the West Virginia Supreme Court to illustrate the Center's position.  *Id.* ¶ 10. They did not mention that the Justice was a candidate or even that West Virginia Supreme Court of Appeals Justices are elected.  The communications asked West Virginia residents to "[c]all Spike Maynard . . . and thank him for his 12 years of impartial judicial service to West Virginia courts."  *Id.*  West Virginia's electioneering disclosure requirements thus may not constitutionally be applied to the Center's communications.

Third, although the representations that enforcement is not presently intended are not a substitute for relief, they preclude Defendants from justifying application of the former statute to the Center's speech.

Thus, the Court should declare that West Virginia's campaign finance laws may not constitutionally be applied to punish or burden the speech discussed above.

## CONCLUSION

The First Amendment's command that government make "no law" restricting free speech is the foundation of our political system.  Although it has not received the absolute construction its language suggests, it demands the highest respect.  Thus, when a state legislature targets speech, particularly speech about how we are governed and who governs us, it must proceed with the utmost care.  The legislature must first determine, and be prepared to prove, that the

34

burdens and restrictions imposed are strictly necessary and that the standards employed are so precise and objective that speakers can quickly and confidently judge exactly what is restricted. There must be no gray areas that cause speakers to steer clear or that invite abuse of governmental discretion to censor speech content.

The West Virginia statutes were not crafted in such a careful manner.  They were cobbled together without an evidentiary record by solons who hardly concealed their desire to suppress disfavored speech.  To restore the freedom the First Amendment guarantees, the Court should hold that West Virginia's corporate speech regulations are facially invalid as described above, and that the then-existing speech bans and electioneering communication restrictions may not constitutionally be applied to the 2008 speech of the Center.  Finally, the Court should award the Center the legal fees and expenses incurred to vindicate its rights, and those of the public.

September 14, 2010

Respectfully submitted,

ROBINSON & MCELWEE PLLC

_____ /s/  William C. Porth _____
William C. Porth
West Virginia Bar No. 2943
400 Fifth Third Center
700 Virginia St., East
P.O. Box 1791
Charleston, WV  25301
(304) 344-5800


Jan Witold Baran
Thomas W. Kirby
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
(202) 719-7000

Attorneys for Plaintiff Center for
Individual Freedom