## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |
|---|---|
| CENTER FOR INDIVIDUAL FREEDOM, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Case No. 1:08-00190 |
| NATALIE E. TENNANT, *et al.*, | ) ) |
| Defendants. | ) ) ) |

## PLAINTIFF CENTER FOR INDIVIDUAL FREEDOM'S
## REPLY TO DEFENDANTS' MEMORANDUM IN RESPONSE TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

William C. Porth (W. Va. Bar. No. 2943)
ROBINSON & MCELWEE PLLC
400 Fifth Third Center
700 Virginia St., East
P.O. Box 1791
Charleston, WV 25301
(304) 344-5800

*Attorney for Plaintiff Center for Individual Freedom*

Jan Witold Baran
Thomas W. Kirby
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Attorneys for Plaintiff Center for Individual Freedom*

October 19, 2010

# TABLE OF CONTENTS

SUMMARY ........................................................................................................... 1

ARGUMENT ........................................................................................................ 2

I.   WEST VIRGINIA'S DEFINITION OF EXPRESS ADVOCACY IS
     UNCONSTITUTIONALLY VAGUE. ............................................................... 3

II.  DEFENDANTS' REGULATION OF BOTH BROADCAST AND
     NON-BROADCAST "ELECTIONEERING COMMUNICATIONS"
     IS NOT SUPPORTED BY THE FACTS OR THE LAW. ................................. 7

     A.   The Center Properly Challenged West Virginia's Vague Targeting
          Standards, and the State Has Made No Substantive Effort to Defend
          Them Here. .......................................................................................... 8

     B.   Defendants Have Not Justified Their Regulation of Non-Broadcast Media. ....... 11

III. DEFENDANTS' FAILURE TO JUSTIFY THE STATUTORY EXCEPTIONS IS
     FATAL TO THE ENTIRE ELECTIONEERING COMMUNICATIONS REGIME...... 12

IV.  THE REPORTING REQUIREMENTS ARE VAGUE. .................................. 13

     A.   A "Draft" Change to a Reporting Form Does Not Cure Statutory Vagueness,
          Particularly Where the State Refuses to Acknowledge the First Amendment
          Violation. ............................................................................................ 13

     B.   The State's Proffered Reading of the Donor Disclosure Requirements
          Misconstrues the Plain Language of the Statute and Misallocates the
          Burden of Justification. ....................................................................... 15

     C.   The Other Reporting Requirements and Definitions Relying on the
          "Supporting/Advocating or Opposing" Terminology Are Vague. ...................... 17

V.   AS-APPLIED RELIEF REMAINS NECESSARY HERE TO PROTECT
     THE CENTER FOR ITS PAST SPEECH. ...................................................... 17

CONCLUSION ...................................................................................................... 20

## SUMMARY

Plaintiff Center for Individual Freedom, Inc. ("Center") replies to the "Defendants'

Memorandum in Response to Plaintiffs' Second (or Renewed) Motions for Summary Judgment."

The Center shows below that:

- Two parts of West Virginia's definition of express advocacy are unconstitutionally vague, and the Defendants' suggestion that this Court should ignore binding U.S. Supreme Court and Fourth Circuit precedent is meritless.

- As during the preliminary injunction phase, Defendants have offered nothing more than assertions in support of their regulation of non-broadcast media, none of which is sufficient to justify the substantial burdens on core First Amendment activity.

- Defendants have not justified the qualitative differences between the federal electioneering communication statute and West Virginia's own "targeting" standard, which is vague and lacks the essential safeguards recognized in *McConnell v. FEC*, 540 U.S. 93 (2003), and *Citizens United v. FEC*, 130 S. Ct. 876 (2010), for determining how many individuals must receive speech before it becomes an electioneering communication.

- Because so many of the exceptions to the definition of "electioneering communication" are constitutionally infirm, the only appropriate remedy is to invalidate the entire electioneering communication statute; otherwise, any revisions this Court makes would burden more speech than the legislature intended.

- The Defendants' attempts to narrowly construe certain statutory reporting requirements to avoid vagueness, either by amending the instructions to a reporting form or through other means, fail to cure the First Amendment violations.

- Also, permanent as-applied relief is necessary to protect the Center from retaliatory action based on ads run in reliance on the preliminary injunction.[1]

---

[1]   During a telephonic scheduling conference on February 24, 2009, the parties agreed that (a) if the intervening defendants were dismissed, as has been done, there would be no need for discovery, and (b) the case could and should be decided on summary judgment. *See* Dkt. No. 157 at 2 (District Judge Daybook Entry).  Rather than addressing substantive issues, Defendants devote the opening portion of their brief to launching inaccurate, irrelevant, and unsupported attacks on the Center's historical background and providing a self-serving portrait of the Attorney General's use of his office.  *See* Dkt. No. 216 at 2 (incorporating prior filings by reference).  The Center takes issue with much of that discussion and will, in the appropriate setting, correct the Defendants' factual errors and mischaracterizations.  However, these assertions do not affect summary judgment.

