**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

CENTER FOR INDIVIDUAL FREEDOM, INC.,

                Plaintiff,

v.                                   CIVIL ACTION NO.  1:08-cv-00190

NATALIE TENNANT, et al.,

                Defendants,

WEST VIRGINIANS FOR LIFE, INC.,
and ZANE LAWHORN,

                Plaintiffs,

v.                                   CIVIL ACTION NO.  1:08-cv-01133

NATALIE TENNANT, et al.,

                Defendants.

**MEMORANDUM OPINION AND SUMMARY JUDGMENT ORDER**

       Pending before the Court are Plaintiff Center for Individual Freedom, Inc.'s (CFIF) Renewed Motion for Summary Judgment [Docket 210] and Plaintiffs Zane Lawhorn and West Virginians for Life, Inc.'s (WVFL) Second Motion for Summary Judgment [Docket 209].  On February 11, 2011, the parties argued both motions at a hearing before the Court.  (Docket 225.)  The parties agree that no issues of fact remain outstanding and that the Court can properly dispose of the case on summary judgment.

## I.  SUMMARY OF HOLDINGS

1.  *PAC and Related Definitions*.  The Court finds no reason to depart from its preliminary injunction order.  The reach of W. Va. Code § 3-8-1a(19) is limited to committees organized "for *the purpose* of supporting or opposing the election or nomination of one or more candidates."  *Id.* (emphasis added).  This language is equivalent to "the sole purpose of supporting or opposing a candidate," and it is narrower than "the major purpose" test approved by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976).  WVFL's Second Motion for Summary Judgement [Docket 209] is **DENIED** on this issue.

2.  *"Expressly Advocating" Definition*.  Subsection (B) of the "expressly advocating" definition, W. Va. Code § 3-8-1a(12), is not constitutionally overbroad, as Plaintiffs suggest.  Likewise, after examining *Citizens United* and other relevant case law, the Court concludes that Plaintiffs cannot demonstrate that subsection (C) is constitutionally overbroad either.  However, relying on the opinions in *WRTL II* authored by Chief Justice Roberts and Justice Scalia, the Court finds that subsection (C) is unconstitutionally vague for employing the "appeal to vote" test as a freestanding test.  In *WRTL II*, two justices upheld the "appeal to vote" test only within the "bright-line" context of electioneering communications, and three justices indicated their disapproval of the test's constitutionality in any context.  The motions for summary judgment [Dockets 209, 210] are therefore **GRANTED IN PART** on this issue, and subsection (C) is **SEVERED** from the remainder of the "expressly advocating" definition.

3.  *Corporate Expenditure Ban*.  In the wake of *Citizens United*, the West Virginia Legislature repealed the ban on certain corporate speech.  There being no live issue for the Court to resolve, Plaintiffs' motions for summary judgment [Dockets 209, 210] are **DENIED AS MOOT** on this issue.

4.  *"Electioneering Communication" Definition*.  The West Virginia Legislature's failure to justify the inclusion of non-targeted print media sources renders the definition of "electioneering communication" unconstitutionally overbroad.  Pursuant to W. Va. Code § 2-2-10(cc), the definition's reference to communications appearing in newspapers, magazines, and other periodicals is **SEVERED**, and the motions for summary judgment [Dockets 209, 210] are therefore **GRANTED IN PART**.  The Court is unable to determine whether the definition of "targeted to the relevant electorate"—one element of the "electioneering communication" definition—is unconstitutionally vague, and the motions for summary judgment are **DENIED IN PART** on that issue.

5.  *"Electioneering Communication" Exemptions*.  The "grassroots lobbying" exemption to the "electioneering communication" definition, W. Va. Code § 3-8-1a(11)(B)(v) is neither vague nor insufficiently tailored to withstand constitutional scrutiny.  The "voter guide" exemption contained in W. Va. Code § 3-8-1a(11)(B)(viii) contains two clauses that impermissibly depend on "intent-and-effect" tests of the kind criticized in *WRTL II*.  The phrases "intended as nonpartisan public education" and "appearance of" are therefore **SEVERED** from the

exemption. CFIF lacks standing to challenge the "bona fide news account" exemption in W. Va. Code § 3-8-1a(11)(B)(I). Finally, the "501(c)(3) organization" exemption is sufficiently tailored to meet West Virginia's interest in regulating election-related speech, and CFIF lacks standing to challenge the "operating under" language. In sum, CFIF's Renewed Motion for Summary Judgment [Docket 210] is **DENIED** as to the "grassroots lobbying," "bona fide news account," and "501(c)(3) organization" exemptions, and it is **GRANTED** as to the "voter guide" exemption. Accordingly, portions of the "voter guide" exemption are **SEVERED**.

6. *Reporting Requirements*. CFIF's Renewed Motion for Summary Judgment [210] is **GRANTED IN PART** as to W. Va. Code § 3-8-2b(b)(5), such that the names and other information of corporate contributors must only be disclosed pursuant to that subsection if the individuals contributed in response to a solicitation or earmarked the funds for use in electioneering communications. As to the Plaintiffs' other challenges to the reporting requirements, the motions for summary judgment [Dockets 209, 210] are **DENIED**. None of the remaining provisions are unconstitutionally vague or overbroad.

7. *Preliminary Injunction Dissolution*. The Court's preliminary injunction order, entered on October 17, 2008, is **DISSOLVED** upon entry of this summary judgment order.


## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Center for Individual Freedom and Judge Faber's Preliminary Injunction

This action is the consolidation of two similar actions, *Center for Individual Freedom, Inc. v. Tennant et al.*, Case No. 1:08-cv-00190, and *West Virginians for Life, Inc. v. Tennant et al.*, Case No. 1:08-cv-01133. CFIF is a non-partisan, non-profit organization organized under § 501(c) of the Internal Revenue Code. (Docket 1 ¶¶ 3, 3(b) in Case No. 1:08-cv-00190.)[1] CFIF's stated mission "is to protect and defend individual freedoms and individual rights guaranteed by the U.S. Constitution." (*Id.* ¶ 3.) It plans to "speak to the public in the Southern District of West Virginia

---

[1] CFIF's complaint was subsequently verified by its president, Jeffrey Mazzella, in an affidavit filed on March 24, 2008, as an attachment to CFIF's motion for a preliminary injunction. (Docket 4-2.) Due to the consolidation of these cases, the respective complaints are both labeled as Docket 1. Accordingly, the Court will distinguish the complaints by stating the appropriate case number or by stating the corresponding party.

on matters of litigation reform and related justice issues, including criminal law enforcement and sentencing, legal reform, and judicial decision-making [using] various media, including broadcast, print, and telephone banks." (*Id.* ¶ 17.) That speech "will refer to West Virginia candidates to illustrate its points and ask members of the public to contact the candidates and petition them to take or maintain certain positions." (*Id.*) For fear of prosecution and litigation, CFIF suspended its plans pending judicial intervention, allegedly resulting in an unconstitutional chill on its speech. (*Id.* ¶ 23.)

CFIF filed its initial action on March 21, 2008, seeking to invalidate a number of provisions of West Virginia's campaign finance laws as unconstitutionally vague and/or overbroad.[2] Specifically, CFIF challenged West Virginia's prohibition on corporate spending, W. Va. Code §§ 3-8-8(a), 3-8-8(b)(2)(H), 3-9-14,[3] and W. Va. Code R. § 146-1-3, and reporting and disclosure requirements for expenses incurred for "advocating or opposing the nomination, election or defeat of any candidate," W. Va. Code § 3-8-5, for independent expenditures "in support of or opposition to the nomination or election" of a candidate, §§ 3-8-1a(14), 3-8-2(b), and for "electioneering communications," §§ 3-8-1a(11), 3-8-2b.

In anticipation of the May 13, 2008, primary election, CFIF filed a motion for a preliminary injunction holding those laws unconstitutional facially and as applied to a number of communications CFIF intended to publish in the days leading up to the primary. By order, the West

---

[2]  The case was originally assigned to the Honorable David A. Faber, Senior United States District Judge for the Southern District of West Virginia, Bluefield Division.

[3]  A number of the sections referenced in the fact section were amended effective June 7, 2007, and again effective September 26, 2008. In this part of the opinion, the provisions are referred to as they existed on the date they were challenged. In the discussion sections, the Court will refer to the current version unless otherwise noted.

Virginia Association for Justice (WVAJ), West Virginia American Federation of Labor and Congress of Industrial Organizations (WV AFL-CIO), West Virginia Council of Churches (WVCOC), West Virginia Education Association (WVEA), West Virginia Citizens Action Group (WVCAG), Ohio Valley Environmental Coalition (OVEC), (Docket 13), West Virginia Employment Lawyers Association (WVELA) and West Virginia State Democratic Executive Committee (WVSDEC), (Docket 45), were permitted to participate as amici curiae.  Also by order, Robert M. Bastress, Jr., Margaret L. Workman, Menis E. Ketchum,[4] WVEA and WV AFL-CIO were permitted to intervene as defendants.  (Docket 25.)

Judge Faber heard argument on the motion for a preliminary injunction on April 9, 2008. On April 22, 2008, Judge Faber entered an order granting in part and denying in part CFIF's motion. More specifically, Judge Faber enjoined defendants Betty Ireland and Timothy D. Boggess[5] "from applying West Virginia Code sections 3-8-1a(14), 3-8-2(b), 3-8-5(a), 3-8-8(a), 3-8-8(b)(2)(H), and 3-9-14, and West Virginia Code of State Rules section 146-1-3, to anything other than communications that expressly advocate the election or defeat of a clearly identified candidate." (Docket 38 at 1–2.)  In that ruling, Judge Faber adopted "the bright-line definition" of express advocacy set forth in *Buckley v. Valeo*, 424 U.S.  1, 44 n.52 (1976) (per curiam).  Judge Faber also restricted the definition of "electioneering communications" to certain forms of broadcast media and

---

[4]  Bastress, Workman, and Ketchum were all seeking nomination for election to a seat on the West Virginia Supreme Court of Appeals, and were allegedly targets of CFIF's communications.

[5]  Timothy D. Boggess was the prosecuting attorney of Mercer County and represents the class of prosecuting attorneys in the State of West Virginia.  Together with then-Secretary of State Betty Ireland, Boggess and his class of prosecutors are responsible for investigating and enforcing the criminal provisions of West Virginia's campaign finance laws, W. Va. Code §§ 3-1A-1, 3-1A-6, 3-8-7(a), 3-8-7(b), 3-8-8(e).

enjoined Defendants "from applying [West Virginia's] reporting and disclosure requirements to the following forms of political advocacy: mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or published materials." (Docket 38 at 2.) Based on that ruling, CFIF ran a series of ads, including ads about current West Virginia Attorney General Darrell V. McGraw. (Docket 72-2 ¶ 2.)

On June 28, 2008, in a second extraordinary session, the West Virginia Legislature passed H.B. No. 219, amending West Virginia Code sections 3-8-1, 3-8-1a, 3-8-4, 3-8-5, and 3-9-14.[6] Thereafter, several Defendants moved to dissolve the preliminary injunction on the basis that the amendments rendered the injunction moot. Shortly before the amended sections took effect on October 1, 2008, Judge Faber granted Defendants' motions and dissolved the injunction by Order entered on September 29, 2008, and directed CFIF to move for a new injunction based on the language in the amendments. CFIF appealed that order to the United States Court of Appeals for the Fourth Circuit, which issued an Order on October 8, 2008, agreeing with Judge Faber and dismissing the appeal.

      B.    *West Virginians for Life*

WVFL, like CFIF, is a non-partisan, non-profit organization organized under § 501(c) of the Internal Revenue Code. (Docket 1 ¶ 9 in Case No. 1:08-cv-01133.) Zane Lawhorn, who is also a named Plaintiff in this case, is a resident of Princeton, West Virginia, and wishes to receive WVFL's communications. (*Id.* ¶¶ 12-13.) WVFL's stated purpose "is to present information upon which individuals and the general public may make informed decisions about such topics as fetal

---

[6] The West Virginia Legislature does not provide any type of formal legislative history, however, these amendments were presumably made in response to Judge Faber's injunction.

development, abortion and its alternatives, and euthanasia." (*Id.* ¶ 25). WVFL alleges that its speech has been chilled by West Virginia's campaign finance laws because it reasonably fears prosecution by Defendants if it proceeds with its planned communications. (*Id.* ¶ 44.)

On September 30, 2008, WVFL filed a verified complaint and motion for preliminary injunction seeking relief from several of the amended provisions, such as West Virginia's ban on corporate express advocacy, W. Va. Code §§ 3-8-1a(13), 3-8-8, W. Va. Code R. § 146-1-3, reporting requirements for express advocacy, W. Va. Code §§ 3-8-2b, 3-8-5a, 3-8-5b, definition of political committee, political action committee (PAC), and unaffiliated PAC, §§ 3-8-1a(21), (22), (29), definition of electioneering communication, §§ 3-8-1a(12), (26), and reporting requirements for electioneering communications, §§ 3-8-1a(20), 3-8-2(a), 3-8-2(d), 3-8-2b(a)-(g), 3-8-5, 3-8-5b. Specifically, WVFL alleged that those provisions are vague and overbroad and accordingly unconstitutional both facially and as applied.

Shortly after WVFL filed its complaint, CFIF filed an emergency motion for a preliminary injunction on October 6, 2008, challenging some of those same provisions, namely the ban on corporate express advocacy and the definition of electioneering communications, §§ 3-8-1a(13), (12), (26), 3-8-8, and the reporting requirements resulting therefrom. In support of its emergency motion, CFIF stated that Attorney General McGraw engaged in a series of threats and retaliatory acts in response to CFIF's earlier ads. (Docket 90-2 ¶ 2.) CFIF further stated that it wished to respond to McGraw's alleged threats and retaliatory acts, however, it feared that such a response would be deemed express advocacy or electioneering communications under the recent amendments. (*Id.* ¶ 6.) Accordingly, CFIF sought injunctive relief holding that the amended sections are unconstitutionally both facially and as applied.

7

On October 7, 2008, *CFIF v. Ireland*, No. 1:08-cv-00190, was reassigned to the undersigned District Judge and consolidated with *WVFL v. Ireland*, No. 1:08-cv-01133.[7]  One week later, on October 14, 2008, a hearing on the preliminary injunction motions was held.  (Docket 118.)  The Court issued its memorandum opinion and order on the preliminary injunction motions on October 17, 2008.  (Docket 125.)  In that opinion, the Court made the following findings.

First, the Court applied a limiting principle in interpreting West Virginia's ban on corporate express advocacy, holding that the West Virginia legislature impliedly excepted corporations, such as WVFL, that meet the criteria set forth by the Supreme Court in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 263 (1986).  (Docket 125 at 14-15.) This holding approximated the Supreme Court's holding in *Federal Election Commission v. McConnell*, 540 U.S. 93, 209-11 (2003), and quashed WVFL's argument that the corporate advocacy ban was overbroad as applied to it.

Second, the Court agreed with CFIF and WVFL that West Virginia's definition of express advocacy, as it then stood, was vague and overbroad for a multitude of reasons.  Relying heavily on *Federal Election Commission v. Wisconsin Right to Life, Inc.* (*WRTL II*), 551 U.S. 449 (2007), and *North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008), the Court found West Virginia's express advocacy definition overbroad for failing to limit its application to electioneering communications as defined by the Bipartisan Campaign Reform Act of 2002 (BCRA).  (Docket 125 at 19-20.)  Furthermore, because West Virginia's definition of express advocacy relied on contextual factors and employed the interpretation of a "reasonable person" to determine the boundaries of

---

[7]  Defendant Natalie Tennant was substituted for Defendant Betty Ireland on January 19, 2009. (Docket 149.)

express advocacy, the Court held W. Va. Code § 3-8-1a(13)(B) unconstitutionally vague on its face. (Docket 125 at 20-23.)

Third, the Court upheld West Virginia's definitions of "political action committee," "political committee," and "unaffiliated political action committee" as sufficiently tailored.  In reaching this conclusion, the Court noted that West Virginia's definition was narrower than the "major purpose" test that was expounded in *Buckley v. Valeo*.  (Docket 125 at 24-29.)  West Virginia's definition captures only those committees with the *sole purpose* of supporting or opposing a candidate's nomination, rather than those with the *major purpose* of supporting or opposing nomination, as *Buckley* condoned.  Additionally, and contrary to the arguments of CFIF and WVFL, the phrase "supporting or opposing" was held sufficiently definite to pass constitutional muster.  (Docket 125 at 29-31.)

Fourth, the Court struck down West Virginia's definition of "electioneering communication" as overbroad because it encompassed more varied media than those contained in BCRA's definition (which the Supreme Court upheld) and failed to adequately justify that broader scope.  (*Id.* at 35-41.) Fifth and finally, the Court found that there was no significant risk of threats and reprisals such that WVFL should be exempted from all disclosure requirements imposed by West Virginia law.  (*Id.* at 42-48.)

On February 4, 2009, WVFL and Zane Lawhorn filed their Motion for Summary Judgment. (Docket 152.) CFIF filed a separate Motion for Summary Judgment on the same day.  (Docket 154.) In August 2009, the Fourth Circuit issued a preliminary injunction opinion in *Real Truth About Obama, Inc. v. Federal Election Commission* (*RTAO*), 575 F.3d 342 (4th Cir. 2009), which potentially impacts the resolution of this case.  In consideration of *RTAO*, on September 16, 2009,

the Court granted WVFL's motion to stay this case pending resolution of a petition for rehearing en banc before the Fourth Circuit and a petition for writ of certiorari before the Supreme Court in *RTAO*. (Docket 184). On May 6, 2010, WVFL advised the Court that the Supreme Court granted the certiorari petition in *RTAO*, vacated the Fourth Circuit panel decision, and remanded the case to the Fourth Circuit in light of the recent *Citizens United* decision. Consequently, on May 26, 2010, the Court dissolved the stay. Only CFIF and WVFL/Zane Lawhorn remain as plaintiffs.

In the 2010 regular session, the West Virginia legislature again revisited certain provisions of the election chapter. In particular, W. Va. Code § 3-9-14 was repealed, and §§ 3-8-1 (purposes), 3-8-1a (definitions), 3-8-2 (requirements for reporting independent expenditures), 3-8-8 (corporate contribution ban), and 3-8-12 (anonymous advertising ban) were amended, effective June 11, 2010. *See* 2010 W. Va. Acts ch. 76 (H.B. 4647). Both WVFL and CFIF maintain that their challenges remain live issues because the 2010 amendments did little to remedy the constitutional infirmities they perceive in West Virginia's election laws. On September 14, 2010, WVFL and Zane Lawhorn filed their Second Motion for Summary Judgment, arguing many of the same points from the preliminary injunction stage. (Docket 209.) On the same day, CFIF filed its Renewed Motion for Summary Judgment. (Docket 210.) The Court held a lengthy hearing on both summary judgment motions on February 11, 2011, where it heard argument from counsel for Plaintiffs and the West

Virginia defendants.[8]  The issues have been fully briefed and argued and the matter is now ripe for the Court's consideration.

### III.  LEGAL STANDARDS

A.      Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Conversely, summary judgment is inappropriate if there exist factual issues that reasonably may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When construing such factual issues, it is well established that the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

At the hearing on the summary judgment motions pending before the Court, all parties agreed that there are no outstanding factual issues to be resolved.  Instead, the remaining questions are purely questions of law for the Court's interpretation and analysis.  Accordingly, this case is ripe for disposition on these motions.

----

[8]  The named defendants in these consolidated cases include: Natalie H. Tennant, Secretary of the State of West Virginia; Timothy D. Boggess, Prosecuting Attorney for Mercer County; and Gary A. Collias, William N. Renzelli, Robert Rupp, and Cindy Smith, Members of the West Virginia State Election Commission.  Together, these defendants will be referred to simply as "West Virginia," since they are all named in their official capacities as servants of the State.  Additionally, defendant Boggess's Motion to Dismiss [Docket 226] is **GRANTED**, and his successor as Mercer County Prosecutor, Scott Ash, is substituted in his place as a named defendant, sued in his official capacity.

B.      *Vagueness and Overbreadth*

WVFL and CFIF challenge certain of West Virginia's election laws as impermissibly vague. It is a fundamental tenet of constitutional law that a statute or regulation "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A vagueness challenge arises under the Due Process Clause of either the Fifth or Fourteenth Amendment. *See Holder v. Humanitarian Law Project*, ___ U.S. ___, 130 S. Ct. 2705, 2718 (2010). Laws are impermissibly vague if they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. A vagueness challenge can also be asserted on the basis that a statute or regulation permits "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Id.* When assessing a statute or regulation that "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). This "more stringent vagueness test" requires more than fair notice, but "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Additionally, "even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of [either] the Fifth [or Fourteenth] Amendment for lack of notice." *Holder*, 130 S. Ct. at 2719. To be certain, vagueness turns on considerations of clarity, not government reach.