For these reasons, the Center asks the Court to (1) enjoin enforcement of both the broadcast and non-broadcast electioneering communications provisions (leaving it to the legislature to craft a law that affords ample protection for speakers under the First Amendment), (2) enjoin or declare invalid the various other restrictions and vaguely-worded provisions identified in its Summary Judgment filings, (3) declare that the Center's West Virginia speech is constitutionally protected from any punishment, and (4) award the Center its reasonable fees and costs.

## ARGUMENT

West Virginia's casual approach to burdening core First Amendment speech has produced fundamentally flawed legislation that, in many respects, must be narrowed or struck down.  The Defendants' Opposition to the Center's motion for summary judgment repeatedly admits basic constitutional flaws but asserts that, for one reason or another, relief should be denied.  Defendants are mistaken, both in the reasons they advance and their underlying premise that this Court should strain to preserve flawed legislation burdening core speech.

The First Amendment says there shall be "no law" abridging the freedom of speech, and speech about how we are governed and those who govern us lies at the core of that command. Although the Supreme Court nevertheless has permitted some legislation burdening core speech, it is strongly disfavored.  Courts will sustain such legislation only to the extent the government demonstrates a strong necessity and cuts precisely square corners in constructing the statute. Moreover, because many potential speakers stand silent rather than challenging improper legislation, depriving the public of free speech the First Amendment seeks to guarantee, courts are considerably more active in reviewing speech burdens than with respect to other forms of legislation.  Defendants' pleas in avoidance fall short, and the challenged West Virginia provisions fail as a matter of law.

2

I.      **WEST VIRGINIA'S DEFINITION OF EXPRESS ADVOCACY IS UNCONSTITUTIONALLY VAGUE.**

Defendants do not deny that the speech burdens imposed by West Virginia's disclosure provisions trigger the First Amendment's requirement of exceptional clarity.  Defendants are unable to show that West Virginia's definition of express advocacy – to the extent it ventures beyond the *Buckley* formulation – meets that standard.  And their efforts to get around the vagueness are unavailing.

The Defendants first assert that the vagueness is tolerable because the statute only punishes "willful" violations.  They cite one punishment provision, W. Va. Code § 3-8-2(g), which indeed speaks of willful misconduct.  But they inexplicably ignore § 3-8-7(a) and (b), which authorize civil and criminal punishment without requiring willfulness.  Thus, the factual premise of their argument is wrong.

Moreover, the Defendants simply assume a misconstruction of a vague standard would provide a complete defense to a charge of willful violation.  That is not necessarily so.  *See United States v. M.W.*, 890 F.2d 239 (10th Cir. 1989) (knowing conduct typically is willful).  They do not show that West Virginia deems a mistake of law to negate willfulness.  But since the statute does not require willfulness, this is a moot issue.

Defendants also assert that, because the legislature added clause (C) to the definition after the Center amended its Complaint, that clause is not at issue in this suit.  However, the Complaint and Supplemental Complaint allege (Dkt. Nos. 1, ¶¶ 6, 15; 55, ¶ 38) that the challenged statute is vague and chills speech.  Whether the new clause cured the alleged

vagueness is a pure issue of law fairly comprised by the allegation.  Defendants do not claim to

be surprised or to assert any prejudice.  This is a baseless effort to avoid the issue.[2]

Defendants concede (at 5-6)[3] that the term "no . . . reasonable meaning" in clause (B) and

"no reasonable interpretation" in clause (C) are "ambiguous," but argue that the combined

application of various canons of construction, such as the rule of lenity and the rule of

constitutional avoidance, favor construing the language in an "objective" sense rather than a

subjective one.  To the extent that is so, however, the admitted vagueness should be clarified by a

declaratory judgment, rather that leaving the Center and other speakers to hope that future

enforcers will take the same view.

Beyond that, the Defendants never clearly explain what the "objective standard" means.

It is common ground that clause (A) embodies *Buckley*'s definition encompassing explicit and

express words of electoral advocacy.  The clause expressly includes phrases such as "Bob Smith

in '04" that, by sufficient usage, have an explicit electoral message.

Clause (B) obviously is directed toward speech not encompassed in clause (A) – since

statutes are construed to give meaning to each provision.  *See State ex rel. Tucker County Solid*

*Waste Auth. v. W. Va. Div. of Labor*, 222 W. Va. 588, 599 & n.24 (2008).  It regulates

"individual words" that "have no reasonable meaning than to urge the election or defeat" of a

---

[2]    Where a summary judgment motion presents an issue and the defendant is not prejudiced, pointless pleading amendments are not required.  *In re Citron*, No. 08-71442, 2010 WL 2978062, at *5 (Bankr. E.D.N.Y. July 23, 2010) (collecting authority); *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993); *Furlow v. City of N.Y.*, No. 90 CIV 3956, 1994 WL 714340 (S.D.N.Y. Dec. 21, 1994); *Walton v. Jennings Cmty. Hosp., Inc.*, 875 F.2d 1317, 1320 n.3 (7th Cir. 1989) (collecting authority); Fed. R. Civ. P. 15(b).  If necessary, the Center would ask the Court to deem its motion for summary judgment an implied motion for leave to amend.  *See Furlow*, *supra*.