A statute may be attacked as unconstitutionally vague on its face only in limited circumstances. Courts are not "roving commissions assigned to pass judgment on the validity of the

Nation's laws." *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973).  A party who cannot complain that its own conduct was ensnared by an impermissibly vague statute generally is prohibited from arguing that the statute may injure others who are not before the court.  *See L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999) ("[A] person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court."); *Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). The Supreme Court has carved out an exception to this general rule when First Amendment freedoms are at issue: A defendant may challenge a statute as facially vague if it has the potential to inhibit First Amendment freedoms. *See L.A. Police Dep't*, 528 U.S. at 38; *Grayned*, 408 U.S. at 109.

In addition to vagueness, the litigants in this case challenge West Virginia's election laws as overbroad.  When a statute or regulation is challenged as overbroad, a court's task "is to determine whether the enactment reaches a *substantial amount* of constitutionally protected conduct." *Hoffman Estates*, 455 U.S. at 495.  "If it does not, then the overbreadth challenge must fail." *Id.*  In addressing an overbreadth challenge, the court is to first construe the challenged law to determine its proper scope, then ask whether the law burdens a substantial amount of protected activity.  *Williams*, 553 U.S. at 293, 297.  The potential vagueness of a law impacts a court's overbreadth analysis because uncertain boundaries (vagueness) can chill constitutionally protected speech without actually infringing on any constitutional rights.  *See Williams*, 553 U.S. at 304 ("[O]rdinarily a plaintiff . . . cannot complain of the vagueness of the law as applied to the conduct of others, [but] we have relaxed that requirement in the First Amendment context, permitting

13

plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech."); *see also Hoffman Estates*, 455 U.S. at 494 n.6 (noting that "the vagueness of a law affects overbreadth analysis").

C.     *Levels of Scrutiny in Political Speech*

A threshold issue for courts weighing fundamental rights against government interests is the level of means-end scrutiny to apply in specific circumstances.  The distinction relevant to this case centers on whether each challenged law amounts to (1) a prohibition or restriction on speech or certain speakers or (2) a disclaimer, disclosure, or reporting requirement, which may burden the ability to speak but "imposes no ceiling on campaign-related activities" and "do[es] not prevent anyone from speaking."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. ___, ___, 130 S. Ct. 876, 914 (2010) (citations omitted).

Political "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people."  *Citizens United*, 130 S. Ct. at 898 (citing *Buckley*, 424 U.S. at 14–15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential."))  For this reason, when a law burdens core political speech, courts apply strict scrutiny, under which "the Government must prove that [the law] furthers a compelling interest related to the process of governing."  *Fed. Election Comm'n v. Wisc. Right to Life, Inc.* (*WRTL II*), 551 U.S. 449, 464 (2007); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (when law burdens core political speech, a court will "uphold the restriction only if it is narrowly tailored to serve an overriding state interest").  For instance, the Supreme Court has applied strict scrutiny to strike down content-based restrictions on speech and restrictions based on the identity of the speaker.  *See, e.g.*, *United States v. Playboy Entm't Grp.,*

14

*Inc.*, 529 U.S. 803, 813 (2000) (striking down content-based restriction); *First Nat'l Bank of Boston v. Belotti*, 435 U.S. 765, 784 (1978) (striking down restriction distinguishing among corporate and non-corporate speakers). These principles are at their zenith in the context of political speech. *See Buckley*, 424 U.S. at 14 ("The First Amendment affords the broadest protection to . . . political expression."); *Monitor Patriot Co. v. Roy*, 424 U.S. at 14-15 ("[I]t can hardly be doubted that the constitutional guarantee [of the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office.").

On the other hand, because disclosure and disclaimer requirements are a less restrictive alternative to more comprehensive regulations of speech, challenges to such requirements are reviewed under a less rigorous test that has been termed "exacting scrutiny." *See, e.g.*, *Citizens United*, 130 S. Ct. at 914 ("The Court has subjected [disclosure] requirements to 'exacting scrutiny'"); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam); *accord Doe v. Reed*, ___ U.S. ___, ___, 130 S. Ct. 2811, 2814 (2010). This standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64, 66). To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (citing *Buckley*, 424 U.S. at 68). The *Citizens United* Court cited at least one government interest that is significant in the analysis: "'[P]rovid[ing] the electorate with information' about the sources of election-related spending." 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64).

## IV.  *"POLITICAL ACTION COMMITTEE" AND RELATED DEFINITIONS*

WVFL challenges several subsections of W. Va. Code § 3-8-1a, which provides the definitions for "political committee," "political action committee" (or "PAC"), and "unaffiliated political action committee."  W. Va. Code §§ 3-8-1a(19), (20), (26).  WVFL requests "[a] declaratory judgment that . . . [these definitions] . . . are unconstitutional as applied to [WVFL's] communications and facially, are void, and are set aside."  (Docket 128 ¶ 238.)  The West Virginia legislature did not amend these definitions in 2010, except to renumber them.  At the summary judgment hearing, West Virginia fully endorsed the Court's preliminary injunction holding on this issue, and the Court can find no reason to depart from that analysis. Accordingly, the Court adopts in full the discussion and analysis of these arguments set forth in the preliminary injunction order, as set forth below:

> WVFL does not challenge the substance of the definitions. Rather, it is challenges their scope. WVFL claims that the definitions of political committee, PAC, and unaffiliated PAC are facially vague and overbroad and that WVFL does not know if its planned advertising and advocacy efforts will convert it into a political committee as that term is defined by W. Va. Code § 3-8-1a(22). As a consequence of this uncertainty, WVFL states that it will continue to refrain from communicating its message for fear that it will run afoul of West Virginia law. In WVFL's words, it seeks to conduct its operations "without fear of becoming a political committee."[9] (Docket 2 ¶ 163 in Case No. 1:08-cv-1133.)
> WVFL's broader argument is that the phrase "the purpose of supporting or opposing" in the PAC definition is unconstitutional as applied to WVFL and facially vague and overbroad. However, WVFL dissects this phrase into "the purpose of" and "supporting or opposing" and maintains that each constituent part is constitutionally infirm for separate reasons.

---

[9]  WVFL objects to being classified as a political committee because many of the provisions of W. Va. Code ch. 3, art. 8 are triggered if the actor is a political committee. For instance, PACs and political committees must file a written statement of organization with the Secretary of State, W. Va. Code § 3-8-4; maintain and report detailed records of all financial transactions, including the identity of contributors, *id.* §§ 3-8-5, -5a, -5b; refuse contributions from corporations, *id.* § 3-8-8(a); and refrain from soliciting or accepting funds in excess of $1000 prior to registration, *id.* § 3-8-12(g).

WVFL points to its planned communications concerning West Virginia Supreme Court of Appeals candidate Margaret Workman. In 1993, then-Chief Justice Workman penned the Supreme Court of Appeals' decision in *Women's Health Ctr. of W. Va. v. Panepinto*, 446 S.E.2d 658 (W. Va. 1993), a prominent abortion-rights case. WVFL plans to conduct a mass mailing, radio advertising campaign, and petition drive to highlight Workman's opinion in *Panepinto*. (Docket 2-2 at 42-45 in Case No. 1:08-cv-1133.) WVFL fears that these communications may be construed as "opposing" Workman's candidacy, thereby converting WVFL into a PAC and subjecting it to West Virginia's campaign laws.

### a. Applicable Law

In their current forms,[10] the challenged definitions are as follows:

(19) "Political action committee" means a committee organized by one or more persons *for the purpose of supporting or opposing the nomination or election of one or more candidates*. The following are types of political action committees:
> (A) A corporate political action committee, as that term is defined by subdivision (8)[11] of this section;
> (B) A membership organization, as that term is defined by subdivision (18)[12] of this section;
> (C) An unaffiliated political action committee, as that term is defined by subdivision (29)[13] of this section.

(20) "Political committee" means any candidate committee, political action committee or political party committee.
. . . .
(26) "Unaffiliated political action committee" means a political action committee that is not affiliated with a corporation or a membership organization.

---

[10] All citations and excerpts involving the definitions section (W. Va. Code § 3-8-1a) reflect the post-2010 numbering.

[11] As in the original. This subdivision should have been renumbered in 2010 to reflect that "corporate PAC" is now defined in W. Va. Code § 3-8-1a(7).

[12] As in the original. This subdivision should have been renumbered in 2010 to reflect that "membership organization" is now defined in W. Va. Code § 3-8-1a(16).

[13] As in the original. This subdivision should have been renumbered in 2010 to reflect that "unaffiliated PAC" is now defined in W. Va. Code § 3-8-1a(26).

W. Va. Code § 3-8-1a (emphasis added). The challenged definitions were enacted by the West Virginia Legislature on June 7, 2007 and were not changed subsequent to Judge Faber's April 22, 2008, ruling. *See* 2008 W. Va. Acts 13. [They also were not substantively changed after the Court's 2008 preliminary injunction order. *See* 2010 W. Va. Acts ch. 76 (H.B.4647).]

Although WVFL fears becoming a "political committee" under West Virginia law, only the definition of "political action committee" need be addressed; an organization becomes a "political committee" or "unaffiliated political action committee" by virtue of its status as a PAC. *See* W. Va. Code § 3-8-1a(20) (defining political committee as "any candidate committee, political action committee or political party committee").

*b. Analysis*

WVFL's bifurcation of the phrase "the purpose of supporting or opposing" in the PAC definition unnecessarily complicates the issue. *Cf. Leake*, 525 F.3d at 286 (evaluating the phrase "a major purpose to support or oppose the nomination or election of one or more clearly identified candidates" as a compete unit in a challenge to North Carolina's definition of political committee). However, in the interests of comprehensiveness, each argument will be addressed.

*i. "The Purpose Of"*

The definitions in W. Va. Code § 3-8-1a were not cut from whole cloth. Similarly worded statutes have been challenged in other cases and the contours of constitutionally permissible language are well-established. As will be explained in detail below, the question presented by WVFL's PAC definition argument is a matter of semantics: Is the phrase "*the purpose* of supporting or opposing*" found in W. Va. Code § 3-8-1a(19) more like "*a major purpose* to support or oppose" (which is unconstitutionally vague) or "*the major purpose* of supporting or opposing" (which is constitutional)?

In *Buckley*, the Supreme Court made a distinction between issue advocacy and advocacy for the election of a particular candidate. *See Buckley*, 424 at 80 (holding that campaign finance laws must be "unambiguously related to the campaign of a particular . . . candidate"). Although each form of speech is of equal constitutional gravity, *see McConnell*, 540 U.S. at 193, the latter form may be subject to narrowly tailored regulation in order to serve the important governmental interests of preventing corruption or the appearance of corruption in elections. *See Buckley*, 424 U.S. at 25–26. The government's interest in preventing corruption in elections, however, does not extend in equal measure to speech that advocates for or against issues that do not directly relate to the election of a candidate for public office. Accordingly, campaign finance laws must not be so broad as to infringe individuals' rights to express opinions on such issues, *see NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive,

government may regulate in the area only with narrow specificity."), nor may they be so vague as to make it uncertain whether they cover issue advocacy, *see Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 665 (5th Cir. 2005).

To screen issue advocacy groups from the reach of campaign finance laws, the *Buckley* Court stated that the term "political committee" "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* at 79. Although the *Buckley* opinion addressed federal campaign law, many states, including West Virginia, have incorporated this language into their definitions of political committees, PACs, or similar terms. *See, e.g.*, Alaska Stat. § 15.13.400(8); Ariz. Rev. Stat. Ann. § 16-901(19); Kan. Stat. Ann. § 25-4143(k); La. Rev. Stat. Ann. § 18:1483(14); N.C. Gen. Stat.§ 163-278.6(14); Wash. Rev. Code § 42.17.020(39); W. Va. Code § 3-8-1a(19). It therefore behooves the Court to view West Virginia's campaign law through the lense of *Buckley* and its progeny.

*Buckley* makes it clear that it is constitutionally permissible to define a political committee as an organization controlled by a candidate or an organization for which "the major purpose" is the election of a candidate to public office. In *Leake*, the Fourth Circuit reviewed a North Carolina campaign law that closely tracked the language of *Buckley*. The law defined "political committee" as

> a combination of two or more individuals . . . that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:
>
> > a. Is controlled by a candidate; [or]
> > . . . .
> > d. Has as *a major purpose to support or oppose* the nomination or election of one or more clearly identified candidates.

N.C. Gen. Stat.§ 163-278.6(14) (emphasis added). North Carolina's campaign laws, like West Virginia's, impose significantly greater burdens on political committees than on other entities.  North Carolina Right to Life, Inc. lodged a facial challenge to the law, arguing that the phrase "a major purpose" was unconstitutionally vague and potentially subjected it to regulation as a political committee. *See Leake*, 525 F.3d at 287.

The task before the Fourth Circuit in *Leake* was to determine if there was a constitutionally significant difference between"a major purpose," which was used by North Carolina to define "political committee," and "*the* major purpose," which was approved by *Buckley*. The Fourth Circuit concluded there was. The court reasoned that the Supreme Court did not speak haphazardly in *Buckley* when it said that a political committee was an organization with "the major purpose" of electing a candidate. By use of the definite article, "the," the *Buckley* court was signifying that the major-purpose test referred to organizations whose "only or primary goal"

was the election or opposition of a candidate. *Id.* at 287. In contrast, the phrase, "a major purpose," does not denote an only or primary purpose. It indicates that the election or opposition of a candidate is but one purpose among many. "Permitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple 'major purposes' threatens the regulation of too much ordinary political speech to be constitutional." *Id.* at 288–89.

West Virginia's definition of PAC does not use "the major purpose" or "a major purpose." It omits the word "major," regulating groups "organized . . . for *the purpose* of supporting or opposing the nomination or election of one or more candidates." W. Va. Code § 3-8-1a(19) (emphasis added). The question, therefore, is whether the absence of the adjective "major" makes West Virginia's statute more like the definition of political committee in *Buckley* or *Leake*.

Like the Supreme Court in *Buckley*, West Virginia's legislature chose the definite article to limit the word "purpose." However, West Virginia differs because it does not qualify the requisite purpose with the word "major." This difference does not make West Virginia's statute more vague or more broad; the opposite is true. Stating that an organization has one "major purpose" implies that it at least could have other, minor purposes. "*The* purpose," being without qualification, indicates that there is but one and only one purpose—namely, to support or oppose a candidate. Thus, by omitting "major," West Virginia's definition of a PAC more precisely identifies the scope of regulated organizations than the language found to be constitutional in *Buckley*.

The Court does not arrive at this meaning by construction or interpretation. Instead, it is the plain meaning of this statute to limit its application to singular–purpose organizations. *See Caminetti v. United States*, 242 U.S. 470, 485 ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.").

An organization is a regulable "political committee" under W. Va. Code § 3-8-1a(20) only if it is a "candidate committee, [PAC] or political party committee." Similarly, "unaffiliated PACs," as defined in W. Va. Code § 3-8-1a(26), are merely a subset of organizations labeled as PACs. Because the definition of PAC is not unconstitutionally vague or overbroad on its face, it follows that the definitions of political committee and unaffiliated PAC are not unconstitutional on the grounds alleged by WVFL.

### ii. *"Supporting or Opposing"*

WVFL lodges a facial constitutional challenge to the use of "supporting or opposing" in W. Va. Code § 3-8-1a(22). It therefore bears the "heavy burden" of proving "a substantial risk that application of the provision will lead to the suppression of speech." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). WVFL does not appear to meet this burden.

Tellingly, WVFL cites no authority where a court has found the terms "supporting or opposing" a candidate in the definition of political committee or PAC to be unconstitutionally vague. The few courts which have addressed the issue raised here have concluded that "supporting or opposing" a candidate is not vague or overbroad. *See, e.g.*, *McConnell*, 540 U.S. at 170 n.64; *Leake*, 525 F.3d at 289 ("[T]he Supreme Court[] insist[s] that political committees can only be regulated if they have the support or opposition of candidates as their primary purpose . . . ."); *Real Truth About Obama, Inc. v. FEC*, No. 3:08-cv-483, 2008 U.S. Dist. LEXIS 73551, at * 37 (E.D. Va. Sept. 24, 2008) ("[C]ase law and Supreme Court precedent make it clear that the use of 'support or oppose' is not unconstitutionally vague . . . ."); *EMILY'S List v. FEC*, No. 05-0049 (CKK), 2008 U.S. Dist. LEXIS 58046, at *98 (D.D.C. July 31, 2008) ("EMILY's List's [vagueness] argument is entirely unavailing as to the words 'support' or 'oppose,' because the Supreme Court rejected just such a claim in *McConnell* . . . ."); *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 166 P.3d 1174, 1184 (Wash. 2007) ("[W]e conclude that a person of ordinary intelligence would have a reasonable opportunity to understand the meaning of 'in support of, or opposition to, any candidate' in the definition of '[p]olitical committee' . . . ."); *cf. Carmouche*, 449 F.3d at 663 (dismissing a vagueness and overbroad challenge to a Louisiana statute that defined "expenditure" as "a purchase . . . made for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office" because a limiting construction was sufficient). In cases where statutes containing the phrase "support or oppose" were found to be vague or overbroad, the words "support" and "oppose" were not the offending terms. *See Real Truth About Obama*, 2008 U.S. Dist. LEXIS 73551, at *36–*38 (discussing cases).

WVFL's attempt to distinguish the instant action from *McConnell* is not persuasive. In *McConnell*, the Supreme Court held that the words "support" and "oppose" are not unconstitutionally vague in the campaign finance law context because they "clearly set forth the confines within which potential *party speakers* must act in order to avoid triggering the provision." *McConnell*, 540 U.S. at 170 n.64 (emphasis added). WVFL correctly points out that the statute at issue in this section of *McConnell*, 2 U.S.C. § 301(20)(A)(iii), applies to political parties involved in federal election campaigns. WVFL would have this Court limit the application of the *McConnell* Court's holding to statutes applying to sophisticated political parties, but not other individuals. This argument might be more convincing were it not for the remainder of the Supreme Court's discussion on the matter: "These words [support and oppose] 'provide explicit standards for those who apply them' and '*give the person of ordinary intelligence a reasonable opportunity to know what is prohibited*.'" *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)) (emphasis added). Thus, it is evident that the *McConnell* Court's reasoning should not be limited to sophisticated political party members. The phrase "supporting or opposing" is not unconstitutionally vague. Furthermore, because it has been established that the phrase applies to groups organized for the only purpose of supporting or opposing a candidate for election, its sweep is not overbroad.

21

For the reasons stated above, the Court concludes that West Virginia's definitions of political committee, PAC, and unaffiliated PAC are not unconstitutionally vague or overbroad. The definitions are "'unambiguously related to the campaign of a particular . . . candidate.'" *Leake*, 525 F.3d at 287 (quoting *Buckley*, 424 U.S. at 80). Accordingly, the Court further **FINDS** that there is no likelihood that WVFL will succeed on the merits with its facial challenge to those definitions.

### c. Political Action Committee Definition As-Applied

WVFL's as-applied challenge to the definitions has a similar fate. Defendants have not argued in their briefs that WVFL's only or primary purpose is to support or oppose a candidate for state election. Furthermore, Defendant Betty Ireland, West Virginia Secretary of State, conceded at the hearing on October 14, 2008, that WVFL's sole purpose is not supporting or opposing candidates. Because there appears to be no basis to find that WVFL's sole, or even major, purpose is supporting or opposing candidates, the likelihood of success of WVFL's as-applied challenge is easily ascertained.  As WVFL will be not be deemed a PAC under the constitutionally valid definition in W. Va. Code § 3-8-1a, there is little likelihood that the challenged section will be impermissibly applied to WVFL. *See Turchick v. United States*, 561 F.2d 719, 721 n.3 (distinguishing overbreadth and as-applied challenges in First Amendment context). Accordingly, the Court **FINDS** that there is little likelihood that WVFL will succeed on the merits of its as-applied challenge to the organizational definitions in W. Va. Code § 3-8-1a.

(Docket 125 at 23-32.)