[3]    Unless otherwise indicated, page citations are to the "Defendants' Memorandum in Response to Plaintiffs' Second (or Renewed) Motions for Summary Judgment," which is available at Dkt. No. 216.

clearly-identified candidate, such as "posters, bumper stickers, advertisements, etc. which say . . . 'Baker.'"  But by what "objective" means can the word "Baker" be determined to have the meaning required by clause (B) without having the explicit meaning that would subject it to clause (A)?  This clause must contemplate consideration of factors such as context and timing, but it gives no guidance as to how such factors are to be evaluated.  And this Court previously has recognized that standards turning on such contextual considerations are vague.  Feb. 12, 2009 Op. (Dkt. No. 155 at 17 n.11, 19-23).  In short, Defendants identify no clear and precise meaning for clause (B), regardless of how "objective" it may be.

Clause (C) then seeks to reach speech that is not within clauses (A) or (B), but that has "no reasonable interpretation" other than an electoral appeal.  Defendants give no hint as to how such an "interpretation" is to be identified.  It cannot simply depend on the express and explicit meaning of the words used, because that would duplicate clause (A), violating the canon of separate meaning.  Again, any "objective" interpretation must depend on implications, apparently drawn in light of unspecified circumstances such as context and timing.

The Defendants argue (at 8-9) that the "no reasonable interpretation" language must not be vague because it was used by the leading opinion in *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 470 (2007) ("*WRTL II*").  But they overlook how it was used.  Wisconsin Right to Life, Inc. challenged the application of federal legislation to speech that concededly was within the facially valid "electioneering communication" standard.  There was no dispute that such standard met the demanding *Buckley* standard of clarity.  Instead, the issue was whether the government could show a sufficient substantive justification for burdening some of the speech encompassed by the facially constitutional definition.

The lead *WRTL II* opinion held that the government had not justified burdening the type of speech engaged in by the plaintiff there.  It described plaintiff's type of speech as "susceptible of no reasonable interpretation" other than electoral advocacy.  *Id.* at 474 n.7.  Justice Scalia complained that the description was vague.  *See id.*  In response, the lead opinion pointed out that its description "is only triggered if the speech meets the brightline requirement of BCRA [i.e. the facially valid "electioneering communication" standard] in the first place."  *Id.*  There is no doubt that the lead opinion in *WRTL II* sought to speak clearly.  But there also is no doubt that the lead opinion carefully refrained from holding, or even suggesting, that its description met the standards of facial clarity the First Amendment demands of a statute's definition of the core speech it burdens.  To satisfy that requirement, *WRTL II* explicitly relied on the facially valid, brightline "electioneering communication" standard.

In *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 283 (4th Cir. 2008), the Fourth Circuit refused to read *WRTL II* to establish a new standard for speech regulation.  *Id.* Instead, the Court of Appeals read *WRTL II* as just outlined.  Defendants mistakenly assert (at 10) that the Fourth Circuit was "impliedly overrul[ed]" by "language" in *Citizens United*, 130 S. Ct. at 915.  But *Citizens United* held that the government had justified requiring certain disclosures for all speech within the facially valid, brightline "electioneering communication" standard.[4]  It did not hold that the *WRTL II*'s "reasonable interpretation" language established a new facially valid test for burdening core speech.  To the contrary, it avoided any reliance on the "no reasonable interpretation" language.

---

[4]     The Defendants acknowledge (at 3 n.3) that West Virginia has made a different choice. That choice has no bearing on vagueness issues, and Defendants do not argue otherwise.

Contrary to the Defendants' assertions, the Center does not contend that West Virginia is constitutionally limited to any particular definition of burdened speech. Instead, the Center contends that whatever standard West Virginia chooses must be spelled out with exacting, brightline clarity so that speakers will not need to hedge, trim, or steer clear of potentially regulated speech. West Virginia has not met that burden. And to the limited extent portions of the statute may be saved by declaring them to have a specified precise and narrow meaning, the Court should so declare in a judgment that will bind Defendants and their successors.

II.   **DEFENDANTS' REGULATION OF BOTH BROADCAST AND NON-BROADCAST "ELECTIONEERING COMMUNICATIONS" IS NOT SUPPORTED BY THE FACTS OR THE LAW.**

*McConnell* sustained "electioneering communication" regulation of certain broadcast communications that met a series of brightline criteria and were proven to be a particular source of abuse, and it did so only after the FEC implemented an objective, readily-ascertainable mechanism for speakers to verify whether their communications were regulated. Rather than adopt the approach and safeguards approved by *McConnell*, West Virginia has elected to regulate core speech in a manner that is inconsistent with both the First Amendment and other fundamental constitutional principles.