As to the Court's overbreadth holding, at the summary judgment hearing, WVFL argued that the Court's interpretation of the PAC definition, as set forth above, cannot be correct because it would permit foolish results.  In particular, WVFL stated that, under the Court's construction of W. Va. Code § 3-8-1a(19), an organization could spend 99% of its treasury to "support or oppose the nomination or election of one or more candidates" (and 1% on, say, charitable activity) but not fall within the definition of "PAC" because supporting or opposing a candidate's nomination or election is not the organization's *sole purpose*.  In lieu of the Court's interpretation, WVFL proposes that the Court refuse to "read[] 'only' . . . into West Virginia law" and hold § 3-8-1a(19) unconstitutionally overbroad for capturing organizations that have simply *a purpose* of supporting or opposing a

candidate's nomination or election.  (Docket 211 at 32-34.)  Contrary to WVFL's suggestion, the Court is not reading anything into the PAC definition.[14]  Rather, the Court is giving warranted deference to the West Virginia Legislature in interpreting § 3-8-1a(19), taking that elected body to mean what it says in crafting the laws of West Virginia.  The legislature chose the definite article "the" in drafting the PAC definition, and the Court's analysis is faithful to that choice.  If WVFL takes issue with what it perceives as poor draftsmanship in the West Virginia Code, it would be better served to argue its case to the West Virginia Legislature.

As to the Court's vagueness holding, WVFL makes no new arguments and simply reiterates that the phrase "support or oppose" is unconstitutionally vague as a matter of law.  Based on the analysis in the Court's preliminary injunction order, and with particular emphasis on the Supreme Court's holding in *McConnell*, WVFL's argument remains unpersuasive.  The PAC definition is sufficiently definite to withstand constitutional scrutiny, and accordingly, WVFL's Second Motion for Summary Judgment [Docket 209] is **DENIED** as to this issue.

## V.  *"EXPRESSLY ADVOCATING" DEFINITION*

Plaintiffs challenge West Virginia's definition of "expressly advocating," contained in W. Va. Code § 3-8-1a(12).  That section, which was amended by the Legislature in 2010, admittedly in response to the Court's preliminary injunction hearing,[15] reads:

---

[14]  Remarkably, in making its argument, WVFL fails to appreciate that to substitute the phrase "organized . . . for a purpose" for the phrase "organized . . . for the purpose" would go beyond "reading into the statute" and effectively eviscerate the limited scope of PAC regulation under West Virginia law.

[15]  West Virginia admitted as much in the summary judgment hearing.  Furthermore, materials from the legislative debates confirm that the West Virginia Legislature acted at least partly in response to the Court's preliminary injunction order in passing the 2010 amendments.  (*E.g.*, Docket 121.)

"Expressly advocating" means any communication that:

(A) Uses phrases such as "vote for the Governor," "re-elect your Senator," "support the Democratic nominee for Supreme Court," "cast your ballot for the Republican challenger for House of Delegates," "Smith for House," "Bob Smith in '04," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidates, "reject the incumbent";

(B) Communications of campaign slogans or individual words, that can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, advertisements, etc., which say "Smith's the One," "Jones '06," "Baker", etc; or

(C) Is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.

*Id.* The West Virginia Code incorporates the phrase "expressly advocating" into the definition of "independent expenditure" and nowhere else. An "independent expenditure" is "an expenditure . . . by a person . . . [e]xpressly advocating the election or defeat of a clearly identified candidate . . . [and not made by or in cooperation with a candidate or PAC]." W. Va. Code § 3-8-1a(15). Independent expenditures are the subject of fairly extensive disclosure and disclaimer requirements once certain annual dollar amounts are reached.

All parties agree that subsection (A) of the "expressly advocating" definition embodies the "magic words" of express advocacy embraced by the Supreme Court in *Buckley*, and it is therefore *per se* constitutional. Plaintiffs CFIF and WVFL allege that subsections (B) and (C) are unconstitutionally vague and subsection (C) is unconstitutionally overbroad, both facially and as applied. In particular, Plaintiffs take issue with the phrase "reasonable meaning" in subsection (B) and the entirety of subsection (C), arguing that the language is vague, imprecise, and impermissibly relies on "intent and effect" tests, as condemned by the Supreme Court in *WRTL II*. Additionally, Plaintiffs assert that subsection (C) exceeds the scope of constitutionally permissible election

24

regulation by capturing communications that "appeal to vote" but are neither express advocacy nor electioneering communications.  (Docket 210 at 13-15.)  Finally, Plaintiffs allege that the reporting requirements that attend expressly advocating, W. Va. Code §§ 3-8-2 and 3-8-5,[16] chill their speech and are thus unconstitutional by extension.  West Virginia retorts that no constitutional infirmity remains after the 2010 amendments.

The 2010 amendments broke former subsection (A) into current subsections (A) and (B) and removed an instruction in the latter subsection to evaluate communications "in context."  (Docket 193-1 at 13.)  The 2010 amendments also thoroughly revised what was subsection (B), currently subsection (C), to approximate Chief Justice Roberts's "appeal to vote" test from *WRTL II*.  *See* 551 U.S. at 469-70 ("[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.").  In the preliminary injunction order, the Court held old subsection (B) unconstitutionally vague for failing to incorporate the definition of electioneering communication from BCRA, as required by *Leake*, and for referring to context and incorporating other vague standards of the kind decried in *WRTL II*.  (Docket 125 at 20-23.)  Although much of the Court's analysis is no longer applicable to the amended definition of "expressly advocating," a similar conclusion is unavoidable—subsection (C) is unconstitutionally vague.

---

[16]  These sections impose reporting requirements on persons making "independent expenditures" over certain threshold amounts. "Independent expenditure" is defined as an "expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate . . . ." W. Va. Code § 3-8-1a(15).  Thus, if the definition of "expressly advocating" fails constitutional scrutiny, the reporting and disclosure requirements in §§ 3-8-2 and 3-8-5 must fail to the same extent.

A.      *Applicable Law*

Any discussion regarding the proper definition of express advocacy and associated reporting requirements must necessarily begin with *Buckley*. At the time *Buckley* was decided, it was well established that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." 424 U.S. at 64. The Supreme Court examined Congress's purpose for enacting reporting and disclosure requirements in FECA—"promot[ing] full disclosure of campaign-oriented spending to insure both the reality and the appearance of the purity and openness of the federal election process," *id.* at 78-79—and determined that the purpose was insufficient to restrict the speech of persons and groups engaging only in issue advocacy. *Id.* ("To fulfill the purposes of the Act [the disclosure requirements] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate.") Accordingly, the Court limited the definition of "expenditure" to "reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate [and that are] directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* at 80 (footnote omitted).[17]   The Court then articulated a list of what have become known as "magic words" which are indicative of such express advocacy. *Id.* at 44 n.52 and 80 n.108.  *Buckley* thus stands for the dual proposition that the "magic words" of express advocacy are both within government's regulatory reach, at least as to reporting and disclosure requirements, and sufficiently definite to avoid a vagueness challenge.

---

[17]  West Virginia's definition of "independent expenditure" is similarly limited to "expenditure[s] . . . expressly advocating the election or defeat of a clearly identified candidate . . . ."  W. Va. Code § 3-8-1a(15).

*Buckley*'s bright line "magic words" test stood as the law on this issue for over twenty-five years, until Congress passed BCRA, and the Supreme Court revisited the issue in *McConnell*. In *McConnell*, the Court rejected the idea that "the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy" and determined that the "magic words" test was "functionally meaningless" as a limit of government reach because persons and organizations could avoid reporting simply by not using those particular words. *Id.* at 192. Then, finding that the governmental interests articulated in *Buckley* applied in full to the new provisions of BCRA requiring reporting and disclosure of expenditures for ads that "are intended to influence voters' decisions and have that effect," the Court expanded the legitimate sweep of such requirements to reach the "functional equivalent of express advocacy." *Id.* at 206. In other words, *McConnell* upheld BCRA's reporting and disclosure requirements as a valid exercise of government regulatory authority "to the extent that" the electioneering communication ads to be regulated "are the functional equivalent of express advocacy." *Id.* The *McConnell* Court also stated that the definition of "electioneering communication" was not unconstitutionally vague. *Id.* at 103 (electioneering communication definition is "both easily understood and objectively determinable.").

The Supreme Court revisited and refined the definition of "functional equivalent of express advocacy" four years later in *WRTL II*. Addressing an as-applied challenge to the same provision that was held to be facially valid in *McConnell* (BCRA § 203), Chief Justice Roberts[18] recognized

---

[18] Chief Justice Roberts was joined only by Justice Alito in Parts III and IV of the opinion. Justice Scalia filed a separate opinion, joined by Justices Kennedy and Thomas, concurring in part and concurring in the judgment. Specifically, although Chief Justice Roberts and Justice Alito saw "no occasion to revisit" *McConnell*, *WRTL II*, 127 S. Ct. at 2674, Justices Scalia, Kennedy, and Thomas nevertheless expressed a desire to overrule its "functional equivalent" holding as unconstitutionally vague. *Id.* at 504 (Scalia, J., concurring). Accordingly, Parts III and IV constitute binding portions
(continued...)

that *McConnell* "did not explain that it was adopting a particular test for determining what constituted the 'functional equivalent' of express advocacy." 551 U.S. at 466. Accordingly, Chief Justice Roberts held that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL II*, 551 U.S. at 469-70. In declining to adopt a more subjective, intent-driven test because such a test "would chill core political speech by opening the door to a trial on every ad," *id.* at 468, Chief Justice Roberts emphasized that "the proper standard for an as-applied challenge . . . must be objective, focusing on the substance of the communication rather than the amorphous considerations of intent and effect," *id.*, and that "contextual factors . . . should seldom play a significant role in the inquiry." *Id.* at 473-74.

Since *WRTL II* was decided, the Fourth Circuit has had occasion to apply the Supreme Court's holding to a case strikingly similar to the one at bar. In *North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008), a non-profit corporation challenged, among other things, North Carolina's two-pronged test to determine whether "an individual acted 'to support or oppose the nomination or election of one or more clearly identified candidates." *Id.* (quoting N.C. Gen. Stat. § 163-278.14A(a)). The Fourth Circuit held that

> to be considered the "functional equivalent of express advocacy," a communication must meet two separate requirements[:] the communication must qualify as an "electioneering communication," [as] defined by [BCRA], [and then] only if [it] is

_____

[18](...continued)
of the opinion. *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'") (citing *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

> susceptible of no reasonable interpretation other than as an appeal to vote for or
> against a specific candidate.

*Leake*, 525 F.3d at 281-82. Applying that test and recognizing that *WRTL II* "was entertaining an

'as-applied challenge'" to a statute held facially valid in *McConnell*, the Fourth Circuit struck down

North Carolina's regulation as facially vague and overbroad.  *Leake*, 525 F.3d at 285. The Court

based its holding on the "multiple First Amendment deficiencies that North Carolina's definition

displays," including "determin[ing] whether speech is regulable based on how a 'reasonable person'

interprets the speech's 'essential nature' in light of four 'contextual factors.'"  *Id.* at 285-86.

Most recently, the Supreme Court decided *Citizens United v. Federal Election Commission*,

___ U.S. ___, 130 S. Ct. 876 (2010).  In *Citizens United*, the Supreme Court struck down the federal

ban that made it a "felony for all corporations . . . either to expressly advocate the election or defeat

of candidates or broadcast electioneering communications."  *Id.* at 897.  Under the challenged law,

corporations and unions were barred from using general treasury funds for express advocacy or for

electioneering communications, but they were permitted to establish a PAC to engage in those

communications.  *Id.* at 887.  Notably, although the Supreme Court struck down the federal ban on

independent expenditures, it upheld disclosure and disclaimer requirements, which impose no ceiling

on campaign spending and are considered a less restrictive alternative, and stated that such

requirements need not "be limited to speech that is the functional equivalent of express advocacy."

*Id.* at 915.  In other words, *Citizens United* held that government cannot all-out ban independent

express advocacy or electioneering communications (regardless of the speaker's identity), but it can

impose well-tailored disclosure and disclaimer requirements on such express advocacy and

electioneering communications.  With these precedents in mind, the Court turns to West Virginia's

definition of express advocacy.

B.      *Analysis of Subsection (B):  "No . . . Reasonable Meaning"*

Prior to the 2010 amendments, W. Va. Code § 3-8-1a(12)(B) included in the definition of "expressly advocating" "communications . . . which *in context* can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates." *Id.* (words "in context" deleted in 2010).  That provision was subject to constitutional attack, because the Supreme Court has warned that "contextual factors . . . should seldom play a significant role in the inquiry" into whether a communication is express advocacy.  *WRTL II*, 551 U.S. at 473-74.  However, the words "in context" have been removed, and the provision therefore presents no infirmities for too heavily referencing context.

Section 3-8-1a(12)(B), as part of old § 3-8-1a(12)(A), was not specifically challenged by Plaintiffs in their initial pleadings (although current § 3-8-1a(12)(C) was specifically challenged).  Nonetheless, the Court finds that subsection (B) of the "expressly advocating" definition is sufficiently clear to avoid constitutional problems.  First, although "reasonable interpretation," which is part of subsection (C), focuses on a listener's perception or understanding of a communication, the phrase "reasonable meaning" is confined to the words of a communication themselves.  That is, rather than inviting a myriad of interpretations, subsection (B) uses as a measure the plain meaning of a communication's words.  Second, subsection (B) features several examples of the communications to which it refers, providing additional guidance to speakers as to whether their speech will fall within the definition.  Finally, subsection (B) was originally part of subsection (A), which clearly contemplates *Buckley*-style words of express advocacy.  By splitting old subsection (A) into current subsections (A) and (B), the legislature evinced no intent to capture a broader swath of speech; instead, the purpose of the alteration appears to have been clarity.  For

30

these reasons, the Court **FINDS** that W. Va. Code § 3-8-1a(12)(B) is not unconstitutionally vague and contemplates, like subsection (A), words of express advocacy pursuant to *Buckley v. Valeo*.

    C.      *Analysis of Subsection (C): Freestanding "Appeal to Vote" Test*

Plaintiffs argue that subsection (C) of West Virginia's "expressly advocating" definition is unconstitutionally vague and overbroad because it incorporates Chief Justice Roberts's "appeal to vote" test wholly apart from the "bright line requirements of BCRA's [electioneering communication definition]." *WRTL II*, 551 U.S. at 474 n.7. Plaintiffs also argue that the "appeal to vote" test has been overruled, or at least rendered constitutionally meaningless, by *Citizens United*. West Virginia responds, as it must, that the "appeal to vote" test, on its own, is both sufficiently tailored and clear to survive constitutional scrutiny, whether *Citizens United* stripped it of its previous utility or not.

               *(1)      Overbreadth*

In further considering the proper scope and meaning of the "appeal to vote" test, it is necessary to reiterate the foundational principles announced in *Buckley*. There, the Supreme Court recognized that it must weigh two countervailing interests: on the one hand, government's interest in regulating elections to prevent corruption and the appearance of corruption; and on the other hand, public debate and cross-pollenation on issues essential to our system of government. *See* 424 U.S. at 26, 45. In striking a balance between those competing interests and squaring them with the First Amendment, the Court recognized the government's regulatory interest but limited its ability to enforce that interest to communications that are "unambiguously campaign related." *Id.* at 80. That government regulation of election speech must be "unambiguously campaign related" has never been overruled or circumscribed by the Supreme Court, and it is the foundation for regulating both

"express advocacy," demarcated by *Buckley*'s "magic words," and the "functional equivalent of express advocacy," marked by Chief Justice Roberts's "appeal to vote" test.  Importantly, this line of analysis pertains to the breadth of permissible election regulation, not the clarity which is required of all government regulation.

Also as to the breadth of permissible election regulation, *McConnell* held that "electioneering communications," as defined in BCRA, may be regulated only insofar as they are the "functional equivalent of express advocacy." *Id.* at 206.  The "functional equivalent" test was thus devised in the context of BCRA's "electioneering communication" definition, and its purpose was to anchor the election regulations at issue in that case to *Buckley*'s "unambiguously campaign related" boundary, which was previously restricted to only "magic words express advocacy." *WRTL II* addressed an as-applied challenge to the very same federal electioneering communication regulations as *McConnell*, and it prescribed the "appeal to vote" test as a proxy for "functional equivalence."  Although the Chief Justice's opinion in *WRTL II* emphasizes that the "functional equivalent" test was never applied outside the context of BCRA's electioneering communications regulations (in either *McConnell* or *WRTL II*),[19] nothing in that case indicates that the *power* of government to regulate election speech is limited to "electioneering communications" as defined by federal law.  It is, of course, true that the Supreme Court has only addressed and upheld regulation of election speech in those two contexts—*Buckley*-style express advocacy and electioneering communications as defined in BCRA—but *Buckley*'s outer boundary, that government regulation is permissible if "unambiguously campaign related" does not dictate that election regulation can go

---

[19]  Indeed, when the Court again applied the functional equivalent test to *Hillary: The Movie* in *Citizens United* itself, it first noted that the movie qualifies as an electioneering communication pursuant to BCRA. *See* 130 S. Ct. at 914-915.

no further.[20]  The Court cannot, therefore, hold that West Virginia's implementation of the "appeal

to vote" test in subsection (C) is unconstitutionally overbroad, at least not without a more nuanced

analysis.  That analysis would harken back to *Buckley v. Valeo* and turn on whether the speech

regulated under subsection (C) is "unambiguously campaign related."[21]  However, because there

exists a separate constitutional infirmity with subsection (C), the Court declines to engage in such

an overbreadth analysis.

> *(2)    Vagueness*

The Supreme Court's vagueness holdings run through many of the same decisions, and a

brief summary is again warranted at the outset.  First, *Buckley* held that the "magic words of express

advocacy" are not unconstitutionally vague.  424 U.S. at 44 n.52 and 80 n.108 (setting forth express

---

[20]  West Virginia argues that *Citizens United* did away with the "appeal to vote" test, such that
government can impose disclosure requirements on the full range of political speech, including pure
issue advocacy.  (Docket 216 at 12-13.)  This argument goes too far, and threatens *Buckley*'s
"unambiguously campaign related" standard.  Even after *Citizens United* and the Supreme Court's
broad endorsement of disclosure requirements, the power of government to regulate political speech
is not without bounds, and any assertion to the contrary must be rejected.

[21]  Again, the analysis would take this form because the "appeal to vote" test was born and applied,
and thus expressly approved by the Supreme Court, only as it relates to BCRA "electioneering
communications."  The limited scope of "electioneering communications" as defined by BCRA, and
particularly the temporal and content limitations, was surely a factor in the Supreme Court's
conclusion that BCRA electioneering communications that "appeal to vote" are constitutionally
regulable, i.e., "unambiguously campaign related."  Lower courts will thus need to analyze whether
other communications that "appeal to vote" are similarly "unambiguously campaign related."
Finally, the Court notes the uncertain future for this sort of analysis in the wake of *Citizens
United*, where the Supreme Court held that "disclosure requirements [need not] be limited to speech
that is the functional equivalent of express advocacy."  130 S. Ct. at 915.  Whether or not this
holding eviscerates the constitutional utility of the "appeal to vote" test is subject to debate, at least
for the time being.  What surely remains as a constraint on the scope of permissible regulation,
however, is *Buckley*'s "unambiguously campaign related" boundary.  Whether political speech meets
that standard is the probative question, regardless of whether the "appeal to vote" test is
implemented in order to anchor speech regulations to *Buckley*'s standard (as is the case in West
Virginia's subsection (C)).

advocacy as constitutionally firm standard).   Second, *McConnell* held that "electioneering communications," as defined by BCRA, are not unconstitutionally vague.  540 U.S. at 103.  Then, in *WRTL II*, the Court issued a highly enlightening decision, market by two divergent opinions, which guide the Court's analysis of vagueness in this case.