Disregarding a clear holding of *Citizens United*, West Virginia's laws fail to provide an objectively verifiable brightline method for speakers to determine whether a particular communication is "targeted" to a sufficient number of individual recipients to become an "electioneering communication." Moreover, West Virginia has expanded its regulation of "electioneering communications" beyond those covered by federal law to also include certain non-broadcast mediums – i.e., newspapers, magazines, and periodicals. W. Va. Code § 3-8-1a(11)(A). In preliminarily enjoining enforcement as to non-broadcast media, the Court noted that such expanded coverage was not supported by the type of "proof," "stud[ies,]"and "concrete

7

data" relied upon in *McConnell*.  Feb. 12, 2009 Op. (Dkt. No. 155 at 38, 41).  The additional

materials now offered by the Defendants are more of the same, dressed up with a few

calculations that prove nothing.  As a result, the Center asks the Court to strike down the

electioneering provisions as to all forms of communication, broadcast and otherwise.

> **A.    The Center Properly Challenged West Virginia's Vague Targeting Standards, and the State Has Made No Substantive Effort to Defend Them Here.**

The Center's Complaint (Dkt. No. 1, ¶ 15(b)(ii)) alleged that the "target[ing]" aspect of

the definition of "electioneering communication" – i.e., the provision that requires a certain

"number of individuals . . . [to] receive the communication" before it can be regulated – was

"vague with respect to many covered media."  *See also id.* ¶¶ 15, 13(c) (noting that the phrase

"[t]argeted to the relevant electorate" is "vague").  The Center reiterated and briefed this concern

over 20 months ago in its initial Summary Judgment Motion (Dkt. No. 154 at 9), and then again

in its Reply Brief (Dkt. No. 180 at 10-11),[5] emphasizing that the West Virginia statute failed to

incorporate the important safeguard found in federal law – a clear, objective means for verifying

the number of recipients for a particular communication.  Defendants did not object to briefing

this issue in connection with the earlier summary judgment motion.  In fact, they chose to ignore

the matter altogether in their initial Opposition Brief.  *See id.* at 11.  Even now, the Defendants

offer no justification for the statute's failure to include an easily-ascertainable means of

determining whether a particular broadcast or non-broadcast communication will reach enough

individuals to trigger regulation.

This is no arcane or trivial matter.  *Citizens United* underscored the vagueness and

chilling effects of an electioneering communication statute requiring speakers to perform "a

---

[5]    Both filings are incorporated herein by reference.

calculation as to the number of people a particular communication is likely to reach, with an inaccurate estimate potentially subjecting the speaker to criminal sanctions."  130 S. Ct. at 889. As the Court emphasized, the First Amendment forbids "laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day."  *Id.*  Yet this is precisely what West Virginia's statute does here, leaving "[p]eople 'of common intelligence [to] necessarily guess at [the law's] meaning and differ as to its application.'"  *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).[6]

The FEC confronted this exact problem when implementing the electioneering communication provisions found in the Bipartisan Campaign Reform Act of 2002.  Throughout its initial rulemakings, the FEC emphasized that a readily-determinable database was a Congressional "require[ment]" and "necessary to promote compliance with the disclosure and funding" obligations.  Federal Election Commission, *FCC Database on Electioneering Communications*, 67 Fed. Reg. 65212, 65213-14 (Oct. 23, 2002).  *See also* Bipartisan Campaign Reform Act of 2002 § 201(b), 2 U.S.C. § 431 (requiring the FCC to work with the FEC to implement the electioneering communication provisions).  "Those who wish to make communications . . . *must be able to easily determine* whether the radio or television stations, cable systems, or satellite systems . . . will reach 50,000 or more persons in the State . . . or Congressional district . . . in which the candidate mentioned in the communication is running."  *FCC Database on Electioneering Communications*, 67 Fed. Reg. at 65213-14 (emphasis added).

---

[6]     This injury is particularly acute here since the number of necessary recipients varies widely depending on the office sought by the identified candidate.  *Compare* 11 C.F.R. § 100.29(b) (containing a flat 50,000-person recipient requirement, regardless of the office sought) *with* W.Va. Code § 3-8-1a (which provides that a communication may be "targeted" to as many as 140,000 or as few as 2,410 individuals depending on the office sought).

Even the staunchest supporters of campaign finance regulation, Senators John McCain and Russ Feingold, pushed for such an objective mechanism to be adopted, noting that organizations "should be able to rely on [the database] and be legally protected from complaints that their communications have been targeted to the relevant electorate." Comments of John McCain, Russell Feingold, *et al.*, *Notice 2002-13*, at 4(Aug. 23, 2002), *available at* http://fec.gov/pdf/nprm/electioneering_comm/comments/us_cong_members.pdf. Without this essential safeguard, West Virginia speakers are necessarily forced to guess at the size of a communication's audience, mindful that state regulators (even with both parties acting in good faith) could reach a different conclusion. This is precisely the sort of problem that the First Amendment vagueness doctrine is designed to avoid. And because *every* electioneering communication must be targeted, the entire provision is unconstitutional as to all forms of speech.