The main thrust of Chief Justice Roberts's *WRTL II* opinion was that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  551 U.S. at 469-70.  Chief Justice Roberts was joined only by Justice Alito in the substantive portion of the *WRTL II* opinion.  Justice Scalia filed a separate opinion, joined by Justices Kennedy and Thomas, concurring in part and concurring in the judgment.  Specifically, although Chief Justice Roberts and Justice Alito saw "no occasion to revisit" *McConnell*, the concurrence expressed a desire to overrule *McConnell*'s "functional equivalent" holding as unconstitutionally vague. *Id.* at 504 (Scalia, J., concurring).  In addressing the concurring opinion's vagueness argument, Chief Justice Roberts emphasized the fact that the new "appeal to vote" test was "only triggered if the speech meets the bright-line requirements of BCRA [referring to the law's definition of electioneering communication]."  *Id.* at 474 n.7; *see also McConnell*, 540 U.S. at 103 (upholding BCRA's "electioneering communications" definition on its face).  In other words, Chief Justice Roberts expressly cabined the "appeal to vote" test within the confines of BCRA's "electioneering communication" definition to assuage the concurrence's vagueness concern.  Notwithstanding this cabining, however, the three concurring justices outright rejected the "appeal to vote" test on vagueness grounds, arguing that it

> ultimately depend[s] . . . upon a judicial judgment . . . concerning 'reasonable' or
> 'plausible' import that is far from certain, that rests upon consideration of

> innumerable surrounding circumstances which the speaker may not even be aware
> of, and that lends itself to distortion by reason of the decision maker's subjective
> evaluation of the importance or unimportance of the challenged speech.

*Id.* at 493 (Scalia, J., concurring).  The fractured holding of the *WRTL II* Court leaves the "appeal to vote" test on shaky ground, at least as to the vagueness issue identified and addressed by all five justices joining in the judgment.

Subsection (C) of West Virginia's definition of "expressly advocating" is the Chief Justice's "appeal to vote" test from *WRTL II*, verbatim.  Justice Scalia's *WRTL II* concurrence makes it abundantly clear that three justices would strike down W. Va. Code § 3-8-1a(12)(C) as unconstitutionally vague.  *See* 551 U.S. at 493 (Scalia, J., concurring).  In addition, according to Chief Justice Roberts and Justice Alito, that the "appeal to vote" test was triggered only once a communication met the  "bright line" requirements of BCRA's "electioneering communication" definition was a significant, if not dispositive, reason the test survived vagueness scrutiny in their plurality opinion in *WRTL II*.  *See id.* at 474 n.7.  *WRTL II* thus approved the "appeal to vote" test only within the confines of a BCRA "electioneering communication," which previously was upheld as facially valid, i.e., not vague, in *McConnell*.[22]  In the case of West Virginia's utilization of the "appeal to vote" test, there is no larger, facially valid framework in which the test is couched; it is a free-standing rule, unaccompanied by other, objective criteria.  West Virginia regulates all communications that "appeal to vote" and refer to a candidate for office, without consideration of when the communication is made, in what medium the communication is made, or to whom the

---

[22]  It also relevant that the *McConnell* Court emphasized the extreme overlap between BCRA "electioneering communications" and political speech that is the "functional equivalent of express advocacy."  *See* 540 U.S. at 206.  The "appeal to vote" test drew on that overlap, such that the facial clarity of BCRA's "electioneering communication" definition lent to the clarity of the newly devised "functional equivalent" test.

communication is directed.  In contrast, the Supreme Court applied the "appeal to vote" test only

to communications that are disseminated by certain means (cable, broadcast, and satellite), refer to

a clearly identified candidate for federal office, are disseminated within certain time periods before

an election (60 days before a general or special election or 30 days before a primary election or

convention), and are directed toward the relevant electorate.  *See* 2 U.S.C. § 434(f)(3).  Footnote 7

in *WRTL II* indicates that these bright-line requirements informed the Supreme Court's vagueness

holding.

Although the Court's overbreadth analysis above permits the *possibility* of implementing the

"appeal to vote" test to anchor other election regulations to *Buckley*'s "unambiguously campaign

related" requirement, a stand-alone "appeal to vote" test cannot survive a vagueness challenge.[23]

The "appeal to vote" test, on its own, "ultimately depend[s] . . . upon a judicial judgment . . .

concerning 'reasonable' or 'plausible' import that is far from certain, that rests upon consideration

of innumerable surrounding circumstances which the speaker may not even be aware of, and that

lends itself to distortion by reason of the decision maker's subjective evaluation."  *WRTL II*, 551

U.S. at 493 (Scalia, J., concurring).  West Virginia's use of the "appeal to vote" test contains none

of the objective, clearly-discernable elements that WRTL II emphasized in footnote 7.  Instead, it

"puts the speaker . . . wholly at the mercy of the varied understanding of his hearers," *Buckley*, 424

U.S. at 43, and will therefore muddle the scope of attendant regulation.  Due to this impermissible

vagueness, W. Va. Code § 3-8-1a(12)(C) is unconstitutional.  Accordingly, Plaintiffs' motions for

---

[23] This is not to say that the only standards that are not vague are *Buckley*'s "magic words of express advocacy" and the BCRA definition of "electioneering communications."  To the contrary, while those are the only standards the Supreme Court has identified and approved, they are not necessarily the outer limits of permissibly clear election regulation.

summary judgment are **GRANTED IN PART** (as to subsection (C)) and **DENIED IN PART** (as to the remainder of W. Va. Code § 3-8-1a(12)). Subsection (C) is therefore **SEVERED**[24] from the remainder of the "expressly advocating" definition.[25]

## VI.  CORPORATE EXPENDITURE BAN

In its pleadings and at the preliminary injunction stage of this case, WVFL argued that W. Va. Code § 3-8-8(a) imposed an unconstitutional ban on corporate express advocacy and electioneering communications. In the alternative, WVFL argued that it qualified as an "*MCFL* corporation" and was therefore impliedly excepted from the corporate ban. In the preliminary injunction order, the Court agreed with the latter argument, found WVFL to be exempt from the

---

[24]  The availability of severance is a question of state law, and the West Virginia Legislature has stated that, unless otherwise indicated, severance is available to a reviewing court. *See* W. Va. Code § 2-2-10(cc).

[25]  The Court's "expressly advocating" holding is reached with some hesitation. Courts of appeals, including the Fourth Circuit and the Supreme Court of the United States, have expressed fractured and somewhat obscure opinions in the context of election-related speech freedoms. The lack of clarity on the contours of election-related speech regulation has led the Court to make a holding that is in tension with the Fourth Circuit's now-vacated panel decision in *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), and Chief Judge Spencer's opinion in that same case on remand, *see* No. 3:08-CV-483, 2011 WL 2457730 (E.D. Va. June 16, 2011) (upholding as constitutional a federal regulation that approximates the "appeal to vote" test, even outside the electioneering communications framework). Nonetheless, the Court has engaged in an extensive review of binding and persuasive authority on the scope of express advocacy regulation and the constitutional standard of clarity applicable to all speech regulation in reaching its current decision. This decision is based largely on the Supreme Court's substantive analyses in *Citizens United* and *WRTL II*, as well as Chief Justice Roberts's instruction that "in a debatable case, the tie is resolved in favor of protecting speech," *WRTL II*, 551 U.S. at 474 n.7. The ultimate conclusion that West Virginia goes too far in imposing a freestanding "appeal to vote" test was also informed by practical considerations, inquiring into the demands placed on political speakers in West Virginia and how those demands square with constitutional command. It should be apparent from the length of time elapsed between the Court's hearing on the summary judgment motions and the issuance of this opinion that the Court underwent significant analytical struggle and did not reach the present decision lightly.

corporate ban, and opined that the ban was constitutional under then-existing law.  (Docket 125 at 10-15.)

Since that time, the Supreme Court's decision in *Citizens United* unequivocally established the unconstitutionality of such a ban on corporate expenditures.  West Virginia acknowledged the monumental shift in this area of election-related speech, and in 2010, it amended W. Va. Code § 3-8-8(a) to impose disclosure requirements on corporate expenditures instead.  Nothing further is required of the Court on this issue, and Plaintiffs' motions for summary judgment [Dockets 209, 210] are therefore **DENIED AS MOOT** on this issue.

### VII.  *"ELECTIONEERING COMMUNICATION" DEFINITION*

Both CFIF and WVFL challenge West Virginia's definition of "electioneering communication."  W. Va. Code § 3-8-1a(11) provides, in pertinent part:

(11)(A) "Electioneering communication" means any paid communication made by broadcast, cable or satellite signal, or published in any newspaper, magazine or other periodical that:

(i) Refers to a clearly identified candidate for Governor, Secretary of State, Attorney General, Treasurer, Auditor, Commissioner of Agriculture, Supreme Court of Appeals or the Legislature;

(ii) Is publicly disseminated within:

(I) Thirty days before a primary election at which the nomination for office sought by the candidate is to be determined; or

(II) Sixty days before a general or special election at which the office sought by the candidate is to be filled; and

(iii) Is targeted to the relevant electorate: *Provided*, That for purposes of the general election of 2008 the amendments to this article are effective October 1, 2008.

38

*Id.* This definition was first amended in the June 28, 2008, second extraordinary session in response to Judge Faber's Order granting a preliminary injunction on the motion of CFIF. (Docket 38.) In that order, Judge Faber held that West Virginia's definition of "electioneering communication" was vague and overbroad because, unlike its federal counterpart in BCRA,[26] West Virginia's definition included "mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or published materials." (*Id.* at 38 n.2.) Judge Faber concluded that the additional portions of West Virginia's "electioneering communication" definition might not "further the compelling interests at which they are aimed" because there was no "empirical justification for regulating mailings, faxes, emails, phone banks, leaflets, pamphlets, and other printed or published materials." (*Id.* at 11.)

In response to Judge Faber's order, West Virginia removed leaflets, pamphlets, flyers, and outdoor advertisements from the list of types of communications that are included in the definition of an "electioneering communication." *See* W. Va. Code 3-8-1a(12)(2008). The 2008 definition of "electioneering communication" thus differed from its federal counterpart by including mass mailings, telephone banks, billboard advertisements, newspapers, magazines, and other periodicals

---

[26]   (i) The term "electioneering communication" means any *broadcast, cable, or satellite communication* which—
>    (I) refers to a clearly identified candidate for Federal office;
>    (II) is made within—
>>        (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
>>        (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
>    (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.
2 U.S.C. § 434(f)(3)(A)(I) (emphasis added).

as types of communications defined as "electioneering communications" and therefore subject to disclosure requirements.

In the preliminary injunction phase of this litigation, Plaintiffs CFIF and WVFL contended that West Virginia's inclusion of print media, in addition to broadcast media, chilled the speech of organizations wishing to engage in those communications without adhering to burdensome and invasive reporting requirements.  (Docket 110 at 43.)  In particular, WVFL sought to broadcast a radio advertisement, send out a mass mailing, and circulate petitions.  (*Id.* at 44.)  WVFL sought "a declaratory judgment and an injunction against the electioneering communication definition and reporting requirements."  (*Id.*)

In the preliminary injunction order, the Court held the new "electioneering communication" definition unreasonably overbroad and supported by inadequate justification. (Docket 125 at 35-41.) The Court's preliminary injunction holding reviews the applicable case law and undertakes a relevant analysis, and it is therefore reproduced, in large part,[27] here:

> BCRA requires stringent reporting requirements of broadcast communications that are included in the definition of "electioneering communications." In *McConnell*, the Supreme Court found BCRA's definition of "electioneering communication" was constitutional on its face. 540 U.S. at 194. . . . . To support its finding, the *McConnell* Court noted that "Congress found that corporations and unions used soft money to finance a virtual torrent of televised election-related ads during the periods immediately preceding federal elections, and that remedial legislation was needed to stanch that flow of money." *Id.* at 207. . . . .
>
> Defendants ask the Court to uphold West Virginia's definition of "electioneering communication" though it goes significantly beyond the types of communications regulated by BCRA. When Judge Faber entered the April 22, 2008, injunction, West Virginia's laws did not contain legislative findings or a statement of purpose explaining the State's justification for including various forms of print

---

[27] All citations are updated, and typographical and other errors are corrected.  Other changes are noted by ellipses and brackets.

media in its definition.  (Docket 37 at 12 n.4 (citations omitted).)  However, House Bill 402 included a statement of purpose, explaining that due to the small size of the state senate districts, print media is prevalent during elections.  W. Va. Code § 3-8-1. Among other findings, the Legislature provided that the

> [d]isclosure provisions are appropriate legislative weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions, and the ceilings imposed accordingly serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion.

*Id.*

In addition, Defendant Ireland has provided the Court with declarations of several members of the legislature.  Each of these West Virginia legislators assert that they participated in the drafting and/or discussions of H.B. 402 and its sister bill in the Senate, S.B. 4009.  (Docket 107, Exh. 8 at 2.)  They also suggest that these bills were "the subjects of significant discussion and debate in both the Senate and the House of Delegates."  (Docket 107, Exh. 7 at 3; Docket 115 at 2.)  Furthermore, they claim that, based upon their experience campaigning, "non-broadcast media such as phone banks, mass mailings, and billboards are extremely effective forms of political communication."  (*Id.*)  They aver that "transparency in political advertising is an important tool for voters to make informed decisions," and that "[o]ftentimes the identity of the messenger who is bankrolling the message is an important factor for the electorate to consider in weighing the credibility and/or bias of the message itself."[28]  (*Id.*)

The Defendants clearly demonstrate that the Legislature has a compelling interest in safeguarding the integrity of the electoral process.  The Supreme Court has long recognized "the governmental interest in preventing the corruption and the appearance of corruption in election campaigns."  *WRTL II*, 551 U.S. at 478 (citing *Buckley*, 424 U.S. at 45).  In both *WRTL II* and *Buckley*, the Court explained that this interest supports upholding contribution limits, and "[t]o the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined."  *Id.* (citing *Buckley*, 424 U.S. at 26-27).  Furthermore, the Court said

---

[28]  Delegate John Pino makes an assertion that does not support [Defendants'] argument [for] regulating non-broadcast media.  (Docket 116, Exh. 1 at 3.)  Delegate Pino complains that damaging direct mail advertisements attacking him and his voting records were disseminated shortly before the 2008 primary election.  Delegate Pino, among other things, complains that these mailings occurred so late that no response was possible.  However, if no response was possible, it is difficult to understand what use disclosures may have been.

that "this interest might also justify limits on electioneering expenditures because it may be that, in some circumstances, 'large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions.'" *Id.* (citing *Buckley*, 424 U.S. at 45.).

However, in addition to showing a compelling interest, Defendants must show that the definition of "electioneering communication" is narrowly tailored to meet that interest. *WRTL II*, 551 U.S. at 464-65. In determining whether Defendants have proven the definition to be narrowly tailored, the Court recognizes that Defendants have the great burden of justifying the restriction of free speech in print media. In *McConnell*, the Supreme Court reached the maximum extent of the curtailment of free speech for the laudable purpose of political integrity when it upheld BCRA. *See WRTL II*, 551 U.S. at 502-03 (Scalia, J., concurring). Notably, in *McConnell*, the Court found the regulation of only broadcast media to be constitutional when it upheld BCRA. However, more recently the Court has tipped the scale back toward First Amendment rights in *WRTL II* by recognizing that "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Id.* at 457.

Defendants have failed to show how West Virginia's definition of "electioneering communication" is narrowly tailored despite the fact that it goes far beyond the definition of BCRA. Unlike Congress's proof that "remedial legislation was needed to stanch [the] flow of money" to broadcast media, Defendants have not sufficiently shown that large amounts of money are being spent for print electioneering communications. For example, when justifying the inclusion of broadcast media in the definition of "electioneering communication," Senator Feingold offered a study by the Brennan Center that found forty cents of every dollar is used to purchase broadcast ads in support of or opposition to candidates for federal office. 148 Cong. Rec. S1991-02 (daily ed. Mar. 18, 2002). Also, the Brennan Center found that "the vast money spent by the parties on TV ads was 'soft money.'" *Id.* In addition, Senator Snow quoted from a 2001 Annenberg Public Policy Center study that found spending on sham issue advocacy advertisements was at $500 million in the year 2000 election. 147 Cong. Rec. S2433-02 (daily ed. Mar. 19, 2001). It is clear that Senator Snow was referring primarily to television ads because at the same time, she cited statistics regarding television ads. *Id.*[29] Moreover, Senator Edwards said that, "in support of restricting broadcast media through BCRA, congress [sic] made several findings." 147 Cong. Rec. S3022-05 (daily ed. Mar. 28, 2001).[30]

---

[29] The study she cited regarding television ads was to justify the sixty-day period included in the definition of "electioneering communication." She stated that in 2000, "[n]inety-five percent of all television spots that aired 2 months before the election mentioned the candidates [sic] name."

[30] For example, he mention that Senator Wellstone pointed to a Brennan research group study that
(continued...)

Conversely, Defendant Betty Ireland, West Virginia Secretary of State, has merely offered assertions that various members of the Legislature believe that campaign communications in print media are effective. She supports these assertions with an article, stating the general proposition that direct mailing can be effective on a national level. (Docket 121, Campaign Findings no. 11.) In addition, she filed an article that quotes Kathleen Sullivan, Dean and professor of constitutional law at Stanford Law School who states, "Mandatory disclosure of the amounts and sources of political contributions enables the voters themselves, aided by the press, to follow the money and hold their representatives accountable if they smell the foul aroma of undue influence." (Docket 121, Finding no. 13.) However, this article does not assert that the same type of influence backing broadcast media advertisements is used for print media advertisements. *Id.* Furthermore, Dean Sullivan also provides a statement in reference to limits on political contributions that should be applied to the restrictions on the speech in question: "They should be constitutionally permissible only if there is strong justifications for them—that is, if they will truly work to serve important or compelling government interests." Defendants have not shown that including print media in the definition of "electioneering communication" will "truly work to serve important or compelling government interests."

The Secretary of State has also filed a number of documents that do not support the assertion that print media is effective in West Virginia or that with it comes the risk of corruption or the risk of the appearance of corruption. She filed information about the general census; information regarding the democratic party; definitions provided by Wikipedia; a Gallup poll indicating that the public is dissatisfied with campaign finance laws; independent expenditure and electioneering communications reports; and other seemingly irrelevant information. (Docket 121.) Moreover, one article filed by the Secretary of State undermines her argument that print media has the same kind of influence as broadcast media because, though the article shows that expenditures on print media are growing, it shows that direct mail is still a small fraction of overall spending. (Docket 121, Campaign Finding no. 9.) This article specifically states, "What's exploded is broadcast and cable advertising." (*Id.*) Another article filed by the Secretary of State follows suit by stating that "states have witnessed an escalating volley of *televised* attack and counter-attack ads." (Docket 121, Finding no. 12 (emphasis added)). That article did not mention print advertising.

It appears that Defendant Betty Ireland has certainly filed a sufficient amount of information for the inclusion of broadcast media in West Virginia's definition of "electioneering communication," which is clearly constitutional. However, much less has been offered in support of the inclusion of print media. In general what has

---

[30](...continued)
found that only two out of on hundred "issue" advertisements were true issue ads. Congress's failure to make legislative findings regarding *print* media is indicative of its lack of concern regarding non-broadcast media.

been offered is (1) conclusory, as in the case of the legislative findings; (2) anecdotal instead of empirical, such as the testimonials of several legislators; or (3) not specifically applicable to West Virginia.

In the absence of more concrete data supporting the inclusion of print media, the Court must "err on the side of protecting political speech," *WRTL II*, 551 U.S. at 457, and find that Defendants have not met their burden of showing West Virginia's definition of "electioneering communication" is narrowly tailored.  Further, in contrast to *McConnell*'s limitation of electioneering communications to broadcast media, the parties have not offered a single case where a court has upheld an extension of electioneering communications to print media.  The Court is unwilling to blaze that trail on this record.  Accordingly, the Court **FINDS** it likely that Plaintiffs will succeed on the merits of their facial challenge to the definition of "electioneering communication . . . ."

(Docket 125 at 35-40.)

In the 2010 regular session, the West Virginia Legislature again amended the provisions of the "electioneering communication" definition, presumably to comport with the October 2008 preliminary injunction order in this case.  House Bill 4647 strikes the inclusion of "mass mailing[s], telephone bank[s], and billboard advertising" from the definition of "electioneering communication.

 (Docket 193-1.)  However, West Virginia's definition of "electioneering communication" still retains "any paid communication . . . published in any newspaper, magazine or other periodical," which exceeds the corresponding definition in BCRA.  It remains true that the Legislature has a compelling interest in safeguarding the integrity of the electoral process, and that interest is adequately set forth in the record and legislative findings.  As was the case at the preliminary injunction phase, the pertinent question is whether, in order to execute that interest, there exists a sufficient justification for regulating non-print media (now confined to newspapers, magazines, and periodicals) in a manner similar to broadcast media.  As such, an analysis parallel to what the Court undertook in the preliminary injunction order follows.