As the Center noted in its earlier filings, *see* Dkt. Nos. 1, ¶ 15(b)(ii); 180 at 11, verifying the recipient population for non-broadcast communications presents its own unique set of challenges. How does a speaker determine with confidence how many people in a district "can" receive a publication? For example, if a library, barber, or a dentist has a magazine subscription, does every patron count? If Mother subscribes, do Father, Uncle, Grandma, and little Billy and Sue also "receive" the magazine? What sources of information should a speaker use to assess potential recipients? A carefully crafted statute could answer these questions. But Defendants provide no answers because there are none.[7]

---

[7]     Defendants' only response is to repeat their citation to the website of an obscure organization with limited publicly available information about *aggregate* circulation totals. *See* Dkt. No. 216 at 13 n.17. But such statistics are irrelevant for multiple reasons. These figures do not address how many individuals in a particular district can receive a communication, which is

## B.      Defendants Have Not Justified Their Regulation of Non-Broadcast Media.

In their attempt to justify regulation of communications using non-broadcast media, the Defendants generally rely on their earlier memoranda.  In responding to these arguments, the Center similarly relies on its earlier Reply Brief.  *See* Dkt. No. 180 at 5-10.[8]

The only new pieces of "evidence" offered by the Defendants are a pair of revised spreadsheets – attached to an inadmissible affidavit – that include a new column of figures that were not before the legislature when the 2010 amendments were passed.  *See id.* at 7-9; Dkt. No. 210 at 14-15.  The Defendants' contention (at 13) that these figures "demonstrat[e] the importance of print media in local races" is not sufficient to justify the burdens imposed here. *See, e.g.*, Feb. 12, 2009 Op. (Dkt. No. 155 at 40) (requiring Secretary of State to show "that print media . . . comes [with] the risk of corruption or the risk of the appearance of corruption"); *W. Virginians for Life, Inc. v. Smith*, 960 F. Supp. 1036, 1041 (S.D. W. Va. 1996) (actual "evidence of . . . corruption" is necessary to justify the burden on "core [F]irst [A]mendment rights").  Moreover, any assertions about the alleged effectiveness of newspaper advertising are counter to the opinion of Chief Justice Roberts in *WRTL II*.  *See* 551 U.S. at 477 n.9 (noting that "newspaper ads . . . are not [a] reasonable alternative[] to broadcast speech in terms of impact and effectiveness").[9]  Finally, because West Virginia seeks to burden so much more speech, it faces an even greater burden of justification, which it has not met.

---

what the statute requires, nor is information obtained from a third-party website a complete defense to a prosecution.  *See also* Dkt. No. 210 at 17 (elaborating on these concerns).

[8]      The Center notes that certain forms of non-broadcast communications media (e.g., mass mailings, telephone banks, and billboards) that were included in its original Reply Brief are no longer regulated as electioneering communications.

[9]      Contrary to the Defendants' suggestion (at 12), nothing in *Citizens United* excuses the Government's failure to justify its actions when regulating beyond broadcast, cable, or satellite communications.  Furthermore, as the entirety of sub-part II.C makes clear, the Court's

### III.   DEFENDANTS' FAILURE TO JUSTIFY THE STATUTORY EXCEPTIONS IS FATAL TO THE ENTIRE ELECTIONEERING COMMUNICATIONS REGIME.

The Defendants largely rely on their earlier defense of the vague and unjustified statutory exceptions, and the Center likewise adopts the relevant portions of its earlier Reply Brief in response.  *See* Dkt. No. 180 at 13-18.  In so doing, the Center highlights its earlier argument that imposing a judicially-crafted *narrowing* construction on any of the exceptions would *expand* the statute's coverage and impose substantial burdens on core First Amendment activity that the legislature did not authorize.

In addition to recycling their old arguments, the Defendants add a few sentences tacking on other spurious claims that are readily dismissed.  The Defendants object (at 14) that the Center's Complaint did not specifically invoke the Equal Protection Clause.  But the State does not deny that the Center pled a valid First Amendment challenge to the exceptions, *see* Dkt. No. 1, ¶ 15,[10] and limits on speech-related discrimination under the First Amendment and Equal Protection Clause merge.  *See Burson v. Freeman*, 504 U.S. 191, 197 n.3 (1992) (plurality opinion) (collecting authority); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (equating analysis under the First Amendment and Equal Protection Clause).  Also, the summary judgment papers gave clear notice and the Defendants claim no prejudice.

discussion with respect to various "means of communications" involved concerns that the Court would have to revisit whether a particular new "technology" constituted a cable, satellite, or broadcast electioneering communication.  130 S. Ct. 876, 890-91 (2010).  Newspapers and periodicals are hardly a new technology, and in any event, the Court's discussion simply did not apply to non-broadcast communications.  *See id.* at 890 (noting that the communication could be regulated because a "subscri[ption] to cable" was required).  *See also id.* at 888 (noting that ad was a "cable . . . communication"); Brief for the Appellee, *Citizens United v. FEC*, No. 08-205, at 23-24 n.7, available at http://fec.gov/law/litigation/citizens_united_sc_08_fec_brief.pdf (noting that the communication at issue was a "cable transmission" that qualified as an "electioneering communication").

[10]      In addition to the introductory paragraph, the Center's challenge to the specific exceptions is detailed in ¶ 15(b)(iv)(1)-(3) of the Complaint (Dkt. No. 1).