A.       *Overbreadth Challenge*

Preliminarily, West Virginia argues that Plaintiffs lack standing to challenge the definition

of "electioneering communication," as amended and restricted to newspapers, magazines, and

periodicals (as well as broadcast media).  (Docket 194 at 16-17.)  This contention relies on the fact

that WVFL never asserted, in its complaint or otherwise, that it was contemplating print-source

communications in newspapers, magazines, or periodicals.  (*Id.*)  However, the Court need not

address the standing of WVFL, because it is clear that CFIF has standing to challenge the remaining

portions of West Virginia's print-source regulation.  As betrayed in an affidavit submitted by the

Defendant itself, CFIF has engaged in the prohibited print-source communication in past elections,

and it will presumably continue to utilize that media type in the future, especially if disclosures are

not required as to those methods of communication in particular.  (Docket 176-1 at 14.)

As to the substance of the overbreadth challenge, *Citizens United* made it clear that exacting

scrutiny, and not strict scrutiny, is applicable to disclosure requirements.  *See, e.g.*, *Citizens United*,

130 S. Ct. at 914 ("The Court has subjected [disclosure] requirements to 'exacting scrutiny'").

Electioneering communications, as defined by West Virginia law, are subject only to disclosure.

*See* W. Va. Code §§ 3-8-2(f), -2b.  Exacting scrutiny "requires a 'substantial relation' between the

disclosure requirement and a 'sufficiently important' governmental interest."  *Id.* at 914 (quoting

*Buckley*, 424 U.S. at 64, 66).  To survive the challenge to the remaining print-media sources, West

Virginia must prove that imposing the disclosure requirements on newspapers, magazines, and

45

periodicals[31] bears a "substantial relation" to the governmental interest in avoiding the risk of corruption or the risk of the appearance of corruption.

In addressing a similar overbreadth argument, the Supreme Court struck down a Massachusetts law that prohibited corporate speech on referenda issues. *See First Nat'l Bank of Boston v. Belotti*, 435 U.S. 765, 789-93 (1978). The Court invalidated the Massachusetts law by reasoning that it was (1) not based on "inherently persuasive" arguments, (2) not supported by precedent, and (3) not supported by an adequate "record or legislative findings." *See id.* at 789. The Court will analyze those three possible bases for upholding West Virginia's law in turn. First, the argument that regulating print media is essential to effectively curbing corruption and the appearance of corruption in elections is not inherently persuasive to the Court. Documents demonstrate that print media is not heavily utilized for campaign-related speech, and the premise for regulating such print media is therefore severely undercut. Second, the Court is aware of no binding precedent establishing that the means West Virginia has chosen (regulating newspapers, magazines, and periodicals) serves the stated interest of regulating "electioneering communications." Although several federal courts have upheld similar regulations in other states, *see, e.g.*, *Nat'l Org. for Marriage v. Roberts*, ___ F. Supp. 2d ___, 2010 WL 4678610, at *1, 4 (N.D. Fla. Nov. 8, 2010), those decisions presumably rest on sufficient legislative findings to justify the breadth of the regulations at issue. Third, and most importantly, Defendants have failed to show how West Virginia's regulation of print media bears a substantial relationship to the stated purpose of

---

[31] The disclosure requirements attendant to "electioneering communications" apply only to "*paid communication[s]* . . . published in any newspaper, magazine or other periodical" that meets further requirements. W. Va. Code § 3-8-1a(11)(A) (emphasis added). The "paid" element limits the application of the disclosure requirement, in large part, to advertising in the listed media sources.

regulating "electioneering communications" despite the fact that it goes far beyond the corresponding definition in BCRA. Unlike Congress's proof that "remedial legislation was needed to stanch [the] flow of money" to broadcast media, Defendants have not demonstrated that large amounts of money are being spent for print electioneering communications.

Since the entry of the Court's preliminary injunction order, Defendants have submitted additional affidavits from legislators, state executive officials, and various officers in the state Democratic Party. Those affidavits exhibit largely the same assertions as their predecessors, including conclusory statements such as "West Virginia campaigns rely extensively on non-broadcast media," Docket 176-1 at 12, and anecdotal statements such as "I unequivocally believe that non-broadcast media such as phone banks, mass mailings, and billboards are extremely effective forms of political communication," *id.* at 30-31. Furthermore, several of the affidavits expressly refer to print media sources that were removed from the "electioneering communication" definition in 2010, such as direct mail. (*E.g.*, Docket 176-1 at 15-19.) Although several of the affidavits illustrate the *potential* of non-broadcast media as an effective electioneering tool, none of them presents anything more than anecdotal claims that, in the experience of several individuals who have run campaigns in the past, print media is widely used and must be regulated. These individuals very well may be correct, but West Virginia is not entitled to circumscribe the First Amendment rights of its citizens on the basis of legislators' and campaign officials' firmly held beliefs. Such justification will not suffice.

West Virginia also heavily relies on a spreadsheet, compiled and submitted by Nicholas Casey, chairman of the West Virginia State Democratic Party. (Docket 176-1 at 61-63; Docket 216-1.) That spreadsheet reflects candidate spending during select 2006 and 2008 "state, competitive

47

district races" and third party spending in those races, as compiled by Mr. Casey and his staff from publicly-available information.  In analyzing the data in that spreadsheet, Mr. Casey makes several conclusions.  Specifically, he states that, in statewide races, broadcast media "plays a significant role; representing 61.6% of spending [by candidates]" and "[t]argeted print media, particularly mass mailings, [are] not as significant representing only 10.6% of spending."  (Docket 176-1 at 59.)  Notably, although Mr. Casey's affidavit is ostensibly aimed at justifying forms of print media that are no longer part of West Virginia's "electioneering communications" (namely, targeted mass mailings), it acknowledges the small role that print media plays in state-wide elections.  This assertion is even more accurate as to "print/newspaper" sources, which represented a mere 2.3% of candidate spending in the attached chart.  Mr. Casey continues to state that "[i]n regards to competitive district races, broadcast media . . . represent[s] 27.8%, however mass mailing is more effective and represents 24.7% of [candidate] spending."  (*Id.*)  Again, this statement is largely aimed at *targeted* forms of non-broadcast media, such as mass mailings, and Mr. Casey specifically highlights the targeted feature of such communications by saying that "for district races, targeted, non-broadcast media is a more effective means of communications [sic] and more cost effective, *since it can be targeted*."  (*Id.* (emphasis added).)  According to the chart compiled by Mr. Casey, "print/newspaper" sources represented 16.7% of total candidate spending in the select "competitive district races" for which information was compiled.  Finally, the most relevant of Mr. Casey's charts, which relates to spending by third parties in those 2006 and 2008 races for which data was compiled, does not support West Virginia's incorporation of newspapers and periodicals in the definition of "electioneering communication" either.  That information betrays that "[i]n regards to third party expenditures, which can cover statewide or district races, or both, 65.8% of the expenditures are on

48

broadcast media and 28.6% are for *targeted* non-broadcast media."  (*Id.* (emphasis added).)

Although the affidavit is predictably silent on the figures relevant to West Virginia's current law,

the corresponding chart reveals that a minuscule 0.4% of third-party spending in the sampled 2006

and 2008 races was spent on "print/newspaper" communications.  (*Id.* at 61.)

Mr. Casey's affidavit and the corresponding charts most acutely highlight two points: first,

as to third-party spending, which is most relevant for the "electioneering communication"

definition,[32] "print/newspaper" spending is negligible; and second, based on Mr. Casey's compiled

information, West Virginia's definition of "electioneering communication" is severely

underinclusive insofar as it does not incorporate mass mailings.  Stated in other words, mass

mailings were shown to be the most utilized of non-broadcast media in 2006 and 2008 state and

district elections, both regarding candidates and third-parties; why, then, did the Legislature

eliminate the disclosure requirements previously imposed on mass mailings but retain those

requirements as to newspapers and periodicals?  The varied affidavits presented by West Virginia

support the notion that if any non-broadcast media is utilized as extensively as broadcast media, it

is mass mailings, which can be targeted with far greater precision than either broadcast media or

newspapers and periodicals.  This blatant underinclusiveness, combined with the unfounded

justification for imposing disclosure requirements on newspaper and periodical communications,

underscores the arbitrary manner in which West Virginia is attempting to regulate election-related

speech.  It also draws the stated purpose of expanding the "electioneering communication" definition

---

[32]  This is because separate and more demanding disclosure requirements are already imposed on candidates for office.  *See* W. Va. Code § 3-8-5 (requiring disclosure of various financial transactions for candidates and certain other political organizations).

49

to non-broadcast media into serious doubt because, based on information proffered by West Virginia itself, the Legislature is clearly not acting to effectively achieve that purpose.

A final document submitted by West Virginia is remarkable for this line of analysis. During the Senate Debate on House Bill 4647, Senator Evan Jenkins, a democrat from Cabell County and member of the Senate Judiciary Committee, remarked at the dearth of evidence supporting the Legislature's actions:

> We've been through this now two times before. . . . Part of this bill that we are going to pass now is trying a third time [to promote disclosure by expanding electioneering communications to print media]. And it is important to point out that we are getting the cart before the horse. The Court said that in the findings [and] the justification . . . the Court said it's okay, you can do what you're doing *if you justify it*. And we went through this . . . and there were these findings about why there needed to be this regulation [of newspapers and periodicals] . . . and when I asked what is the basis for those [findings], what are the facts, what has been the testimony, what is the research . . . and there was very little, if any . . . and we rush in and we put affidavits before the Court saying "the Legislature was right in what they said." What we need to be doing to get it right is we need to be holding the hearings, we need to be collecting the research, we need to be collecting the data, and then make a well-informed decision and vote on a bill. And then when the judge says, "what was the basis for your decision?," we roll it out for him—"here's what we had." What we are going to have this time is, we're going to have passed the bill and if the judge wants to look at the record, he will see that it came up in Senate Judiciary on about the last day or two [of the regular session] . . . and . . . we passed this out in seven minutes. . . . Seven minutes was how fast we took this up and passed it out. There wasn't any discussion about the research and the data and the information that justified why we are expanding this to the print media. . . . If we get struck down a third time, which we probably will if the Court looks at the process that we went through—because we haven't collected the data ourselves and made an informed decision based on the data— . . . please, when we do it the fourth time, let's do it right.

(Docket 198-1 at approx. 12:30-16:00.) These comments, although certainly not binding or limiting on the Court, illustrate a lack of *foundation* for the Legislature's actions. No such foundation has been laid in the time since Senator Jenkins's statement.

It appears that West Virginia has certainly filed a sufficient amount of information for the inclusion of broadcast media (and perhaps mass mailings) in West Virginia's definition of "electioneering communication."  However, much less has been offered in support of the inclusion of newspaper and periodical communications.  In general, what has been offered is (1) conclusory, as in the case of the legislative findings; (2) anecdotal instead of empirical, such as the testimonials of several legislators and other officials; or (3) not specifically applicable to West Virginia or the narrow class of media still at issue.  Additionally, and perhaps most fatally, the sparse empirical data in the record indicates that spending on non-targeted print sources like newspapers and magazines is so insignificant that West Virginia's inclusion of newspaper and periodicals cannot be substantially related to any significant governmental purpose.  It must be re-emphasized that these criticisms, fatal as they may be, do not speak to the West Virginia Legislature's ability to regulate non-broadcast media.  Rather, as the *Citizens United* Court instructed, courts "must decline to draw . . . constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker."  130 S. Ct. at 891.  Nothing in that holding, however, obviates the duty of government to tailor laws in accordance with constitutional command.

In the absence of more concrete data *supporting the inclusion of newspapers, magazines, and periodicals*, the Court must "err on the side of protecting political speech," *WRTL II*, 551 U.S. at 457, and find that Defendants have not met their burden of showing West Virginia's definition of "electioneering communication" is substantially related to eliminating corruption and the appearance of corruption in elections.  Accordingly, the Court **FINDS** that W. Va. Code § 3-8-1a(11) is unconstitutionally overbroad insofar as it includes "newspapers, magazines, and periodicals" in the

definition of "electioneering communication."  Relying on W. Va. Code § 2-2-10(cc)[33] and finding

both that the remainder of W. Va. Code § 3-8-1a(11) can stand on its own and that the Legislature

so intended, the Court **SEVERS** the phrase  "or published in any newspaper, magazine, and other

periodical" from § 3-8-1a(11).

      B.     *Vagueness Challenges*

      CFIF mounts two additional challenges to West Virginia's definition of "electioneering

communication," both of which argue that certain aspects of the definition are unconstitutionally

vague.  First, CFIF challenges the portion of the "electioneering communication" definition that

restricts its application to communications that are "publicly disseminated within . . . [t]hirty days

before a primary election . . . or . . . [s]ixty days before a general or special election."  W. Va. Code

§ 3-8-1a(11)(A)(ii).  According to CFIF, the phrase "publicly disseminated" is vague as to print

---

[33]  W. Va. Code § 2-2-10(cc) provides:

> Unless there is a provision in a section, article or chapter of this code specifying that
> the provisions thereof shall not be severable, the provisions of every section, article
> or chapter of this code, whether enacted before or subsequent to the effective date
> of this subdivision, shall be severable so that if any provision of any such section,
> article or chapter is held to be unconstitutional or void, the remaining provisions of
> such section, article or chapter shall remain valid, unless the court finds the valid
> provisions are so essentially and inseparably connected with, and so dependent upon,
> the unconstitutional or void provision that the court cannot presume the Legislature
> would have enacted the remaining valid provisions without the unconstitutional or
> void one, or unless the court finds the remaining valid provisions, standing alone, are
> incomplete and are incapable of being executed in accordance with the legislative
> intent: Provided, That if any such section, article or chapter of this code has its own
> severability clause, then such severability clause shall govern and control with
> respect to such section, article or chapter in lieu of the provisions of this subdivision.
> The provisions of this subdivision shall be fully applicable to all future amendments
> or additions to this code, with like effect as if the provisions of this subdivision were
> set forth in extenso in every such amendment or addition and were reenacted as a
> part thereof, unless such amendment or addition contains its own severability clause.

media because it fails to pinpoint when print media is disseminated.  (*E.g.*, Docket 198 at 8.)  This subsection, argues CFIF, is insufficient to "give the person of ordinary intelligence a reasonable opportunity to know," *Grayned*, 408 U.S. at 108, when a print-source communication is "publicly disseminated" and therefore subject to disclosure requirements as an electioneering communication. Although the Court acknowledges that CFIF's argument is not wholly without merit, a resolution is no longer required.  The Court held that inclusion of "newspaper[s], magazine[s] or other periodical[s]" in the definition of "electioneering communication" is not constitutionally justified (as the record now stands) and renders the "electioneering communication" definition fatally overbroad.  The Court therefore struck those forms of print-media from the definition.  Accordingly, this argument is moot.

Second, CFIF challenges the definition of "targeted to the relevant electorate," a phrase contained in the "electioneering communication" definition.  *See* W. Va. Code § 3-8-1a(11)(A)(iii). West Virginia's definition of "electioneering communication" largely approximates the corresponding definition in BCRA.  Both BCRA and West Virginia's definition encompass "broadcast, cable, or satellite" communications that "refer[] to a clearly identified candidate for . . . office" and "[are] made within . . . 60 days before a general or special election . . . or . . . 30 days before a primary . . . election."  *See* 2 U.S.C. § 434(f)(3)(A)(I); W. Va. Code § 3-8-1a(11) (insubstantial differences).  BCRA further requires that, in order to be considered an electioneering communication, "in the case of a communication which refers to a candidate for an office other than President or Vice President, [it must be] targeted to the relevant electorate."  A communication "targets the relevant electorate" if it can be received by 50,000 or more people in the district (in the case of a U.S. House candidate) or state (in the case of a U.S. Senate candidate) which the candidate

seeks to represent.  2 U.S.C. § 434(f)(3)(C); 11 C.F.R. 100.29(b)(5).  The Federal Communications Commission provides on its website the information necessary to determine whether a communication "can be received by 50,000 people" and therefore "targets the relevant electorate" such that it is an "electioneering communication" under BCRA.  *See* Fed. Commc'ns Comm'n, Electioneering Communications Database (ECD), http://gullfoss2.fcc.gov/ecd/ (last visited Mar. 9, 2011).  This federal database permits a speaker to quickly and easily get a "yes" or "no" answer to the question of whether a particular media outlet is capable of reaching the threshold 50,000 individuals, and several federal legislators emphasized the importance of the database to BCRA's "targeted" requirement.  *See* Memorandum from John McCain, Russel D. Feingold, Olympia Snow, and James Jeffords, U.S. Senators, and Christopher Shays and Marty Meehan, U.S. Congressmen, to Mai T. Dinh, Acting Asst. Gen. Counsel, Fed. Election Comm'n (Aug. 23, 2001), *available at* http://fec.gov /pdf/nprm/electioneering_comm/comments/us_cong_members.pdf.

West Virginia mimics the "targeted to the relevant electorate" threshold structure that BCRA created, but several differences are readily observable.  First, W. Va. Code § 3-8-1a(11) requires that *every* "electioneering communication" be "targeted to the relevant electorate"; BCRA requires only that geographically-sensitive elections (i.e., Senate and House elections) be "targeted to the relevant electorate."[34]  Second, West Virginia's definition of "targeted to the relevant electorate" is somewhat

---

[34]  This distinction, however, is warranted. Although BCRA imposes no threshold amounts on Presidential election communications, West Virginia is correct to impose threshold amounts on state-wide election communications.  Such an additional requirement furthers the rationale underlying the limited scope of "electioneering communications," as illustrated by comments from several of the architects of BCRA:

> The threshold of 50,000 persons was chosen to make sure that only communications
> broadcast to a substantial number of people voting in the election in which the
> (continued...)

repetitive, in that it reiterates the requirement that an "electioneering communication" "refer[] to a clearly identified candidate for statewide office or the Legislature." W. Va. Code § 3-8-1a(24). This language is extraneous but ultimately unharmful to the legitimacy of the electioneering provisions. Third, W. Va. Code § 3-8-1a(24) sets forth threshold figures similar to BCRA's 50,000 threshold. In particular, to be "targeted to the relevant electorate" in West Virginia, a communication must be *capable* of being received by 140,000 individuals in the case of statewide office elections, 8,220 individuals in the case of Senate elections, and 2,410 individuals in the case of elections to the House of Delegates. *Id.* These figures are reportedly proportionate to the 50,000 figure incorporated in BCRA, and thereby de facto justified on policy grounds.[35] Finally, West Virginia provides no public, searchable database to discern whether the thresholds are met when utilizing

----

[34](...continued)

> candidate mentioned in the broadcast was participating would be considered electioneering communications. Ads broadcast primarily in Jurisdiction A should not be considered electioneering communications simply because they mention a candidate who is running for election in Jurisdiction B and the broadcast outlet's signal can be received by a small number of people in Jurisdiction B.

*See* Memorandum from John McCain et al. to Fed. Election Comm'n, *supra*. As an example, a broadcast in Western Virginia that mentions a candidate for Governor of West Virginia and reaches only a few hundred viewers in Southeastern West Virginia would not and should not be considered an electioneering communication *in West Virginia*.

[35] West Virginia asserts that it used a simple ratio to calculate the thresholds contained in W. Va. Code § 3-8-1a(24), based on BCRA's 50,000 figure. Although not specified, the Court gleans that the Legislature used the 50,000 figure in relation to a U.S. Congressional district as its starting point. It must be noted that at least one state with a similar scheme used the 50,000 figure in relation to a U.S. Senate election as its starting point. *See* N.C. Gen. Stat. § 168-278.80 (2010) (defining "targeted to the relevant electorate" as capable of receipt by 50,000 individuals in a statewide election). This alternative allows a state to take advantage of the federal electioneering communications database, at least as to statewide elections.

particular media outlets.  This final difference, argues CFIF, is constitutionally intolerable because it renders the "targeted" definition vague.  (Docket 220 at 11-13.)

Although not advanced by CFIF in great detail, the argument is twofold.  First, an average citizen is unable to determine whether the "targeted" definition is satisfied as to a particular broadcast, and he is therefore unable to know in advance whether an advertisement is an "electioneering communication" under W. Va. Code § 3-8-1a(11).  *See Grayned*, 408 U.S. at 108 (laws are impermissibly vague if they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.").  Second, even if the average citizen successfully inquires with a particular broadcast outlet as to their viewership figures in the relevant locale, there is no indication that West Virginia will adopt the word of that outlet as legally binding.  In other words, State officials are free to make ad hoc determinations as to whether a communication "can be received" by the threshold number of individuals, even if that determination conflicts with the broadcast outlet's information.  *Id.* (vagueness challenge can be also be asserted on the basis that a statute or regulation permits "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.").  Both aspects of vagueness contained in W. Va. Code § 3-8-1a(24) could chill political speech protected by the First Amendment, speech that the West Virginia Legislature presumably intended to protect by imposing the thresholds in the first place.