Defendants also claim that the Center lacks standing to challenge the exceptions. However, the Center is directly subject to a standard that the exceptions render facially vague and overbroad.  Also, as explained in the Complaint (*see* Dkt. No. 1, ¶ 19), as a matter of policy and the well-grounded fear of retaliation against its members, the Center will refrain from speaking if its donors are disclosed.  Since the legislature has chosen to grant exceptions to the disclosure laws in a constitutionally impermissible manner, the Center has standing to challenge the exceptions.[11]

## IV.     THE REPORTING REQUIREMENTS ARE VAGUE.

### A.     A "Draft" Change to a Reporting Form Does Not Cure Statutory Vagueness, Particularly Where the State Refuses to Acknowledge the First Amendment Violation.

Rather than openly (and accurately) admitting that the statute requiring disclosure of persons "sharing or exercising direction or control over the activities of the person making the expenditure" is vague, the Defendants claim that a staff member's "draft" modifications to a reporting *form* eliminate the *statutory* vagueness problems.  But in reality, there is no basis for such a claim.

Nothing the state has done to this point is binding on anyone.  As the affidavit to Exhibit B (Dkt. No. 216-2) points out, the instructions are in "draft form" and still subject to review by the Secretary of State's in-house attorneys.  This is not the type of "authoritative construction[]" by a government agency entitled to deference by the judiciary.  *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).  *See also City of Lakewood v. Plain Dealer*

---

[11]     The Defendants also disagree over which heightened level of scrutiny applies to the legislature's content-based regulation of speech.  Regardless of which elevated standard should apply, the burden remains on the Government to justify its demand for disclosure, and it has not done so here.

*Publ'g Co.*, 486 U.S. 750, 770 (1988) (requiring that limiting construction "be made explicit by textual incorporation, *binding* judicial or *administrative construction*, or well-established practice) (emphasis added).  Nor do the Defendants show that compliance with a form is a defense.  This type of "regulation by form" is incompatible with the demanding standards for precision and clarity necessary when regulating core speech.

Ample grounds also exist to question the Defendants' commitment to the alleged "narrowing construction."  Even though the FEC considered the statutory standard vague absent an interpretive regulation, the Defendants steadfastly refuse to concede any ambiguity in West Virginia's language.  *See, e.g.*, Dkt. No. 216 at 15 (characterizing the terminology as "*purportedly* vague" and elsewhere using quotation marks to describe the "vague" statute) (emphasis added).  In the same manner, the Defendants' effort to characterize the edits as a routine "updating" of the reporting forms rings hollow.  The statutory language has been around for at least five years, *see* 2005 W. Va. Acts 9, and the Defendants did not make any effort to clarify the language until shortly before filing their Summary Judgment Opposition Brief.  As has often been their pattern, the Defendants begrudgingly make just enough changes "on paper" to give the superficial appearance that the law – and their enforcement of it – will pass muster under the First Amendment.  But this skin-deep commitment provides little assurance to either past or future speakers that West Virginia officials will refrain from demanding broader – and unjustifiable – disclosures once this case is complete.  That is why this Court must declare the provision unconstitutionally vague and enjoin its enforcement.[12]

---

[12]    As noted in its Summary Judgment Memorandum (at 28), the Center believes that the Court should simply declare this reporting provision unconstitutionally vague, permanently enjoin its enforcement, and leave it to the legislature to craft a constitutionally-permissible standard.  If the Court is unwilling to grant that form of relief, the Center respectfully requests that the Court either (1) enjoin enforcement of the reporting statute until the Government

Finally, the revised instructions do not address all of the statutory vagueness issues.  For example, the Center explained (Dkt. No. 210 at 27-28) why the term "activities" was vague and susceptible of two different interpretations.  Nothing in the Defendants' brief, "draft" instructions, or any other document addresses this issue.

>   **B.     The State's Proffered Reading of the Donor Disclosure Requirements Misconstrues the Plain Language of the Statute and Misallocates the Burden of Justification.**

The electioneering communication reporting requirements mandate disclosure of the "names and addresses of any *contributors* who *contributed* a total of more than [$1,000] between the first day of the preceding calendar year and the disclosure date and whose *contributions* were used to pay for electioneering communications."  W. Va. Code § 3-8-2b(b)(5) (emphasis added).  Although not entirely clear from their brief, the Defendants appear to read this provision to require an organization making electioneering communications to disclose essentially *all* of its donors who gave funds in excess of $1,000 to the organization for up to a two-year lookback period.  Such enormous and unprecedented burdens are the result of both a flawed reading of the statutory language and a misguided attempt to reallocate the State's burden of justification.