Although the parties argue that there exist no remaining questions of material fact, the Court is without sufficient information to grant summary judgment on this issue.  There is no indication of what, if any, mechanisms exist to gauge the reach of various broadcast media in West Virginia. The Court is aware of several public and private organizations that provide audience measurement

services and compile and release select data.  It is unclear whether such data exists for broadcast media in West Virginia, and the Court is unwilling to strike down the electioneering communications laws based on what appears to be speculation of the parties.  Summary judgment is therefore **DENIED** on this issue.  The parties may proceed to trial on this issue if they so wish.

C.     *Challenges to the Electioneering Communications Exemptions*

While W. Va. Code § 3-8-1a(11)(A) sets forth the general definition of an "electioneering communication," subsection (11)(B) goes on to list certain communications that are exempt from the definition and therefore not subject to the reporting requirements in later sections of the election chapter.  CFIF challenges four of those exemptions as vague and/or overbroad.

(1)     *Grassroots Lobbying Exemption*

First, CFIF challenges the so-called "grassroots lobbying exemption" to the definition of "electioneering communication."  W. Va. Code § 3-8-1a(11)(B)(v) provides that "electioneering communication" does not include "[a] communication made while the Legislature is in session which, incidental to promoting or opposing a specific piece of legislation pending before the Legislature, urges the audience to communicate with a member or members of the Legislature concerning that piece of legislation."  In essence, then, the grassroots lobbying exception permits what would otherwise be an electioneering communication[36] to go unreported if: (1) it is made while the Legislature is in session; (2) it is "incidental to promoting or opposing a specific piece of legislation pending before the Legislature"; and (3) it urges the audience to contact a member of the

---

[36]  That is, a paid communication made by broadcast, cable or satellite signal that (1) refers to a clearly identified candidate for state office, (2) is publicly disseminated within 60 days of a general or special election or within 30 days of a primary election, and (3) is targeted to the relevant electorate.  *See* W. Va. Code § 3-8-1a(11)(A).

57

legislature. CFIF challenges this exemption as "impermissibly discriminat[ory] based on the content

and viewpoint of a communication" and unconstitutionally vague.  According to CFIF, the phrase

"incidental to promoting or opposing" is vague because a person of ordinary intelligence cannot

discern whether a communication is "incidental" to promoting or opposing legislation, and the terms

"promoting" and "opposing" are impermissibly vague in themselves.  (Docket 210 at 23.)

a.    <em>Vagueness Challenge</em>

Laws are impermissibly vague if they fail to "give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited."  *Grayned*, 408 U.S. at 108.  In support of its

vagueness argument, CFIF cites to the Fourth Circuit's decision in *North Carolina Right to Life, Inc.*

*v. Bartlett*, 168 F.3d 705, 712-13 (4th Cir. 1999), a decision striking down North Carolina's

definition of a political committee as vague and overbroad.  The statute at issue in *Bartlett* defined

political committee as any group "the primary or incidental purpose of which is to support or oppose

any candidate . . . *or* to influence or attempt to influence the result of an election."  *Id.* (citing N.C.

Gen. Stat. § 163-278.6(14) (emphasis added)).  The Fourth Circuit in *Bartlett* first held the use of

"incidental" vague and overbroad because it "expressly sweeps within [the] ambit [of the definition]

those groups that only incidentally engage in express advocacy."  *Id.* at 712.  From the discussion

in *Bartlett*, it is clear that the court interpreted "incidental" as meaning "accidental," "unplanned,"

or "minor," such that an organization with even a very minor purpose of engaging in express

advocacy fell within the definition of political committee.  Such a result went far beyond the

Supreme Court's holding in *Buckley*, and the *Bartlett* court took issue with the term "incidental" for

that reason.  In contrast, the term "incidental," as used in W. Va. Code § 3-8-1a(11)(B)(v), implies

causation or association, and the Court perceives no reason why a person of ordinary intelligence

58

cannot readily apprehend that meaning.  While it may have been more precise had the legislature said "*incident* to supporting or opposing a specific piece of legislation,"[37] the meaning of the phrase "incidental to" as it stands is sufficiently clear to withstand CFIF's vagueness challenge.

As for CFIF's challenge to the phrase "support or oppose," as used to modify particular speech, the Supreme Court settled the matter in *McConnell*.  There, the Court addressed a challenge to the definition of "federal election activity," which included "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office . . . ."  *McConnell*, 540 U.S. at 169-70; *see* 2 U.S.C. § 431(20)(A)(iii).  In rejecting a vagueness challenge to the quoted provision, the *McConnell* Court noted that "[t]he words 'promote,' 'oppose,' 'attack,' and 'support' *clearly set forth* the confines within which potential party speakers must act in order to avoid triggering the provision."  *Id.* at 170 n.64 (emphasis added).  The Court continued that "[t]hese words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"  *Id.* (quoting *Grayned*, 408 U.S. at 108-09).  It is important to emphasize that the Supreme Court in *McConnell* upheld the terms "promote," "oppose," "attack," and "support" *when used to classify particular speech*, not simply when used to categorize an organization as a political entity based on its primary or major purpose.  Thus, the West Virginia Legislature need not provide any clarification of "support or oppose" because the Supreme Court has recognized this phrase is sufficiently clear on its face.[38]

---

[37] "Incident" is defined as "[d]ependent upon, subordinate to, arising out of, or otherwise connected with."  Black's Law Dictionary 346 (3d pock. ed. 2006).

[38] It is true that in *NCRL v. Leake*, the Fourth Circuit struck down as vague North Carolina's use of
(continued...)

b.       *Viewpoint Discrimination Challenge*

CFIF additionally argues that the grassroots lobbying exemption unfairly and unconstitutionally discriminates on the basis of the content of a communication and its viewpoint. CFIF's challenges the legislature's choice to limit this exemption to communications that (1) refer to pending legislation rather than including proposed legislation or amendments, (2) are addressed to legislators rather than all government officials, and (3) are made while the legislature is in session rather than at any time.   (Docket 210 at 21-22.)   According to CFIF, the grassroots lobbying exemption is subject to strict scrutiny and therefore "must be invalidated unless [West Virginia] can prove that the distinctions it draws are necessary to serve a compelling interest that no less restrictive alternative can adequately precise to achieve."  (*Id.* at 22.)  West Virginia responds that, because the exemption ultimately impacts only the scope of disclosure and disclaimer requirements, it is subject to exacting scrutiny, not strict scrutiny.

"Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Citizens United*, 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64; *McConnell*, 540 U.S. at 201).   As opposed to content-based *restrictions* on speech, which the Supreme Court has subjected to strict scrutiny, *see e.g.*, *Playboy Entm't Grp.*, 529 U.S. at 813, the Court has subjected disclosure and

_____

[38](...continued)
the phrase "support or oppose."  However, the statutes at issue in *Leake*, impermissibly defined the phrase "support or oppose" in part as a communication whose "essential nature . . . goes beyond a mere discussion of issues" and instructed regulators to consider "contextual factors such as the . . . timing of the communication in relation to the events of the day."  525 F.3d at 280-81.  It was the statutory reliance on contextual factors and the focus on the "essential nature" of a communication that the Fourth Circuit found vague and constitutionally flawed.  The standards challenged and struck down in *Leake* are therefore distinguishable from those at issue in this case.

disclaimer requirements to exacting scrutiny, which requires only a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest. *See Citizens United*, 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64, 66). To withstand exacting scrutiny, "the strength of the government interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis*, 554 U.S. at 744 (citing *Buckley*, 424 U.S. at 68). West Virginia is correct that the grassroots lobbying exemption relates to disclosure and disclaimer requirements and does not impose any manner of ban on speech, and it is therefore subject only to exacting scrutiny. Thus, CFIF's challenge will succeed only if West Virginia cannot adequately justify the imposition of disclosure and disclaimer requirements on communications that do not meet the grassroots lobbying exemption, in light of the exemption for qualifying communications. In other words, to save the exemption, it must be shown that there exists substantial relation between the exemption scheme and a sufficiently important government interest.[39]

The Supreme Court long ago identified at least three government interests that are "sufficiently important" to justify disclosure and disclaimer requirements like those at issue in West Virginia's electioneering communications scheme. "First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent . . .' in order to aid the voters." *Buckley*, 424 U.S. at 66 (quoting H.R. Rep. No. 92-564, at 4 (1971)). "Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.* at 67 (citing S. Rep. No. 93-689,

---

[39] In literal terms, it must be shown that imposing reporting requirements on communications falling outside the scope of the exemption bears a "substantial relation" to a "sufficiently important" government interest, although imposing those same reporting requirements on communications meeting the definition of a "grassroots lobbying communication" does not bear such a "substantial relation" to the government interest.

at 2 (1974)).  "Third, and not least significant, record keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of other election regulations.  *Id.* at 67-68.  The Supreme Court in *Buckley*, although engaging in an exacting scrutiny analysis like the one required here, went on to proclaim that "[t]he disclosure requirements, as a general matter, directly serve *substantial* governmental interests."  *Id.* at 68 (emphasis added).

Having established that reporting requirements may serve several sufficiently important government interests, the Court now turns to whether West Virginia's choice to exempt such a narrow class of communications from the reporting requirements is substantially related to furthering those interests.  This analysis begins by revisiting the purpose behind regulating electioneering communications (in addition to express advocacy) in the first place: to capture and require reporting of so-called "sham issue ads"—communications that avoid the magic words of express advocacy announced in *Buckley v. Valeo* but are nonetheless electioneering speech.  *See generally McConnell*, 540 U.S. at 192-94.  According to the Supreme Court in *McConnell* and *WRTL II*, the government interest in regulating such electioneering speech is sufficient to the extent the speech is the functional equivalent of express advocacy.

The grassroots lobbying exemption contained in W. Va. Code § 3-8-1a(11)(B)(v) represents a judgment by the West Virginia legislature that (1) the State does not have a sufficiently great interest in requiring disclosure of certain issue-based or legislative communications and (2) the carve-out to recognize that insufficient interest should be narrowly cabined.  The requirements that an exempted grassroots communication be made while the legislature is in session and that it relate to a pending piece of legislation ensure that the communication concerns a relevant and pressing issue.  Both requirements severely restrict the ability of speakers to construct "sham issue ads" that

62

fit the exemption but operate as electioneering speech, and they therefore further the government interests that West Virginia is pursuing with its reporting requirements.  Stated another way, by circumscribing the scope of the exemption as it has, West Virginia acknowledges that communications occurring outside the legislative session or concerning issues other than the active legislative agenda are more likely to be "sham issue ads," and it therefore subjects those communications to disclosure and disclaimer requirements.  In terms of the exacting scrutiny analysis, the Court is satisfied that West Virginia's choice to exempt such a narrow class of communications from the reporting requirements is substantially related to furthering the government interests discussed above—both because it imposes reporting requirements on communications more likely to be "sham issue ads" and because the exemption spares from reporting requirements those communications least likely to be "sham issue ads."  The Court **FINDS** that the "grassroots lobbying exception" to the definition of "electioneering communication" contained in W. Va. Code § 3-8-1a(11)(B)(v) is neither vague nor insufficiently tailored to withstand constitutional scrutiny.  Summary judgment is therefore **DENIED** as to this exemption.

*(2) Voter Guide Exemption*

CFIF next challenges the so-called "voter guide exemption" contained in W. Va. Code § 3-8-1a(11)(B)(viii).  That section excludes from the definition of "electioneering communication" and attendant reporting requirements any "communication, such as a voter's guide, which refers to all of the candidates for one or more offices, which contains no appearance of endorsement for or opposition to the nomination or election of any candidate and which is intended as nonpartisan public education focused on issues and voting history."  W. Va. Code § 3-8-1a(11)(B)(viii).  In particular, CFIF challenges this exemption as vague because it requires "no appearance of

63

endorsement" and impermissibly relies on the intent of the speaker.  (Docket 210 at 24-25.)  West Virginia's only response is to state that CFIF lacks standing to challenge this exemption because it never published, attempted to publish, or stated a desire to publish a voter's guide.  (Docket 194 at 21.)

*a.     Standing*

Article III of the U.S. Constitution confines the judicial power of the United States to the resolution of actual cases or controversies.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The case or controversy restriction includes the concept of standing, which requires that the party invoking federal jurisdiction have a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (citation omitted).  In a prospective statutory challenge, standing generally requires that the plaintiff face a genuine threat of imminent prosecution.  *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  However, in First Amendment cases, standing requirements are relaxed, such that a person need not "expose herself to arrest or prosecution" before bringing a First Amendment challenge because "a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement," namely self-censorship. *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (citations omitted); *see also N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d at 710 (citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).

Although West Virginia correctly points out CFIF has, at no point during the pendency of this case, asserted an intent to publish a "voter's guide," the relevant language is not so limited.  By its very words, W. Va. Code § 3-8-1a(11)(B)(viii) exempts any communication that (1) refers to all

64

candidates for the relevant office, (2) contains no appearance of endorsement for any candidate, and (3) is intended for nonpartisan education.  In order to establish standing, then, a plaintiff need only assert that its speech is chilled by the demands of West Virginia's allegedly unconstitutional law. Here, CFIF has stated that "[b]ecause CFIF's speech sometimes addresses the positions or actions of candidates, its ads could take a form that might be deemed voter guides."  (Docket 180 at 22.) CFIF also alleges that it generally desires to avoid West Virginia's reporting requirements and therefore desires not to engage in any speech that could be classified an "electioneering communication."  (Docket 220 at 15.)  CFIF has thus hedged its speech, some of which may be excepted from the definition of "electioneering communication" by the voter guide exemption, to avoid the accompanying reporting requirements.  "Since the statute[] challenged by the plaintiffs threaten[s] to subject them to [preclusive disclosure requirements], and the plaintiffs are therefore 'chilled' from engaging in potentially protected First Amendment political expression, standing exists in this case."  *Leake*, 525 F.3d at 280 n.2.

> b.    *Vagueness Challenge*

At this point in the Court's analysis, it has been said several times that intent-based tests are unconstitutionally vague because they "chill core political speech by opening the door to a trial on every ad."  *WRTL II*, 551 U.S. at 468.  The Supreme Court in *WRTL II* emphasized that election-related speech standards "must be objective, focusing on the substance of the communication rather than the amorphous considerations of intent and effect."  *Id.* at 469 (citing *Buckley*, 424 U.S. at 43-44).  "A test focused on the speaker's intent could lead to the bizarre result that identical ads aired at the same time could be protected speech for one speaker, while leading to criminal penalties for another."  *Id.*  W. Va. Code § 3-8-1a(11)(B)(viii) plainly embodies the kind of "intent and effect"

test that the Supreme Court condemned in *WRTL II*.   The scope of an "electioneering communication" is determined, in part, by this exemption, which permits a voter guide to go unreported if it is "intended [by the speaker] as nonpartisan public education focused on issues and voting history." W. Va. Code § 3-8-1a(11)(B)(viii).  Permitting burdens on speech to hinge on the intent of the speaker, as West Virginia has done, is constitutionally infirm, and the Court **FINDS** the phrase "intended as nonpartisan public education" contained in W. Va. Code § 3-8-1a(11)(B)(viii) unconstitutional.  The Court further **FINDS** that the intent-based clause of W. Va. Code § 3-8-1a(11)(B)(viii) is severable from the remainder of the exemption, and so severing the intent-based clause will broaden the exemption, therefore lessening the impact on speakers' First Amendment rights.   Accordingly, the phrase "intended as nonpartisan public education" is **SEVERED** from W. Va. Code § 3-8-1a(11)(B)(viii).

CFIF additionally challenges the prong of the voter guide exemption that requires a communication to "contain[] no *appearance* of endorsement for or opposition to . . . any candidate." W. Va. Code § 3-8-1a(11)(B)(viii) (emphasis added).  According to CFIF, "[r]equiring a speaker to judge how a message will appear to others creates fatal uncertainty." (Docket 210 at 25.)  In support of that argument, CFIF cites to *WRTL II*, where the Supreme Court stated:

> *Buckley* also explains the flaws of a test based on the actual effect speech will have on an election or on a particular segment of the target audience. Such a test "'puts the speaker . . . wholly at the mercy of the varied understanding of his hearers.'" 424 U.S. at 43.  It would also typically lead to a burdensome, expert-driven inquiry, with an indeterminate result.  Litigation on such a standard may or may not accurately predict electoral effects, but it will unquestionably chill a substantial amount of political speech.

551 U.S. at 469.  West Virginia makes no attempt to defend its law on the merits.  Although CFIF is correct in stating that West Virginia may not impose an effect-on-the-listener based test, it is

unclear that W. Va. Code § 3-8-1a(11)(B)(viii) does so.  The term "appearance" could mean either "occurrence," "display," "manifestation," or "an external show," in which case the statute would not necessarily call for an effect-on-the-listener test, or it could mean "indication" or "perception, idea, [or] notion of what a thing appears to be," in which case the statute would depend on listener-based criteria.  *See generally* Oxford English Dictionary (2d ed. 1989 & Mar. 2011 online ed.), *available at* http://www.oed.com/view/Entry/9555?redirectedFrom=appearance#eid. This ambiguity, however, only serves to compound the vagueness problem that CFIF highlights in its briefing.  The statute arguably calls for listener-based evaluation of the content of speech.  Because a speaker cannot know whether the statute requires such listener-based evaluations or not, and because the statute may reasonably be read as so requiring, the Court **FINDS** the "appearance" clause of W. Va. Code § 3-8-1a(11)(B)(viii) unconstitutionally vague.   The Court additionally **FINDS** the words "appearance of" severable from the remainder of the exemption pursuant to W. Va. Code § 2-2-10(cc), such that the legislature's intent remains intact and the remainder of the exemption meets constitutional demands.  The words "appearance of" are therefore **SEVERED** from W. Va. Code § 3-8-1a(11)(B)(viii).  Summary judgment is **GRANTED** as to this exemption.

### (3) Bona Fide News Account Exemption

CFIF next challenges W. Va. Code § 3-8-1a(11)(i), which embodies an exemption for "bona fide news accounts."   According to CFIF, this provision is unconstitutionally vague because the determination of what constitutes a "bona fide news account" is not clear on its face and ultimately lies within the sole discretion of state regulators.  (Docket 210 at 26-27.)  West Virginia responds that CFIF lacks standing to assert such a challenge, arguing that the provision is really an "exception

67

to an exception to [an] exemption." (Docket 176 at 32-33.) W. Va. Code § 3-8-1a(11)(i) provides

that "electioneering communication" does not include:

> [a] news story, commentary or editorial disseminated through the facilities of any
> broadcast, cable or satellite television or radio station, newspaper, magazine or other
> periodical publication not owned or controlled by a political party, political
> committee or candidate: *Provided*, That a news story disseminated through a medium
> owned or controlled by a political party, political committee or candidate is
> nevertheless exempt if the news is:
> (I) A bona fide news account communicated in a publication of general circulation
> or through a licensed broadcasting facility; and
> (II) Is part of a general pattern of campaign-related news that gives reasonably equal
> coverage to all opposing candidates in the circulation, viewing or listening area[.]

*Id.* As West Virginia asserts, this provision sets forth several rules related to the scope of

"electioneering communication." The first clause establishes that news stories, commentaries, and

editorials are generally exempt from the definition of "electioneering communication" when they

are published or broadcast in media outlets that are not owned or controlled by a candidate, political

party, or political committee. Stated conversely, the first clause establishes the general rule that

news stories, commentaries, and editorials published or broadcast in media outlets that *are* owned

or controlled by a candidate, political party, or political committee fall within the definition of

"electioneering communication." The second clause then goes on to state an exception to the

general rule: even if a news story is disseminated by a candidate-owned or political committee-

owned media outlet, it does not fall within the definition of "electioneering communication" if it is

(1) a bona fide news account and (2) part of a general pattern of news coverage that affords

reasonably equal coverage to all candidates. *See* W. Va. Code § 3-8-1a(11)(B)(i).