As the italicized language of the reporting requirement makes clear, the only donors whose identities must be disclosed are those who made "contributions" that are "used to pay for electioneering communications."  Contribution is a specifically defined term, requiring that funds be given "for the purpose of influencing the nomination, election or defeat of a candidate." W. Va. Code § 3-8-1a(6).  Thus, so long as funds are not donated to an organization for the

---

authoritatively construes such provision through the formal rule-making process or (2) enter a declaratory judgment defining the phrase in a way that mirrors the definition found in the FEC's regulations.  In the latter case, the Center notes that such a declaration would still not address the vagueness inherent in the term "activities," which is discussed in the following paragraph and in the Center's Summary Judgment Memorandum.  *See* Dkt. No. 210 at 27-28.

purpose of influencing an election, no donor disclosure is required under West Virginia law, regardless of what use ultimately may be made of them.  Since West Virginia regulators apparently take a different (and unjustified) view, the Center is entitled to a declaratory judgment confirming this reading of the disclosure obligations, or the requirement should be struck as vague and unjustified.[13]

The far-reaching and unparalleled disclosures sought by the Defendants are closely linked to the Government's unfounded efforts to shift its own constitutional burdens onto others. While their brief suggests otherwise, the Government bears the burden of justifying the disclosure obligations under exacting scrutiny.  *See John Doe # 1 v. Reed*, 130 S. Ct. 2811, 2818 (2010) (examining "the subordinating interests *of the State offered to justify compelled disclosure*" in applying exacting scrutiny) (internal brackets omitted) (emphasis added); *Nat'l Org. for Marriage v. McKee*, 666 F. Supp. 2d 193, 204 (D. Me. 2009) (requiring the "State [to] demonstrate[] a sufficiently important interest" in applying exacting scrutiny).  And since the Defendants offer absolutely no justification for why such broad-based disclosures are necessary, the Government has not met its burden here, particularly in light of the FEC's own conclusion that more targeted disclosures satisfy the public's informational interests.  *See* 72 Fed. Reg. 72899, 72911 (Dec. 26, 2007).[14]

---

[13]    Contrary to the Defendants' repeated assertions (at 18-19), the Center based its challenge to these reporting provisions on vagueness grounds.  *See* Dkt. No. 210 at 31-32.  The Center does not dispute, however, that requiring an organization to review, analyze, and report its donor history over two-year period is "onerous."

[14]    Defendants' citation to *McConnell v. FEC*, 540 U.S. 93, 196 (2003), is inapposite here. The disclosure provision at issue in *McConnell* only required the identification of donors to a separate, segregated account that was used to fund electioneering communications.  *See id.* at 195 & n.79.  *McConnell* did not sanction disclosure of an organization's entire membership/donor roster simply because some portion of the donations received by a particular entity were used to make electioneering communications, which is the interpretation the Government asks the Court to adopt here.

**C.    The Other Reporting Requirements and Definitions Relying on the "Supporting/Advocating or Opposing" Terminology Are Vague.**

The State's defense (at 16) of the remaining reporting requirements and definitions –

including those that allegedly are limited to candidates and political committees – rests on two

mistaken premises.  While the Defendants may suggest otherwise now, the still-pending election

law complaints filed by the Attorney General and his staff allege that the Center is a political

committee.  *See* Part V, *infra*.  Moreover, as explained above, the "express advocacy" standard is

vague, and in any event, it is not entirely clear from a plain reading of the statute that the

"expressly advocating" terminology applies to each of the entities identified in W. Va. Code § 3-

8-5(a).[15]

**V.    AS-APPLIED RELIEF REMAINS NECESSARY HERE TO PROTECT THE CENTER FOR ITS PAST SPEECH.**

As before, the Center largely relies on its earlier Reply Brief (Dkt. No. 180 at 18-20) and

its Opposition to the State Defendants' Motion to Dismiss As Moot (Dkt. No. 198 at 10-14) in

explaining why as-applied relief is necessary here.  But what is also noteworthy, particularly

given the State Defendants' emphasis on recent events and changes in the law, is what the State

Defendants have not done during the pendency of this litigation.

As the State Defendants' earlier filing noted (Dkt. No. 199 at 5 n.5), the complaints

against the Center for its past speech are still pending with the State Election Commission.

Although hardly a model of precise legal drafting, these complaints clearly allege violations of

West Virginia law involving many of the same statutes and legal principles currently before this

---

[15]    Since the term "political purposes" and its "supporting or opposing" constituent elements are used in other record-keeping and reporting statutes, *see, e.g.*, W. Va. Code § 3-8-2, the Center reiterates its request (Dkt. No. 210 at 28-31) for the Court to clarify its earlier ruling and limit the application of such vague terminology to situations involving the assessment of an organization's purpose rather than in the context of evaluating ongoing speech.

Court.  For example, citing the same statutory provisions described in the Center's Complaint, *see* Dkt. No. 1, ¶¶ 15(b)(2), 19, the "Supplement to Election Violation Complaint" ("Supplemental Campaign Complaint") alleges that the Center's "advertisements that spurred the original Complaint [filed with the Secretary of State] were clearly political in nature and targeted the relevant electorate."[16]  Citing the then-existing definition of "electioneering communication," the Supplemental Campaign Complaint also demands an investigation because the Center distributed "mailers" in an alleged attempt to influence an election.  If West Virginia officials intend to abide by this Court's orders and the recent statutory amendments removing mailers from the scope of the electioneering communication provisions, then why – over two years later – has this complaint not been dismissed?  Moreover, even though the Opposition Brief (at 16) filed by "Darrell V. McGraw Jr., Attorney General" states that the Center is not a "political committee," the election law complaint filed by "Darrell V. McGraw, Jr. Incumbent West Virginia Attorney General" claims that the Center is a West Virginia political committee.  *See* Dkt. No. 202-1 at 2 (citing the definition of "political action committee" found in then-existing W. Va. Code § 3-8-1a(19)).[17]  Other provisions of the complaints allege in various places that the Center is involved in activities that are "intended or tend[] to affect voting at the impending election" and that the Center attempted to "influence voters and . . . influence the results of the