CFIF does not challenge the general exemption applicable to all news stories, commentaries,

and editorials published in non-candidate, non-political committee owned or controlled media

outlets. Instead, CFIF challenges the phrase "bona fide news account," which appears in the

exception to the exemption, as vague.  However, as stated above, the exception only applies to news stories (not commentaries or editorials) disseminated by media outlets owned or controlled by candidates for office, political parties, or political committees.  CFIF has never alleged, nor can it, that it disseminates or intends to disseminate news stories in media outlets owned or controlled by candidates or political parties or committees.  As opposed to commentaries and editorials, which are frequently contributed by the public at large, news stories are generally authored by freelance journalists and writers employed by the media outlet.  CFIF has never alleged that it acts in either capacity.  As such, CFIF cannot demonstrate that it publishes or intends to publish a *news story* at all.  In addition, CFIF has never averred that it functions as a candidate, political committee, or political party, such that its publication of a news story could possibly qualify for the exception.  Simply stated, under the facts presented to the Court, there is no set of circumstances under which CFIF could be impacted by the language "bona fide news account," and it therefore lacks standing to assert this challenge.  *Cf. Leake*, 525 F.3d at 280 n.2 ("Since the statute[] challenged by the plaintiffs threaten[s] to subject them to prosecution, and the plaintiffs are therefore 'chilled' from engaging in potentially protected First Amendment political expression, standing exists in this case.").  CFIF's Renewed Motion for Summary Judgment [Docket 210] is therefore **DENIED** as to this exemption.

### *(4) 501(c)(3) Organization Exemption*

CFIF's final challenge to the "electioneering communication" exemptions is to W. Va. Code § 3-8-1a(11)(B)(iv), which excludes any "communication paid for by any organization operating under § 501(c)(3) of the Internal Revenue Code."  CFIF argues that the 501(c)(3) exemption "violates equal protection" and is unconstitutionally vague because CFIF is uncertain what it means

to "operate under" § 501(c)(3).  (Docket 210 at 27-28.)  In addition, CFIF argues that West Virginia has not and cannot articulate a reasonable basis for exempting communications by § 501(c)(3) organizations but not § 501(c)(4) organizations, such as CFIF itself.  (*Id.*)  West Virginia responds by stating that the 501(c)(3) exemption mirrors federal law, is not unconstitutionally vague, and stands with good reason.  (Docket 176 at 35-40.)  In particular, West Virginia points to federal tax law as supplying the rationale for the 501(c)(3) exemption, which West Virginia argues is sufficient to survive exacting scrutiny.  (*Id.*)

26 U.S.C. § 501(c)(3) provides for the exemption from federal income tax of organizations organized and operated exclusively for religious, charitable, scientific, or educational purposes. S*ee id.*  Section 501(c)(3) organizations are absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign in support of or opposition to any candidate for public office.  *See* 26 C.F.R. 1.501(c)(3)-1 (2006); Rev. Rul. 2007-41 (June 18, 2007).  If a qualified organization engages in such campaign-related speech, the Internal Revenue Service (IRS) will deny or revoke the organization's § 501(c)(3) status.  *See* Internal Revenue Serv., IRS Continues Program on Political Campaign Activity by Charities; Stresses Education and Enforcement (Apr. 17, 2008), *available at* http://www.irs.gov/newsroom/article/0,,id=181570,00.html.   Certain non-partisan activities, such as preparing and distributing voter guides or engaging in other issue-driven voter education activities, are permitted of § 501(c)(3) organizations, provided they are carried out in an unbiased manner.  *See* Rev. Rul. 2007-41, at 2-3.  "Section 501(c)(3) organizations may take positions on public policy issues . . . [h]owever, [they] must avoid any issue advocacy that functions as political campaign intervention."  *Id.* at 8.  In short, section 501(c)(3) organizations may only engage in pure issue advocacy. U.S. Treasury Department guidance lists key factors in determining

70

whether a communication results in prohibited political campaign intervention, including: (1) whether a statement identifies a candidate for public office; (2) whether the statement expresses approval or disapproval for a candidate's actions or views; (3) whether the statement is delivered near in time to an election; (4) whether the statement references voting or an election; and (5) whether the statement relates to specific legislation, put forward by a legislator who also happens to be running for office. *See id.* at 8-9.  The factors for determining § 501(c)(3) eligibility vis-à-vis an organization's election involvement closely track the factors for determining the scope of an "electioneering communication" under West Virginia and federal law.

West Virginia essentially argues that because § 501(c)(3) absolutely prohibits an organization from participating or intervening in any political campaign on behalf of or in opposition to candidates for public office, no organization can simultaneously meet the definition of a § 501(c)(3) organization and engage in an "electioneering communication" under State law.  Instead, any § 501(c)(3) organization that engages in election-related communications (i.e., anything other than pure issue advocacy) will be divested of its tax-exempt status by the IRS and will no longer qualify for the exemption to West Virginia's definition of "electioneering communication."  The Court agrees with West Virginia.  W. Va. Code § 3-8-1a(11)(B)(iv) represents the Legislature's recognition that § 501(c)(3) organizations may only engage in issue advocacy, and its interest in requiring "electioneering communication" disclosures for such communications is therefore insufficient to burden the speech with reporting requirements.  As stated in its brief, West Virginia relies on the Federal Election Commission's justification for including a similar exemption in BCRA—without the exemption, restrictions on electioneering communications "could inadvertently stifle the ability of charitable organizations to carry out their core functions by limiting or

71

prohibiting their advertising."  Electioneering Communications: Explanation and Justification, 67 Fed. Reg. 65,190-01, 65,199(I)(F)(2) (Oct. 23, 2002).  Commentary on the proposed federal rule illustrate that the § 501(c)(3) exemption ensures fundraising appeals, public service announcements, documentaries, and other educational programming that feature (but do not endorse or oppose) candidates are not captured by the "electioneering communication" definition and therefore discouraged or restricted.  *Id.* at 65,199.  West Virginia additionally argues that requiring disclosures from § 501(c)(3) organizations would result in multiple and unnecessary layers of enforcement.  The FEC was also aware of this rationale in crafting the federal exemption; it characterized as "compelling" the testimony of one witness, which stated, "already the tax rules are complicated enough.  If you throw in election law on top of that, there are many [§ 501(c)(3)] groups that will just throw up their hands and say we're not going to get involved (in grassroots lobbying activity), it's just too risky, it's too much to take on."  67 Fed. Reg. at 65,200.  These arguments demonstrate that West Virginia's electioneering communication definition, as well as the § 501(c)(3) exemption, bear a substantial relation to important government interests, sufficient to withstand exacting scrutiny.  Although the West Virginia Legislature has not set forth comprehensive findings for enacting such an exemption, the § 501(c)(3) exemption finds support in analogous federal law.

Finally, CFIF argues that the phrase "operating under" is unconstitutionally vague because the term is not defined and federal tax law does not require IRS approval to claim § 501(c)(3) status while an application is pending.  According to guidance published by the Treasury Department, "[w]hen the IRS approves a timely filed exemption application, [tax] exempt status is recognized back to the date the organization was created.  Thus, while an application is pending, the organization can treat itself as exempt from federal income tax under section 501(c)(3)."  Internal

Revenue Serv., Contributions to Organization with IRS Application Pending (Oct. 26, 2010), *available at* http://www.irs.gov/charities/charitable/article/0,,id=164254,00.html.   Applicant organizations thus proceed under provisional approval until the IRS makes a final determination on their tax-exempt eligibility under § 501(c)(3).   The Court need not reach the merits of CFIF's vagueness challenge because it is apparent that CFIF has neither alleged nor at any time asserted an intent to apply for § 501(c)(3) status with the IRS.   Whether the words "operating under" require an organization to have received IRS approval or simply apply for tax-exempt status, the phrase at least requires the filing of a § 501(c)(3) application.   Without an allegation that CFIF intends to file such an application, this challenge presents no live controversy for the Court to decide.   CFIF's Renewed Motion for Summary Judgment is **DENIED** on this issue.

## VIII.   *REPORTING REQUIREMENTS*

The challenges addressed thus far relate to the definitional portions of the West Virginia Code.   Plaintiffs also challenge the contours of the burdens imposed on campaign-related speech once those definitions are accepted as legitimate.   As stated previously, election-related disclosure and disclaimer requirements are constitutional if they survive exacting scrutiny, meaning they are substantially related to a sufficiently important government interest.   *See, e.g.*, *Doe v. Reed*, 130 S. Ct. at 2818.

### A.      *Vagueness Challenge to W. Va. Code § 3-8-2b and § 3-8-2(b)*

W. Va. Code §3-8-2(b) imposes disclosure and disclaimer requirements on individuals and organizations making independent expenditures "in an aggregate amount of value in excess of $1,000 during a calendar year."   W. Va. Code § 3-8-2b imposes similar requirements on individuals and organizations that have spent more than $5,000 during a calendar year on electioneering

73

communications.  *See id.* § 3-8-2b(a).  Both reporting provisions require disclosure of "the name of any person sharing or exercising direction or control over the activities of the person making the expenditure."  W. Va. Code § 3-b-2(b)(1)(A), 3-8-2b(b)(1).  Plaintiffs challenge the "sharing or exercising direction or control over the activities" language in both sections, arguing that it is vague and seeking a permanent injunction to prevent enforcement of the reporting requirements.  (Docket 210 at 30-31.)

West Virginia's reporting requirements are largely modeled on those in BCRA.  As CFIF pointed out in its supporting memorandum, "recognizing the vagueness inherent in the federal statute, the [FEC] subsequently promulgated its own regulation clarifying that disclosure is limited to 'officers, directors, executive directors or their equivalent, partners, and in the case of unincorporated organizations, owners of the entity or person making the disbursement for the electioneering communication.'" (Docket 210 at 31 (quoting 11 C.F.R. § 104.20(a)(3)).)  During the pendency of this action, West Virginia has implemented a similar provision, albeit in the relevant administrative reporting forms rather than the state administrative code.  The Secretary of State's independent expenditure and electioneering communication forms expressly state that "'[p]ersons sharing or exercising direction or control' means officers, directors, executive directors or their equivalent, partners, and in the case of unincorporated organizations, owners of the entity or person making the disbursement for the electioneering communication [or independent expenditure]." (Docket 227 at 6, 9.)  West Virginia additionally filed an affidavit of Dave Nichols, Manager of Elections in the Secretary of State's Office, swearing that the forms have been officially adopted and implemented by the Secretary of State, as contemplated by W. Va. Code §§ 3-8-2 and 3-8-2b.

74

Despite these forms, however, CFIF maintains that the statute is vague and the administrative forms are insufficient to cure the constitutional defect.[40]  (Docket 220 at 15-16.)

When state law has been authoritatively construed so as to render it constitutional or an easily understood and uniformly applied practice has developed that has virtually the force of a judicial construction, state law must be read in light of those limits when challenged on First Amendment grounds.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988).  Although *City of Lakewood* concerned the discretion of agency officials to burden speech rather than statutory vagueness, its holding sheds light on the sufficiency of the Secretary of State's reporting forms.  Not only do the forms represent binding agency action, as the Secretary of State is required by state law to prescribe such forms and enforce them, they also evidence the implementation of an easily understood and uniformly applied practice for reporting independent expenditures and electioneering communications.  In addressing a similar challenge to a federal criminal statute, the Fourth Circuit  noted that statutory vagueness can be cured by regulatory guidance, and it refused to limit such regulatory guidance to "published regulations," instead citing "longstanding [government] practice" in its discussion.  *See United States v. McAusland*, 979 F.2d 970, 974-75 (4th Cir. 1992) ("While we agree that the existence of a published regulation . . . prevents the statute from being vague as applied, we do not believe it is the exclusive method of preventing vagueness.").  The Supreme Court has additionally instructed that "[i]n evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."   *Hoffman Estates*, 455 U.S. at 494 n.5 (citing *Grayned*, 408

---

[40]  CFIF replied before West Virginia submitted the final forms at Docket 227.  Thus, it is unclear whether CFIF concedes that the final forms are sufficiently binding to cure its vagueness concerns. The Court will proceed under the assumption that CFIF does not so concede.

U.S. at 110); *see also Boos v. Barry*, 485 U.S. 312, 330 (1988) ("[F]ederal courts are without power to adopt a narrowing construction of a state statute *unless such a construction is reasonable and readily apparent*." (emphasis added)).  In light of these precedents, the Court must conclude that the West Virginia Secretary of State has issued sufficiently binding reporting forms, such that any vagueness in the phrase "sharing or exercising direction or control over the activities" is remedied. The narrowing construction is reasonable and readily apparent, and a reasonably intelligent individual seeking to make independent expenditures or engage in electioneering speech is on notice as to what must be reported to the Secretary of State in exchange for his speech.

CFIF also separately challenges the word "activities" in the same phrase, arguing that it could encompass either "only political/policy speech of an organization" or "everything that the organization does." (Docket 210 at 30.)  This argument is unavailing for the reasons set forth above. The Secretary of State's forms makes clear that the required reporting of "the name of any person sharing or exercising direction of control over the activities of the person making the expenditure," as used in the relevant code sections, is limited to directors, partners, and business executives.  Quite simply, there is no longer any ambiguity as to which activities the statutes pertain; they require disclosure of the names of corporate officers, directors, and the like when a corporation speaks, and disclosure of similar, enumerated individuals when other business entities speak.  Plaintiffs' motions for summary judgment are therefore **DENIED** on this issue.

B.     *24 and 48-hour Reporting Requirements*

WVFL also argues that certain reporting requirements imposed upon independent expenditures and electioneering communications by W. Va. Code §§ 3-8-2 and 3-8-2b, respectively, are "patently unreasonable" and "severely burden First Amendment rights."  (Docket 211 at 51.)

76

Without any further explanation of its argument, WVFL asks the Court to hold those reporting requirements unconstitutional and unenforceable. West Virginia responds that WVFL did not properly plead this challenge in either its original or amended complaint, and it is therefore not a part of this lawsuit. (Docket 216 at 25 n.25.)

<em>(1)     Summary of Reporting Provisions</em>

W. Va. Code § 3-8-2 contains three separate reporting requirements applicable to anyone making independent expenditures.[41]  First, any person who makes independent expenditures aggregating more than $1,000 during a calendar year must file a report with the Secretary of State. *See* W. Va. Code § 3-8-2(b)(1).  There is no time limit specifically applicable to this provision, and it is therefore not subject to WVFL's challenge.  Second, any person who makes or contracts to make independent expenditures aggregating $10,000 or more at any time before an election must file a report with the Secretary of State, describing the expenditure, within forty-eight hours.  *See* W. Va. Code § 3-8-2(d)(1).  An additional report must be filed for each aggregate $10,000 the individual spends thereafter, again within forty-eight hours of surpassing the threshold.  *See id.* § 3-8-2(d)(2).  Both of these independent expenditure reporting requirements (the "48-hour requirements") appear, nearly verbatim, in BCRA.  *See* 2 U.S.C. § 434(g)(2).  Third, any person who makes or contracts to make independent expenditures aggregating either $1,000 in the case of a multi-county or statewide election or $500 in the case of a single-county or municipal election within the last two weeks of an election must file a report with the Secretary of State, describing the

---

[41]  An "independent expenditure" is "an expenditure . . . by a person . . . [e]xpressly advocating the election or defeat of a clearly identified candidate . . . [and not made by or in cooperation with a candidate or PAC]."  W. Va. Code § 3-8-1a(15).  Thus, an "independent expenditure" is one made in support of a subset of election speech—namely speech that supports or opposes a candidate for state or local office.

expenditure, within twenty-four hours.[42]  *See* W. Va. Code § 3-8-2(c)(1) (detailing requirements applicable to expenditures made "after the fifteenth day, but more than twelve hours, before the date of an election.").  Again, subsequent expenditures aggregating the respective threshold amounts require additional reports within twenty-four hours.  *See id.* § 3-8-2(c)(2).  Both of these independent expenditure requirements (the "24-hour independent expenditure requirements") appear, nearly verbatim, in BCRA.  *See* 2 U.S.C. § 434 (g)(1) (reporting required within twenty-four hours for "expenditures aggregating $1,000 or more after the 20th day, but more than 24 hours, before the date of an election.").

Similarly, W. Va. Code § 3-8-2b contains two reporting requirements applicable to electioneering communications, which by definition are communications clearly referring to a candidate for statewide office disseminated within thirty days of a primary election or sixty days of a special or general election.  *See* W. Va. Code § 3-8-1a(11)(A).  First, reporting is required of every person who has spent a total of $5,000 or more during any calendar year on electioneering communications.  *See* W. Va. Code § 3-8-2b(a)(1).  Second, reporting is required of every person who has spent a total of $1,000 or more during the two weeks immediately preceding the day of an election.  *See* W. Va. Code § 3-8-2b(a)(2).  For both reporting requirements—the $5,000 long-term requirement and the $1,000 short-term requirement—an individual is required to file a report with the Secretary of State only "within twenty-four hours of each disclosure date."  W. Va. Code § 3-8-2b(a)(2).  "Disclosure date" is defined as either "[t]he first date during any calendar year on which

---

[42]  W. Va. Code § 3-8-2(c)(1) also provides that, in the case of persons making independent expenditures aggregating $1,000 or more for statewide or legislative candidates, the speaker is to file the report prescribed pursuant to W. Va. Code § 3-8-2b (relating to electioneering communications) rather than the report prescribed in W. Va. Code § 3-8-2.

any electioneering communication is disseminated after the person paying for the communication has spent a total of $5,000 or more [on electioneering communications]" or "[a]ny other date during that calendar year after any previous disclosure date on which the person has made additional expenditures totaling $5,000 or more [on electioneering communications]." W. Va. Code § 3-8-1a(9). In other words, an electioneering communications report must be filed within twenty-four hours of each increment of $5,000 spent on electioneering communications in a calendar year.[43] Federal law features a somewhat similar provision, requiring disclosure within twenty-four hours every time a person spends an aggregate amount in excess of $10,000 on electioneering communications in a calendar year. *See* 2 U.S.C. § 434(f)(1). The federal electioneering reporting

---

[43] It is not apparent to the Court what purpose the "$1,000 short-term" requirement serves. No report must be filed pursuant to W. Va. Code § 3-8-2b until a "disclosure date" occurs. "Disclosure date" is defined by W. Va. Code § 3-8-1a(9) as each increment of $5,000 spent on electioneering communications. Thus, every time a "disclosure date" occurs, the "$5,000 long-term" reporting requirement will take effect, and a report will follow. It is difficult, therefore, to discern what role the "$1,000 short-term" requirement serves independent of the "$5,000 long-term" requirement. The Secretary of State's form inadvertently highlights this incongruity. It states:

> Once a person or group spends more than $5,000 in "purchasing, producing, or disseminating electioneering communications" in a calendar year, a report must be filed with the Secretary of State's Office. This report must be filed within 24 hours of incurring the expense that eclipses the expenditure threshold of $5,000. A separate report must then be filed each time the person or group spends over $5,000 since the last report filed within that calendar year of filing. If a person spends a total of $1,000 on or after the fifteenth day but more than 12 hours before the day of any election, a report must be filed within 24 hours of the disclosure date.

(Docket 227 at 9.) The Secretary fails, however, to expressly acknowledge that a "disclosure date" will not occur until the next increment of $5,000 is eclipsed, a detail that renders the "$1,000 short-term" reporting requirement somewhat useless. In all likelihood, the Legislature meant to impose the "$1,000 short-term" reporting requirement independent of the "disclosure date" trigger, so that enhanced reporting was required closer to election day.

requirement is very similar to the "$5,000 long-term" reporting requirement imposed by West Virginia, meaningfully differing only as to the threshold amounts.

### (2)  *Discussion of Reporting Provisions*

As an initial matter, WVFL's amended complaint specifically seeks a declaratory judgment that West Virginia's definition of "expressly advocating," and by extension the independent expenditure definition and associated reporting requirements are unconstitutional on their face and as applied to WVFL.  (Docket 128 at 47.)  The amended complaint also seeks a declaratory judgment that the definition of "electioneering communication" and associated reporting requirements are unconstitutional on their face and as applied to WVFL.  (*Id.* at 48.)  Although both challenges appear to be centered on the definitions of "expressly advocating" and "electioneering communication," reading the complaint liberally, WVFL sufficiently challenges the reporting requirements as unconstitutional.

The brevity of WVFL's challenge to the reporting requirements extends to its summary judgment briefing, where the organization cursorily states that the disclosure requirements are "patently unreasonable" because "the burden of the independent-expenditure reporting requirements and the electioneering-communication reporting requirements are so great that the government's interest does not reflect the burden on speech."  (Docket 211 at 51.)