---

[16]    In connection with earlier motions, the Center prepared a red-lined version of the statutes showing the law in existence at the time the complaints were filed by the Attorney General and his deputies.  It is available as Exhibit A to Plaintiff's Opposition to Defendants' Motions to Vacate the Preliminary Injunction (Dkt. No. 68-1), and shows that many of the statutory citations incorporated into the allegations are the same as those challenged in the Center's Complaint.

[17]    While the Center would like to believe that the reporting requirements found in W. Va. Code § 3-8-5 (and the relevant definitions) would never be applied to its speech, the still-pending complaints demonstrate why the Center's fears persist.  Even if it were true that the requirements are only applied to "candidates and political committees," *see* Dkt. No. 16 at 16, the Supplemental Campaign Complaint alleges that the Center is just such an entity.

impending election." *See, e.g.*, Exhibit C (Dkt. No. 72-2).  Notwithstanding any representations the State Defendants make in their legal pleadings, the Center remains concerned that these vague statutory terms and phrases will be applied against the organization for its past speech activities.  And frankly, the State Defendants' acknowledgement (Dkt. No. 199 at 5 n.5) that the Secretary of State's Office "condoned criminal charges" against a speaker in direct contravention of an earlier permanent injunction issued by this Court did little to assuage those fears.

Second, despite having had ample time to do so, the Secretary of State has yet to amend W. Va. Code of State Rules § 146-1-3.1 to reflect the Supreme Court's decision in *Citizens United*.  This administrative rule, which was challenged in the Center's Complaint (*see* Dkt. No. 1, ¶¶ 9, 15(a), 18), prohibits corporate expenditures and still employs the vague terminology "in connection with election to any local or state office."  *See id.*

Third, although the State Defendants filed an Opposition Brief and made various legal claims and representations, the Center is not aware that Defendant Boggess, the class representative for the West Virginia prosecuting attorneys, has filed any document opposing the Center's Summary Judgment Motion.  *See* Dkt. No. 216 at 1 (stating that the Memorandum in Opposition "is filed jointly on behalf of all *State Defendants*") (emphasis added).[18]  To the extent that such local prosecuting attorneys have independent authority to prosecute the Center for past conduct, the Center's need for permanent injunctive relief remains alive for this reason as well.

---

[18]     The local prosecuting attorneys are not "State Defendants," a specific term that the Defendants have used to refer only to the Secretary of State and the members of the West Virginia State Election Commission.  *See, e.g.*, Dkt. No. 192 at 1.  When adopting other pleadings on past occasions, Defendant Boggess has clearly stated his intent to do so.  *See, e.g.*, Dkt. No. 195 (requesting the Court's permission to adopt the State Defendants' brief concerning mootness).  The record contains no such statement here.

Finally, as this Court recognized in its September 3, 2010, Order on mootness, the "Legislature [did not] directly and completely address the concerns this Court raised in connection with the Preliminary Injunction." *See* Dkt. No. 206 at 3. The permanent injunctive relief sought here is the only method to fully guarantee that the legislature will comply with its obligations under the First Amendment.

## CONCLUSION

During this litigation, the West Virginia legislature had repeated opportunities to remedy the constitutional defects. But it made only marginal changes, leaving the core violations in place, and Defendants now ask this Court to re-write the law through judicial decree. The Supreme Court has cautioned, however, that, at the point of final judgment, courts have a very limited mandate "to implement [a] less restrictive alternative through judicial decree," and that beyond those limits, the "appropriate remedy [is] not to repair the statute, [but] to enjoin the speech restriction," leaving it to the legislature to craft proper legislation. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 823 (2000).

The Center requests the Court to enjoin or declare invalid the restrictions and burdens discussed above, leaving it to the West Virginia legislature to craft a permissible statute. But to the extent the Court determines portions can be clarified and saved, the Center requests a declaratory judgment that will bind the Defendants and provide a basis for further relief if disregarded. *See* 28 U.S.C. §§ 2201, 2202. The Center also requests an award of its reasonable fees and costs in an amount to be determined.

October 19, 2010                      Respectfully submitted,

                                      ROBINSON & MCELWEE PLLC

                                      _____/s/ William C. Porth_____
                                      William C. Porth
                                      West Virginia State Bar Id. No. 2943
                                      400 Fifth Third Center
                                      700 Virginia St., East
                                      P.O. Box 1791
                                      Charleston, WV  25301
                                      (304) 344-5800

                                      Jan Witold Baran
                                      Thomas W. Kirby
                                      WILEY REIN LLP
                                      1776 K Street, NW
                                      Washington, DC  20006
                                      (202) 719-7000

                                      Attorneys for Plaintiff Center for
                                      Individual Freedom