The provisions challenged, because they concern reporting and disclosure requirements, are subject to exacting scrutiny.  *See, e.g.*, *Buckley*, 424 U.S. at 64.  The Court is tasked, therefore, with determining whether the reporting requirements set forth above bear a "substantial relation" to "important state interests," not to determine whether the requirements are the least restrictive means of advancing those interests.  *See N.C. Right to Life Comm. Fund for Ind. Political Expenditures v.*

*Leake* (*NCRL-FIPE*), 524 F.3d 427, 439 (4th Cir. 2008).  The state interests served by reporting

requirements such as these are familiar.  As the Supreme Court aptly stated in *Buckley v. Valeo*:

> The governmental interests sought to be vindicated by the disclosure requirements
> are of [great] magnitude.  They fall into three categories.  First, disclosure provides
> the electorate with information "as to where political campaign money comes from
> and how it is spent by the candidate" in order to aid the voters in evaluating those
> who seek . . . office.  It allows voters to place each candidate in the political
> spectrum more precisely than is often possible solely on the basis of party labels and
> campaign speeches.  The sources of a candidate's financial support also alert the
> voter to the interests to which a candidate is most likely to be responsive and thus
> facilitate predictions of future performance in office.    Second, disclosure
> requirements deter actual corruption and avoid the appearance of corruption by
> exposing large contributions and expenditures to the light of publicity.    This
> exposure may discourage those who would use money for improper purposes either
> before or after the election.  A public armed with information about a candidate's
> most generous supporters is better able to detect any post-election special favors that
> may be given in return . . . .  Third, and not least significant, record-keeping,
> reporting, and disclosure requirements are an essential means of gathering the data
> necessary to detect violations of [other election laws].

424 U.S. at 66-68.  West Virginia's reporting requirements closely approximate those found in

federal law, and they are substantially related to the three categories of government interest

enumerated by the *Buckley* Court.  As to the electioneering communications reporting requirement,

the Supreme Court in *McConnell* upheld a nearly identical provision that required a report to be filed

within twenty-four hours of the date on which expenditures exceeded a trigger amount.  540 U.S.

at 195-96.  Although West Virginia's trigger amount is $5,000, while the federal trigger is $10,000,

the disparity reflects the reality that more money is spent on federal elections.  In addition, a

challenge to the triggering amounts will fail.  The application of exacting scrutiny means that West

Virginia is not required to show that it has adopted the least restrictive reporting requirements to

achieve its purposes.  Along this line, the Supreme Court in *Buckley v. Valeo* "rejected an argument

that FECA's $10 and $100 thresholds for disclosure of contributions were unconstitutionally low

. . . reason[ing] that it could not 'require Congress to establish that it has chosen the highest reasonable threshold' that would still achieve the government's interest." *NCRL-FIPE*, 524 F.3d at 439 (quoting *Buckley*, 424 U.S. at 83).   Accordingly, West Virginia is not required to adopt the lowest thresholds to achieve its purposes, and the Court concludes that the thresholds incorporated in West Virginia's reporting requirements bear a substantial relation to the significant interests set forth above.

WVFL cites to *Citizens for Responsible Gov. State Political Action Comm. v. Davidson*, 236 F.3d 1174 (10th Cir. 2000), a case in which the Tenth Circuit invalidated a state reporting requirement because of a provision mandating separate notice to the candidates in an affected race and a "patently unreasonable" twenty-four hour deadline for all reports.  *Id.* at 1197.   Several differences exist between the statute at issue in *Davidson* and the reporting requirements challenged in the present action.  First, and perhaps most compelling, West Virginia's reporting requirements feature threshold amounts and limited time frames, which severely hedge their applicability.  The invalidated statute in *Davidson* required twenty-four hour disclosure for any expenditure in excess of $1,000.   *See id.*   In contrast, West Virginia imposes twenty-four hour reporting only on electioneering communications that aggregate $5,000 in a calendar year, W. Va. Code § 3-8-2b(a)(1), and electioneering communications and independent expenditures that aggregate $1,000 (or $500 in the case of county or municipal elections) in the final two weeks of an election, W. Va. Code §§ 3-8-2(c)(1), 3-8-2b(a)(2).  West Virginia also imposes a more relaxed, forty-eight hour reporting requirement on independent expenditures aggregating $10,000 in a calendar year.  W. Va. Code § 3-8-2(d)(1).  The tiered approach that West Virginia has enacted, whereby larger thresholds apply to total expenditures and smaller thresholds apply to expenditures made during the final weeks

82

before an election, proportionately reflects the State's varying interest in prompt disclosure of election-related information.   Thus, although West Virginia's reporting laws are not required to withstand strict scrutiny, they appear narrowly tailored to achieve the governmental interests at play. Electioneering communications are, by definition, communications that refer to a candidate within one month of primary elections or two months of general or special elections.   Second, it is noteworthy that West Virginia imposes its reporting requirements only on individuals and groups engaging in electioneering communications, which are by definition close in time to elections and refer to a clearly identified candidate, *see* W. Va. Code § 3-8-1a(11)(A), and independent expenditures, which are expenditures featuring *Buckley*-style words of express advocacy in support of or opposition to a clearly identified candidate, *see* W. Va. Code § 3-8-1a(15).   Thus, West Virginia requires reporting of only money spent on communications falling within one of those definitions, and only then once the spending aggregates eclipse certain thresholds, some of which are further limited by time constraints.   Finally, West Virginia does not require immediate written notice of expenditures to all candidates in the relevant race, as the state reporting law in *Davidson* did. *See* 236 F.3d at 1198.   The twenty-four and forty-eight hour reporting requirements applicable to electioneering communications and independent expenditures under West Virginia law bear a substantial relationship to sufficiently important State interests.   Accordingly WVFL's Second Motion for Summary Judgment [Docket 209] is **DENIED** on this issue.

(3)     <i>Discussion of Disclaimer Provisions</i>

West Virginia also imposes disclaimer requirements on all independent expenditures and electioneering communications.   Those disclaimers must (1) clearly indicate that the communication is not authorized by the candidate or candidate's committee and (2) clearly identify the person

making the expenditure.  *See* W. Va. Code §§ 3-8-2(e), 3-8-2b(e).  If the communication is disseminated by broadcast, cable and satellite transmission, the statements must be both clearly spoken and clearly readable.  WVFL challenges these provisions by stating that the required disclaimers "will take up precious space and air time, distract those receiving the speech, and mislead them into believing speech is election-related, rather than issue-related. . . .  Besides, how is anyone to fit all the information the law requires into a 30 or 60 second ad and still have time to say much else?"  (Docket 211 at 51.)  Therefore, states WVFL, "the burden of the disclaimer requirements is so great that the government's interest does not reflect the burden on the speech." (*Id.*)

West Virginia's disclaimer provisions serve the same interests as the disclosure provisions just discussed.  The Supreme Court upheld disclaimer requirements nearly identical to West Virginia's in *Citizens United*, stating that

> The disclaimers required by [BCRA] § 311 "provid[e] the electorate with information," *McConnell*, [540 U.S.] at 196, and "insure that the voters are fully informed" about the person or group who is speaking, *Buckley*, [424 U.S. at 76]; *see also Bellotti*, 435 U.S. at 792, n. 32 ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected"). At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party.

130 S. Ct. at 915.  Like the disclosure provisions, West Virginia's disclaimer requirements must survive only exacting scrutiny.  The disclaimer provisions at issue here concern only electioneering communications, which occur close to an election, and independent expenditures, which feature words of express advocacy.  *See* W. Va. Code §§ 3-8-1a(11)(A), 3-8-1a(15).  Avoiding confusion and supplying the public with important information about the sources of election-related advertising serve important State interests.  While speakers may experience additional costs as a consequence

84

of supplying such information to the public, these costs do not render the disclaimer provisions per se unconstitutional, as WVFL seems to assert.  Following the Supreme Court's lead in *Citizens United*, the Court finds the disclaimer requirements constitutional on their face and as applied to WVFL.  Accordingly, WVFL's Second Motion for Summary Judgment [Docket 209] is **DENIED** on this issue.

C.     *Vagueness Challenge to "Political Purposes" as used in W. Va. Code § 3-8-5*

CFIF next challenges the phrase "political purposes" as used in W. Va. Code § 3-8-5, which requires detailed accounting and reporting for loans or contributions made "for political purposes." W. Va. Code § 3-8-1a(23) defines "political purposes" as "supporting or opposing the nomination, election or defeat of one or more candidates . . . ."  According to CFIF, the phrase "political purposes," which its complaints challenge only in the context of W. Va. Code § 3-8-5, is unconstitutionally overbroad unless confined to words of express advocacy.  (Docket 210 at 34.) West Virginia responds that W. Va. Code § 3-8-5(a) specifically limits the accounting and reporting requirements to entities "expressly advocating the election or defeat of a clearly identified candidate for state, district, county or municipal office," and so CFIF's challenge is moot.  (Docket 216 at 19.) CFIF responds by stating that W. Va. Code § 3-8-5 is ambiguous at best.  CFIF further argues that, regardless of § 3-8-5, the definition of "political purposes" also appears in W. Va. Code § 3-8-2, such that the Court should confine the definition of "political purposes" to express advocacy whether § 3-8-5 is independently limited to express advocacy or not.  (Docket 220 at 19 & n.15.)  The Court will address the arguments in turn: first, whether W. Va. Code § 3-8-5 is limited to express advocacy apart from the definition of "political purposes," and second, whether the Court must construe "political purposes" at all if § 3-8-5 is so limited.

85

CFIF is certainly correct that W. Va. Code § 3-8-5(a) is not a model of clarity. That subsection provides:

> Every candidate, treasurer, person and association of persons, organization of any kind, including every corporation, directly, or by an independent expenditure, supporting a political committee established pursuant to paragraph (C), subdivision (1), subsection (b), section eight of this article or engaging in other activities permitted by this section and also including the treasurer or equivalent officer of the association or organization, expressly advocating the election or defeat of a clearly identified candidate for state, district, county or municipal office, and the treasurer of every political committee shall keep detailed accounts of every sum of money or other thing of value received by him or her, including all loans of money or things of value and of all expenditures and disbursements made, liabilities incurred, by the candidate, financial agent, person, association or organization or committee, for political purposes, or by any of the officers or members of the committee, or any person acting under its authority or on its behalf.

W. Va. Code § 3-8-5(a). According to CFIF, it is unclear whether it must "keep detailed accounts" and provide financial statements for all money given "for political purposes," which it argues is impermissibly broader than *Buckley*-style words of express advocacy, or only for money given for the purpose of "expressly advocating the election or defeat of a clearly identified candidate." (Docket 220 at 19.)  Even if the Court determines that CFIF must only comply with W. Va. Code § 3-8-5 as to money given for the purpose of "expressly advocating," CFIF asserts that the "expressly advocating" definition is vague.  (*Id.*)

The Court has already struck subsection (C) from the definition of "expressly advocating" in W. Va. Code § 3-8-1a(12), and effectively held that the remaining definition of "expressly advocating" is limited to *Buckley*-style words of express advocacy.  Thus, any vagueness challenge to that definition has already been resolved.  Accordingly, should the Court find that W. Va. Code § 3-8-5(a) applies to an "association of persons" or an "organization of any kind" (such as CFIF)

86

only when it spends for "expressly advocating," then CFIF's sought relief will be granted.  (*See* Docket 210 at 32-34.)

From a plain reading of W. Va. Code § 3-8-5(a), this is indeed the conclusion the Court must reach.  The phrase "expressly advocating the election or defeat of a clearly identified candidate for state, district, county or municipal office" serves as an important limiting factor in § 3-8-5(a), and by the words of the statute, it applies to "[e]very candidate, treasurer, person and association of persons, [and] organization of any kind."  The intervening phrase "including every corporation . . . supporting a political committee . . . or engaged in other activities . . ." simply clarifies that such corporations are among the "association[s] of persons" and "organization[s] of any kind" contemplated by the initial clause.  The result of this statutory interpretation is to render CFIF's remaining claims moot.  Pursuant to W. Va. Code § 3-8-5(a), only when an organization or association is "expressly advocating" must it account for and report expenditures.  Any ambiguity that existed in the definition of "political purposes" is rendered moot as to CFIF, because regardless of the "political purposes" definition, pursuant to W. Va. Code § 3-8-5, CFIF must only account for and report expenditures for "expressly advocating."

As a final point, CFIF argues that the Court should rule on the definition of "political purposes," which appears in W. Va. Code § 3-8-2 as well, regardless of the resolution of its obligations under W. Va. Code § 3-8-5.  CFIF's argument was first made in its reply brief, and it was made only after West Virginia pointed out that § 3-8-5 is already limited to express advocacy, arguably mooting the challenge CFIF actually plead.  To be certain, CFIF challenges the "political purposes" definition and its accompanying "supporting or opposing" language only in the context of W. Va. Code § 3-8-5.  (Docket 1 at 7-8.)  In contrast, CFIF challenges § 3-8-2 only on the

definition of "independent expenditure," an issue that has already been addressed by the Court. (Docket 1 at 12.)  CFIF failed to give notice, until its very last substantive filing, to the Court and the other parties that it intended to challenge the phrase "political purposes" as it appears in § 3-8-2. The Court therefore declines CFIF's urging to rule more expansively than the scope of this case as it was plead.  Accordingly, CFIF's Motion for Summary Judgment [Docket 210] is **DENIED** on this issue.  Section 3-8-5(a) is already limited to words of express advocacy, and the Court declines to construe the phrase "political purposes" in light of that holding.

> D.      *Earmark Challenge to W. Va. Code § 3-8-2b(b)(5)* [44]

CFIF's final argument is that W. Va. Code § 3-8-2b(b)(5) is vague insofar as it requires disclosure of the "names and addresses of any contributors who contributed a total of more than one thousand dollars between the first day of the preceding calendar year and the disclosure date and whose contributions were used to pay for electioneering communications."  According to CFIF, it is unclear whether an organization such as it must disclose only the names and addresses of individuals who specifically earmarked their contributions to be spent on electioneering communications or all contributors to the organization's general treasury.  In CFIF's view, the ambiguity requires it to disclose all contributors to its general treasury, subject to the temporal and dollar amount limitations in W. Va. Code § 3-8-2b(b), a result that extends beyond the State's

---

[44]   CFIF also challenges W. Va. Code §§ 3-8-2(b)(1)(E) and 3-8-2(b)(1)(G)(2), which impose various reporting requirements when money is spent "for the purpose of furthering an independent expenditure" and "for the purpose of funding an independent expenditure," respectively.  West Virginia correctly points out that these provisions became law only in mid-2010, and neither CFIF nor WVFL amended their complaints to challenge the provisions.  CFIF does not respond to West Virginia's request that the Court not address these subsections because they were not adequately pled.  Accordingly, finding no actual or constructive amendment of the complaints in this case, the Court declines to rule on these two subsections.

justifications for imposing disclosure and disclaimer requirements.  (Docket 210 at 34-35.)  In support of its argument, CFIF cites to a federal regulation that limits similar disclosure rules in federal law to "funds that are either designated for [electioneering communications] or received in response to solicitations that specifically request donations for making [electioneering communications]."  72 Fed. Reg. 72,899, 72,910 (Dec. 26, 2007).  CFIF seeks a similar restriction on W. Va. Code § 3-8-2b(b)(5), such that organizations and associations must only report the names and addresses of individuals who *specifically earmark* their contributions for use in electioneering communications.  West Virginia responds by stating that the federal limitation was a voluntary measure that the FEC implemented, and the State is not bound to confine its disclosure laws similarly.  (Docket 216 at  20-21.)  In other words, West Virginia disavows any ambiguity in the statute, and instead argues that it is empowered to enforce the broader reading of W. Va. Code § 3-8-2b(b)(5), whereby the names and addresses of all contributors to an organization's general treasury who meet spending threshold ($1,000) must be disclosed.

Like all disclosure requirements, W. Va. Code § 3-8-2b(b)(5) is subject to exacting scrutiny. *See, e.g.*, *Citizens United*, 130 S. Ct. at 914 ("The Court has subjected [disclosure] requirements to 'exacting scrutiny'").  This standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* at 914 (quoting *Buckley*, 424 U.S. at 64, 66).  To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (citing *Buckley*, 424 U.S. at 68).  Although West Virginia argues no government interest in its briefing, the government interest at stake in W. Va. Code § 3-8-2b(b)(5) is plainly transparency—the notion that elections will be fairer and the electorate more

89

informed if the sources of election-related spending are fully disclosed.  For purposes of exacting scrutiny, the probative question then becomes whether the burden on speech that W. Va. Code § 3-8-2b(b)(5) imposes is commensurate with, or substantially related to, that government interest.

It is apparent to the Court that requiring the disclosure of corporate or organizational contributors' personal information can be quite burdensome on those entities and may discourage general treasury contributors from associating with and giving to the entity as a consequence. Furthermore, as the FEC has explained,

> A corporation's general treasury funds are often largely comprised of funds received from investors such as shareholders who have acquired stock in the corporation and customers who have purchased the corporation's products or services, or in the case of a non-profit corporation, donations from persons who support the corporation's mission.  These investors, customers, and donors do not necessarily support the corporation's electioneering communications.  Likewise, the general treasury funds of labor organizations and incorporated membership organizations are composed of member dues obtained from individuals and other members who may not necessarily support the organization's electioneering communications.

72 Fed. Reg. at 72,911.  The practical effect of requiring such expansive disclosure is not only to compel a flood of information, but a flood of information that is not necessarily relevant to the purpose the regulation purportedly serves: to provide the electorate with information as to who is speaking.  Other disclosure requirements in the West Virginia Code—such as those requiring reasonable disclosure when $5,000 is directly spent on electioneering communications, *see* W. Va. Code § 3-8-2b(a)(1), or those requiring disclosure when $1,000 is spent on electioneering communications in the last two weeks of an election, *see* W. Va. Code § 3-8-2b(a)(2)—provide the electorate with the identity of the speaker, the organization.  When read as West Virginia suggests, W. Va. Code § 3-8-2b(b)(5) adds so much information that it ultimately fails to further the government interest it was enacted to serve.

90

Other considerations indicate that the statute, interpreted as West Virginia suggests, bears no substantial relation to the government interest it serves.  Not only may a large swath of general treasury contributors not support an organization's electioneering communications, they may not even be aware that the organization is engaging in electioneering communications.  In addition, several witnesses in the relevant FEC hearing indicated that even identifying all individuals who provided $1,000 in funds to a corporation or labor organization "would be very costly and require an inordinate amount of effort."  *Id.*  Administrative costs aside, the consequence of the disclosures required by W. Va. Code § 3-8-2b(b)(5), which encompass the names and addresses of general donors, corporate investors, and even customers who have purchased the company's products or services, will surely discourage organizations from speaking, or else face diminished business or organizational success.

In summary, W. Va. Code § 3-8-2b(b)(5) does not bear a sufficient relationship to the interest of providing the electorate with meaningful information as to who is speaking in electioneering communications.  It adds little value to the disclosure scheme that exists in West Virginia law, and it does so at great cost to the vitality and ability to speak of corporations and organizations.   On the other hand, interpreting W. Va. Code § 3-8-2b(b)(5) to reach only contributions that are either (1) received by the organization or corporation in response to a solicitation specifically requesting funds to pay for an electioneering communication or (2) specifically designated for electioneering communications by the contributor, the statute does not overreach and bears a substantial relation to the information-providing purpose it serves.  Accordingly, CFIF's Renewed Motion for Summary Judgment [Docket 210] is **GRANTED** on this issue, and the phrase "contributors . . . whose contributions were used to pay for electioneering

communications" in W. Va. Code § 3-8-2b(b)(5) is restricted to those individuals who respond to a solicitation for electioneering communications or earmark their contributions for such use.

### IX.  PRELIMINARY INJUNCTION DISSOLUTION

The Preliminary Injunction Order [Docket 123] entered on October 17, 2008, is **DISSOLVED** upon entry of this summary judgment order.  As Judge Faber stated in his earlier opinion dissolving the first preliminary injunction in this case, "dissolution of this court's preliminary injunction order . . . does not mean that either the new or old versions of West Virginia's Election Code may be applied to violations that are alleged to have occurred prior to" the date of dissolution.  (Docket 80 at 4 n.2.)  The law as set forth in the Court's October 17, 2008, preliminary injunction order will remain in effect with regard to violations alleged to have occurred between its entry and the entry of this order—in other words, while the preliminary injunction was in effect.

### X.  CONCLUSION

For the reasons above, WVFL's Second Motion for Summary Judgment [Docket 209] is **GRANTED IN PART** and **DENIED IN PART**.  CFIF's Renewed Motion for Summary Judgment [Docket 210] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       July 18, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

92